UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE AEGEAN MARINE PETROLEUM NETWORK, INC. SECURITIES LITIGATION | Case No. 18 Civ. 4993 (NRB)<br><br>**<u>JURY TRIAL DEMANDED</u>** |

## <u>CONSOLIDATED CLASS ACTION COMPLAINT</u>

## KEY DEFINED TERMS

| | |
|---|---|
| Lead Plaintiff | Utah Retirement Systems |
| Aegean or Company | Non-Party Debtor Entity Aegean Marine Petroleum Network Inc. |

**COMPANY DEFENDANTS:**

| | |
|---|---|
| Melisanidis or Founder | Dimitris Melisanidis |
| Nikolas Tavlarios | E. Nikolas Tavlarios |
| Gianniotis | Spyros Gianniotis |
| McIlroy | Jonathan McIlroy |
| Fokas | Spyridon Fokas |
| Georgiopoulos | Peter C. Georgiopoulos |
| Papanicolaou | Yiannis N. Papanicolaou |
| John P. Tavlarios | John P. Tavlarios |
| Koutsomitopoulos | Konstantinos D. Koutsomitopoulos |
| Konomos | George Konomos |
| Officer Defendants | Nikolas Tavlarios, Gianniotis, McIlroy and Fokas |
| Outside Directors | Geogiopoulos, John Tavlarios, Papanicolaou, Koutsomitopoulos and Konomos |
| Audit Committee Defendants | Papanicolaou, Koutsomitopoulos and Konomos |

**AUDITOR DEFENDANTS:**

| | |
|---|---|
| DTTL | Deloitte Touche Tohmatsu Limited |
| Deloitte Greece | Deloitte Certified Public Accountants, S.A. |
| Deloitte U.S. | Deloitte & Touche LLP |
| Deloitte Defendants | Deloitte Greece, DTTL, Deloitte U.S. |
| PwC International | PricewaterhouseCoopers International Limited |

PwC Greece                          PricewaterhouseCoopers S.A

PwC U.S.                            PricewaterhouseCooopers LLP

PwC Defendants                      PwC Greece, PwC International and PwC U.S.

**OTHER KEY TERMS:**

Form 20-F                           Annual Report Pursuant to Section 13 or 15(D) of The
                                    Securities Exchange Act of 1934 on Form 20-F filed by
                                    Aegean with the SEC (the Form 20-F filings are
                                    referenced herein including the fiscal period for which
                                    they cover, *e.g.*, "2018 Form 20-F")

Form 6-K                            Report of Foreign Private Issuer Pursuant to Rule 13a-
                                    16 or 15d-16 Under the Securities Exchange Act of
                                    1934 on Form 6-K filed by Aegean with the SEC (the
                                    Form 6-K filings are referenced herein including date
                                    on which they were filed with the SEC, *e.g.*, "June 4,
                                    2018 Form 6-K")

FY                                  Fiscal Year

Q1, Q2, Q3, Q4                      Refers to the "first quarter," "second quarter," "third
                                    quarter," and "fourth quarter," respectively (the
                                    quarterly periods are referenced herein by the quarter
                                    ("Q1" for the quarter ending March 31, "Q2" for the
                                    quarter ending June 30, "Q3" for the quarter ending
                                    September 30, and "Q4" for the quarter ending
                                    December 31) and year to which they relate, *e.g.*, "Q1
                                    2017"))

Release                             Refers to interim releases issued by the Company, and
                                    filed by Aegean with the SEC on Form 6-K,
                                    announcing financial results (the Releases are
                                    referenced herein by the quarter and year to which they
                                    relate, *e.g.*, "Q1 2016 Release")

Press Release                       Refers to interim press releases issued by the
                                    Company, and filed by Aegean with the SEC on Form
                                    6-K (the Press Releases are referenced herein by the
                                    date on which they were filed with the SEC, *e.g.*,
                                    "September 20, 2016 Press Release")

SEC                                 U.S. Securities and Exchange Commission

## <u>TABLE OF CONTENTS</u>

I.     SUMMARY OF THE ACTION ....................................................................... 2

II.    JURISDICTION AND VENUE .................................................................... 17

III.   PARTIES AND RELEVANT NON-PARTIES ............................................. 18

     A.    Lead Plaintiff – Utah Retirement Systems .......................................... 18

     B.    The Company (Non-Party Debtor Entity) – Aegean Marine Petroleum
          Network Inc. ........................................................................................ 19

     C.    Company Defendants ........................................................................... 20

          1.    The Company's Founder, Principal Shareholder and Aegean's Head
                of Corporate Development .......................................................... 21

               a)    Dimitris Melisanidis .......................................................... 21

          2.    Executive Officers ...................................................................... 22

               a)    E. Nikolas Tavlarios ........................................................ 22

               b)    Spyros Gianniotis ............................................................. 23

               c)    Jonathan McIlroy .............................................................. 24

               d)    Spyridon Fokas ................................................................. 24

          3.    Outside Directors ....................................................................... 25

               a)    Peter C. Georgiopoulos ..................................................... 25

               b)    Yiannis N. Papanicolaou ................................................... 26

               c)    John P. Tavlarios .............................................................. 26

               d)    Konstantinos D. Koutsomitopoulos ................................. 27

               e)    George Konomos ............................................................... 27

     D.    The Auditor Defendants ...................................................................... 28

          1.    The Deloitte Defendants ............................................................ 28

          2.    The PricewaterhouseCoopers Defendants ................................. 33

|  |  | 3. | Deloitte Greece and PwC Greece Were Acting Within the Course and Scope of their Agencies and Under the Control of Their Respective Network of Affiliated Member Firms ..................................... 36 |
|---|---|---|---|
|  |  | a) | Deloitte ................................................................................. 36 |
|  |  | b) | PwC ...................................................................................... 45 |
| IV. | BACKGROUND ....................................................................................... 49 |
|  | A. | Aegean's Business ...................................................................... 49 |
|  | B. | Founder's Early Background ....................................................... 52 |
|  | C. | Convertible Note Offerings ........................................................ 55 |
|  |  | 1. | 2015 Offering of 4.00% Convertible Unsecured Senior Notes due 2018 ........................................................................................ 55 |
|  |  | 2. | 2016 Private Placement of 4.25% Convertible Unsecured Senior Notes due 2021 ..................................................................... 57 |
| V. | THE COMPANY DEFENDANTS ENGAGED IN THE MASSIVE FRAUDULENT SCHEME TO DEFRAUD INVESTORS ........................... 59 |
|  | A. | Manipulation of Revenue and Income that Misled Investors Regarding the Value of Aegean ..................................................................... 60 |
|  | B. | Misappropriation of the Company's Cash and Assets that Defrauded Investors ................................................................................... 63 |
|  |  | 1. | Fraudulent Payments in Connection with Fujairah Facility .................... 63 |
|  |  | 2. | Fraudulent Prepayments for Future Oil Deliveries ................................. 67 |
|  | C. | The $100 Million Sale of the Founder's Stake in Aegean that Defrauded Investors ................................................................................... 69 |
|  | D. | Acts Taken to Conceal the Massive Fraudulent Scheme with the HEC Acquisition and the Efforts to Block this Acquisition ........................................... 73 |
| VI. | THE COMPANY DEFENDANTS' U.S. GAAP VIOLATIONS ................................... 81 |
| VII. | THE COMPANY DEFENDANTS ISSUED AND CAUSED THE COMPANY TO ISSUE FALSE AND MISLEADING STATEMENTS .................................................. 86 |
|  | A. | Materially False and Misleading Statements Concerning Aegean's Financial Results in its Quarterly and Annual Filings ........................................... 86 |

B.  Materially False and Misleading Statements Regarding Account Receivables ................................................................... 91

C.  Materially False and Misleading Statements Concerning Internal Controls over Financial Reporting ............................................... 92

D.  Materially False and Misleading Sarbanes-Oxley Certifications ........................ 95

E.  Materially False and Misleading Statements Made in Connection with the 2015 4.00% Convertible Unsecured Senior Note Offering ................................. 97

F.  Materially False and Misleading Statements Concerning Aegean's Unique Business Model, Strong Financial Results and Profitability and Solid Balance Sheet .................................................................. 98

G.  Materially False and Misleading Statements Concerning the Company's Financial Ability to Repurchase the Founder's Shares ...................................... 114

H.  Materially False and Misleading Statements Concerning the HEC Acquisition ................................................................. 115

VIII.  THE AUDIT COMMITTEE DEFENDANTS INTENTIONALLY AND/OR RECKLESSLY CAUSED AEGEAN TO ISSUE MATERIALLY FALSE AND MISLEADING STATEMENTS IN FURTHERANCE OF THE MASSIVE FRAUDULENT SCHEME .................................................... 117

IX.  ADDITIONAL ALLEGATIONS OF SCIENTER ......................................... 121

X.  THE ACCOUNTANTS KNOWINGLY AND/OR RECKLESSLY VIOLATED THE EXCHANGE ACT BY FAILING TO COMPLY WITH AUDITING STANDARDS IN ISSUING CLEAN AUDIT REPORTS THAT CONTAINED MATERIALLY FALSE AND MISLEADING STATEMENTS TO THE INVESTING PUBLIC ............................................................ 125

A.  The Auditors were Bound to Comply with Applicable Accounting Standards .................................................................... 125

B.  The Auditor Defendants Knew and/or were Reckless in Ignoring a Series of Red Flags in Issuing their Respective Clean Audit Opinions ........................... 132

1.  Melisanidis' Criminal Background and Control:  Red Flag Nos. 1 and 2 ...................................................................... 133

a)  Red Flag No. 1 (Melisanidis' Criminal Background) ................. 133

b)  Red Flag No. 2 (Melisanidis' Control Over Aegean) ................. 139

2. Related-Party Transactions and Control: Red Flag Nos. 3 - 6 ................ 142

    a) Red Flag No. 3 (Substantial Related-Party Transaction Involving Melisanidis that was the Primary Means for the $300 Million Misappropriation of Company Assets) ................ 142

    b) Red Flag No. 4 (Marine Fuel Supply Service Agreement with Affiliate Aegean Oil S.A. Owned by Melisanidis Family) .................................................................................... 145

    c) Red Flag No. 5 (Service Agreements with Affiliate Aegean V Owned by Melisanidis Family) ................................................ 147

    d) Red Flag No. 6 (Using Aegean to Pay Expenses to Firm Owned by Insiders Melisanidis, Georgiopoulos and Tavlarios) .......................................................................... 148

3. Escalating Receivables and Defaults, Including by Related Entitles: Red Flag Nos. 7- 10 ............................................................. 150

    a) Red Flag No. 7 (Escalating Receivables) .................................. 150

    b) Red Flag No. 8 (Non-payment for Sales to Aegean Shipping Owned by Melisanidis Family) ................................................ 153

    c) Red Flag No. 9 (Defaulting Payments to AOTC by UAE Firms) ............................................................................ 155

    d) Red Flag No. 10 (Delinquencies by GMC Corporation) ............ 156

4. Melisanidis' Maneuvers to Unload All of His Aegean Shares: Red Flag Nos. 11 - 12 .................................................................. 159

    a) Red Flag No. 11 (Company Repurchases All of Melisanidis' Shares) ....................................................................... 159

    b) Red Flag No. 12 (The Repurchase of Melisanidis' Shares Caused a Liquidity Crisis for the Company) .............................. 160

5. Material Weaknesses and Misstatements: Red Flag No. 13 ................... 162

    a) Red Flag No. 13 (Material Weaknesses in Internal Controls Identified in 2014 Form 20-F) .................................... 162

C. These Red Flags Support a Strong Inference That the Auditor Defendants Intentionally and/or Recklessly Violated the Accounting Standards They were Bound to Follow .......................................................... 167

D.    In Intentionally and/or Recklessly Violating the Audit Accounting Standards, the Auditor Defendants Issued Audit Opinions that Contained False and Misleading Statements ............................................................ 174

    1.    Fiscal Year 2013 ............................................................................. 174

    2.    Fiscal Year 2014 ............................................................................. 180

    3.    Fiscal Year 2015 ............................................................................. 186

    4.    Fiscal Year 2016 ............................................................................. 191

XI.    LOSS CAUSATION .......................................................................................... 196

XII.    PRESUMPTION OF RELIANCE ................................................................... 201

XIII.    NO SAFE HARBOR ....................................................................................... 203

XIV.    CLASS ALLEGATIONS ................................................................................. 204

XV.    COUNTS ............................................................................................................ 207

1.      Court-appointed Lead Plaintiff Utah Retirement Systems ("Lead Plaintiff" or "URS") brings this securities class action for violations of Sections 10(b), 20(a), 20(b) and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), 78t(b) and 78t-1, and the rules and regulations promulgated thereunder, including Rule 10b-5, 17 C.F.R. §§ 240.10b-5(b) (misrepresentations and omissions) and 240.10b-5(a) and (c) (scheme liability), individually and on behalf of investors who purchased or otherwise acquired Aegean Marine Petroleum Network Inc. ("Aegean" or the "Company") securities between February 27, 2014 through November 5, 2018, both dates inclusive, (the "Class Period") and were damaged as a result.

2.      URS is a large public pension fund that provides retirement and insurance benefits for Utah public employees, serving more than 200,000 members and about 470 public employers, including employees of the State of Utah, its local governments, school districts and institutions for higher education.  It seeks to recover the significant losses suffered not only by its retirees and other beneficiaries, but also those of other investors, both large and small, who were intentionally and recklessly deceived into purchasing securities in Aegean at artificially inflated prices – a company that is now in bankruptcy.

3.      Lead Plaintiff alleges the following based upon personal knowledge as to the allegations specifically pertaining to itself and upon information and belief as to all other matters. Lead Plaintiff's information and belief as to allegations concerning matters other than itself and its own acts is based upon an the investigation by Lead Counsel, which included a review and analysis of (a) SEC filings concerning Aegean and/or the Defendants named in this action; (b) press releases and other public statements published or made by Aegean or the other Defendants; (c) securities analyst reports concerning the Company; (d) media coverage regarding

Aegean, its business and the other Defendants named in this action; (e) court filings, including filings in the United States Bankruptcy Court in the Southern District of New York concerning Aegean's bankruptcy; and (f) other publicly available information concerning Aegean and the Defendants named herein. Many of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their custody and/or control. Lead Plaintiff believes that substantial evidentiary support exists for these allegations and more will be revealed after a reasonable opportunity for discovery. This belief is well-founded based on the Company's admissions in its November 2, 2018 Form 6-K filing with the SEC.

I.   **SUMMARY OF THE ACTION**

4.   Aegean is an international marine fuel logistics company founded in 1995 by Dimitris "The Tiger" Melisanidis (also referred to as Melissanidis) ("Melisanidis" or the "Founder"), a Greek billionaire, with numerous enterprises throughout the world.[1] The Company held its initial public offering in December 2006 (the "IPO") at which time Melisanidis became Aegean's Head of Corporate Development. Until its bankruptcy filing in the fall of 2018, Aegean's common stock traded on the New York Stock Exchange ("NYSE").

5.   Throughout the Class Period, the Company was portrayed as having a strong and dynamic business model producing a sustainable track record of profitability and growth while maintaining a solid balance sheet and ample liquidity. The stock climbed to a Class Period high of $15.53 in April 2015. During the Class Period, the Company's outside auditors and gatekeepers issued unqualifiedly clean audit opinions, providing the necessary assurances to investors. Specifically, the Deloitte Defendants (defined below) issued unqualified audit opinions from the

---

[1] Kerin Hope, *Auditors probe potential $200m fraud at Aegean Marine*, Financial Times (Oct. 31, 2018), https://www.ft.com/content/ffc4e71a-dd30-11e8-9f04-38d397e6661c.

Company's IPO through 2015 and the PWC Defendants (defined below) issued an unqualified audit opinion for FY ended December 31, 2016.

6.     This portrayal was, however, false.  While the Company was touting how its "strong financial position and dynamic business model distinguish[ed] Aegean from the competitive landscape,"[2] Defendants were engaged in a multi-faceted scheme to defraud investors in the Company's securities.  Defendants' scheme took place over at least an eight-year period during which the Company (a) significantly overstated the its income and revenue; (b) overstated the Company's assets and the strength of its balance sheet; and (c) misled investors concerning the adequacy of the Company's internal controls over financial reporting.

7.     Because of actions undertaken by certain shareholders, the Company's entire Audit Committee was forced to step down in May 2018, and a reconstituted Audit Committee (the "Reconstituted Audit Committee") was formed with new, independent directors.  Only weeks later, on June 4, 2018, the Company shocked the market by revealing that it had discovered that $200 million in accounts receivable had to be written off because the receivables were based on bogus transactions.  The Reconstituted Audit Committee announced that it had retained counsel and forensic accountants to conduct a massive internal investigation.[3]  Then, on November 2, 2018, under new leadership, the Company admitted that the Company's Class Period "senior managers" and the Company's Founder had engaged in an elaborate fraudulent scheme where (a) the Company's financial results were manipulated by improperly booking approximately $200 million in accounts receivables from bogus transactions with shell companies controlled by former employees or affiliates of the Company, which artificially inflated the Company's earnings and

---

[2] *See* Q4 2013 Release, attached as Ex. 99.1 to February 26, 2014 Form 6-K.

[3] *See* June 4, 2018 Press Release, attached as Ex. 99.1 to June 4, 2018 Form 6-K.

revenue; and (b) approximately $300 million in cash and assets had been misappropriated by the Founder and/or his affiliates (together, the "Massive Fraudulent Scheme").[4]

8.      The Company now admits that the misappropriation of Company assets, and the fraudulent accounting entries and fictitious documentation designed to conceal it, "involved over a dozen Company employees, including [former] members of senior management," and included the creation of "falsified and forged documents, including bank statements, audit confirmations, contracts, invoices and third party certifications."  The Company further admits that its internal controls over financial reporting was ineffective and that it believes that the Massive Fraudulent Scheme occurred in part because the Company's Founder "exerted significant control over Company personnel and assets through various inappropriate means, including threats of economic retaliation and physical violence."  *See* November 2, 2018 Press Release.

9.      As a result of the Massive Fraudulent Scheme, the Company concedes that its revenues and earnings of the Company were "substantially overstated" in the years 2015, 2016 and 2017 and that its financial results will have to be restated.  *See* November 2, 2018 Press Release.  Despite over eight months of investigation, the Reconstituted Company (as defined below) never announced the net effect of the Massive Fraudulent Scheme on the Company's financials.

10.      This delay is not surprising as the Company states that its access "to relevant emails and other electronic data stored on the Company's server" has been thwarted by the Company's Founder who has made "threats of retaliation against Company personnel."  Further there has been at least one attempt "to delete and permanently erase documents from the Company's server through the remote installation of data deletion software by a person with administrator access."

---

[4] *See* November 2, 2018 Press Release, attached as Ex. 99.1 to November 2, 2018 Form 6-K.

The Founder, Defendant Melisanidis, still has access to and control over the Company's electronic and physical files.  *See* November 2, 2018 Form 6-K.

11.     On November 2, 2018, the Company disclosed that it had reported its findings to the SEC and U.S. Department of Justice ("DOJ").  On October 3, 2018, the DOJ issued a grand jury subpoena to the Company "in connection with suspected felonies."  This fraudulent scheme was so significant that it led to the filing of proceedings under Chapter 11 of the U.S. Bankruptcy Code on November 6, 2018 (only four days after revealing the preliminary results of the Company's internal investigation).[5]  The Company was delisted from the NYSE on December 3, 2018 and the stock now trades at $0.025 per share on the over-the-counter ("OTC") market.[6]

12.     While the Company admits that certain former senior managers and the Founder are at the heart of the Massive Fraudulent Scheme, other former executives, members of the Board of Directors ("Board") (in particular the Audit Committee) along with the Company's auditors are also culpable for their own intentional and/or reckless conduct that allowed the Massive Fraudulent Scheme to continue for years.  Indeed, from the time of the Company's IPO, the Board and the auditors were aware of heightened risks of fraud at the Company based on the checkered past of the Company's Founder, his significant and questionable related-party transactions with the Company and, more importantly, signs that the Founder was exerting *de facto* control over the Company and its officers and directors.

13.     Incredibly, in the Company's 2014 Form 20-F for the FY ended December 31, 2014, filed with the SEC on May 15, 2015, the Company noted for the first and only time that

---

[5] Voluntary Petition for Non-Individuals Filing for Bankruptcy (on behalf of Debtor Aegean Marine Petroleum Network Inc.), No. 18-13374-MEW (Bankr. S.D.N.Y. Nov. 6, 2018), ECF 1 ("Nov. 6, 2018 Bankruptcy Petition).

[6] *Aegean to be Delisted from NYSE on December 3*, Ship & Bunker (Nov. 22, 2018), https://shipandbunker.com/news/world/966698-aegean-to-be-delisted-from-nyse-on-december-3.

there was "an absence of an effectively designed control to identify and disclose transactions with new related parties" – one of the very issues that form the crux of the Massive Fraudulent Scheme. In addition, Deloitte Greece (defined below) included a finding of internal control weaknesses for the first and only time in its 2014 audit opinions.

14.     Yet, the Company soon claimed that the issues were resolved and continued to issue inflated income and revenue results from bogus related-party transactions for three more years. Most importantly, its auditors issued clean audit reports in 2015 and 2016, leading investors to believe that any problems with the internal controls were resolved and did not impact the Company's prior results.

15.     In late 2016, before the Massive Fraudulent Scheme began to collapse and the stock price fell, the Founder Melisanidis engaged in insider trading by selling his 22% stake directly to the Company at artificially inflated prices for proceeds of approximately $100 million (11,303,031 common shares at $8.81 per share).  In connection with this sale, he resigned his title as Head of Corporate Development (and became a "consultant"), but effectively remained a control person. Further, as disclosed in a 2018 lawsuit (the RBM Lawsuit, referred to below), the Company's General Counsel (Spyridon Fokas ("Fokas")) and Chief Financial Officer ("CFO") (Spyros Gianniotis ("Gianniotis")) also engaged in insider trading by selling $1 million of stock – at the same time the Company approved the Melisanidis repurchase.[7]  Note, under the federal securities laws, investors do not need to report their holdings or trades in foreign companies that are SEC issuers.  Accordingly, it is unclear what other insider trading may have occurred during the Class Period.

---

[7] *See* August 17, 2016 Press Release, attached as Ex. 99.1 to August 18, 2016 Form 6-K.

16.     At the time of the repurchase, the Company touted that it had a "solid balance sheet and strong free cash flow," which provided the Company with the opportunity to repurchase shares.  *See* August 17, 2016 Press Release.  However, this was not true.  The $100 million payment to the Founder created a liquidity crisis and caused the Company to violate covenants in its credit facilities.  Unbeknownst to investors, the Company was forced to engage in a $20 million related-party loan with an affiliate of the Founder to float the Company.  *See* RBM Complaint (described below).  To shore up its balance sheet, the Company was forced to dilute current shareholder by issuing $172.5 million of 4.25% Convertible Unsecured Senior Notes due 2021. *See* ¶¶187-188, below.

17.     On May 23, 2017, just months after the Founder's alleged exit from the Company, the Company surprised the market when it reported Q1 earnings per share which were significantly below the street estimates.  The Company attributed the earnings miss to "increased competition across operations and continued challenging market dynamics."[8]   Aegean common shares collapsed during the following three trading sessions to closed at $5.10 on May 26, 2017.

18.     On June 1, 2017 (only nine months after the Founder left the Company), E. Nikolas Tavlarios ("Nikolas Tavlarios") suddenly resigned as the Company's President and Principal Executive Officer.[9]  On June 16, 2017, Peter C. Georgiopoulos ("Georgiopoulos"), the Company's Chairman of the Board and a major shareholder with 13.7% of the Company's outstanding shares, stepped down from the Board along with John P. Tavlarios ("John Tavlarios").[10]   Both Georgiopoulos and John Tavlarios (Nikolas Tavlarios' brother) had been directors since the IPO.[11]

---

[8] *See* Q1 2017 Release, attached as Ex. 99.1 to May 24, 2017 Form 6-K.

[9] *See* June 1, 2017 Press Release, attached as Ex. 99.1 to June 1, 2017 Form 6-K.

[10] *See* June 16, 2017 Press Release, attached as Ex. 99.1 to June 19, 2017 Form 6-K.

[11] *See* 2006 Form 20-F for the FY ended December 31, 2006, filed with the SEC on May 25, 2007.

19.    The resignations left the Board with only four members.  Two members had been appointed almost 10 years earlier at the time of the IPO: Yiannis N. Papanicolaou ("Papanicolaou") and Fokas who was also Aegean's General Counsel.  The two other Board members, Konstantinos D. Koutsomitopoulos ("Koutsomitopoulos") and George Konomos ("Konomos"), had been appointed in 2008.  Papanicolaou was named interim Chairman of the Board upon the resignation of Georgiopoulos.    Papanicolaou, Koutsomitopoulos and Konomos served on the Audit Committee.

20.    On December 20, 2017, a group of shareholders representing more than 12% of Aegean's outstanding shares who called themselves the Committee for Aegean Accountability ("Activist Investors Committee"), notified the Company that it intended to nominate four independent directors to the Board in light of the Company's suggestion that it would reduce the Board to four members.  The Activist Investors Committee also raised numerous concerns about the Company's performance (particularly since the Founder's departure), continuing related-party transactions with the Founder and corporate governance issues.[12]

21.    Under pressure from outside shareholders pushing for the election of new and independent directors who would have been in position to discover the Massive Financial Fraud, the Founder, Aegean senior management and the Board approved a transaction that would have provided the Founder with 33% of the outstanding stock of Aegean (which forms a quorum for shareholders' meetings and votes under the Company's Second Amended and Restated Bylaws (as adopted May 27, 2015)) and the ability to appoint three nominees to the Board.  *See* ¶375,

---

[12] S*hareholder Group Issues Letter to Aegean Marine Petroleum Network Chairman*, PR Newswire (Dec. 20, 2017) ("Activist Shareholder Letter"), https://www.prnewswire.com/news-releases/shareholder-group-issues-letter-to-aegean-marine-petroleum-network-chairman-300573719.html.

below.  More specifically, pursuant to this transaction, Aegean would acquire H.E.C. Europe Limited ("HEC"), a closely-related company owned by the Founder and his family (the "HEC Acquisition"), for consideration totaling $367 million – a price nearly 300% more than HEC's value according to one securities analyst.  Moreover, under the terms of the HEC Acquisition, the Founder and his family would receive 33% of the outstanding stock of Aegean and would designate three nominees (including the Founder's son) for appointment to the Board and recommend an independent nominee to the Board.  The hastily arranged HEC Acquisition would therefore effectively thwart the election of outside directors proposed by the Activist Investors Committee.[13]

22.    On March 8, 2018, certain shareholders from the Activist Investors Committee, RBM Holdings LLC ("RBM Holdings") initiated a lawsuit[14] against Aegean and its four directors (Konomos, Papanicolaou, Fokas and Koutsomitopoulos) seeking to enjoin the HEC Acquisition.  The trial court granted a temporary restraining order ("TRO")[15] enjoining the HEC Acquisition.  The court found that "the timing of the transaction is highly suspect" and noted that the Founder "stands on both sides of the transaction" insofar as he "exercises *de facto* control over Aegean, the proposed acquirer, and exercises control over the proposed acquiree" and that there are "interconnections between the three members of the independent committee and [the Founder] and his other companies."[16]

---

[13] *See* February 20, 2018 Press Release, attached as Ex. 99.1 to February 22, 2018 Form 6-K; RBM Complaint (described below).

[14] Complaint, *RBM Holdings LLC v. Aegean Marine Petroleum Network, Inc.*, No. 1:18-cv-02085-LAP (S.D.N.Y. Mar. 8, 2018), ECF No. 1 ("RBM Complaint").

[15] Temporary Restraining Order, *RBM Holdings LLC v. Aegean Marine Petroleum Network, Inc.*, No. 1:18-cv-02085-LAP (S.D.N.Y. Mar. 13, 2018), ECF. No. 12 ("TRO Order").

[16] Reporters Transcript of Proceedings of March 12, 2018, *RBM Holdings LLC v. Aegean Marine Petroleum Network, Inc.*, No. 1:18-cv-02085-LAP (S.D.N.Y. Mar. 21, 2018), ECF No. 21 ("RBM

23.     On March 27, 2018, the HEC Acquisition was terminated.[17]  On April 17, 2018, the Company announced the resignation of Gianniotis, Aegean's CFO since September 2008.[18] On May 2, 2018, the Company announced that it negotiated a settlement with RBM Holdings resulting in the appointment of three new independent directors: Tyler Baron ("Baron"), Donald Moore ("Moore") and Raymond Bartoszek ("Bartoszek").[19]

24.     Shortly thereafter, the Company ousted Papanicolaou, Koutsomitopoulos and Konomos from the Audit Committee and appointed three new independent directors:  Baron, Moore and Bartoszek (the Reconstituted Audit Committee).  *See* June 4, 2018 Press Release.

25.     On June 4, 2018 (only weeks after the appointment of Baron, Moore and Bartoszek), the Company reported that "***approximately $200 million of accounts receivable owed to the Company at December 31, 2017 will need to be written off***" and that "the transactions that gave rise to the accounts receivable … may have been, in full or in part, ***without economic substance and improperly accounted for*** in contravention of the Company's normal policies and procedures."[20]  *See* June 4, 2018 Press Release.  In response to this news, shares of Aegean fell from $2.85 per share to close at $0.70 per share on June 5, 2018, (a decline of 75%), on heavy volume.

26.     On November 2, 2018, after the market closed, the Company issued its November 2, 2018 Press Release, announcing a number of significant findings from investigation of the Reconstituted Audit Committee:

---

TRO Transcript").

[17] *See* March 27, 2018 Press Release, attached as Ex. 99.1 to March 28, 2018 Form 6-K.

[18] *See* April 17, 2018 Press Release, attached as Ex. 99.1 to April 18, 2018 Form 6-K.

[19] *See* May 2, 2018 Press Release, attached as Ex. 99.1 to May 2, 2018 Form 6-K.

[20] All emphasis is added, unless otherwise noted.

(a) ***First***, the Reconstituted Audit Committee stated that it believed that nearly ***$300 million of the Company's cash and assets were misappropriated*** principally through a March 31, 2010 contract with OilTank Engineering & Consulting Ltd. ("OilTank"), a company controlled by a "former affiliate" of the Company, to oversee the construction of the Fujairah Oil Terminal Facility (the "Fujairah Facility").  In a filing by Aegean with the United States Bankruptcy Court December 15, 2018, the Company acknowledged that there were potential "claims and causes of action relating to misstated accounting records, fraudulent misappropriation of funds by Dimitris Melisanidis, claims against auditors and other professionals related to misappropriation of funds, any related conspiracy to defraud AMPNI or investors in AMPNI, …"[21]  Thus, the "former affiliate" referred to in the November 2, 2018 Press Release is believed to be Melisanidis.

(b) ***Second***, the Reconstituted Audit Committee found that Company had engaged in the prepayment for future oil deliveries which were never made and other actions to defraud the Company since as early as 2010.

(c) ***Third***, the Reconstituted Audit Committee found that the Company had engaged in bogus commercial transactions with shell companies owned or controlled by former employees or affiliates of the Company with no material assets or operations and improperly booked accounts receivable

---

[21] Notice of Debtors' Motion For Entry of an Order (I) Authorizing The Debtors To Enter Into and Perform Under Restructuring Support Agreement and (II) Granting Related Relief, *In re Aegean Marine Petroleum Network Inc.*, No. 18-13374-MEW (Bankr. S.D.N.Y. Dec. 15, 2018), ECF 223 ("Dec. 15, 2018 Bankruptcy Filing").

from these transactions occurring in 2015, 2016 and 2017, totaling approximately $200 million.  The Reconstituted Audit Committee has further confirmed that the ***approximately $200 million of receivables were uncollectible*** and will be written off.

(d)     ***Fourth***, the Reconstituted Audit Committee found that the misappropriation of Company assets, and the fraudulent accounting entries and fictitious documentation designed to conceal it, included "members of senior management."  The employees who directed the scheme, which involved the creation of "falsified and forged documents, including bank statements, audit confirmations, contracts, invoices and third party certifications," were terminated.

(e)     ***Fifth,*** the Reconstituted Audit Committee believed that this misconduct occurred in part because the "former affiliate" exerted significant control over Company personnel and assets through various inappropriate means, including threats of economic retaliation and physical violence.  In addition, the "former affiliate" continued to have access to and control over the Company's electronic and physical files.

27.     Based on these findings, the Reconstituted Audit Committee concluded that (a) the Company had material weaknesses in its internal controls over financial reporting as of December 31, 2015, 2016 and 2017, and (b) the Company's quarterly and annual consolidated financial statements issued beginning in Q1 of the FY ended December 31, 2015 would have to be restated and that the Company expected the "financial impact on restated periods to be material

and believes that the ***revenues and earnings of the Company were substantially overstated in the years 2015, 2016 and 2017***." *See* November 2, 2018 Press Release.

28.     In response to this news, shares fell from $0.92 per share to $0.66 per share (or 29%), on November 5, 2018.  During the mid-day on Monday, November 5, 2018, Aegean trading was halted because of pending news (which was later revealed to be the Company's bankruptcy filing).[22]

29.     On November 6, 2018, the Company announced that it had filed a Petition for Relief under Chapter 11 of the Bankruptcy Code in United States Bankruptcy Court for the Southern District of New York.[23]  On November 7, 2018, when trading resumed shares closed at $0.12 per share.

//

//

//

---

[22] *Aegean Marine (ANW) Halted, News Pending*, StreetInsider.com (Nov. 5, 2018), https://www.streetinsider.com/Trading+Halts/Aegean+Marine+%28ANW%29+Halted%2C+News+Pending/14784599.html.

[23] *See* November 6, 2018 Press Release, attached as Ex. 99.1 to November 6, 2018 Form 6-K; *see also* Nov. 6, 2018 Bankruptcy Petition.

30.    As the truth was revealed concerning Aegean's financial condition, the value of Aegean's shares collapsed, and members of the Class were damaged:



31.    While there are many victims of the Massive Fraudulent Scheme, this action seeks to recover damages suffered by investors as a direct result of Defendants' violations of U.S. accounting and auditing principles designed with the express purpose of protecting investors and the violation two provisions of federal securities laws under Rule 10b-5(b) for their material misrepresentations and omissions and under Rule 10b-5(a) and (c) for their participation in a scheme to defraud.

32.    First, Defendants Nikolas Tavlarios and Gianniotis, as President/Principal Executive Officer and CFO, respectively, had the responsibility to assure that the Company's consolidated financial statements were accurate and not misleading and that the Company's internal controls over financial reporting were effective.  Throughout the Class Period, Nikolas

Tavlarios and Gianniotis allowed the Company to issue materially false financial results, falsely certifying the effectiveness of the Company's internal controls, and made materially false and misleading statements concerning the Company's financial condition in SEC filings, press releases and conference calls with investors.  Furthermore, Nikolas Tavlarios and Gianniotis are liable for their participation in a fraudulent scheme actionable under Rule 10b-5(a) & (c).  In particular, they participated in a scheme to misappropriate hundreds of millions of dollars in Company cash and assets through falsified and forged documentation and by attempting to conceal the misappropriations by engaging in bogus, commercial transactions to artificially inflate the Company's revenue and earnings and/or by participating in the fraudulent HEC Acquisition.

33.     Second, directors of the Company, Georgiopoulos, John Tavlarios, Papanicolaou, Konomos, Koutsomitopoulos and Fokas (also Aegean's General Counsel), were responsible for providing oversight of the Company.  Among other matters, these directors approved of and signed the Offering Documents (as defined below) for the sale of $48.3 million of 4.00% Convertible Unsecured Senior Notes due 2018.  Moreover, the Audit Committee, composed of Papanicolaou, Konomos, Koutsomitopoulos, was specifically responsible for (a) appointing and evaluating the independent auditors; (b) reviewing the annual audit consolidated financial statements and quarterly consolidated financial statements and discussing them with management and the independent auditors; and (c) providing oversight to accounting and financial reporting principles, policies, controls, procedures and practices.  By approving the Company's financial statements and auditors, these Board members were reckless in taking acts in furtherance of the fraudulent scheme and allowed the Massive Fraudulent Scheme to be carried out.  Moreover, Papanicolaou, Konomos, Koutsomitopoulos, as supposed "independent" members of the Board, also authorized the purchase of the Founder's shares in the Company and engaged in a scheme to conceal

fraudulent accounting practices by authorizing the HEC Acquisition.  Likewise, Georgiopoulos and John Tavlarios exercised significant control over the Company as large investors in the Company at the time of the IPO and continued to hold their significant stakes throughout most of the Class Period.  Both Nikolas Tavlarios and Georgiopoulos share office space with Aegean's President John Tavlarios in New York and had access to detailed information concerning the Company's finances.  Related companies run by Georgiopoulos and John Tavlarios (and audited by Deloitte & Touche LLP) engaged in numerous related-party transactions with Aegean (including the reimbursement of private aircraft flights), and Georgiopoulos participated in earnings conference calls and drafted letters to shareholders, which misled investors. Accordingly, they are liable under Rule 10b-5(a) and (c) and was a direct and proximate cause of the harm suffered by the Class.

34.     Third, Melisanidis is liable both for his exercise of *de facto* control over the Company and for orchestrating the Massive Fraudulent Scheme to defraud investors with the assistance of the Company's employees, including senior management.  The Massive Fraudulent Scheme allowed him to steal hundreds of millions of dollars in cash and assets and sell his entire stake in the Company at artificially inflated prices.

35.     Fourth, Melisanidis, Fokas and Gianniotis engaged in illegal insider trading and are thereby liable to investors who traded contemporaneously with them pursuant to Section 20A of the Exchange Act.

36.     Finally, the Deloitte Defendants and the PwC Defendants (defined below, and sometimes referred to collectively as the "Auditor Defendants") acted as auditors for the Company for the following time periods: the Deloitte Defendants from 2006 through 2015 (including an approved restatement of the 2015 audit opinion in 2016), and PwC Defendants for 2016.  As the

Company's independent auditors, they served as the "public watchdog" to ensure the reliability of the Company's financial statements and were required to comply with applicable auditing standards when performing their audits.  During the Class Period, the Auditor Defendants – during their respective auditing retention periods – opined on the accuracy of the Company's consolidated financial statements.  By so doing, the Auditor Defendants intentionally and/or recklessly ignored a series of red flags that were evident during the Class Period (including some that had occurred prior to the Class Period, but that continued as red flags).  Those red flags included, *inter alia*: (a) Melisanidis' extensive prior dealings with criminal and regulatory authorities focusing on his alleged misconduct; (b) his exercise of domination and control over the Company; (c) his extensive related-party transactions; (d) the fact that receivables were substantially outpacing sales (revenues); and (e) the series of efforts undertaken by Melisanidis both prior to – and following – when he sold out his entire shareholdings, roughly 22%, at artificially inflated prices for $100 million in September 2016, which caused a liquidity crisis.  That the Reconstituted Audit Committee (in such a short period of time) was able to piece together this misconduct is compelling evidence, standing on its own, that the Auditor Defendants should have been able to do the same.  Ignoring the red flags, the Deloitte Defendants and the PwC Defendants violated their professional responsibilities and intentionally and/or recklessly issued false and misleading statements in their "clean" audit opinions which allowed the Company to perpetrate and perpetuate the Massive Fraudulent Scheme.

## II.     **JURISDICTION AND VENUE**

37.     Lead Plaintiff asserts claims arising under §§ 10(b), 20(a), 20(b) and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), 78t(b) and 78t-1, and Rule 10b-5(a), (b) & (c) promulgated thereunder by the SEC, 17 C.F.R. §§ 240.10b-5(a), (b) & (c).

38.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because this is a civil action arising under the laws of the United States.

39.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), (c) and (d) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because many of the false and misleading statements were made in or issued from this District.  Many of Defendants' acts and practices that give rise to this Complaint substantially occurred in this District.  In addition, at all relevant times, Aegean's common stock was offered, sold and traded on the NYSE.   Aegean had an office in New York, New York, where it oversaw corporate, financial and accounting, marketing, sales and other functions for the U.S. operations.

40.     This Court may properly exercise subject matter jurisdiction over the claims of investors or employees who purchased or otherwise acquired Aegean securities on the NYSE.

41.     In connection with the wrongful acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

III.    **PARTIES AND RELEVANT NON-PARTIES**

A.      **Lead Plaintiff – Utah Retirement Systems**

42.     Established in 1963, URS is a public pension fund that provides retirement and insurance benefits for Utah public employees, serving more than 200,000 members and approximately 470 public employers, including employees of the State of Utah, its local governments, school districts and higher education.  It is headquartered at 560 East 200 South in Salt Lake City, Utah 84102.  As of December 31, 2017, URS had total net investment position of

$37.8 billion.  As set forth in its Certification attached as **Exhibit 1**, URS purchased Aegean securities during the Class Period and was damaged as a result.

> **B.     The Company (Non-Party Debtor Entity) – Aegean Marine Petroleum Network Inc.**

43.     Aegean is a marine fuel logistics company that supplies and markets refined marine fuel and lubricants to ships in port and at sea.  The Company also owns and operates a fleet of bunkering tankers in a variety of jurisdictions, including in the U.S.  The Company's corporate offices are located in (a) Piraeus, Greece, where it oversees certain corporate, financial and accounting, marketing, sales, and ship-management functions; and (b) New York, New York, where it oversees corporate, financial and accounting, marketing, sales and other functions for the U.S. operations.  Aegean was formed on June 6, 2005, under the laws of the Marshall Islands, for the purpose of acquiring all outstanding common shares of companies owned, directly and indirectly, by Leveret International, Inc. ("Leveret"), which, during all times relevant, was controlled by Aegean's founder and Head of Corporate Development, Dimitris Melisanidis.

44.     During the Class Period, the Company's common shares traded on the NYSE under the ticker symbol "ANW."  Aegean shares were delisted from the NYSE on December 3, 2018.

45.     Since 2011, Aegean's Greek office has been located at 10 Akti Kondili, Piraeus 185 45, Greece.  This office space is leased from Aegean Warehouse which is owned and controlled by the Founder's family.[24]  According to the Company's 2014 Form 20-F, Aegean paid approximately $60,000 monthly under the rental agreement, which expires on March 2023.  During the year ended December 31, 2014, 2013 and 2012, Aegean paid approximately $0.7 million, $0.7 million and $0.7 million under the agreement.

---

[24] *See* 2016 Form 20-F for the FY ended December 31, 2016, filed with the SEC on May 16, 2017.

46.     During the Class Period, Aegean also leased space from Gener8 Maritime, Inc. (formerly, General Maritime Corporation ("GMC")) ("Gener8") for its New York office at 299 Park Avenue, Second Floor, New York, New York.[25] Georgiopoulos served as Chairman and Chief Executive Officer of Gener8, and John Tavlarios served as the Chief Operating Officer of Gener8.  *Id.*  Gener8's headquarters were also located at 299 Park Avenue, 2nd Floor, New York, New York.[26]

47.     Aegean was formerly named as a defendant in the underlying complaints initiating this litigation prior to the Company filing a Chapter 11 petition on November 6, 2018.  The filing of that Chapter 11 petition operates as a stay against the continuation of litigation against Aegean until such time as the stay is lifted, either as a matter of law or by order of the U.S. Bankruptcy Court, and this action is permitted to continue as against the Company. While Aegean is not included as a named defendant in this Consolidated Complaint, it has not been dismissed from this Action.

## C.     Company Defendants

48.     Several present and former officers and directors acted intentionally and/or recklessly with the Founder to perpetrate and perpetuate the Massive Fraudulent Scheme (the "Company Defendants.").

//

//

//

---

[25] *See* 2016 Form 20-F.

[26] *See* Gener8, Form 20-F for the FY ended December 31, 2016, filed with the SEC on March 13, 2017.

1.   **The Company's Founder, Principal Shareholder and Aegean's Head of Corporate Development**

a)   <u>**Dimitris Melisanidis**</u>

49.    Defendant Melisanidis founded Aegean in 1995 and managed the companies that formed Aegean.  *See* 2006 Form 20-F.  Melisanidis served as the Company's President and Chief Executive Officer ("CEO") from June 2005 to December 2006 and served as a director and Chairman of the Board until July 2006.  Following the completion of the Company's IPO in 2006, Melisanidis formally stepped down from his position as President and CEO and became the Head of Corporate Development, which involved developing new business.  According to the 2006 offering documents, he would receive an annual base salary of $100,000 and would receive an annual consulting fee of $150,000.  He served as the Company's Head of Corporate Development from December 2006 to September 2016, after which he served as a consultant to the Company until May 2018.[27]

50.    Following the completion of the IPO, Leveret, a company controlled by Melisanidis, was expected to own 55.3% of Aegean's outstanding shares, or 52.9% if the underwriters' over-allotment option were exercised in full.  *See* November 24, 2006 IPO Prospectus.  As reflected in the Company's Form 20-F filings, during FY 2013, 2014, and 2015 Melisanidis owned 22.3%, 22.4%, and 22% of the Company's securities, respectively.  On September 15, 2016, the Company repurchased 11,303,031 common shares that were beneficially owned by Melisanidis, representing approximately 22% of common shares then outstanding, for proceeds of nearly $100 million.[28]

---

[27] *See* 2015 Form 20-F for the FY ended December 31, 2015, filed with the SEC on April 28, 2016; Amendment No. 3 to its Registration Statement on Form F-1, filed with the SEC on November 24, 2006 ("November 24, 2006 IPO Prospectus").

[28] *See* September 19, 2016 Press Release, attached as Ex. 99.1 to September 19, 2016 Form 6-K.

51.     Melisanidis has a wide range of business enterprises including a number of businesses engaged in related-party transactions with Aegean.  Melisanidis and his family own or control Aegean Oil, S.A. (one of the largest oil companies in Greece) ("Aegean Oil S.A."), Aegean Shipping Management S.A. ("Aegean Shipping"), Agency Piraeus, and Hellenic Environmental Center.  Melisanidis also has stakes in AEK Athens F.C. (a Greek football club) and OPAP S.A ("OPAP") (a Greek gaming company), among other businesses.[29]

### 2.     Executive Officers

#### a)     E. Nikolas Tavlarios

52.     Defendant Nikolas Tavlarios was the Company's President and Principal Executive Officer from December 2006 until June 1, 2017.  After June 1, 2017, he purportedly stayed on with the Company as a consultant.  Aegean listed Defendant Nikolas Tavlarios's address at 299 Park Avenue, New York, New York 10171 and as the Company Contact Person in all relevant SEC filings.  During the Class Period, he made statements in press releases and participated on quarterly conference calls as set forth herein.  He signed registration statements for the October 2013 and January 2015 public offerings.  Nikolas Tavlarios also signed each of the Company's annual Form 20-Fs filed with the SEC during the Class Period.  In addition, he signed all of the Company's Quarterly Reports on Form 6-K ("Quarterly Report" or "Form 6-K") filed with the SEC during the Class Period, except those filed after August 2017.

53.     When Nikolas Tavlarios stepped down as President and CEO he entered into a Settlement Agreement with the Company.  The terms of the Settlement Agreement were allegedly

---

[29] *See, e.g.*, November 24, 2006 IPO Prospectus; Kerin Hope, *Auditors probe potential $200m fraud at Aegean Marine*, Financial Times (Oct. 31, 2018).

not honored, leading to Nikolas Tavlarios filing suit against Aegean in May 2018 in the Supreme Court of the State of New York County of New York., seeking $1.2 million.[30]

54.     Before joining Aegean in 2006, Nikolas Tavlarios was the Vice President of General Maritime Management LLC, a tanker operating subsidiary of GMC (the former name of Gener8), between 2003 and 2006.

### b)     Spyros Gianniotis

55.     Defendant Gianniotis was the Company's CFO from 2008 until April 17, 2018. Throughout the Class Period, he made statements in press releases and participated on quarterly conference calls.  He signed registration statements for the October 2013 and January 2015 public offerings.  During the Class Period, Gianniotis certified the Company's Form 20-Fs.  Gianniotis served as a member of NewLead Holdings Ltd.'s ("NewLead") Board and Audit Committee since 2009.  NewLead is an international shipping company that owns and operates product tankers and dry bulk vessels based in Piraeus, Greece.  NewLead's common shares traded on the OTC Pink Marketplace under the trading symbol "NEWLF."  NewLead's last filing with the SEC was a May 2, 2017, a Form 12b-25 Notification of Late Filing concerning its Form 20-F for the FY ended December 31, 2016.  On February 16, 2018, the Supreme Court of the State of New York County of New York entered a $22 million judgment against NewLead, its CEO Michael Zolotas, and affiliated parties related to a lawsuit alleging that NewLead was engaged in an elaborate "pump and dump" stock scam.[31]  On September 18, 2018, the SEC suspended NewLead from trading.

---

[30] Summons with Notice (filed May 22, 2018) & Notice of Voluntary Discontinuance Without Prejudice (filed Aug. 20, 2018) in *Nikolas Tavlarios v. Aegean Marine Petroleum Network, Inc.*, No. 652568/2018 (S.D.N.Y.).

[31] Judgment (filed Feb. 16, 2018) & Second Amended Compl. (filed Sept. 30, 2016), *Transasia Commodities Inv. Ltd. v. Newlead JMEG, LLC, et al.*, No. 654414/2013 (N.Y. S.Ct.).

### c)   Jonathan McIlroy

56.     Defendant Jonathan McIlroy ("McIlroy") was the Company's President from July 2017 until November 2018.  From January 2016 to July 2017, he was the manager of global trading at Aegean.  Starting in August 2017, he made statements in press releases and participated on quarterly conference calls.  Between August 2017 and September 2018, he signed all of the Form 6-K's filed with the SEC.

### d)   Spyridon Fokas

57.     Defendant Fokas has been the Company's General Counsel and Secretary as well as a member of the Company's Board since June 2005.  In his role as General Counsel, he made statements on a quarterly conference call held on November 17, 2016.  He also signed registration statements for the October 2013 and January 2015 public offerings.

58.     Fokas has close ties with Melisanidis.  Fokas has been a member on the Board of the Greek gaming monopoly, OPAP, since September 2013 and Vice Chairman since November 2013.  Melisanidis is a shareholder of OPAP through his company Geonama Holdings owning a stake in Emma Delta Ltd. ("Emma Delta"), a private equity fund, which acquired a 33% stake of OPAP in 2012.[32]  Fokas has a law firm that had rendered services to Aegean from "time to time."

59.     Together, Nikolas Tavlarios, Gianniotis, McIlroy and Fokas are referred to herein as the "Officer Defendants."

//

//

---

[32] *Melissanidis' Aegean Marine Petroleum: Unanswered Questions*, To BHMA (March 8, 2018), https://www.tovima.gr/2018/03/08/international/melissanidis-aegean-marine-petroleum-unanswered-questions/; Emma Capital Overview, https://www.emmacapital.cz/opap (last visited Jan. 25, 2019).

### 3.   Outside Directors

#### a)   Peter C. Georgiopoulos

60.   Defendant Georgiopoulos served as Chairman of the Company's Board from December 2006 until June 2017.  During the Class Period, Georgiopoulos made statements on quarterly conference calls.  He signed registration statements for the October 2013 and January 2015 public offerings.

61.   During FY 2013, 2014, 2015 and 2016, Georgiopoulos owned 10.8%, 10.4%, 10.8% and 13.7% of the Company's securities, respectively.

62.   From 2015 to the present, Georgiopoulos has also served as Chairman of the Board and Chief Executive Officer of Gener8.  Gener8 is a tanker company that purchases marine fuel and lubricants from Aegean.[33]  As reflected in the Company's Form 20-F filings, Aegean sales of marine petroleum products to Gener8 for the years ended December 31, 2014, 2013 and 2012 amounted to $7.2 million, $6.3 million and $30.6 million, respectively. Gener8's independent public accounting firm is Deloitte & Touche LLP (since 2001).

63.   Georgiopoulos served as Chairman of the Board of Genco Shipping & Trading Limited, ("Genco") a public dry-bulk shipping company whose shares are listed on the NYSE. Genco is headquartered at 299 Park Avenue, New York, New York.  According to Genco's Form 10-K for the FY ended December 31, 2014, filed with the SEC on March 15, 2015 ("Genco 2014 Form 10-K"), Genco has entered into related-party transactions with Aegean to purchase lubricating oils for certain vessels in the its fleets.  Genco's independent public accounting firm is Deloitte & Touche LLP (since 2005).  Genco also engaged in related-party transactions with

---

[33] Georgiopoulos served as chairman of the board, president and CEO of General Maritime Corporation which merged with Navig8 Crude Tankers, Inc. in May 2015, and became Gener8 (NYSE: GNRT).

Gener8.   For example, Genco incurred travel and other office related expenditures for Georgiopoulos in 2015 and 2016 which were reimbursed by Gener8.   According to Genco 2014 Form 10-K, Genco "[made] available employees performing internal audit services to [Gener8], where the [Genco's] Chairman, Peter C. Georgiopoulos, also serves as Chairman of the Board."

64.   Aegean leases office space at 299 Park Avenue, New York, New York 10171 from Gener8.   Georgiopoulos and John Tavlarios both had offices in this same New York office space as did Aegean's President Nikolas Tavlarios.

### b)   Yiannis N. Papanicolaou

65.   Defendant Papanicolaou has served as a member of the Company's Board from December 2006 through the Class Period.   In that role, he had served as the Chairman of the Compensation Committee and as a member of the Audit and Nominating and Corporate Governance Committees until June 4, 2018, when the Company announced that he was removed from the Audit Committee.   He made statements in a March 7, 2018 press release and signed registration statements for the October 2013 and January 2015 public offerings.

### c)   John P. Tavlarios

66.   Defendant John Tavlarios served as a member of the Company's Board from December 2006 to June 2017.   He signed registration statements for the October 2013 and January 2015 public offerings.   John Tavlarios is the brother of Nikolas Tavlarios.

67.   John Tavlarios is the Chief Operating Officer ("COO") of Gener8.   Gener8 is a tanker company that purchases marine fuel and lubricants from Aegean.   Prior to Gener8, John Tavlarios served as a director, President, CEO and COO of GMC at various times.   Aegean leases office space at 299 Park Avenue, New York, New York 10171 from Gener8.   As reflected in the Company's Form 20-F filings, Aegean sales of marine petroleum products to Gener8 for the

years ended December 31, 2014, 2013 and 2012 amounted to $7.2 million, $6.3 million and $30.6 million, respectively.

68.     Based on Aegean's Form 20-F SEC filings, Tavlarios held 850,000 shares of Aegean as of April 24, 2014, and held 695,324 shares as of May 11, 2016 (a decline of 154,676 shares).

### d)     <u>Konstantinos D. Koutsomitopoulos</u>

69.     Defendant Koutsomitopoulos has served as a member of Company's Board between May 2008 and June 4, 2018.  In that role, Koutsomitopoulos served as Chairman of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee.  Koutsomitopoulos began serving on the Audit Committee in 2012.  He signed registration statements for January 2015 public offerings.   On June 4, 2018, the Company announced that he was removed from the Audit Committee.

### e)     <u>George Konomos</u>

70.     Defendant Konomos has served as a member of the Company's Board and as the Chairman of the Audit Committee from November 2008 through June 4, 2018, when the Company announced that he was removed from the Audit Committee.   Konomos is also a member of the Company's Compensation Committee.  He signed registration statements for the October 2013 and January 2015 public offerings.    Konomos resides in New York.  According to the RBM Lawsuit, Konomos had his "own individual office" in Aegean's "Park Avenue offices."

71.     Along with Georgiopoulos and John Tavlarios, Konomos served a director on the Board of GMC.

72.     Geogiopoulos, John Tavlarios, Papanicolaou, Koutsomitopoulos and Konomos are referred to herein as the "Outside Directors."  Papanicolaou, Koutsomitopoulos and Konomos are referred to herein as the "Audit Committee Defendants."

**D.     The Auditor Defendants**

      **1.     The Deloitte Defendants**

73.     Deloitte, through its Greek member firm, was engaged by Aegean to provide independent and/or consulting services, including the examination and/or review of Aegean's consolidated financial statements for FY 2006-2015.  These documents were disseminated to investors in the United States and worldwide and used to convey information about the Company's financial condition and business prospects.  Aegean paid Deloitte millions of dollars in fees for that audit work and other work.

74.     Defendant **Deloitte Touche Tohmatsu Limited ("DTTL")**, headquartered in the United Kingdom, is a membership-based company with member and network accounting and advisory firms operating locally in countries around the world, including the United States and Greece.  Deloitte touts its global services as follows:

> Deloitte provides audit, consulting, financial advisory, risk advisory, tax, and related services to public and private clients spanning multiple industries.  Deloitte serves four out of five Global 500® companies through a globally connected network of member firms in more than 150 countries and territories, brings world-class capabilities, insights, and high-quality service to address clients' most complex business challenges.  To learn more about how Deloitte's approximately 245,000 professions make an impact that matters, please contact us on Facebook, LinkedIn, or Twitter.[34]

75.     DTTL has global policies that address relationships between its foreign associated firms and their audit clients and affiliates including SEC registrants. [35]  Those policies have been

---

[34] About   Deloitte – Learn   about   our   network   of   member   firms, https://www2.deloitte.com/pl/en/legal/about-deloitte1.html (last visited Jan. 28, 2019).

[35] *See* Deloitte U.S.' Application for Registration on Form 1, filed with the PCAOB on or about

provided, along with its restricted entity list, to foreign associated firms, including the partners and managers of those firms.[36]

76.     According to filings with the Public Company Accounting Oversight Board ("PCAOB") and DTTL's own profiles, DTTL has offices located in the United States at 30 Rockefeller Plaza, New York, New York.

77.     Defendant **Deloitte Certified Public Accountants, S.A.** ("Deloitte Greece") is headquartered in Athens, Greece and was formerly known as Deloitte Hadjipavlou Sofianos Cambanis S.A.[37]  Deloitte Greece provides audit, accounting and other financial consulting services to its clients.  Since prior to the IPO in 2006 through June 20, 2016, Deloitte Greece served continually as Aegean's principal accountant and independent auditor, rendering opinions and preparing audit reports for Aegean.  As represented to investors in each of Aegean's Form 20-Fs issued during the Class Period, Deloitte Greece is a member of DTTL.  Deloitte Greece prepared all but one of the audit opinions issued during the Class Period.  For FY 2016, Deloitte Greece reissued its 2015 audit opinion without revision or qualification and executed it as of May 16, 2017, thereby authorizing its inclusion in Aegean's 2016 Form 20-F.  In these audit opinions, Deloitte Greece represented that it had conducted its "audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)," which standards, it notes, "require that we plan and perform the audit to obtain reasonable assurance about whether the

---

August 25, 2003 ("Deloitte U.S. PCAOB Form 1"), Exhibit 4.1 (*Overview of Quality Control Policies*),                available                for                download                from https://rasr.pcaobus.org/Forms/FormSummary.aspx?ID=ED48209AE9860E63A73663E4525302 DB.

[36] *Id.*

[37] On or about July 25, 2016, Deloitte Greece filed a Special Report with the PCAOB on PCAOB Form 3 describing its name change from Deloitte Hadjipavlou Sofianos Cambanis S.A, to Deloitte Certified Public Accountants, S.A., effective July 11, 2016.

financial statements are free of material misstatement" and "require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects."

78.     For the years 2013-2016, Deloitte Greece was held out in the Company's Form 20-Fs as a member of DTTL.  For the years ended December 31, 2013, December 31, 2014 December 31, 2015, Deloitte Greece provided audit-related services to Aegean, and for each of these years plus the year ended December 31, 2016, Deloitte Greece provide non-audit related services.  In particular, for each of the years 2013 through 2015, Deloitte Greece issued unqualified or "clean" audit opinions in connection with its audits of the Company's consolidated financial statements, which were included in the Company's Form 20-F filings with the SEC.  For 2013 and 2015, Deloitte Greece also issued unqualified or "clean" audit opinions in connection with its audits of Aegean's internal controls over financial reporting.  According to the Form 20-Fs, Deloitte Greece was paid as follows in each of these years:

- $800,000 in "Audit fees" for 2013.  "Audit fees" were defined as "compensation for professional services rendered for (i) the audit of our financial statements included herein; (ii) the review of our quarterly financial information; and (iii) services provided in connection with public or private offerings effectuated or withdrawn and any other services performed for the SEC or other regulatory filings by us or our subsidiaries[;]"

- $800,000 in "Audit fees" for 2014 (as defined above);

- $1,000,000 in total fees for 2015, $900,000 of which was "Audit fees" (as defined above) and $100,000 of which was for "other fees."

- $100,000 for "other fees" for 2016.

79.     During the Class Period, Deloitte Greece issued an audit report for only a small number of issuers: (a) 11 companies including Aegean for the "reporting period"[38] of April 1, 2012

---

[38] The PCAOB Annual Reports on Form 2 required auditing firms to provide information on "each

through March 31, 2013; (b) 14 companies including Aegean for the reporting period of April 1, 2013 through March 31, 2014; (c) 12 companies including Aegean for the reporting period of April 1, 2014 through March 31, 2015; (d) 11 companies including Aegean for the reporting period of April 1, 2015 through March 31, 2016; (e) 10 companies including Aegean for the reporting period of April 1, 2016 through March 31, 2017.[39]

80.    In its Annual Reports on Form 2, filed with the PCOAB, Deloitte Greece names Deloitte U.S. (defined below), Office of General Counsel, Deloitte LLP, 30 Rockefeller Plaza as its agent upon whom the Commission or the Board may serve any request.

81.    A former audit supervisor at Deloitte who was there since September 2004 left to become the finance and accounting manager at Aegean in April 2008, according to LinkedIn profile.  She remained in that position at Aegean until May 2018, when the Reconstituted Audit Committee uncovered the bogus accounts receivable.  At Deloitte, she participated in "various types of engagements mostly in shipping industry … (statutory audits, due diligence, audits of US, UK listed companies, Sarbanes Oxley projects regarding 404 implementation) … [p]reparing financial statements and disclosures and also resolving account issues related to local and international gaap."  At Aegean, her duties included "[c]ontrolling and reporting the financial results of the group's legal entities under the local gaap and usgaap … [p]erforming intragroup accounts reconciliations, ensuring balances are kept at a minimum … [c]ontrolling the cash

---

issuer for which the firm issued any *audit report(s)* during the reporting period" (emphasis in original).

[39] *See* Deloitte Greece's PCAOB Annual Report filing on Form 2:  2013 PCAOB Annual Report (Form 2), filed June 28, 2013; 2014 PCAOB Annual Report (Form 2), filed June 27, 2014; 2015 PCAOB Annual Report (Form 2), filed June 26, 2015 ("Deloitte Greece 2015 PCAOB Form 2"); 2016 PCAOB Annual Report (Form 2), filed June 29, 2016; 2017 PCAOB Annual Report (Form 2), filed June 30, 2017 (all are available for download from https://rasr.pcaobus.org/Firms/FirmSummaryPublic.aspx?FirmID=F70C8E7BD00E6FBC3E63D2B2EFCB01E4).

inflows and outflows of the group entities … [a]nalyzing numbers and address issues arising and related with group's activities."  Similarly, the profile of a former Internal Reporting Analyst at Aegean from 2016-2018, shows that she was a "Senior Consultant (Internal Auditor)"at PwC Greece from 2008-2016, immediately prior to her hiring at Aegean. Other LinkedIn profiles show that other former Deloitte employees were hired by Melisanidis' entities during the Class Period, including the Chief Accountant at Aegean Shipping Management S.A. (who was an Audit Senior at Deloitte Greece from 2008-2012), and the CFO of Aegean Shipping Management S.A. (who was a Senior Manager at Deloitte from 2013-2014 and a Manager at PwC from 2009-2013).

82.    Defendant **Deloitte & Touche LLP** ("Deloitte U.S.") is a Delaware corporation with headquarters in New York, New York and offices throughout the United States, including Connecticut.  Deloitte U.S. is a member firm of DTTL.[40]  Deloitte U.S.' foreign associated entities include Deloitte & Touche Hadjipavlou Sofianos & Cambanis SA (now known as Deloitte Certified Public Accountants, S.A.).  Deloitte U.S. PCAOB Form 1, Item 1.6.3.  Deloitte U.S.' National Office maintains the restricted entities list and "at a high level, monitors the content for accuracy and completeness" and the "client acceptance process includes a review by National Office – Independence. National Office performs research on engagement-team submitted information to validate its completeness and accuracy." *Id.*

83.    Deloitte U.S.' National Office – SEC Services is responsible for "assisting in resolving issues surrounding SEC regulations, initiating and coordinating contacts with the staff of the SEC, performing preissuance reviews of financial information and [Deloitte U.S.] reports thereon in certain circumstances (e.g., when included or incorporated by reference in documents used in public financings, in private placements, or in connection with transfers of ownership

---

[40] *See* Deloitte U.S. PCAOB Form 1, Ex. 4.1.

interests), and developing communications to [its] personnel concerning [its] policy, practice guidance, and current developments that have a bearing on our SEC practice." Deloitte U.S. PCAOB Form 1, Ex. 4.1. SEC Services also "reviews documents to be used in connection with the sale or exchange of securities, in which the [Deloitte U.S.'] report or consent to a report appears or is referred to, prior to issuance of such documents. This review applies to documents filed with the SEC under the Securities Act of 1933 (1933 Act), documents that will be incorporated into a filing with the SEC, private placement documents for issuance of securities, and exempt offerings." *Id.*

84.    According to Deloitte Greece, for certain SEC filings, "a pre-issuance review is completed of all documents to be filed with the SEC, by SEC Services, in the U.S. Firm's National Office. Any comments from the SEC reviewer or SEC Services that impact the audit opinion are resolved prior to rendering an opinion on the financial statements of the SEC registrant." [41]

85.    Deloitte Greece, DTTL, Deloitte U.S. are sometimes referred to collectively as the "Deloitte Defendants."

**2.    The PricewaterhouseCoopers Defendants**

86.    Aegean engaged PwC, through its Greek member firm, as its independent auditor for the FY ending December 31, 2016 when it dismissed Deloitte Greece on June 20, 2016. PwC issued an audit opinion for 2016, which was disseminated to investors in the United States and worldwide and used to convey information about the Company's financial condition and business prospects. Aegean paid PwC roughly $1 million in fees for that 2016 audit work.

---

[41] Deloitte Greece's Application for Registration on Form 1, filed with the PCAOB on or about April 16, 2004 ("Deloitte Greece PCAOB Form 1"), Exhibit 4.1 (*Overview of Quality Control Policies*), available for download from, https://rasr.pcaobus.org/Forms/FormSummary.aspx?ID=790327D6BF5BD963D198818ED6971 72D.

87.     Defendant **PricewaterhouseCoopers International Limited** ("PwC International"), headquartered in the United Kingdom, is a membership-based company with member and network accounting and advisory firms operating locally in countries around the world, including the United States and Greece.  PwC touts its global services as follows: "With offices in 158 countries and more than 250,000 people, we are among the leading professional services networks in the world.  We help organisations and individuals create the value they're looking for, by delivering quality in assurance, tax and advisory services. Some facts about PwC:" (a) "In FY18, PwC firms provided services to 429 of the Global Fortune 500 companies and more than 100,000 entrepreneurial and private businesses"; (b) "64,766 people joined PwC firms around the world in FY18" and (c) "For the year ending 30 June 2018, PwC's gross revenues were US$41.3 billion, up 7% on the previous year."[42]

88.     Defendant **PricewaterhouseCoopers S.A**. ("PwC Greece") is located in Halandri (near Athens), Greece.  PwC Greece is a member firm of the PricewaterhouseCoopers network of firms, described below, and is the Greek arm of the global organization with the brand name: PricewaterhouseCoopers, or simply "PwC."

89.     PwC Greece served as Aegean's principal accountant and independent auditor between June 20, 2016 and the remainder of the Class Period.  PwC Greece issued unqualified or "clean" audit opinions on the Company's consolidated financial statements, including Aegean's consolidated financial statements dated as of, and for, the year ended December 31, 2016, which were included in the Company's 2016 Form 20-F.  PwC also issued an unqualified or "clean" audit opinion in connection with its audit of Aegean's internal controls over Aegean's internal controls over financial reporting as of December 31, 2016.  In this audit opinion, PwC Greece represented

---

[42] PwC Global, About Us, https://www.pwc.com/gx/en/about.html (last visited Jan. 30, 2018).

that it had conducted its "conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States)," which standards, it notes, "require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects."

90.    PwC Greece's audit opinion included in Aegean's 2016 Form 20-F was disseminated to investors in the United States and worldwide and was used by Aegean to convey information about the Company's financial condition, the effectiveness of its internal controls and business prospects.  Aegean paid PricewaterhouseCoopers $1 million dollars in fees for 2016, which fees included (a) $900,000 in "Audit fees," which "represent compensation for professional services rendered for (i) the audit of our consolidated financial statements included herein; (ii) the review of our quarterly financial information; and (iii) services provided in connection with public or private offerings effectuated or withdrawn and any other services performed for the SEC or other regulatory filings by us or our subsidiaries"; and (b) $100,000 for "Audit-related fees."

91.    For the "reporting period" of April 1, 2017 through March 31, 2018, Greece issued an audit report for only 6 companies including Aegean, 4 of which appear to be related entities.[43]

92.    Defendant **PricewaterhouseCooopers LLP** ("PwC U.S.") is a Delaware corporation and has its principal office in this District located at 300 Madison Avenue, in New York City, New York.   PWC U.S. offers business advisory services, including auditing, accounting, taxation, strategy management and human resource consulting services.   The

---

[43] *See* PWC Greece's 2018 PCAOB Annual Report filing on Form 2, filed June 29, 2018, available for                                    download                                    from https://rasr.pcaobus.org/Forms/FormSummary.aspx?ID=41772BA859C4AFED82A07D64CA8F90C0.

International Consulting and Review Group (discussed below) is part of the U.S. firm's national office. According to its audit quality report, "PwC is a member of PricewaterhouseCoopers International Limited (PwCIL), a UK private company limited by guarantee. Member firms of PwCIL form a network of separate legal entities providing professional services under the 'PwC' brand. Members of the PwC Network share knowledge, skills, and resources. This membership facilitates PwC Network firms working together on a global scale to provide quality services to large multinational clients, while retaining the advantages of being local businesses knowledgeable about local laws, regulations, standards, and practices."[44]

93.    Defendants PwC Greece, PwC International and PwC U.S. are sometimes collectively referred to as the "PwC Defendants."

### 3.    Deloitte Greece and PwC Greece Were Acting Within the Course and Scope of their Agencies and Under the Control of Their Respective Network of Affiliated Member Firms

94.    During all times complained of herein, Deloitte Greece and PwC Greece were each acting as agents within the course and scope of their agencies, and under the control, of their respective network of member affiliated firms, as described below.

### a)    Deloitte

95.    Throughout the Class Period, Deloitte Greece described itself to investors as a "member" of DTTL. During all times complained of herein, while performing its audit of Aegean, Deloitte Greece was acting within the course and scope of its agency, and under the control, of both DTTL and Deloitte U.S.

---

[44] *Our focus on audit quality 2018*, PwC (2018) ("Audit Quality Report"), https://www.pwc.com/us/en/audit-assurance-services/assets/pwc-our-focus-on-audit-quality-2018.pdf.

96.     Deloitte Greece has never operated in a vacuum, separate and apart from the broader network of Deloitte member firms.  In fact, Deloitte Greece depends heavily on Deloitte member firms including DTTL for guidance, audit support services and SEC review of auditing opinions for public reporting companies.

97.     In its brochures, Deloitte Greece emphasized the benefits of its global network:

> The power of our global network is delivered through dedicated Audit Centers of Excellence available to our professionals.  We use a consistent audit delivery approach across engagements, especially those for multinational clients, resulting in seamless audit experience.[45]

98.     More specifically, Deloitte Greece has touted its reliance on, and access to, affiliated Deloitte accounting technology resources available from other Deloitte entities within the broader network of Deloitte firms, including, among others, Magnia, an audit delivery program, and Cognia, a portal with tools and approaches that generate advancements in cloud, artificial intelligence and machine learning:

> At Deloitte, quality comes through in results we create, and at every point along the way.  This commitment is supported by the tools we use, such as **Deloitte Magnia, our advanced global audit delivery program**. Supporting our methodology, Magnia allows us to deliver a comprehensive focused and streamlined audit across the globe. All of which means that you benefit from greater quality and better outcomes in all we do.
>
> …
>
> As our audit practitioners work with you, they are able to draw upon Deloitte Cognia, a single collaborative global repository of innovative auditing tools and leading practices.  This platform enables us to continually drive consistency, high quality, and impact throughout the audit.
>
> …

---

[45] *Aspire with assurance – Illuminating the  audit of the future – Audit and Assurance*, Deloitte (2017),
https://www2.deloitte.com/content/dam/Deloitte/gr/Documents/audit/gr_audit_brochure_noexp.pdf.

We bring to the table a whole world of perspective, drawing on knowledge from across our firm to inform any given challenge.  Collaborating across services and areas of specialization, we engage in a richer conversation about the issues at hand. No other organization is able to deliver the same breadth and depth of knowledge and insight.  The unique history and composition of Deloitte – and our commitment to draw from across disciplines and business lines to serve you better – means that you can anticipate more valuable insights into more of the issues on which your future turns.[46]

99.     Further, in connection with its expertise in the shipping sector, Deloitte Greece has touted its access to the broader network of Deloitte member firms and the absence of geographic barriers in the provision of services to its clients:

Drawing on the talents of 182,000 people – of which over 550 are maritime industry-focused – across 150 countries, Deloitte member firms assist clients in responding to critical issues arising as a result of regulatory changes, competition, globalisation, advances in technology and the ever-changing demands of their customers. Deloitte member firms offer real value to clients by combining strong technical skills across many disciplines, thorough knowledge of the industry and a global network. Without geographic barriers, Deloitte member firms are able to respond quickly to clients' needs.[47]

100.     In a press release dated November 22, 2014, issued by Deloitte, Deloitte emphasized the centralized, coordinated and global approach it provides to its clients:

The flexible service delivery model of Deloitte member firms helps enable clients to choose a level of support that is right for them.  Services can be provided using a local approach, a global or regionally coordinated approach, or a centralized approach to help increase efficiency and control over tax activities.

…

**Clients benefit from the global reach of the worldwide network of Deloitte member firms**, while retaining access to local tax knowledge when and where they need it.  …[48]

---

[46] *Id.*

[47] *Ship shape and ready for business – Our expertise in the shipping sector*, Deloitte (2015), available for download from https://www2.deloitte.com/global/en/pages/energy-and-resources/solutions/shipshape-ready-business.html.

[48] Press Release, Deloitte, *Tax Expert Guide recognizes Deloitte experts, more than any other organization* (Nov. 11, 2014), https://www2.deloitte.com/mn/en/pages/about-deloitte/articles/tax-expert-guide-press-release.html.

101.    Deloitte Greece's own website acknowledges the importance of the 'Deloitte' brand and this collaboration:

> "Deloitte" is the brand under which tens of thousands of dedicated professionals in independent firms throughout the world collaborate to provide audit, consulting, financial advisory, risk advisory, tax and related services to select clients. These firms are members of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee ("DTTL"). Each DTTL member firm provides services in particular geographic areas and is and is subject to the laws and professional regulations of the particular country or countries in which it operates. …[49]

102.    Deloitte Greece is a member firm of DTTL which licenses or authorizes audit procedures or manuals or related materials and/or the use of its name in connection with the provision of audit services, and that Deloitte Greece has access to and follows these protocols:

> … To facilitate high quality professional conduct & service, DTTL has adopted policies & protocols regarding professional standards, methodologies & systems for quality control & risk management.  DTTL member firms (MFs) provide professional services in specific geographic areas and as appropriate may request assistance from MFs in other countries.  …"[50]

103.    Through a series of internal controls, policies and procedures, DTTL maintains strict oversight of Deloitte Greece.  According to Exhibit 4.1 to the Deloitte Greece PCAOB Form 1, Deloitte Greece acknowledged that it was required to follow not only its own internal standards, policies and procedures regarding quality but those established by DTTL as well:

> Deloitte Hadjipavlou Sofianos Cambanis S.A. …, located in Greece (herein referred to as the "Firm") is a member of Deloitte Touche Tohmatsu ("DTT[L]"), a Swiss Verein each of whose national practices is a separate and independent legal entity.
>
> …
>
> In addition to local laws and standards promulgated by accounting and auditing authorities, our professionals are required to follow internal standards, policies,

---

[49]    About   Deloitte   –   Learn   about   our   global   network   of   member   firms, https://www2.deloitte.com/gr/en/pages/about-deloitte/articles/about-deloitte.html?icid=bottom_about-deloitte (last visited Jan. 26, 2019).

[50] *See, e.g.*, Deloitte Greece 2015 PCAOB Form 2.

and procedures established by the Firm and DTT[L].  Management of the Firm regularly communicates with our professionals regarding the quality control procedures.[51]

104.    "DTT[L] policies require each member firm of DTT[L] to report annually to DTT[L]'s Global Office that the member firm has taken appropriate steps to obtain sufficient evidence that it and its partners and professional staff comply with the DTT[L] independence policies (i.e. that the member firm is independent of its restricted entities and international restricted entities)."  Deloitte Greece PCAOB Form 1, Ex. 4.1

105.    Deloitte Greece further acknowledged that (a) "DTT[L] has programs for conducting comprehensive inspections of member firms' compliance with DTT[L] standards, policies and procedures, including those related to independence.  Inspections occur at both the audit engagement level and the practice office level"; (b) "DTT[L] has developed engagement review questionnaires that are tailored to assess compliance with DTT[L] and Firm policies and procedures, including those related to independence"; (c) "DTT[L] has a practice review program that requires all member firm practices to be subject to a review at least once in a three-year period"; and (d) "DTT[L] has a senior-level partner responsible for taking the lead on all significant global ethics and independence issues in conjunction with DTT's global leadership." Deloitte Greece PCAOB Form 1, Ex. 4.1.

106.    "The administration of the review program [for Deloitte Greece] is the responsibility of the DTT[L] Global Director of Audit Services.  Each region of DTT[L] appoints a regional practice review director to administer the program and coordinate with the Global Director of Audit Services."  Deloitte Greece PCAOB Form 1, Ex. 4.1.

---

[51] Deloitte Greece PCAOB Form 1, Ex. 4.1.

107.    DTTL maintains strict oversight over its member firms, including Deloitte Greece, both in terms of adhering to applicable independence and ethical standards and ensuring, as applicable, that its member firms, including Deloitte Greece, comply with SEC rules and regulations.  That oversight over SEC matters also extends to Deloitte's "National Office" located in the United States:

> DTT[L] and the Firm [Deloitte Greece] issue policies and procedures that are designed to provide reasonable assurance that our Firm renders quality service and complies with applicable independence and ethical standards.  Our standards are based on those issued by the International Federation of Accountants ("IFAC") and are enhanced to reflect local standards that are higher.  Moreover, these policies and procedures are intended to provide reasonable assurance that the Firm [Deloitte Greece] complies with the U.S. Securities and Exchange Commission (SEC") independence rules when serving SEC registrants and their affiliates.
>
> …
>
> For certain of these SEC filings, a pre-issuance review is completed of all documents to be filed with the SEC, by SEC Services, in the U.S. Firm's National Office.  Any comments from the SEC reviewer or SEC Services that impact the audit opinion are resolved prior to rendering an opinion on the financial statements of the SEC registrant.
>
> …
>
> The DTT[L] Global Director of Audit Services, the lead audit partner, and management of the Firm are notified, on a timely basis, if any of the items set forth above come to the attention of the practice review team.  Such items are resolved according to policies established for all practice reviews …[52]

108.    That DTTL required Deloitte Greece to follow, and because Deloitte Greece was obligated to follow, the professional standards, methodologies and protocols and audit procedures and/or manuals promulgated by DTTL, and because DTTL could enforce compliance with those standards and protocols, these factors establish DTTL's control, whether *de facto* and/or *de jure*, over Deloitte Greece such that Deloitte Greece functioned as an agent of DTTL, operating within

---

[52] *Id.*

the course and scope of that agency for DTTL, for the audits it performed of Aegean under the Deloitte brand name during all times complained of herein.

109.    DTTL commits to a set of "Global Principles of Business Conduct that is based on our shared values and reflects our common underlying belief that ethics and integrity are fundamental and non-negotiable."  These Global Principles have been adopted by DTTL and each member firm.  These global principles include, among others, the following:

- We are straightforward and honest in our professional opinions and business relationships.

- We are committed to providing quality services by bringing together the breadth and depth of our resources; experience and insights to help clients address their needs and problems.

- We comply with applicable professional standards, laws and regulations and seek to avoid actions that may discredit ourselves or our professions.

- We understand the broader impact that our work has on society, our people, and our clients, and we conduct business with those interests in mind.

- We are committed to earning and sustaining the public's trust and confidence in the work we do.

- We foster a culture of appropriate professional skepticism and personal accountability which supports clients and drives quality in the services we provide.[53]

110.    In fact, DTTL has a history of asserting oversight and control over member firms as noted in prior litigation:

(a)    DTTL had control over the acceptance and rejection of engagements by member firms and required use of the company name.  DTTL's rules prohibited member firms from suing each other and required that one

---

[53] *A global approach to ethics and compliance Global Principles of Business Conduct*, Deloitte (2016), https://ecode.deloitte.com/codedetails/4 (last visited Jan 26, 2019).

member-firm accept client work referred from another member firm. DTTL could arrange, with the approval of the transferring firm, for the transfer of employees from one member-firm to another. DTTL played also a substantial role in the legal and risk management affairs of member firms. Member firms generally did not have in-house legal counsel but relied instead on DTTL's legal staff. DTTL instructed auditors to refer press inquiries to DTTL and, where lawsuits naming a member firm were threatened or filed, DTTL lawyers reviewed the work papers of that member firm. In addition, DTTL required member firms to purchase specified levels of insurance coverage.

(b) Further, to achieve the similarities across Deloitte member firms, they regularly cross check each other's work to ensure quality, and they cooperate and join together under the direction of a single partner to provide audit services for international clients. Partners and associates of member firms regularly transfer among Deloitte member firms and attend DTTL meetings.

(c) DTTL's Professional Practice Manual states that "'differences of opinion between Member Firms . . . should be resolved' by referring such matters 'to the Chairman and Chief Executive for resolution.'"

111. Similarly, DTTL controls its foreign affiliates for audit work that such member firms undertake for U.S. issuers, as revealed by the following excerpts from Inspection Reports of Deloitte U.S. for the years 2016 and 2012 for certain of its foreign affiliates (quotes below do not identify or refer to Deloitte Greece):

(a) 2016 PCAOB Inspection Report of Deloitte U.S.:

D.2.d.  <u>Review of Processes Related to a Firm's Use of Audit Work that the Firm's Foreign Affiliates Perform on the Foreign Operations of the Firm's U.S. Issuer Audits</u>.

The inspection may review the firm's policies and procedures related to its supervision and control of work performed by foreign affiliates on the firm's U.S. Issuer audits, review available information relating to the most recent internal inspections of foreign affiliated firms, interview members of the firm's leadership, and review the U.S. engagement teams' supervision concerning, and procedures for control of, the audit work that the firm's foreign affiliates performed on sample audits.[54]

(b) 2011 PCAOB Inspection Report of Deloitte U.S.:

In connection with a foreign affiliated firm's audit of an issuer, the Firm tested certain accounts of a subsidiary of the issuer, including the subsidiary's inventory and the related controls.  The subsidiary held certain inventory on a consignment basis.  The Firm failed to obtain sufficient appropriate audit evidence to fulfill the objectives of its role in the audit.  Specifically, the Firm failed to identify and test any controls over the subsidiary's identification of, and accounting for, consigned inventory.  In addition, given the deficiency, the Firm failed to sufficiently test the subsidiary's rights to inventory included in its accounts in that it did not have a basis to rely on the completeness of the population from which it made its selections for testing the subsidiary's rights to inventory.[55]

112.    In 2004, the PCAOB established a registration system and inspection and enforcement programs for non-U.S. accounting firms that audit or play a substantial role in the audit of foreign issuers.[56]   These rules were intended to improve audit quality in foreign

---

[54] 2016 PCAOB Inspection of Deloitte & Touche LLP, PCAOB Release No. 104-2017-198 (Nov. 28, 2017), https://pcaobus.org/Inspections/Reports/Documents/104-2017-198-Deloitte.pdf.

[55] 2011 PCAOB Inspection of Deloitte & Touche LLP, PCAOB Release No. 104-2012-271 (Nov. 28, 2012), https://pcaobus.org//Inspections/Reports/Documents/2012_Deloitte_Touche%20LLP.pdf.

[56] Final Rules Relating to the Oversight of Non-U.S. Public Accounting Firms, PCAOB Release No. 2004-005 (June 9, 2005), https://pcaobus.org/Rulemaking/Docket013/2004-06-09_Release_2004-005.pdf.

jurisdictions.  However, the efficacy of such oversight has been questioned as Deloitte has been

subject to a significant number of fines and sanctions since 2002 culminating in the largest fine (at

that time) imposed by the PCAOB in 2016 against Deloitte Brazil.[57]

113.    As a result of the damage to Deloitte's brand, Deloitte's global headquarters has

stated:

> "Integrity in delivering high-quality services is critical to our business, our clients
> and the public interest; it is non-negotiable at Deloitte.  A limited number of
> individuals in member firms have acted in ways that are inconsistent with this
> fundamental requirement.  This is wholly unacceptable, and in each instance, the
> member firm has worked diligently with regulators to address and resolve the issues
> through appropriate compliance, quality control and personnel actions. ***We have
> enhanced our global focus on appropriate compliance and quality control
> measures with enhanced training, communications, monitoring and discipline.
> The lessons learned from these matters have already made our culture
> stronger***."[58]

**b)    PwC**

114.    In its branded capacity, PwC Holds itself out as "One Firm" and acknowledges that

its various lines support its audit services:

> We believe that auditing is a noble profession, underpinned by the need for trust in
> the capital markets and the quality of our audits.  We approach our profession as
> "**One Firm**," enabling us to use the resources and technologies from our non-audit
> disciplines to benefit audit quality.  Our Advisory and Tax lines support our audits
> in areas such as information systems, cybersecurity threats, valuations, and
> complex tax matters.  As "One Firm," we bring our full capabilities and insights to
> our audits when and where they are needed and appropriate. …[59]

---

[57] Press Release, PCAOB, *PCAOB Announces $8 Million Settlement with Deloitte Brazil for
Violations Including Issuing Materially False Audit Reports and 12 Individuals Also Sanctioned
for Various Violations* (Dec. 5, 2016),  https://pcaobus.org/News/Releases/Pages/enforcement-
Deloitte-Brazil-12-5-16.aspx.

[58] Francine McKenna, *At Deloitte, the problems with audit quality and professionalism start at the
top*, MarketWatch (Dec. 10, 2016), https://www.marketwatch.com/story/at-deloitte-the-problems-
with-audit-quality-and-professionalism-start-at-the-top-2016-12-09/print.

[59]    *2018   Transparency   Report*,   PricewaterhouseCoopers   LLP   (Oct.   31,   2018),
https://www.pwc.com/us/en/about-us/assets/pwc-us-fy18-transparency-report.pdf.

115.    In its 2018 Transparency Report, PwC describes its structure such that PwC International acts as the coordinating entity for member firms, makes resources and methodologies available and, in return, expects member firms to be bound by PwC common policies and to maintain the standards of the PwC network:

> "…[T]he PwC network consists of firms which are separate legal entities. … The firms that make up the network are committed to working together to provide quality service offerings for clients throughout the world.  Firms in the PwC network are members in, or have connections to, PricewaterhouseCoopers International Limited (PwCIL), an English private company limited by guarantee. PwCIL does not practice accountancy or provide services to clients.  Rather, its purpose is to act as a coordinating entity for member firms in the PwC network. Focusing on key areas such as strategy, brand, and risk and quality, the Network Leadership Team and Board of PwCIL develop and implement policies and initiatives to achieve a common and coordinated approach among individual firms where appropriate.  Member firm of PwCIL can use the PwC name and draw on the resources and methodologies of the PwC network.  In addition, member firms may draw upon the resources of other member firms and/or secure the provision of professional services by other member firms and/or other entities.  In return, member firms are bound to abide by certain common policies and to maintain the standards of the PwC network as put forward by PwCIL.[60]

116.    According to the Exhibit 4.1 to PwC Greece's PCAOB Application for Registration on Form 1, filed with the PCAOB on or about April 15, 2004 ("PwC Greece PCAOB Form 1"),[61] all member firms adhere to certain common risk and quality policies approved by PwC International, to protect the PwC brand and, where clients are foreign private issuers subject to SEC review, PwC's U.S. National Office provides guidance and data support:

> … As part of belonging to the PwC Global Network, all member firms (including PwC Greece) are obligated to abide by certain common risk and quality policies approved by PricewaterhouseCoppers International Limited and to conduct risk and quality reviews. The PwC Greece audit and quality control standards are set out in our policies.  These policies are based on the common policies referred to above, supplemented to address local

---

[60] *Id.*

[61] *Accounting and Auditing Practice Quality Control Summary*, Ex. 4.1 to PwC Greece PCAOB Form 1, available for download from, https://rasr.pcaobus.org/Forms/FormSummary.aspx?ID=DCAC508EEE8E5A5616D73C2130C8AB4E.

professional standards and regulatory requirements as well as those applicable to the audits of SEC registered audit clients.

…

Due to the complexities associated with cross-border filings inbound into the United States, additional assistance is provided to individual firms and engagement teams whose clients are foreign private registrants. The International Consultation and Review Group (ICRG), which is part of the US Firm's National Office, in conjunction with the Global Capital Markets Group, and selected other individuals, provide technical guidance on material accounting, auditing and SEC reporting issues to engagement teams serving foreign private issuers, and consult on various accounting, auditing, and SEC reporting issues as necessary, or as required under relevant PwC policy.

The technical guidance is maintained in a database (the ICRG Database) that is deployed globally and available for all engagement teams. This technical guidance includes various alerts and presentations, as well as course training materials that were developed and used in a global training course. ICRG has also developed and globally deployed a US GAAS supplemental database. This database provides engagement teams with the additional steps necessary to supplement as necessary the audit procedures that are required by PwC global audit methodology to those required under US GAAS. ICRG also prepares the guidance included in PwC's SEC Volume that is specifically designed for foreign private issuers.

117.     According to PwC U.S.' statement in response to the PCAOB's March 7, 2013, Release No. 104-2013-054, PwC U.S. is committed to audit consistency and quality, and prides itself as being an auditor with global reach:

The Part II comments relate to some of the most complex, judgmental and evolving areas of auditing. ***Our actions relating to those areas, during the 12 months following issuance of the comments and thereafter, have included providing our audit professionals with enhanced audit tools, training and additional technical guidance to promote more consistent audit execution***. We believe that these efforts have been important positive contributors to audit quality at our firm. We are proud of our focus on continuous improvement and of the dedication and high quality audit work performed by our partners and other professionals.

…

***We are one of the world's largest audit practices and a leader in the profession, and we are committed to maintaining our leading role in promoting further improvements in auditing and financial reporting and delivering the highest***

*quality audits in the profession. We look forward to continuing our dialogue with the Board in support of our commitment to audit quality.[62]*

118.    According to PwC U.S.' Audit Quality Report (2018):

Quality audits across the PwC Network are vital to the US firm's brand. We continue to assist PwC Network member firms in enhancing their quality-focused infrastructure and processes, which includes providing materials for annual update trainings in certain territories on US accounting and auditing standards. Our US firm leadership also meets periodically with leaders from other member firms to share learnings and best practices on quality.

…

A PwC Network-led team inspects member firms' reviews of their quality control systems. When areas needing improvement are identified in their reviews, the member firm prepares a remediation plan and the PwC Network monitors its implementation.  Each PwC Network member firm is responsible for completing inspections to assess whether engagements selected for review were performed in compliance with applicable professional standards and policies. The results of these inspections inform the actions taken by the member firm to continue to enhance audit quality. Individual member firms' quality results are considered by US firm partners in planning their audits, where applicable. We continually refine how we use the work of non-US PwC Network firms so that all components of our audits meet US standards (when applicable) and satisfy our own quality expectations.

119.    PwC U.S.' Audit Quality Report further states that:

The PwC Professional is our global leadership development framework, which provides a single set of expectations across our lines of service, geographies, and roles.

…

Aura, the PwC Network's global audit platform, is used by more than 100,000 auditors worldwide across the Network, driving quality and consistency on a global basis.

---

[62] *Statement of PriceWaterhouseCoopers LLP in PCAOB's March 7, 2013, Release No. 104-213-054*, attached to PCAOB Release No. 104-2013-054, *In the Matter of PriceWaterhouseCoopers LLP's Quality Control Remediation Submissions*, https://pcaobus.org//Inspections/Documents/03072013_PwCReportStatement.pdf.

IV.    **BACKGROUND**

A.    **Aegean's Business**

120.    Aegean was founded by Melisanidis in 1995 as a single bunkering station in the Port of Piraeus, Greece.  *See* 2006 Form 20-F.  Over the years, the Company has grown dramatically.  By the beginning of the Class Period in February 2014, the Company was touting that 2013 was its "third consecutive full year of profitability."  *See* Q4 2013 Release.  The following year, the Company announced that 2014 was as a "landmark year" for Aegean as the Company continued "to extend [its] track record of profitability and growth."[63]

121.    The Company routinely touted its "track record of profitability and growth" (*see, e.g.,* 2015 Corporate Annual Report), "strong excellent balance sheet,"[64] and a "dynamic business model [that] distinguish[ed] Aegean from the competitive landscape" (*see, e.g.*, Q4 2013 Release). Aegean stated that it was the "world's largest independent physical supplier of marine fuels and only fully integrated global bunkering company."  *See* 2015 Corporate Annual Report.  By April 2015, shares were trading at an all-time high of $15.53 giving the Company a market capitalization of approximately $750 million.  Securities analysts had Buy ratings based on the Company's ability to generate profits even in a difficult shipping environment.

122.    In a presentation to investors on March 17, 2016 for Q4 2016, the Company touted its track record of profitability in the following graphic:

---

[63] *See* Q4 2014 Release, attached as Ex. 99.1 to March 16, 2015 Form 6-K; Aegean's Annual Report of 2015 ("2015 Corporate Annual Report").

[64] *See, e.g.*, Q2 2015 Release, attached as Ex. 99.1 to August 17, 2015 Form 6-K.



123.    By 2017, Aegean was considered one of the leading independent physical suppliers of marine fuel and lubricants to vessels in port, at sea, on rivers and other waterways around the globe.  Aegean claims to deliver high-grade fuels to customers in over 30 countries and more than 60 ports, utilizing a fleet of owned and chartered vessels and a broad network of supply hubs. Aegean provides a fully integrated supply chain comprised of fuel sourcing, storage (onshore and offshore), vessel-to-vessel delivery and post-delivery customer care.[65]

124.    Aegean's core business is the physical supply of marine fuel (known as "bunkers") to many types of vessels, including container ships, dry bulk carriers, cruise ships, oil tankers and ferries. Vessel-to-vessel delivery is accomplished via a specialized "bunkering" tanker or barge that delivers bunkers directly to a recipient vessel in port, at sea, on rivers or other waterways.

125.    Aegean operates a fleet of bunkering vessels of diverse sizes and types, ranging from inland waterway tankers and barges to ocean-going offshore bunkering tankers.  In return for the services they provide, the Company is paid a flat monthly management fee which steps up

---

[65] Declaration of Tyler Baron, Director of Aegean Marine Petroleum Network Inc., in Support of Chapter 11 Petitions and First Day Motions, No. 18-13374-MEW (Bankr. S.D.N.Y. Nov. 6, 2018), ECF 2; *see also* Aegean, About Us, http://www.ampni.com/ (last visited Jan. 28, 2019); Annual Report of 2016 ("2016 Corporate Annual Report"); 2016 Form 20-F.

annually over the life of the agreement.  Aegean also utilizes land-based storage facilities where it stores marine fuel in terminals to supply bunkering operations, with an aggregate storage capacity of over 1,000,000 cubic meters.  *See, e.g.*, 2015 Form 20-F.

126.   Bunkering is a capital intensive, low-margin business that is dependent on customer relationships, the ability to extend short-term trade credit, competitive sources of product supply, the management of logistical assets, such as vessels and storage tanks, and adequate liquidity to finance working capital.[66]  For context, according to its reports, Aegean has historically generated sales volumes in the range of approximately 10-16 million metric tons of marine fuel per year over the last five years, with sales volumes at the higher end of that range in FY 2016 and 2017.[67]  Sales volumes of this magnitude equate to billions of dollars in total revenue, yet Aegean has historically generated modest positive earnings of only roughly 1% of revenue.  As a physical supplier, Aegean purchases bunker fuel on the spot market or pursuant to supply contracts, takes possession of the inventory for no more than a few weeks in most cases, and then resells and delivers product directly to customers.  *See, e.g.*, 2015 Form 20-F.

127.   As a capital intensive, low-margin business, Aegean is dependent on the ability to extend short-term trade credit and adequate liquidity to finance working capital.  Access to the capital markets (and such liquidity) was crucial to Aegean to sustain adequate fuel inventories to provide to the Company's customers.  During the Class Period, the Company routinely accessed the capital markets to fund operations and expansion.  For example, as of November 2018, the

---

[66] *See A deep insight into bunkering business*, LiveBunkers, http://livebunkers.com/deep-insight-bunkering-business, (last visited Jan. 29, 2019); *Bunkering supply is a low margin business*, Emerson Process Management (2012), https://www.emerson.com/documents/automation/manual-marine-bunker-faster-more-accurately-micro-motion-en-65254.pdf.

[67] *See* 2016 Form 20-F; March 7, 2018 Press Release, attached as Ex. 99.1 to March 7, 2018 Form 6-K.

Company had approximately $855 million in aggregate funded-debt, including: (a) $131.7 million outstanding under its U.S. credit facility; (b) $249.6 million outstanding under a Global credit facility; (c) $206.6 million outstanding under ten secured term loan facilities that, except for two, financed the acquisition of Aegean's fleet; and (d) $267 million outstanding under two issuances of unsecured convertible notes ($94,550,000 of 4.00% Convertible Unsecured Senior Notes due 2018 and $172,500,000 of 4.25% Convertible Unsecured Senior Notes due 2021).  *See* Dec. 15, 2018 Bankruptcy Filing.

128.    During the Class Period, the Company's offices were located in Piraeus, Greece, and New York, New York.  Aegean stated that it oversaw marketing and operations in Greece.  In New York, the Company oversaw financial and other reporting functions in the United States.  *See, e.g.*, 2015 Form 20-F.  President and Principal Executive Officer Nikolas Tavlarios worked out of the New York office and CFO Gianniotis purportedly worked in Greece, in an office adjacent to the Founder.  In connection with the IPO, the Founder agreed to the creation of the New York office to separate responsibilities for the Company's ultimate administration, financial reporting and control functions, including the preparation of SEC filings, and to cause all levels of the Company and its subsidiaries to report up to such principal executive offices.

**B.    Founder's Early Background**

129.    In 2005, Aegean made its first attempt at a public offering, which failed purportedly because of the Founder's history of legal entanglements with Greek authorities discussed below. According to the 2016 Form 20-F, Melisanidis had been "the subject of a variety of proceedings, including two felony and four misdemeanor cases brought in 1999 and 2000 alleging illegal fuel trading, and a felony case brought by the counterparty to a commercial dispute alleging embezzlement, all resulting in acquittal."  Melisanidis was also subject to a 1988 misdemeanor

case alleging complicity in bribery of a civil servant in connection with obtaining a driver's license for a student at a time when Melisanidis operated a driving school and a 1980 misdemeanor case alleging bribery of two players in an amateur soccer game.  These matters resulted in convictions and fines of approximately $928 and $2,330 (in U.S. dollars at the time).  *See* November 24, 2006 IPO Prospectus.

130.    According to Aegean's November 24, 2006 IPO Prospectus, during the 1990s, the Greek customs authorities investigated industry-wide allegations of sham bunkering transactions intended to avoid customs duties and taxes by diverting into the domestic Greek oil market duty free fuel intended for "transit" vessels stopping at Greek ports only for refueling.  This investigation resulted in felony cases against a number of defendants.  In 1999 and 2000, Melisanidis was charged in two felony cases relating to events, which allegedly took place in 1994 and 1995, involving multiple instances of false certifications, forgery, use of forged documents and trafficking in contraband.  These indictments alleged that Melisanidis distributed duty-free fuel intended for transit vessels into the Greek domestic oil market through sham vessel refueling operations, and that he collaborated with customs officials to falsify certificates showing that duty free fuel was delivered to the transit vessels.  The alleged damages based on the amount of taxes and customs duties evaded totaled approximately $1.8 million (in U.S. dollars at that time) for the two cases.  The cases resulted in the acquittal of Melisanidis by the unanimous decisions of the trial courts.

131.    In 2000, a dock workers union filed a criminal complaint against Melisanidis for making threats of violence and slander arising from an explosion that resulted in the death of a worker on a tanker owned by a company of which Melisanidis was a representative.  At the trial in 2003, the union withdrew the complaint.  *See* November 24, 2006 IPO Prospectus.

132.    In 2002, Melisanidis was charged, in a proceeding initiated by a criminal complaint filed in 1992 by the counterparty to a commercial transaction involving the sale of petroleum, with the felony of embezzlement relating to the commercial transaction.  The indictment alleged that, in 1990 and 1991, a company of which Melisanidis was a representative agreed to sell fuel on behalf of the counterparty, to hold the proceeds of such sales in a separate bank account and to manage the funds to pay for fuel required by the counterparty's ships.  The indictment further alleged that approximately $3.8 million (in U.S. dollars at the time) was unlawfully withheld from the counterparty.  Prior to the criminal trial, Melisanidis reached a settlement with the counterparty in the commercial transaction.  After hearing the evidence, including a statement from the attorney for the complainant counterparty that the dispute had been settled out of court and that the counterparty had no further claims against the defendants, the court acquitted Melisanidis.  *See* November 24, 2006 IPO Prospectus.

133.    Further, the November 24, 2006 IPO Prospectus disclosed that the Company was engaged in substantial related-party transactions with entities controlled by Melisanidis, including a marine fuel supply service agreement with Aegean Oil, S.A., and shipping management services by Aegean Shipping, both related companies then owned and controlled by the Melisanidis family.

134.    In 2013, Melisanidis was accused of threatening to "take [the] head off" of a chief executive of a Greek gaming company, according to allegations in the RBM Lawsuit.[68]

135.    As a result of his background, Melisanidis was forced to take extraordinary steps in order to complete its IPO which ultimately commenced on December 13, 2006.  *See* November 24, 2006 IPO Prospectus.  Pursuant to terms in a "Framework Agreement" that was filed with the

---

[68] *See* RBM Complaint; *see also* Kerin Hope, *Greece faces collapse of second key privatization*, Financial Times (June 27, 2013), https://www.ft.com/content/2741ce06-df31-11e2-881f-00144feab7de#axzz2uW9e5fH9.

SEC on November 3, 2006, Melisanidis agreed to step down from the Board and was precluded from joining the Board or naming directors that would serve as Board Chairman or Chairman of the Audit and Nominating Committees.[69]

136.    Melisanidis offered GMC principal Georgiopoulos and his right hand-man, John Tavlarios, a 25% stake in Aegean.  Both agreed to serve on the Board, with Georgiopoulos serving as Chairman.  *See* RBM Complaint.  These additions were intended to add credibility to the offering given the Founder's past.  After the IPO, Melisanidis was forced to step-down as the Company's President and CEO and as Chairman of the Board.  Nikolas Tavlarios (the brother of John Tavlarios) was appointed President and Melisanidis assumed the title of Head of Corporate Development.  Moreover, Melisanidis agreed that the Company should establish its principal executive offices responsible for financial reporting and control functions, including preparation of reports to the SEC, in the United States, rather than Greece.

137.    At the time of the IPO, Deloitte Greece was Aegean's auditor and issued unqualified audit opinions for the Company's consolidated financial statements.  Defendant Deloitte Greece continued to serve as the Company's auditor, issuing audits for Aegean until it was terminated and replaced by PWC Greece on June 20, 2016.

C.    **Convertible Note Offerings**

1.    **2015 Offering of 4.00% Convertible Unsecured Senior Notes due 2018**

138.    On July 3, 2013, the Company filed with the SEC a shelf Registration Statement on Form F-3 ("Form F-3") for the sale of up to $200,000,000 in Aegean securities ("2013 Notes").

---

[69] *See* Amendment No. 2 to Registration Statement (Form F-1) (Nov. 3, 2006); November 24, 2006 IPO Prospectus.

The Form F-3 was signed by Georgiopoulos, Nikolas Tavlarios, Gianniotis, Fokas, Konomos, Koutsomitopoulos, Papanicolaou and John Tavlarios.

139.    On August 20, 2013, the Company filed with the SEC an Amendment No. 1 to its Registration Statement on Form F-3 ("Prospectus"), which was signed by Georgiopoulos, Nikolas Tavlarios, Gianniotis, Fokas, Konomos, Koutsomitopoulos, Papanicolaou and John Tavlarios (together with the Form F-3, the "Shelf Registration Statement").  On October 18, 2013, the Company filed with the SEC a Prospectus Supplement on Form 424B5 ("October 18, 2013 Prospectus Supplement") for the sale of $75 million of 4.00% Convertible Unsecured Senior Notes due 2018.  On October 23, 2013, Aegean issued and sold $86.3 million aggregate principal amount of 4.00% Convertible Unsecured Senior Notes due 2018.

140.    On January 12, 2015, Aegean announced that it would sell $40 million aggregate principal amount of additional 4.00% Convertible Unsecured Senior Notes due 2018 in a registered public offering.[70]  These new notes have the same terms as (other than the issue date and public offering price) the $86.3 million aggregate principal amount of the Company's 4.00% Convertible Unsecured Senior Notes due 2018 that were issued in October 2013.  These notes also have the same CUSIP number and ISIN as the 2013 Convertible Unsecured Senior Notes due 2018 and are fungible with the 2013 Convertible Unsecured Senior Notes due 2018 for trading purposes.  On January 13, 2015, the Company announced that it was increasing the size of the offering to $42 million.[71]  On January 14, 2015, the Company filed with the SEC a Prospectus Supplement on Form 424B5 ("January 14, 2015 Prospectus Supplement") (together, the Shelf Registration Statement, including the Form F-1 and the Prospectus, the October 18, 2013 Prospectus

---

[70] *See* January 12, 2015 Press Release, attached as Ex. 99.1 to January 16, 2015 Form 6-K.

[71] *See* January 13, 2015 Press Release, attached as Ex. 99.2 to January 16, 2015 Form 6-K.

Supplement and the January 14, 2015 Prospectus Supplement are referred to herein as the "Offering Documents").  On January 16, 2015, the Company sold $48.3 million of 4.00% Convertible Unsecured Senior Notes due 2018.

141.    The Company's Form 20-F filings stated that the 2013 Note offering provided that holders of 4.00% Convertible Unsecured Senior Notes due 2018 may convert their notes to common stock at any time on or after May 1, 2018, but prior to maturity.  However, it further provided that holders may also convert their notes prior to May 1, 2018, under the following circumstances: (a) if the closing price of the common stock reaches and remains at or above 130% of the conversion price of $14.23 per share of common stock, or 70.2679 shares of common stock per $1,000 aggregate principal amount of 2013 Notes, in effect on that last trading day, for at least 20 trading days in the period of 30 consecutive trading days ending on the last trading day of the calendar quarter immediately preceding the calendar quarter in which the conversion occurs; (b) during the five consecutive trading-day period after any five consecutive trading-day period in which the trading price per $1,000 principal amount of the 2013 Notes for each day of that period was less than 98% of the closing price of the Company's common stock multiplied by then applicable conversion rate; or (c) if specified distributions to holders of the Company's common stock are made or specified corporate events occur.

## 2.    2016 Private Placement of 4.25% Convertible Unsecured Senior Notes due 2021

142.    On December 13, 2016, the Company issued a press release announcing a proposed offering of $100,000,000 convertible senior notes due 2021 in a private qualified offering to qualified institutional buyers pursuant to Rule 144A ("2016 Notes").[72]  The Company stated that

---

[72] *See* December 13, 2016 Press Release, attached as Ex. 99.1 to December 13, 2016 Form 6-K.

it "intends to use approximately $40 million of the net proceeds from the sale of the Notes to repay a portion of the outstanding short-term indebtedness under the Company's 2013 Secured Multicurrency Revolving Credit Facility, and the remainder for general corporate purposes and working capital, which may include the funding of growth opportunities and the repurchase in the open market, in negotiated transactions or otherwise, of a portion of the Company's outstanding 4.00% Convertible Unsecured Senior Notes due 2018."

143.    The Company's Form 20-F filings stated that the 2016 Note offering provided that the holders of 4.25% Convertible Unsecured Senior Notes due 2021 may convert their notes at any time on or after June 15, 2021, but prior to maturity.  However, it further provided that holders may also convert their notes prior to June 15, 2021, under the following circumstances: (a) if the closing price of the common stock reaches and remains at or above 130% of the conversion price of $14.95 per share of common stock, or 66.9120 shares of common stock per $1,000 aggregate principal amount of 2016 Notes, in effect on that last trading day, for at least 20 trading days in the period of 30 consecutive trading days ending on the last trading day of the calendar quarter immediately preceding the calendar quarter in which the conversion occurs; (b) during the five consecutive trading-day period after any five consecutive trading-day period in which the trading price per $1,000 principal amount of the 2016 Notes for each day of that period was less than 98% of the closing price of the Company's common stock multiplied by then applicable conversion rate; or (c) if specified distributions to holders of the Company's common stock are made or specified corporate events occur.

144.    On December 19, 2016 and January 11, 2017, the Company issued and sold $150.0 million and $22.5 million, respectively, of aggregate principal amount of its 4.25% Convertible Unsecured Senior Notes due 2021.

## V.   **THE COMPANY DEFENDANTS ENGAGED IN THE MASSIVE FRAUDULENT SCHEME TO DEFRAUD INVESTORS**

145.   Throughout the Class Period and for years leading up to it, Aegean's public disclosures portrayed the Company as a successful enterprise with a track record of profitability and a robust balance sheet.  What investors did not know was that Melisanidis, the Officer Defendants and the Outside Directors had engaged in a brazen scheme to loot the Company over *at least* an eight-year time frame by misappropriating hundreds of millions of dollars of the Company's cash and assets and to manipulate the Company's financial results and balance sheets through, among other things, fraudulent accounting entries and falsified and forged documents.

146.   The intent of the scheme was to portray the Company to the investing public as a well run, strong business, with a track record of profitability, robust cash flows and a healthy balance sheet, while at the same time, the Founder and his affiliates personally profited through the theft of hundreds of millions of dollars of the Company's cash and assets and by Meslisanidis' resale of 11,303,031 shares to the Company at artificially inflated prices that netted him nearly $100 million.

147.   As discussed below, the Officer Defendants took numerous manipulative and deceptive acts in furtherance of the scheme to defraud investors and others.  In addition to the issuance of false and misleading statements outlined in detail in Section VII, below, these included (a) creating false accounts receivables to manipulate revenue and income to conceal the misappropriation of Company assets; (b) funneling Company monies to OilTank, a company controlled by Defendant Melisanidis, through inflated contracts and fraudulent pricing for the construction of Fujairah Facility; (c) the misappropriation of approximately $300 million of Company assets; (d) the insider trading; and (e) efforts to conceal the manipulation of Company

assets through a proposed sham acquisition of HEC that would place total voting control of Aegean

in the hands of Defendant Melisanidis.

A.      **Manipulation of Revenue and Income that Misled Investors Regarding the Value of Aegean**

148.    On June 4, 2018, after the market closed, the Company issued its June 4, 2018 Press

Release, in which the Company first revealed that its financial results from FY 2015, 2016 and

2017 were materially false and misleading because the Company had booked hundreds of millions

of dollars in bogus transactions.  In particular, the Company stated:

> Based on the preliminary findings of the review, the Audit Committee believes that approximately $200 million of accounts receivable owed to the Company at December 31, 2017 will need to be written off. These amounts are currently due from four counterparties that were reflected in the Company's financial statements as of December 31, 2017. There was approximately $172 million as of December 31, 2016 and $85 million as of December 31, 2015 due from these four counterparties. The transactions that gave rise to the accounts receivable ("the Transactions") may have been, in full or in part, without economic substance and improperly accounted for in contravention of the Company's normal policies and procedures.

> At this time, the Company cannot determine the full impact on the financial statements or how this adjustment will be recorded. In addition, there could be other adjustments that result from the Audit Committee's review that could impact the financial statements.

> …

> A number of individuals employed by the Company across multiple functions who are believed to have been involved in the Transactions have been terminated or placed on administrative leave pending the outcome of the investigation.

149.    In the November 2, 2018 Press Release, the Company provided additional

information adding that the bogus transactions were with related parties and were part of a scheme

to facilitate the misappropriation of the Company's assets by certain Defendants:

> As of December 31, 2017, the Company and/or its subsidiaries had an aggregate of approximately US$200 million in accounts receivable that arose from purported commercial transactions that occurred in 2015, 2016, and 2017. These transactions lacked economic substance as ***the relevant counterparties were shell companies***

***with no material assets or operations and were owned or controlled by former
employees or affiliates of the Company*. *The Audit Committee believes that the
receivables were improperly recorded as part of a scheme to facilitate and conceal
an extensive misappropriation of Company assets channeled to OilTank, but
accounted for as transactions with these shell companies*. The Audit Committee
has further confirmed that the approximately US$200 million of receivables are
uncollectible and will be written off.

…

The employees who directed the scheme, which involved the creation of falsified
and forged documents, including bank statements, audit confirmations, contracts,
invoices and third party certifications, among others, have been terminated.

150.   Further, the Company stated that it believed that the financial impact on restated
periods to be "***material***" and that the revenues and earnings of the Company were "***substantially
overstated***" in FY 2015, 2016 and 2017.  However, the Company stated that, "due to the amount
of work involved in the restatement process, the Company cannot be certain when restated
financial statements for the affected periods will be complete."

151.   The Company stated that it was working to determine the individual and net effect
of the inaccurate accounting entries and the theft of Company assets.  Nonetheless, the Company
stated that previously reported financial results for (a) the FY ended December 31, 2015 and
December 31, 2016 included in the Company's Form 20-F filings for the years then ended; (b) the
interim periods within such fiscal years included in the Company's Quarterly Reports on Form
6-K for such periods; (c) the periods ended March 31, 2017, June 30, 2017, September 30, 2017
included in the Company's Quarterly Reports on Form 6-K for such periods; and (d) related press
releases describing the Company's financial results for such periods, as well as the Q4 of each of
2015, 2016 and 2017 (and the year ended December 31, 2017), could no longer be relied upon and
that the Company intended to restate these consolidated financial statements to reflect the effect
of the fraudulent activities.

152.    Under relevant U.S. Generally Accepted Accounting Principles ("GAAP"), revenue may only be recognized when it is earned and realizable.[73]  Revenue is generally "earned" and "realizable" only when all of the following criteria are met: (a) persuasive evidence of an arrangement exists; (b) delivery has occurred or services have been rendered; (c) the seller's price to the buyer is fixed or determinable; and (d) collectibility is reasonably assured.[74]  Determination of whether these criteria had been satisfied required Aegean's consideration of whether the Company's accounting and related financial reporting faithfully represented the economic substance of its underlying transactions.  Assuming these revenue-recognition criteria were satisfied, Aegean could appropriately recognize revenue under U.S. GAAP.  In these circumstances, U.S. GAAP required the Company to regularly monitor the collectibility of its outstanding accounts receivable[75] and recognize losses for uncollectible balances when losses were deemed to be (a) probable (*i.e.*, likely); and (b) reasonably estimable.[76]

153.    Based on the Company's recent revelations, the Company Defendants knew or were reckless in not knowing that the transactions at issue lacked economic substance.  They therefore also knew and/or reckless in not knowing that related revenue and accounts receivable reported during the Class Period would never be realized and collected.

154.    Further, given the Company's admission that earnings were "significantly overstated," these transactions artificially inflated the Company's reported income.  According to

---

[73] ASC 605-10-S99.

[74] ASC 605-10-S99.

[75] ASC 310-10-35-2 and ASC 450-20.

[76] ASC 450-20-25-2.  ASC 450-20-25-3 clarifies that conditions for recognizing an allowance for doubtful accounts are not intended to be so rigid that they require virtual certainty before a loss is accrued.

the Company, as of September 30, 2017, these accumulated amounts approximated at least $172 million and, in all likelihood, were closer to $200 million.

155.    The transactions also impacted the Company's balance sheet.  As the Company has admitted, its previously reported accounts receivable was materially overstated in violation of U.S. GAAP (a) by an amount between $172 million and $200 million as of each of the three quarterly reporting periods ended September 30, 2017; (b) by an amount between $85 million and $172 million as of each of the four quarterly reporting periods ended December 31, 2016; and (c) by at least $85 million as December 31, 2015.

**B.     Misappropriation of the Company's Cash and Assets that Defrauded Investors**

**1.     Fraudulent Payments in Connection with Fujairah Facility**

156.    As noted above, approximately $300 million of the Company's cash and assets were misappropriated through fraudulent activities.   The principal beneficiary of the misappropriation was OilTank, a company believed to be controlled by Melisanidis and with which Aegean contracted to build an in-land storage facility in the United Arab Emirates ("UAE"), the Fujairah Facility.

157.    On April 27, 2010, Aegean announced that it planned to build the Fujairah Facility.[77]  The in-land storage facility was to be constructed pursuant to a 25-year terminal lease agreement which was assumed by the Company from Aegean Oil Terminal Corporation ("AOTC"), a company owned and controlled by the Melisanidis, for no consideration.[78]  Initially, the total estimated cost of the facility was $105.0 million, and construction was estimated to be

---

[77] Press Release, *Aegean Marine Petroleum Network Inc. Announces Plan to Expand Storage Capacity* (Apr. 27, 2010).

[78] *See* 2012 Form 20-F for the FY ended December 31, 2012, filed with the SEC on April 26, 2013.

completed in the end of Q4 2012, with the payment of the contractual amounts to be made in conjunction with the progress of the construction.

158.    According to the Company's From 20-F filings, by December 31, 2010, Aegean had paid advances for construction of the Fujairah Facility amounting to $11.6 million.  By December 31, 2011, the Company had paid advances for construction of the Fujairah Facility amounting to $40.7 million.

159.    By April 26, 2013, the Company stated that it had paid $62.4 million for construction of the Fujairah Facility.  The estimated total cost of the facility was $110.0 million, of which the Company had paid $99.6 million, with remaining contractual obligations of approximately $10.0 million during 2013.  The construction was expected to be completed by the end of year 2013.

160.    The Fujairah Facility, however, was not completed by the end of 2013.  Moreover, the cost of the facility continued to rise.  In the Company's 2013 Form 20-F for the FY ended December 31, 2013, filed with the SEC on April 25, 2014, the Company stated that it had paid an additional $62.7 million in the year ended December 31, 2013 for the construction of the Fujairah Facility.  This brought the total amount that Aegean paid for construction and other related costs to $151.8 million.   The Company stated that it had remaining contractual obligations of approximately $13.0 million for 2014.  The Company then expected to complete the construction of the new facility by Q2 2014.

161.    During a November 25, 2014 Q3 2014 earnings conference call ("Conference Call") held by Aegean, Georgiopoulos commented: "***There is a $200 million asset that we've been carrying on our books for a couple of years now that hasn't generated any money.***"

162.     In Q4 2014, the Fujairah Facility was completed with storage capacity of 465,000 cubic meters.  In the Company's 2014 Form 20-F, the Company stated that it had paid $61.4 million in the year ended December 31, 2014.  The Company stated that it paid $205.3 million for construction and other related costs during the construction period, as well as capitalized interest of $16.6 million.

163.     In December 2014, the Company transferred the cost incurred of $226,067,000 relating to the Fujairah Facility to "other fixed assets" from "advances for other fixed assets under construction" on its balance sheets.  The Company reported the Cost and Net Book Value of its Storage Facility as $226,067,000 and $225,652,000, respectively.

164.     In the Company's 2015 Form 20-F, the Company reported the Cost and Net Book Value of its Storage Facility as $226,910,000 and $ 221,319,000, respectively.

165.     In the Company's 2016 Form 20-F, the Company reported the Cost and Net Book Value of its Fujairah Facility as $226,910,000 and $216,138,000, respectively.

166.     In the November 2, 2018 Press Release, the Company stated:

> ***The Audit Committee believes up to US$300 million of Company cash and other assets were misappropriated through fraudulent activities.*** The Audit Committee believes that the principal beneficiary of the misappropriation is OilTank Engineering & Consulting Ltd. ("OilTank"), a company based in Fujairah and incorporated on March 15, 2010 in the Marshall Islands. On March 31, 2010 OilTank entered into a contract with Aegean's subsidiary to oversee the construction of the Fujairah Oil Terminal Facility (the "Fujairah Facility"). ***The Audit Committee believes that this contract was used to misappropriate Company funds through inflated contracts and fraudulent pricing.*** The Audit Committee has reason to believe that OilTank is controlled by a former affiliate of the Company (the "Former Affiliate").

167.     Further, the Company acknowledged that the misappropriation of Company assets, and the fraudulent accounting entries and fictitious documentation designed to conceal it, involved over a dozen Company employees, including members of senior management. The scheme

involved the creation of "falsified and forged documents, including bank statements, audit confirmations, contracts, invoices and third party certifications."

168. Based on these admissions, the Company's previously issued consolidated financial statements during the Class Period apparently violated U.S. GAAP in they: (a) materially omitted related-party disclosures required under ASC 850; and (b) materially misstated amounts of up to $300 million misappropriated in connection with the scheme to fraudulently divert the Company's assets to OilTank. In particular, the value of the Fujairah Facility was overstated as an asset on the Company's balance sheets.

169. As to the related-party transactions, U.S. GAAP required that Aegean include disclosures of material related-party transactions, other than compensation arrangements, expense allowances and other similar items in the ordinary course of business in the Company's consolidated financial statements. These disclosures were required to include:

- The nature of the relationships involved;

- A description of the transactions;

- The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change; and

- Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. In this regard, accounts receivable from officers, employees, or affiliated entities must be shown separately and not included under a general heading such as notes receivable or accounts receivable.[79]

170. The U.S. GAAP definition of "related parties" includes "parties with which the entity may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully

---

[79] ASC 850-10-50-1 and 2.

pursuing its own separate interests."  The newly admitted ability of Aegean's "former affiliate" to exert control sufficient to misappropriate amounts of up to $300 million (and no less than $200 million), demonstrates that the "former affiliate" met the definition of a related party under U.S. GAAP during the Class Period.  In a recurring violation of U.S. GAAP, Aegean repeatedly failed to make the related-party disclosures necessary under ASC 850-50 in connection with the fraudulent transactions involving the "former affiliate" related party.

171.    Presentation of misappropriated or stolen assets and cash as either an operating expense or asset is inappropriate under U.S. GAAP.  In this regard, cash and other assets improperly stolen from Aegean did not relate to the general operating activities of the Company. In contrast to the underlying nature of Aegean's transactions, U.S. GAAP recognizes that operating activities generally involve producing and delivering goods and providing services.[80] Nor did the amounts constitute a probable, future economic benefit, consistent with the following FASB definition of an asset: "Assets are probable future economic benefits obtained or controlled by a particular entity as a result of past transactions or events."[81]

## 2.    Fraudulent Prepayments for Future Oil Deliveries

172.    In the November 2, 2018 Press Release, Aegean also acknowledged its uncovering of "additional actions to defraud the Company and/or its subsidiaries, including prepayment for future oil deliveries that were never made."  These fraudulent activities were evident as early 2010 and required recognition in Aegean's consolidated financial statements.  In this regard and while no quantitative values were ascribed to these actions, U.S. GAAP recognizes that companies, including Aegean, should not assume that even small intentional misstatements in consolidated

---

[80] FASB Codification, Master Glossary – Operating Activities.

[81] FASB Statement of Concepts No. 6, Elements of Financial Statements, No. 25.

financial statements, for example those pursuant to actions to "manage" earnings, are "immaterial."

173.    Even absent a quantification of these "additional actions to defraud the Company," Aegean's consolidated financial statements included the following material prepayments to fuel suppliers as follows $0 (as of December 31, 2013); $19,845,000 (as of December 31, 2014); $92,372,000 (as of December 31, 2015); and $50,151,000 (as of December 31, 2016).

174.    In the Company's 2015 Form 20-F, Aegean explained that the decrease in net cash provided by operating activities of $49.7 million was mainly attributable to decreased fuel prices and prepayments to oil suppliers.

175.    Presentation of misappropriated cash as a prepaid asset is inappropriate under U.S. GAAP.  The amounts stolen did not constitute a probable, future economic benefit, consistent with the aforementioned definition of an asset.[82]

176.    The Company Defendants knew and/or were reckless in not knowing that the Company would ultimately never receive future oil deliveries from its fraudulent payments and represented losses (*i.e.*, expenses unrelated to Aegean's purported operations).  Accordingly, Aegean knew or should have known that the Company's consolidated financial statements violated U.S. GAAP.

177.    Given that the fraudulent activities occurred "as early as 2010,"[83] Aegean's consolidated financial statements for (a) the FY ended December 31, 2010, 2011, 2012, 2013, 2014, 2015 and 2016 included in the Company's Form 20-F filings; and (b) each of the respective

---

[82] FASB Statement of Concepts No. 6, Elements of Financial Statements, 25.

[83] *See* November 2, 2018 Press Release.

interim reporting periods between March 31, 2010 and September 30, 2017, included in the Company's Quarterly Reports on Form 6-K, were materially false, misleading and unreliable.

### C. The $100 Million Sale of the Founder's Stake in Aegean that Defrauded Investors

178.    As noted above, before the market opened on August 17, 2016, the Company issued its August 17, 2016 Press Release announcing that "an independent committee" of the Board had authorized the repurchase of the 11,303,031 million shares currently owned by the Company's Founder.  Under the terms of the authorization, the Company agreed to repurchase the shares at a price of $8.81 per share, based on the close of trading on August 16, 2016 (approximately $100 million).  The total repurchase represents approximately 22% of Aegean's shares outstanding.  In connection with this announcement, Melisanidis agreed to step down from his role as Head of Corporate Development at Aegean, effective immediately.  He would, however, continue on as a consultant to the Company.

179.    In the press release, Nikolas Tavlarios stated "We believe this sizeable repurchase of the Company's shares underscores the Board's confidence in Aegean's prospects, and will provide meaningful and immediate earnings accretion for all Aegean shareholders…. We are fortunate to have a solid balance sheet and strong free cash flow, which provide us the opportunity to repurchase shares while continuing to invest in our business to drive continued growth and shareholder value." *See* August 17, 2016 Press Release.

180.    Melisanidis also stated in the press release that "I am honored to have played a role in Aegean's evolution, and I am proud that today the Company is a dynamic leader in the maritime shipping and bunkering industries.… I look forward to continuing to work closely with the leadership team as an advisor and to watching Aegean continue on its trajectory of growth and success."

181.   When the market opened on September 19, 2016, the Company issued its September 19, 2016 Press Release, announcing that it had closed on its previously mentioned repurchase of 11,303,031 shares on September 15, 2016.

182.   On August 25, 2016, a *TradeWinds.com* article concerning the repurchase quoted Nikolas Tavlarios as stating, "It's something [Melisanidis] wanted to do.  We were able to find an appropriate point to do it.  The company had good strength on its balance sheet…. It worked out well for him, for us and for the investors.  Everyone wins."[84]

183.   On September 20, 2016, after the close, the Company issued a press release announcing that it "successfully renewed its $1 Billion Secured Global Borrowing Base Multicurrency Revolving Credit Facility."[85]   In addition, Aegean also announced that it had renewed its $250 Million Secured U.S. Borrowing Base Revolving Credit Facility (the "U.S. Borrowing Base") on "improved terms."  Nikolas Tavlarios touted, "We are pleased to reach this agreement with our lenders as we believe it provides Aegean with ample financial flexibility to continue executing our strategy."  Gianniotis stated "We believe that the decision by our bank lenders to renew and contribute to the credit facilities underscores their confidence in the strength of our global platform and ability to generate significant value.  We appreciate their continued support as we execute our strategy, serve our global customers and seek to drive profitable growth."

//

//

---

[84] Joe Brady Stamford, *Aegean Marine president expects 'no quick shift' on M&A activity, TradeWinds* (Aug. 25, 2016), https://www.tradewindsnews.com/weekly/774348/aegean-marine-president-expects-no-quick-shift-on-manda-activity.

[85] *See* September 20, 2016 Press Release, attached as Ex. 99.1 to September 20, 2016 Form 6-K.

184.    In response to the announcement, Jefferies issued an August 17, 2016 analyst report reiterating its Buy rating noting that the "repurchase of its founder's shares reflects the Company's strong balance sheet and cash flow."

185.    On November 16, 2016, after the market closed, Aegean issued its Q3 2016 Release announcing its Q3 2016 financial results, attached as Ex. 99.1 to its November 17, 2016 Form 6-K. In this Q3 2016 Release, Gianniotis reassured that "During the quarter we strengthened our financial flexibility with the renewal of our $1 billion credit facility on improved terms."

186.    During the Company's Q3 2016 Conference Call on November 17, 2016, Gianniotis stated that total debt was $756 million and "net debt increased by $64.5 million as we used cash to buy back shares from our founder."

187.    On December 13, 2016, after the market closed, the Company revealed in its December 13, 2016 Form 6-K that the Company was not in compliance with the covenants in its debt agreements.  As a result, on November 4, 2016, the Company had obtained a waiver from the lenders under its 2013 Secured Multicurrency Revolving Credit Facility ("2013 Credit Facility") with respect to the application of a covenant thereunder requiring the Company to maintain a "Borrowing Base Amount" (as such term is defined therein) of at least zero.  The margin interest rate applicable to Tranche C of this facility was temporarily increased from 2.0% to 3.5% during the waiver period.  The Company stated that the waiver would expire on December 20, 2016, unless earlier cured in accordance with the terms of the waiver.  To cure this violation, the Company stated that it expected that it would satisfy the Borrowing Base Amount requirement upon the closing of the offering of the 4.25% Convertible Senior Unsecured Notes due 2021. According to the 2013 Credit Facility agreement, the "Borrowing Base" is the aggregate of cash, inventory and receivables, and the "Borrowing Base Amount" is the "Base Currency Amount of

the aggregate of the Borrowing Base calculated under the agreement."  "Borrowing Base Amount" was required to be zero or a positive number at all times.

188.    Also, after the market close on December 13, 2016, the Company announced in its December 13, 2016 Form 6-K that it intended to offer $100,000,000 in the 4.25% Convertible Senior Unsecured Notes due 2021 in a private offering to qualified institutional buyers pursuant to Rule 144A.  The Company stated that it intended "to use approximately $40 million of the net proceeds from the sale of the Notes to repay a portion of the outstanding short-term indebtedness under the Company's [2013 Credit Facility], and the remainder for general corporate purposes and working capital."  On December 14, 2016, before the market opened, the Company announced that it was upsizing the offering to $150,000,000.

189.    In response to this news, Aegean common shares fell from $12.20 to close at $10.45 per share (a decline of 14% or $1.75 per share) on December 14, 2016, on heavy volume.  On May 16, 2017, after the market closed, Aegean filed its 2016 Form 20-F with the SEC disclosing for the first time that, shortly after the Company repurchased the Founder's shares, on October 24, 2016, the Company entered into a loan agreement with Grady Properties Corporation SA ("Grady Properties"), a company owned by relatives of the Founder, for up to $25 million at a 6% interest rate (almost 2 points higher than the 4.25% Convertible Unsecured Senior Notes Due 2021 it issued in December).  As of December 31, 2016, the balance under this related-party credit facility was $20 million.

190.    Contrary to senior management's contention that the Company's balance sheets were in a strong position to handle the share repurchase, the $100 million repurchase created a severe liquidity problem behind the scenes because the repurchase caused the Company to violate the terms of its line of credit, according to the HEC Lawsuit filed on March 8, 2018.  As a result,

the Company was forced to borrow the $20 million from a related party to the Founder, Grady Properties (headquartered in the Founder's building in Greece also housing Aegean's offices), at a high rate of interest.  The Company was also forced to conduct a private placement of Convertible Notes, further diluting Aegean's current shareholders.  This additional revelation confirms that the Company's statements that the its balance sheets were sufficient to support the repurchase were false and misleading when made.

### D.    Acts Taken to Conceal the Massive Fraudulent Scheme with the HEC Acquisition and the Efforts to Block this Acquisition

191.    According to the Company's 2016 Form 20-F filings, after the Company repurchased the Founder's stake, Georgiopoulos became the largest shareholder in the Company with 13.7% of the shares outstanding.  The remaining officers and directors had 3.0% of the Company's shares.   Thus, insiders no longer held sufficient shares to alone constitute a quorum for a shareholder vote.  This gave outside investors a greater stake and ability to influence the Company.  For example, Senvest Management and Towle & Co. became the next two largest shareholders with 11.9% and 5.6%, of the Company's shares, respectively.

192.    Unknown to the investing public, on April 25, 2017, one member of the Activist Investors Committee sent a letter to Georgiopoulos highlighting deficiencies in the Company's financing structure and corporate governance and suggested changes to the composition of the Board.  *See* RBM Complaint.

193.    On May 23, 2017, the Company surprised the market when it reported in its Q1 2017 Release earnings per share that were significantly below the street estimates.  The Company attributed the earnings miss to "increased competition across operations and continued challenging market dynamics."  Aegean common shares collapsed the following three trading sessions to close at $5.10 on May 26, 2017.

194.    On June 1, 2017, Nikolas Tavlarios, who succeeded the Founder as President after the IPO, suddenly resigned "by mutual agreement."  According to a filing in the Supreme Court of the State of New York, Tavlarios entered into an undisclosed "Settlement Agreement" effective May 31, 2017.

195.    On June 8, 2017, at the annual shareholder meeting, Georgiopoulos and John Tavlarios failed to receive a majority of votes for their re-election to the Board.[86]  Shortly thereafter, on June 16, 2017, Georgiopoulos and John Tavlarios resigned from the Board.  *See* June 16, 2017 Press Release.  This left the Board with only four members.  Two members had been appointed almost 10 years earlier at the time of the IPO: Papanicolaou and Fokas, who was also Aegean's General Counsel.  The other two Board members, Koutsomitopoulos and Konomos, were appointed in 2008.  Papanicolaou was named interim Chairman of the Board upon the resignation of Georgiopoulos.

196.    Unbeknownst to investors, on December 20, 2017, the Activist Investors Committee, sent a letter to Papanicolaou objecting to (a) a recent suggestion that the Company would consider reducing the size of the Board to four members; (b) continuing related-party transactions with the companies controlled by the Founder; (c) the repurchase of the Founder's shares prior to a 48% decline in the Company's stock price; and (d) the move of the Company's executive functions, including financial and control, to the very same offices in Piraeus as the Founder's other entities.  The Activist Investors Committee also complained that capital expenditure projects had "destroyed an immense amount of shareholder value," and, in particular, the Activist Investors Committee argued that Aegean's share price would be well more than double its present level had the Company not constructed the Fujairah Facility in the UAE.  Based on its

---

[86] *See* June 1, 2017 Form 6-K.

concerns over corporate governance and financial management of the Company, the Activist Investors Committee indicated in the letter that it would be nominating four independent director candidates to the Board at the 2018 Annual Meeting (which typically was held in June).  *See* Activist Shareholder Letter.

197.    Under pressure from outside shareholders pushing for the election of new independent directors who would be in position to discover the fraudulent activities that had been ongoing at Aegean for 8 years or more, senior managers and employees along with the Board and the Founder quickly took action to attempt to continue to conceal the Massive Financial Fraud. On February 20, 2018, the Company surprised the market by announcing, in its February 20, 2018 Press Release, that it had entered into a transaction to acquire HEC, a closely-related company owned by the Founder and his family, for consideration totaling $367 million including the assumption of certain indebtedness, which consideration is payable in the form of a combination of (a) debt; (b) the assignment of certain accounts receivables; (c) cash; and (d) shares of Aegean common stock, which would represent approximately 33% of the issued and outstanding common stock of Aegean after giving effect to the issuance.  The HEC Acquisition was approved by a Special Committee of the Board which included Konomos, Papanicolaou and Koutsomitopoulos. The press release indicated that the Special Committee was advised by "independent financial advisor, Clarksons Platou Securities, Inc.," who the Company had used as a manager for its $42 million 4.00% Convertible Unsecured Senior Note Offering.  As a result of the purchase price for HEC, the Founder and his family would receive 33% of the outstanding stock of Aegean, would designate three nominees (including the Founder's son) for appointment to the Board and would recommend an independent nominee to the Board.  This 33% stake would provide the Founder

with sole ability to form a quorum for shareholder votes pursuant to the Second Amended and Restated Bylaws.

198.    In response to this news, shares of Aegean fell from $4.45 to close on February 21, 2018 at $2.75 per share (a decline of $1.70, or 38%), on heavy volume.  On February 22, 2018, shares fell further to close at $2.55 per share (a decline of 7% or $0.20), on heavy volume.

199.    Also, in response to the proposed HEC Acquisition, a Stifel analyst downgraded the Company and cut the price target from $8.00 to $2.50 per share on February 23, 2018.  The analyst stated that the proposed transaction "takes the cake" in terms of questionable deals, adding "it is hard to even fathom how any transaction could possibly be worse."  Among the reasons he disliked the deal, the Stifel analyst cited the fact that Aegean is issuing equity "at the worst possible time … to the one person in the world the company should most avoid dealing with," and that they would be paying "at least 300% more than even a conservative fair value."  By giving the Founder 20 million shares, the Stifel analyst believed that Aegean would be able to "appoint 'friendly' board members who *would not "rock the boat" and "allow shady related party transactions" to continue* at expense of public shareholders."

200.    The Stifel analyst further criticized the transaction's timing in relation to the shareholder vote, noting that the slate of directors nominated by the Activist Investors Committee was "of the highest quality and experience" and "the only reason for not accepting these board members and putting forward a separate group including [the Founder's] son, would be to *protect some questionable dealings*."

201.    According to the Company's February 22, 2018 Form 6-K, "Pursuant to the terms and conditions of the Purchase Agreement, in consideration for the Sale Shares,  the Sellers [of HEC] will receive aggregate consideration of approximately $367 million valued as of the date the

Purchase Agreement was executed (including the assumption of certain indebtedness), consisting of: (i) *the assignment of approximately $199.6 million in certain accounts receivable on a non-recourse basis by a subsidiary of the Company[Aegean]*;[87] (ii) a $25 million unsecured two-year note issued by AMPNI [Aegean] bearing 4% interest per annum; (iii) $15 million in cash, to the extent AMPNI's [Aegean's] cash resources are sufficient, or up to $15 million in an unsecured two-year note issued by AMPNI [Aegean] bearing 4% interest per annum; and (iv) 20,026,775 shares of the Company's common stock, par value $0.01 per share, as may be adjusted to represent 33% of the issued and outstanding common stock of the Company, after giving effect to the issuance."

202.    During a February 21, 2018 Conference Call to discuss the acquisition of HEC, an analyst from Clarkson's, John Carlo Gandolfo, queried: "And then lastly, before I turn it over, something kind of jumped out in regard to the actual – *your consideration was that you're able to use around $200 million of receivables with the transaction*.  Was there any discount on that versus the balance sheet figure? And also, is there an impact towards the current working capital facilities in terms of maybe a minimum working capital balance going forward?"  Gianniotis respond: "Regarding discounts, there is no discount. *It's the face value of the receivables* and as reported on the balance sheet.  And no – it has no effect on the global facility, because those receivables are ineligible as called under the facility agreements, or in other words, they are not part of the global facility agreement.  They are financed by equity."

203.    On March 8, 2018, certain shareholders from the Activist Investors Committee, RBM Holdings, initiated a lawsuit against Aegean and its four directors (Konomos, Papanicolaou,

---

[87]  On June 4, 2018, the Company disclosed that "approximately $200 million of accounts receivable owed to the Company at December 31, 2017" were without "economic substance" and had to be written off.

Fokas and Koutsomitopoulos) seeking to enjoin the HEC Acquisition in the United States District Court for the Southern District of New York.  *See* RBM Complaint.

204.    According to the RBM Lawsuit, the HEC Acquisition was intended to thwart the appointment of new independent directors and stack the board with additional "friendly directors." Further, the HEC Acquisition was approved by conflicted directors and would massively dilute and disenfranchise current shareholders to "lin[e] the pockets" of the Founder.  *See* RBM Complaint.  The RBM Lawsuit asserted that the purchase price for HEC was "at least 300%" of what HEC was worth and that the HEC Acquisition "siphon[ed] away much of the value of its equity stake in Aegean" to the Founder.  *Id.*

205.    The RBM Lawsuit also averred that, even though the Founder stepped down as the Head of Corporate Development after the sale of his interest to the Company, he continued to exercise control over the Company in a number of ways: (a) he was a listed as a "Corporate Consultant" on the Company's organizational chart "at the same level as then-President and CEO, Nikolas Tavlaros"; (b) "[u]pon information and belief, he has retained the authority to terminate employees and has exercised this authority"; (c) Aegean and a number of the Founder's companies, including HEC, operate of the same building in Greece which is owned by the Founder; (d) the Founder's personal office is located next to the offices of Director Fokas (who is also Aegean's General Counsel) and former Aegean CFO, Gianniotis; (e) "[o]n information and belief, [the Company's] employees in Greece also work for [the Founder's] other companies, though their salaries are paid by [Aegean]"; (f) even after the Founder sold his Aegean stake in 2016, the Autumn 2017 issue of Aegean News, a magazine published by the Founder, continued to list Aegean under his umbrella of companies and Aegean was identified as "one of the most dynamically developing divisions of the Aegean Group"; and (g) "[u]pon information and belief,

that [Melisanidis] personally appointed three of [Aegean's] four [remaining] Board members." *See* RBM Complaint.

206.    The RBM Lawsuit further alleges that the Founder funneled cash to Aegean directors and officers.  For example, the RBM Lawsuit alleges that: (a) Fokas was appointed first deputy chair of OPAP, a Greek gambling monopoly owned by the Founder; (b) Fokas maintains a private law practice, which is paid by Aegean and "on information and belief, [by] other Melisanidis entities"; (c) Gianniotis was "engaged in the financings of Melisanidis's non-affiliated companies; and (d) "other Aegean Marine Directors have similar cozy, symbiotic relationships with Melisanidis and his various entities." *See* RBM Complaint.

207.    The RBM lawsuit further alleges that that the Founder benefited from related-party transactions to the detriment of the Company including: (a) the $100 million repurchase of Melisanidis' Aegean shares; (b) an October 2016 $20 million bridge-loan from a Melisanidis-owned company, Grady Properties, which was prompted by the $100 million repurchase; (c) an April 2005 agreement entered into between Aegean and Melisanidis-owned Aegean Oil S.A. requiring the Company to purchase fuel exclusively from Aegean Oil S.A. in Greece whereby Aegean Oil S.A. acted as an intermediary in such transactions at above-market transfer pricing benefiting Aegean Oil S.A. at the expense of the Company; (d) $205 million in payments from Aegean via its subsidiary AOTC to OilTank for the construction and related costs related to the Fujairah Facility; and (e) Aegean vessels chartered by HEC for well below market rates.  *See* RBM Complaint.

208.    The RBM Lawsuit alleges that, when issues concerning the governance of the Company were discussed with Konomos on November 27, 2017, Konomos "express[ed] his concern that Melisanidis might engineer a purchase of another Melisanidis-owned company by

Aegean in order to regain Aegean voting stock and ensure that no independent directors would be appointed." *See* RBM Complaint.  Further, the RBM Lawsuit alleges that, on February 26, 2018, when a member of RBM spoke with Konomos, Konomos "acknowledged that the transaction would be a problem for current shareholders, stating frankly that, if the transaction closes, '*You'll be f\*\*k\*d.*'"  *Id.*

209.    On March 12, 2018, the Honorable Loretta A. Preska of the Southern District of New York held a hearing and entered a TRO enjoining the HEC Acquisition.  During the hearing, Judge Preska found that "the timing of the transaction is highly suspect[;] [a]fter receiving notice of the [Committee's] decision to nominate a competing slate of directors, the board scheduled the acquisition to close before the annual meeting."  Moreover, Judge Preska stated that based on the papers, the Founder "stands on both sides of the transaction" insofar as he "he exercises *de facto* control over Aegean, the proposed acquirer, and exercises control over the proposed acquiree" and there are "interconnections between the three members of the independent committee and [the Founder] and his other companies."  *See* TRO Transcript.

210.    On March 16, 2018, the Court extended the TRO for an additional 14 days noting (a) that many of the documents necessary for the preliminary injunction hearing were in Greece and that such documents would not be produced absent judicial intervention; and (b) two Greek-resident members of the Special Committee would not appear for deposition in the United States and that travel to Greece would be necessary.[88]

211.    On March 20, 2018, the Court stayed the proceeding pending the parties' attempt to resolve the dispute.  On March 27, 2018, Aegean announced the termination of the HEC

---

[88] Order, *RBM Holdings LLC v. Aegean Marine Petroleum Network, Inc.*, No. 1:18-cv-02085-LAP (S.D.N.Y. Mar. 16, 2018), ECF No. 18.

Acquisition.[89]  On April 17, 2018, the Company announced the resignation of Gianniotis, Aegean's CFO since May 2008.  Then, on May 2, 2018, the Company announced that it had settled the HEC Acquisition lawsuit and had agreed to appoint three additional members the Board: Baron, Moore and Bartoszek.  These members joined existing board members Papanicolaou, Konomos, Koutsomitopoulos and Fokas.

212.    On May 22, 2018, the Company announced that Moore had been appointed Chairman of the Board, that the Audit Committee was reviewing the Company's annual reporting process and that the Company's principal offices currently located in a building owned and operated by the Founder would be re-located.[90]

213.    On June 4, 2018, after the market closed, the Company disclosed in its June 4, 2018 Press Release that the Audit Committee, solely comprised of the three recently elected independent members (Baron, Moore, Bartoszek), had found that "***approximately \$200 million of accounts receivable owed to the Company at December 31, 2017 will need to be written off***" and that "the transactions that gave rise to the accounts receivable … may have been, in full or in part, ***without economic substance and improperly accounted*** for in contravention of the Company's normal policies and procedures…."

## VI.    THE COMPANY DEFENDANTS' U.S. GAAP VIOLATIONS

214.    According to the Company's Form 20-F filings during the Class Period, Aegean states that its consolidated financial statements were prepared in accordance with U.S. GAAP.  By engaging in clear violations of GAAP and the rules established by the SEC, Aegean masked the Company's true financial condition and operating results and created the illusion of a much

---

[89] *See* March 27, 2018 Press Release, attached as Ex. 99.1 to March 28, 2018 Form 6-K.

[90] *See* May 22, 2018 Press Release, attached as Ex. 99.1 to May 22, 2018 Form 6-K.

stronger business.   Accordingly, Aegean's financial condition and operating results reported during the Class Period were materially false and misleading.

215.   As a registrant with the SEC, Aegean was responsible for issuing and fairly presenting its consolidated financial statements in accordance with U.S. GAAP and SEC Rules. In this regard, SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that consolidated financial statements filed with the SEC which are not prepared in compliance with U.S. GAAP are presumed to be misleading or inaccurate.

216.   U.S. GAAP is the set of conventions, rules and procedures, which constitute the professional standards of the accounting profession.   During the Class Period, authoritative U.S. GAAP were promulgated by the Financial Accounting Standards Board ("FASB") and contained within the FASB's Accounting Standards Codification ("ASC").   U.S. GAAP brings consistency, conformity and, over time, comparability to financial reporting.   It includes not only broad guidelines of general application, but also detailed practices and procedures.   Those conventions, rules and procedures provide a standard by which to measure financial presentations.

217.   U.S. GAAP is established in recognition of the following financial reporting objectives:[91]

- To "provide financial information about the reporting entity that is useful to existing and potential investors, lenders and other creditors in making decisions about providing resources to the entity";

- To provide "information about the financial position of a reporting entity, which is information about the entity's economic resources and the claims against the reporting entity";

---

[91] *See Statement of Financial Accounting Concepts No. 8*, *Conceptual Framework for Financial Reporting* – Chapter 1, *The Objective of General Purpose Financial Reporting*, and Chapter 3, *Qualitative Characteristics of Useful Financial Information* (A Replacement of FASB Concepts Statements No. 1 and No. 2), Financial Accounting Standards Board (Sept. 2010), https://www.fasb.org/resources/ccurl/515/412/Concepts%20Statement%20No%208.pdf.

- To "provide information about the effects of transactions and other events that change a reporting entity's economic resources and claims";

- To provide "information that is useful in making economic decisions, … which would also be helpful in assessing how management has fulfilled its stewardship responsibility"; and

- To provide "relevant financial information [that] is capable of making a difference in the decisions made by users."

218.    Of particular relevance, the underlying conceptual framework from which U.S. GAAP is derived recognizes that financial information should faithfully represent the phenomena that it purports to represent.  Faithful representation means that financial information represents the substance of an economic phenomenon rather than merely representing its legal form. Representing a legal form that differs from the economic substance of the underlying economic phenomenon cannot result in a faithful representation. To constitute a perfectly faithful representation, the representation must be complete, neutral and free from error.

219.    During the Class Period, Aegean, through its management/directors and external auditors, repeatedly assured investors that the Company's consolidated financial statements as filed with the SEC were fairly presented in accordance with U.S. GAAP.

220.    Aegean's true operating performance including its financial condition was far below the results it reported to investors, creditors and to others.  In reality, the Company's materially false and misleading financial reporting concealed: (a) the misappropriation of assets of up to $300 million by a "former affiliate" through artificially inflated contracts and fraudulent pricing, commencing as early as March 31, 2010; (b) the related fabrication of at least $200 million of accounts receivables from four shell company transactions that lacked economic substance as of and during the three years ended December 31, 2017; and (c) "additional actions to defraud the Company and/or its subsidiaries," including Aegean's cash payments for purported prepaid oil deliveries that were never received.

221.    As now acknowledged by Aegean, these improper accounting practices and manipulations were in direct violation of U.S. GAAP and SEC rules, and rendered Aegean's consolidated financial statements materially false, misleading and unreliable for the following time periods: (a) the FY ended December 31, 2015 and December 31, 2016, included in the Company's Form 20-F filings; and (b) each of the respective interim reporting periods between March 31, 2015 and December 31, 2017, included in the Company's Quarterly Reports on Form 6-K.

222.    Further, given that the acknowledged misappropriation of Aegean's cash and other assets through fraudulent activities occurred "as early as 2010," Aegean's consolidated financial statements were also materially false, misleading and unreliable for the following time periods: (a) the FY ended December 31, 2013, 2014 and 2015, included in the Company's Form 20-F filings, and (b) each of the respective interim reporting periods between March 31, 2010 and December 31, 2017, included in the Company's Quarterly Reports on Form 6-K.

223.    Aegean's statements that it would restate its financial results constitutes an admission by management of the materiality of the misstatements in the Company's previously issued consolidated financial statements.  Specifically, an "error in previously issued financial statements" is generally limited to material items under U.S. GAAP and is defined in the FASB's Codification as follows:  "An error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared."[92]

224.    ASC 250-10-45-23 states that errors are to be corrected through a restatement: "Any error in the financial statements of a prior period" discovered subsequent to their issuance

---

[92] FASB Codification, Master Glossary – Error in Previously Issued Financial Statements.

shall be reported as a prior-period adjustment by restating the prior period financial statements. Restatement requires that:

- The cumulative effect of the error on periods prior to those presented shall be reflected in the carrying amounts of assets and liabilities as of the beginning of the first period presented;

- An offsetting adjustment, if any, shall be made to the opening balance of retained earnings (or other appropriate components of equity or net assets in the statement of financial position) for that period; and

- Financial statements for each individual prior period presented shall be adjusted to reflect correction of the period-specific effects of the error.

225.    Financial statements for each individual prior period presented shall be adjusted to reflect correction of the period-specific effects of the error."  ASC 250-10-45-23.

226.    The requirement to restate errors in previously issued financial statements does not apply to immaterial errors as ASC 250-10-S99 affirms: "Correcting prior year financial statements for immaterial errors would not require previously filed reports to be amended."  ASC 250-10-S99.

227.    Therefore, in accordance with U.S. GAAP, Aegean's restatement conclusion reflects its acknowledgement that for at least those annual and interim reporting periods as of and ended between March 31, 2015 and December 31, 2017:

- GAAP misstatements existed in its previously issued financial statements;

- The misstatements were material; and

- These misstatements resulted from oversight or misuse of facts that existed at the time the previously issued financial statements were originally presented.

## VII.   THE COMPANY DEFENDANTS ISSUED AND CAUSED THE COMPANY TO ISSUE FALSE AND MISLEADING STATEMENTS

### A.   Materially False and Misleading Statements Concerning Aegean's Financial Results in its Quarterly and Annual Filings

228.   As part of the Massive Fraudulent Scheme, Aegean reported materially false financial results in its annual and quarterly financial statements and Defendants materially misrepresented Aegean's financial condition, including: (a) overstating reported revenues; (b) overstating reported income; (c) overstating prepaids and other assets; (d) overstating trade receivables and understating allowance for doubtful accounts; and, as a result, (e) overstating shareholders' equity.

229.   During the Class Period, the Company filed annual Form 20-F filings with the SEC. The Form 20-F reports are as follows:

| Filing Date | Fiscal Period | Signed by | Auditor |
|---|---|---|---|
| 5/16/2017 | FY 2016 | Tavlarios, Gianniotis | PwC |
| 4/28/2016 | FY 2015 | Tavlarios, Gianniotis | Deloitte |
| 5/5/2015 | FY 2014 | Tavlarios, Gianniotis | Deloitte |
| 4/25/2014 | FY 2013 | Tavlarios, Gianniotis | Deloitte |

230.   In its Form 20-Fs issued during the Class Period (and the March 7, 2018 Form 6-K, signed by McIlroy, for FY 2017), the Company reported the following on its income statement:[93]

| Fiscal Period | Total Revenues | Gross Profit | Net Income | Operating Income | GAAP EPS | Adjusted EPS | Operating Expenses | EBITDA |
|---|---|---|---|---|---|---|---|---|
| FY 2017 | $5,674,287 | $290,307 | ($29,290) | $20,082 | ($0.76) | - | $270,225 | $52,519 |
| FY 2016 | $4,076,219 | $353,484 | $51,929 | $94,079 | $1.11 | $1.35 | $259,405 | $125,610 |
| FY 2015 | $4,231,654 | $331,829 | $35,880 | $76,574 | $0.73 | $0.89 | $255,255 | $110,806 |
| FY 2014 | $6,661,801 | $337,094 | $17,639 | $57,916 | $0.37 | $0.79 | $279,178 | $82,019 |
| FY 2013 | $6,334,729 | $285,992 | $27,030 | $48,753 | $0.58 | $0.58 | $237,239 | $83,231 |

---

[93]   Numbers are stated in thousands of U.S. dollars except EPS.

231.    The reported financial results in ¶230 were materially false and misleading because (a) the Company admits that "revenues and earnings of the Company were substantially overstated in the years 2015, 2016 and 2017"; (b) the Company admits that it booked $200 million in accounts receivable from commercial transactions that lacked economic substance in 2015, 2016 and 2017, which were with undisclosed related parties as described in ¶¶148-155, above; (c) the Company overstated its assets and should have taken a charge to income because its valuation of its Fujairah Facility and prepayments for future oil deliveries were overstated due to fraud as described in ¶¶156-177 (including the $300 million misappropriation), above.

232.    In its Form 20-Fs issued during the Class Period (and the March 7, 2018 Form 6-K), the Company reported the following on its balance sheet:[94]

| Fiscal Period | Prepayments to Fuel Supplies | Prepaids and Other Current Assets | Gross Fixed Assets | Accumulated Depreciation | Current Assets | Allowance for Doubtful Accounts | Gross Trade Receivables | Shareholder Equity |
|---|---|---|---|---|---|---|---|---|
| FY 2017 | - | - | - | - | $1,081,093 | $11,179 | $638,037 | $577,838 |
| FY 2016 | $50,151 | $95,885 | $698,866 | $107,426 | $909,252 | $8,647 | $515,260 | $589,533 |
| FY 2015 | $92,372 | $116,004 | $727,527 | $109,328 | $730,950 | $7,278 | $328,837 | $621,526 |
| FY 2014 | $19,845 | $54,901 | $732,622 | $92,196 | $736,328 | $5,851 | $354,223 | $567,416 |
| FY 2013 | - | $38,707 | $700,781 | $95,696 | $896,730 | $2,622 | $469,921 | $543,455 |

233.    These reported financial results in ¶232 were materially false and misleading because (a) the Company admits that it booked $200 million in accounts receivable from commercial transactions that lacked economic substance in 2015, 2016 and 2017, which were with undisclosed related parties as described in ¶¶148-155; (b) even assuming that the commercial transactions were legitimate, the Company knew that the account receivables were uncollectible

---

[94]  Numbers are stated in thousands of U.S. dollars.

because the transactions were with shell companies with no assets or operations and that, as such, these accounts were overstated, and consequently the allowance for doubtful accounts was understated as described in ¶¶148-155, 239-240; and (c) the values of trade receivables and prepayments for future oil deliveries and the Fujairah Facility were overstated (because of the $300 million misappropriation) on the Company's balance sheets as described in ¶¶148-177; and, as a result, (d) its shareholder equity was overstated.

234.    During the Class Period, the Company filed Quarterly Reports on Form 6-K with the SEC.    The Quarterly Reports included press releases, which were contemporaneously disseminated by the Company with the Company's quarterly financial results and are as follows:[95]

| Filing Date | Fiscal Period (Quarter Ended) | Form 6-K Signed by | Quoted in Press Release |
|---|---|---|---|
| 2/26/2014 | Q4 2013 | Tavlarios | Tavlarios, Gianniotis |
| 5/21/2014 | Q1 2014 | Tavlarios | Tavlarios, Gianniotis |
| 8/13/2014 | Q2 2014 | Tavlarios | Tavlarios, Gianniotis |
| 11/24/2014 | Q3 2014 | Tavlarios | Tavlarios, Gianniotis |
| 3/16/2015 | Q4 2014 | Tavlarios | Tavlarios, Gianniotis |
| 5/27/2015 | Q1 2015 | Tavlarios | Tavlarios, Gianniotis |
| 8/17/2015 | Q2 2015 | Tavlarios | Tavlarios, Gianniotis |
| 11/19/2015 | Q3 2015 | Tavlarios | Tavlarios, Gianniotis |
| 3/16/2016 | Q4 2015 | Tavlarios | Tavlarios, Gianniotis |
| 5/24/2016 | Q1 2016 | Tavlarios | Tavlarios, Gianniotis |
| 8/10/2016 | Q2 2016 | Tavlarios | Tavlarios, Gianniotis |
| 11/17/2016 | Q3 2016 | Tavlarios | Tavlarios, Gianniotis |
| 3/1/2017 | Q4 2016 | Tavlarios | Tavlarios, Gianniotis |
| 5/24/2017 | Q1 2017 | Tavlarios | Tavlarios, Gianniotis |
| 8/10/2017 | Q2 2017 | McIlroy | McIlroy, Gianniotis |
| 11/15/2017 | Q3 2017 | McIlroy | McIlroy, Gianniotis |
| 3/7/2018 | Q4 2017 | McIlroy | McIlroy, Gianniotis |

---

[95]  Numbers are stated in thousands of U.S. dollars.

235.    In its Quarterly Reports issued during the Class Period, the Company reported the

following on its income statement:[96]

| Fiscal Period (Quarter Ended) | Total Revenues | Gross Profit | Net Income | Operating Income | GAAP EPS | Operating Expenses | EBITDA |
|---|---|---|---|---|---|---|---|
| Q4 2013 | $1,470,430 | $74,966 | $7,022 | $14,494 | $0.15 | $60,472 | $22,392 |
| Q1 2014 | $1,694,364 | $82,911 | $5,120 | $15,227 | $0.11 | $67,684 | $23,456 |
| Q2 2014 | $1,720,214 | $84,465 | $9,345 | $19,296 | $0.20 | $65,169 | $26,740 |
| Q3 2014 | $1,809,699 | $82,619 | ($4,325) | $4,937 | ($0.09) | $77,682 | $8,929 |
| Q4 2014 | $1,437,738 | $85,168 | $7,499 | $18,456 | $0.16 | $66,712 | $22,894 |
| Q1 2015 | $1,015,103 | $80,622 | $12,224 | $19,995 | $0.25 | $60,627 | $27,807 |
| Q2 2015 | $1,207,707 | $78,481 | $7,148 | $14,760 | $0.15 | $63,721 | $24,052 |
| Q3 2015 | $1,081,508 | $84,409 | $6,797 | $17,692 | $0.14 | $66,717 | $26,150 |
| Q4 2015 | $929,099 | $88,317 | $9,711 | $24,127 | $0.20 | $64,190 | $32,797 |
| Q1 2016 | $752,932 | $80,868 | $11,770 | $18,300 | $0.24 | $62,568 | $27,147 |
| Q2 2016 | $987,556 | $93,379 | $13,533 | $28,879 | $0.27 | $64,500 | $35,459 |
| Q3 2016 | $1,139,556 | $88,440 | $10,629 | $22,525 | $0.22 | $65,915 | $30,546 |
| Q4 2016 | $1,196,175 | $90,797 | $15,997 | $24,375 | $0.41 | $66,422 | $32,458 |
| Q1 2017 | $1,524,258 | $80,333 | $1,371 | $13,866 | $0.03 | $66,467 | $21,938 |
| Q2 2017 | $1,440,659 | $82,246 | $1,714 | $16,233 | $0.04 | $66,013 | $24,206 |
| Q3 2017 | $1,344,125 | $67,885 | ($3,740) | $6,760 | ($0.10) | $61,125 | $15,160 |
| Q4 2017 | $1,365,245 | $59,843 | ($28,635) | ($16,777) | ($0.70) | $76,620 | ($8,785) |

236.    These reported financial results in ¶235 were materially false and misleading

because the Company admits (a) that "revenues and earnings of the Company were substantially

overstated in the years 2015, 2016 and 2017"; (b) that it booked $200 million in accounts

receivable from commercial transactions that lacked economic substance in 2015, 2016 and 2017,

which were with undisclosed related parties as described in ¶¶138-155; and (c) that it overstated

its assets and should have taken a charge to income because its valuation of its Fujairah Facility

and prepayments for future oil deliveries were overstated due to fraud as described in ¶¶148-177

(including the $300 million misappropriation), above.

---

[96]  Numbers are stated in thousands of U.S. dollars except EPS.

237.    In its Quarterly Reports issued during the Class Period, the Company reported the

following on its balance sheet:[97]

| Fiscal Period (Quarter Ended) | Current Assets | Gross Trade Receivables | Allowance for Doubtful Accounts | Shareholder Equity |
|---|---|---|---|---|
| Q4 2013 | $896,730 | $472,543 | $2,622 | $543,746 |
| Q1 2014 | $994,824 | $544,189 | $3,010 | $548,959 |
| Q2 2014 | $1,002,081 | $562,515 | $3,094 | $559,563 |
| Q3 2014 | $935,967 | $545,776 | $3,380 | $557,942 |
| Q4 2014 | $750,415 | $354,459 | $5,851 | $567,416 |
| Q1 2015 | $733,959 | $369,751 | $6,495 | $593,450 |
| Q2 2015 | $750,691 | $432,395 | $7,260 | $601,917 |
| Q3 2015 | $714,849 | $361,412 | $7,012 | $610,203 |
| Q4 2015 | $730,950 | $317,152 | $7,843 | $621,526 |
| Q1 2016 | $740,638 | $343,028 | $8,059 | $634,704 |
| Q2 2016 | $857,570 | $405,399 | $8,604 | $649,415 |
| Q3 2016 | $781,410 | $429,661 | ($7,911) | $565,101 |
| Q4 2016 | $909,252 | $512,398 | $8,647 | $594,230 |
| Q1 2017 | $963,282 | $625,356 | $9,411 | $595,881 |
| Q2 2017 | $960,718 | $564,863 | $10,559 | $600,590 |
| Q3 2017 | $1,003,490 | $590,506 | $10,492 | $599,132 |
| Q4 2017 | $1,081,093 | $638,037 | $11,179 | $577,838 |

238.    These reported financial results in ¶237 were materially false and misleading

because the Company admits (a) that it booked $200 million in accounts receivable from

commercial transactions that lacked economic substance in 2015, 2016 and 2017, which were with

undisclosed related parties as described in ¶¶148-155; (b) that even assuming that the commercial

transactions were legitimate, the Company knew that the account receivables were uncollectible

because the transactions were with shell companies with no assets or operations and that these

accounts and the allowance for doubtful accounts were therefore understated as described in

¶¶148-155, 239-240; (c) that the values of trade receivables, prepayments for future oil deliveries

and the Fujairah Facility (because of the $300 million misappropriation) were overstated on the

---

[97]  Numbers are stated in thousands of U.S. dollars.

Company's balance sheets as described in ¶¶148-177; and, as a result, (d) its shareholder equity was overstated.

**B.      Materially False and Misleading Statements Regarding Account Receivables**

239.    Each of the annual Form 20-F filings stated the following regarding trade receivables:

> ***Trade Receivables and Allowance for Doubtful Accounts***
> We extend credit on an unsecured basis to many of our customers.  There is uncertainty over the level of collectability of customer accounts.  Our management is responsible for approving credit limits above certain amounts, setting and maintaining credit standards, and managing the overall quality of our credit portfolio. We perform ongoing credit evaluations of our customers and adjust credit limits based upon payment history and the customer's current credit worthiness. Accounts receivable are deemed past due based on contractual terms agreed with our customers.
>
> ***We continuously monitor collections and payments from our customers and maintain a provision for estimated credit losses based upon our historical experience with our customers, current market and industry conditions of our customers and any specific customer collection issues that we have identified.***
>
> Accounts and notes receivable are reduced by an allowance for amounts that may become uncollectible in the future.  ***At the end of each reporting period, we calculate an allowance for doubtful accounts based on an aging schedule where we apply set percentages to categories of overdue trade receivables.  These set percentages are based on historical experience and currently available management information on customer accounts.*** Furthermore, we provide appropriate allowances for any specific customer collection issue we identify which allowance is calculated on a case-by-case basis***.  Trade receivables are written off when it becomes apparent based upon age or customer circumstances that such amounts will not be collected.***
>
> We believe the level of our allowance for doubtful accounts is reasonable based on our experience and our analysis of the net realizable value of our trade receivables during each reporting period.  The estimates driving the calculation of our allowance for doubtful accounts have not changed in the past periods and we do not expect these estimates to change in the foreseeable future because they have resulted and we believe that they will continue to result in accurate calculations of our allowance for doubtful accounts.  We cannot guarantee that we will continue to experience the same credit loss rates that we have experienced in the past, since adverse changes in the marine industry or changes in the liquidity or financial position of our customers could have a material adverse effect on the collectability of our trade receivables and our future operating results.  If credit losses exceed

established allowances, our results of operations and financial condition may be adversely affected.

240.    Aegean's statements noted in the preceding paragraph, which were made throughout the Class Period concerning trade receivables, were materially false and misleading because (a) the Company and/or its subsidiaries had an aggregate of approximately $200 million in accounts receivable that arose from purported commercial transactions that occurred in 2015, 2016 and 2017, which lacked economic substance as the relevant counterparties were shell companies with no material assets or operations and were owned or controlled by former employees or affiliates of the Company as described in ¶¶148-155; (b) receivables were improperly recorded as part of a scheme to facilitate and conceal an extensive misappropriation of Company assets as described in ¶¶148-155; (c) the trade receivables were uncollectible and were not written off when it became apparent that they were not collectible as described in ¶¶148-155; and, as a result, (d) the Company had not followed its policy for recording trade receivables and calculating an allowance for doubtful accounts based on an aging schedule.

**C.    Materially False and Misleading Statements Concerning Internal Controls over Financial Reporting**

241.    Each of the annual Form 20-F filings included reports on internal controls over financial reporting:

> Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) promulgated under the Exchange Act and for the assessment of the effectiveness of internal control over financial reporting.
>
> Internal control over financial reporting is defined in Rule 13a-15(f) or 15d-15(f) promulgated under the Exchange Act as a process designed by, or under the supervision of, our ["President and Principal Executive Officer and Chief Financial Officer" or "principal executive and principal financial officers"] and effected by our board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of … financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

- Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets;

- Provide reasonable assurance that transactions are recorded as necessary to permit preparation of … financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors; and

- Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the … financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements.  Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management conducted the evaluation of the effectiveness of the internal control over financial reporting using the control criteria framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) published in its report entitled Internal Control-Integrated … Framework.

242.    In FY 2016, FY 2015 and FY2013, the Company reported that internal controls were "effective":

(a)    FY 2016:

Management, with the participation of our President and Principal Executive Officer and Chief Financial Officer, assessed the effectiveness of the design and operation of our internal control over financial reporting pursuant to Rule 13a-15 of the Exchange Act as of December 31, 2016.  Based upon that evaluation, our President and Principal Executive Officer and Chief Financial Officer concluded that *our internal controls over financial reporting were effective as of December 31, 2016*.

(b)    FY 2015:

Management, with the participation of our President and Principal Executive Officer and Chief Financial Officer, assessed the effectiveness of the design and operation of our internal control over financial reporting pursuant to Rule 13a-15 of the Exchange Act as of December 31, 2015.  Based upon that evaluation, our President and Principal Executive Officer and Chief Financial Officer concluded that *our internal controls over financial reporting were effective as of December 31, 2015.*

(c)      FY 2013:

Management, with the participation of our President and Chief Financial Officer, assessed the effectiveness of the design and operation of the Company's internal controls over financial reporting pursuant to Rule 13a-15 of the Exchange Act as of December 31, 2013.  Based upon that evaluation, our President and Chief Financial Officer concluded that our ***internal controls over financial reporting were effective as of December 31, 2013.***

243.    In FY 2014, the Company reported that its internal controls over financial reporting

were not effective due to the following "material weaknesses":

a)      Our controls over the preparation and review of bank reconciliations did not operate effectively and, as a result, we failed to identify an overstatement of cash and cash equivalents and short-term borrowings caused by a transfer payment within the Company that could not be processed by the bank.

 The impact of the classification error on our consolidated balance sheet and statement of cash flows for the year ended December 31, 2014 included in our earnings release for the three months and year ended December 31, 2014 was (i) an overstatement of cash and cash equivalents of $13.5 million, (ii) an overstatement of short term borrowings of $13.5 million and (iii) an understatement of net cash used in financing activities of $13.5 million.

b)   There was an absence of an effectively-designed control to identify and disclose transactions with new related parties.

The impact of the above design deficiency on the consolidated balance sheet and statement of income for the year ended December 31, 2014 was (i) an overstatement of revenues–third-parties of $9.9 million, (ii) an understatement of revenues–related companies of $9.9 million, (iii) an overstatement of trade receivables of $0.4 million and (iv) an understatement of amounts due from related parties of $0.4 million.

The classification errors discussed above were identified subsequent to the issuance of our earnings release for the three months and year ended December 31, 2014. ***The classification errors were corrected in the audited consolidated balance sheet, statement of income and statement of cash flows for the fiscal year ended December 31, 2014, which are included herein.***

244.    These statements were materially false and misleading because the Company's

internal controls over financial reporting were ineffective for the following reasons (a) up to $300

million of Company cash and other assets were misappropriated through fraudulent activities;

(b) the Company and/or its subsidiaries had an aggregate of approximately $200 million in accounts receivable that arose from purported commercial transactions that occurred in 2015, 2016 and 2017, which lacked economic substance as the relevant counterparties were shell companies with no material assets or operations and were owned or controlled by former employees or affiliates of the Company and thus approximately $200 million of receivables were uncollectible and would have to be written off; (c) receivables were improperly recorded as part of a scheme to facilitate and conceal an extensive misappropriation of Company assets; (d) additional actions to defraud the Company and/or its subsidiaries, including that prepayments for future oil deliveries, which were never made, had commenced as early as 2010; (e) employees who directed the scheme, created falsified and forged documents, including bank statements, audit confirmations, contracts, invoices and third-party certifications; and (f) the Company's founder had access to and control over the Company's electronic and physical files.  As a direct consequence of the foregoing, the Company admitted that its yearly and quarterly financial results for 2015, 2016 and 2017 would have to be restated.  The Company has also admitted that material weaknesses existed in its internal controls over financial reporting as of December 31, 2015, 2016 and 2017 and, consequently, management's annual report on internal controls over financial reporting as of December 31, 2015 and 2016 included in the Company's annual Form 20-F filings and also for the 2017 interim results should no longer be relied upon and would have to be restated.  *See* ¶¶148-155.

### D.    Materially False and Misleading Sarbanes-Oxley Certifications

245.    Along with each annual Form 20-F filing during the Class Period, Nikolas Tavlarios and Gianniotis signed and issued certifications as the Principal Executive Officer and Principal Financial Officer, respectively, pursuant to Section 906 of SOX (the "SOX Certifications").

246.     In these Certifications, Nikolas Tavlarios and Gianniotis certified that the
Company's Form 20-F's filed during the Class Period "fully complie[d] with the requirements of
Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that the "information contained
in the Report fairly presents, in all material respects, the financial condition and results of
operations of the Company."

247.     These statements were materially false and misleading for the following reasons
(a) up to $300 million of Company cash and other assets were misappropriated through fraudulent
activities; (b) the Company and/or its subsidiaries had an aggregate of approximately $200 million
in accounts receivable that arose from purported commercial transactions that occurred in 2015,
2016 and 2017, which lacked economic substance as the relevant counterparties were shell
companies with no material assets or operations and were owned or controlled by former
employees or affiliates of the Company and thus approximately $200 million of receivables are
uncollectible and would be written off; (c) the receivables were improperly recorded as part of a
scheme to facilitate and conceal an extensive misappropriation of Company assets; (d) additional
actions to defraud the Company and/or its subsidiaries, including prepayment for future oil
deliveries that were never made, commenced as early as 2010; (e) employees who directed the
scheme, created falsified and forged documents, including bank statements, audit confirmations,
contracts, invoices and third-party certifications; and (f) the Company's Founder had access to and
control over the Company's electronic and physical files.  *See* ¶¶148-155.

248.     As a direct consequence of the foregoing, the Company admitted that its yearly and
quarterly financial results for 2015, 2016 and 2017 would have to be restated.  The Company has
also admitted that the material that weaknesses existed in the its internal controls over financial
reporting as of December 31, 2015, 2016 and 2017, and, consequently, management's annual

report on internal controls over financial reporting as of December 31, 2015 and 2016 included in the Company's annual Form 20-F and also for the 2017 interim results should no longer be relied upon and would have to be restated.   *See* ¶¶148-155.

E.  **Materially False and Misleading Statements Made in Connection with the 2015 4.00% Convertible Unsecured Senior Note Offering**

249.  On July 3, 2013, the Company filed with the SEC a Form F-3 for the sale of up to $200,000,000 in Aegean securities, which was signed by Georgiopoulos, Nikolas Tavlarios, Gianniotis, Fokas, Konomos, Koutsomitopoulos, Papanicolaou and John Tavlarios.   On August 20, 2013, the Company filed with the SEC a Prospectus, which was signed by Georgiopoulos, Nikolas Tavlarios, Gianniotis, Fokas, Konomos, Koutsomitopoulos, Papanicolaou and John Tavlarios.

250.  On October 18, 2013, the Company filed with the SEC its October 18, 2013 Prospectus Supplement and on January 14, 2015, the Company filed its January 14, 2015 Prospectus Supplement.   The Offering Documents (*i.e.*, the Form F-3, the Prospectus, the October 18, 2013 Prospectus Supplement and the January 14, 2015 Prospectus Supplement) incorporated by reference Aegean's November 24, 2015 Form 6-K with financial results for the nine months ended September 30, 2014 and the 2013 Form 20-F, which contained audited consolidated financial statements for the most recent fiscal period for which those statements had been filed.

251.  On January 16, 2015, the Company sold $48.3 million of 4.00% Convertible Unsecured Senior Notes due 2018.

252.  The Company's Offering Documents were materially false and misleading because they incorporated by reference the Company's 2013 Form 20-F and thus were false and misleading for the reasons stated in ¶¶230-233, 239-240, 241-244, 245-248.

F.    **Materially False and Misleading Statements Concerning Aegean's Unique Business Model, Strong Financial Results and Profitability and Solid Balance Sheet**

253.    On February 26, 2014, after the market closed, Aegean issued its Q4 2013 Release announcing its Q4 and FY 2013 financial results.  Nikolas Tavlarios stated "We closed 2013 with great momentum and the fourth quarter marked our ***third consecutive full year of profitability***…. [W]e executed on our strategy and once again demonstrated the ***strength of our business model and our ability to drive compelling returns in a challenging environment.  By leveraging our flexible infrastructure, we successfully drove profitable top-line growth*** …."

254.    In the Q4 2013 Release, Gianniotis stated "During the quarter we built on our ***track record of solid financial performance*** and believe we are very well positioned for the year ahead…. ***Our strong financial position and dynamic business model distinguish Aegean from the competitive landscape*** …."

255.    During a February 27, 2014 Q4 2013 Conference Call, Nikolas Tavlarios stated "***Q4 marked our 12th consecutive quarter and third consecutive full-year of profitability, which means that we've achieved profitability in 27 of 28 quarters since becoming a public company,*** while our industry has faced a protracted recession…. ***Our dynamic business model has allowed Aegean*** to leverage its asset base and infrastructure to opportunistically capture additional voyage and storage revenue opportunities as they materialize and ***drive profitability***."

256.    In the Chairman's Letter to Shareholders appended to the Company's Annual Report of 2013 ("2013 Corporate Annual Report"), Georgiopoulos stated:

> In 2013, ***Aegean achieved another strong year of profitable growth*** by expanding our global market share and leveraging our fixed infrastructure. The successful execution of these initiatives has enabled Aegean to further enhance value for shareholders—and we are well-positioned to continue delivering on this important goal in 2014 and beyond. AEGEAN'S FOCUS HAS BEEN ON CONTINUALLY IMPROVING OUR OPERATIONS BY LEVERAGING OUR ***UNIQUE BUSINESS MODEL***, CAPITALIZING ON COMPELLING GROWTH

OPPORTUNITIES AND BUILDING UPON OUR LONG-TERM CUSTOMER RELATIONSHIPS. IN 2013, WE CONTINUED TO EXCEL ACROSS THESE AREAS AND ACCOMPLISHED WHAT WE SET OUT TO DO—DELIVER STRONG RESULTS FOR OUR SHAREHOLDERS.

257.    Analysts responded favorably to Aegean's Q4 2013 results.  In a February 27, 2014 report, a BB&T analyst stated "Aegean reported Q4'13 operating EPS of $0.16 vs. $0.11 last year, ahead of our estimate of $0.13 but in-line with consensus."  The "*solid Q4'13 results*, once again demonstrating its ability to navigate a challenging macro operating environment while delivering strong profitability.  We remain encouraged by the company's ongoing efforts to solidify its position as a global bunker fuel leader with ample liquidity ….  We reiterate our Buy (1) rating and our $15 price target, …"

258.    On May 21, 2014, after the market closed, Aegean issued its Q1 2014 Release announcing its Q1 2014 financial results, attached as Ex. 99.1 to its May 21, 2014 Form 6-K.  In this Q1 2014 Release, Nikolas Tavlarios stated "During the quarter … *we extended our track record of profitability and growth*.  The sustainable growth drivers we have put in place enabled our team to continue delivering positive results despite persistent industry headwinds."

259.    In the Q1 2014 Release, Gianniotis stated "*Our strong financial position and dynamic business model continues to distinguish Aegean from the competitive landscape*…. Regardless of an improvement in our operating environment, *Aegean's business model has proved to be immune to market fluctuations and is built to successfully deliver financial results*."

260.    During a May 22, 2014 Q1 2014 Conference Call, Nikolas Tavlarios stated "We positioned Aegean to benefit from the strength of our business model despite the continued challenging operating environment.  Importantly, *Q1 marked our 13th consecutive quarter of profitability, which means that we have achieved profitability in 28 of 29 quarters since becoming a public company*.  It is important to note that we achieved this profitability while our

99

industry faced a protracted recession…. Our ***unique business model*** has allowed Aegean to … ***drive profitability***…. Despite the persistent challenges, ***Aegean's business model has proved to be immune to market fluctuations and is built to capitalize***."

261.    Analysts responded favorably to Aegean's Q1 2014 results.  In a May 22, 2014 report, a BB&T analyst stated "Aegean reported Q1'14 operating EPS of $0.19 vs. $0.14 last year, ahead of our estimate of $0.14 and consensus of $0.17."  The "***solid Q1'14 results***, once again demonstrating the ability to execute its turnaround by delivering an upside surprise despite an uncertain macro environment.  We remain encouraged by the company's ongoing efforts to solidify its position as a global bunker fuel leader with ample liquidity….  We believe ANW's results are indicative of the company's continued efforts to drive increased profitability while expanding market share and leveraging its core brand offering."

262.    In a May 22, 2014 report, a Jefferies analyst stated "Aegean Marine reported adjusted 1Q14 EPS of $0.18 which topped both Street consensus of $0.17 and our estimate of $0.16."  The analyst further commented that the Company's "strong balance sheet provides financial flexibility" and reiterated the Company as a "Buy."

263.    On August 13, 2014, after the market closed, Aegean issued its Q2 2014 Release announcing its Q2 2014 financial results, attached as Ex. 99.1 to its August 13, 2014 Form 6-K. In this Q2 2014 Release, Nikolas Tavlarios stated "***Our strong second quarter results extend our recent track record of profitability and growth*** and demonstrate that we are successfully executing our strategy despite prevailing industry headwinds."

264.    In this Q2 2014 Release, Gianniotis stated, "On the operating side, ***our business model has consistently proved to be resilient even in volatile market conditions and is a driver of our strong financial position, which differentiates Aegean from its competitors***….  Our

business strategy continues to yield distinct competitive advantages that we believe will allow us to further expand our global market share and pursue profitable revenue growth opportunities."

265.     During an August 14, 2014 Q2 2014 Conference Call, Nikolas Tavlarios stated, **"**Throughout the second quarter, ***we continued to expand our recent track record of profitability and growth***.  And while industry headwinds persisted, we overcame market-wide challenges as we continued to benefit from our streamline operations and the stable growth drivers we have put in place.  Notably, this quarter marks our ***14th consecutive quarter of profitability, and we achieved this goal in 29 quarters of 30 quarters since becoming a public company***.  This is significant accomplishment, especially in light of the protracted recession in our industry and I'd like thank all of our employees for their hard work.  ***The key components of our success and strong results*** include our vigilant focus on opportunistically streamlining expenses, our market leading ability to leverage our assets and our continuing efforts to expand our global market share, all of which support our unique and ***dynamic business model***.  ***This model has allowed Aegean*** to … ***drive profitability***, while simultaneously operating in challenging market environment."

266.     Analysts responded favorably to Aegean's Q2 2014 results.  In an August 14, 2014 report, a BB&T analyst stated "Aegean reported Q2'14 operating EPS of $0.20 vs. $0.13 last year, ahead of our estimate of $0.16 and in-line with consensus."  The "***solid Q2'14 results*** that were indicative of the company's ongoing focus on leveraging its scale and delivering profitability, despite ongoing headwinds from a challenging shipping environment."  In an August 14, 2014 report, a Jefferies analyst stated "Aegean's 2Q14 EPS was the Company's best since 2Q10" and that the Company has a "[s]trong balance sheet provides financial flexibility."

267.     On November 24, 2014, after the market closed, Aegean issued its Q3 2014 Release announcing its Q3 2014 financial results, attached as Ex. 99.1 to its November 24, 2014 Form 6-K.

In this Q3 2014 Release, Nikolas Tavlarious stated "*We believe our third quarter results demonstrate the strong, sustainable growth drivers* we have in place to deliver long-term growth and profitability. *We have a unique business model that not only allows Aegean to grow profitability despite macro headwinds and mitigate industry risks, but also allows us to pursue new pathways to expand our business*."

268.   In this Q3 2014 Release, Gianniotis stated "*Our differentiated business model continues to distinguish our company from the competitive landscape and generate strong financial results*."

269.   During a November 25, 2014 Q3 2014 Conference Call, Nikolas Tavlarios stated "Our third quarter results illustrate that *Aegean is executing the right operating model to drive profitability* and shareholder value, despite considerable industry headwinds."

270.   During this November 25, 2014 Q3 2014 Conference Call, Georgiopoulos touted the value of the Fujairah Facility stating "*There is a $200 million asset that we've been carrying on our books*…."

271.   Analysts responded favorably to Aegean's Q3 2014 results. In a November 25, 2014 report, a BB&T analyst stated "Aegean reported Q3'14 operating EPS of $0.20 vs. $0.16 last year, in line with our estimate of $0.20." The "*solid Q3'14 results* that were driven by nearly 20% volume growth (the highest in three years)…. We believe ANW remains well positioned as a leading global bunker fuel supplier with ample liquidity…." In a November 25, 2014 report, a Jefferies analyst stated "Aegean reported 3Q14 EPS of $0.20 which was in-line with Street consensus and our estimate of $0.20 equaling the Company's *best quarterly result since 2010*."

272.   On March 16, 2015, after the market closed, Aegean issued its Q4 2014 Release announcing its Q4 and FY 2014 financial results. In the Q4 2014 Release, Nikolas Tavlarios stated

"2014 was a landmark year for Aegean" as the Company had, among other things, "launched [its] long-awaited Fujairah storage facility," and that the Company "successfully executed on [its] strategy to streamline [its] infrastructure and leverage [its] full-year results, which include ***fourth quarter and full-year operating income growth of 42 and 47% respectively***."

273.     During a March 17, 2015 Q4 2014 Conference Call, Nikolas Tavlarios stated, "Throughout the fourth quarter and full year, ***we continue to extend our track record of profitability and growth***.  Our performance continues to differentiate us from our peers and [is] a significant accomplishment given the current market conditions…. ***Foundation of our success to date, has been our unique and dynamic business model*** which is focused on leveraging our worldwide logistics network and maintaining sustainable growth drivers, all while capitalizing on opportunities and continually working to expand our global market share.  In addition to these key areas of focus, ***we continue to monitor and optimize our balance sheet*** to ensure that we have the necessary liquidates to support our growth plan and our core operations."

274.     During this Q4 2014 Conference Call, Georgiopoulos stated "I didn't even touch on Fujairah.  Yeah, I mean think about it.  ***There we had an asset where we had couple of hundred million bucks sunk in*** and zero earnings from it and most of that money, and there was equity money from the company and now we're starting to see the benefits of that."

275.     Analysts responded favorably to Aegean's Q4 2014 results.  In a March 17, 2015 report, a BB&T analyst stated "Aegean reported Q4'14 operating EPS of $0.22 vs. $0.16 last year, ahead of our estimate of $0.18 and in-line with consensus …. With $143M of cash on the balance sheet and the outlook for a sustained lower fuel price environment (additional potential FCF generation), we believe ANW is well positioned to pursue strategic market opportunities as they present themselves …. ***we are raising our 2016E to $1.20 (from $1.10)***."  In a March 17, 2015

report, a Jefferies analyst stated "4Q14 EPS Best Since 2Q10; Reiterate Buy On Accelerating Earnings Growth…. We reiterate our Buy and are increasing our PT to $17 (from $14) per share…."

276.    On May 27, 2015, after the market closed, Aegean issued its Q1 2015 Release announcing its Q1 2015 financial results.  In the Q1 2015 Release, Nikolas Tavlarios stated, "During the first quarter, we continued to successfully execute our strategy and ***extended our track record of profitability*** through our expanded global operations.  ***Our unique and dynamic business model*** supported strategic expansion opportunities at the end of 2014 and allowed the Company to advance its position in the global fuel supply market during the start of 2015."

277.    In the Q1 2015 Release, Gianniotis stated "The ***first quarter marked another profitable quarter*** despite persistent market headwinds.  We remain focused on executing on our proven strategy, which has enabled us to overcome market fluctuations, ***strengthen our balance sheet*** and maintain our competitive advantage."

278.    Analysts responded favorably to Aegean's Q1 2015 results.  In a May 28, 2015 report, a BB&T analyst stated "Aegean reported Q1'15 EPS of $0.25 vs. $0.18 last year, ahead of our estimate of $0.19 and consensus of $0.23."  "***Aegean reported solid Q1'15 results*** that were above expectations, highlighted by an 8% increase in volumes."  Further, "[w]ith $91M of cash on the balance sheet, ample liquidity … we believe ANW is well positioned to pursue strategic market opportunities as they present themselves."  In a May 28, 2015 report, a Jefferies analyst stated "Reiterate Buy Rating As Earnings Continue To Ramp … Yesterday after the market close, Aegean Marine reported adjusted 1Q15 EPS of $0.25 which topped Street consensus of $0.23 and was in-line with our estimate of $0.25."

279.   In his Chairman's Letter to Shareholders appended to the Company's Annual Report of 2014 ("2014 Corporate Annual Report"), Georgiopoulos stated:

> TO OUR SHAREHOLDERS *2014 was a landmark year for Aegean; we extended our track record of profitability*, continued to streamline our unique operating platform and significantly expanded our global footprint. *Our success was a direct result of the hard work and dedication of our employees and a management philosophy focused on delivering value over the long term*. With a strong 2014 behind us, highlighted by several strategic acquisitions, we feel Aegean is poised for continued growth and success in 2015 and beyond …. *Aegean has established a proven ability to take market share and profitably grow while maintaining rigorous standards of risk management*. Our results for the year speak for themselves: record sales volumes and *earnings figures*, meaningful growth and continued success in strengthening our operations despite ongoing market headwinds.

280.   On August 17, 2015, after the market closed, Aegean issued its Q2 2015 Release announcing its Q2 2015 financial results.   In the Q2 2015 Release, Nikolas Tavlarios stated "Aegean Marine has built a strong, global platform that has *delivered solid returns in a variety of market conditions*….   Our Fujairah facility is operating at strong utilization levels, and our expanded global operations position the Company for continued growth, success and value creation….   [W]e have a *unique and dynamic business model and strong balance sheet to support strategic expansion opportunities*."

281.   In the same Q2 2015 Release, Gianniotis stated "*We delivered another quarter of profitability* despite market headwinds impacting the business.… With more than $1.8 billion in working capital credit facilities, *we have a strong excellent balance sheet that can support continued profitability over the long-term*.   Given our financial strength, we have been able to move quickly to realize accretive growth opportunities and profitably grow the business, and remain focused on achieving this objective."

282.   On November 19, 2015, after the market closed, Aegean issued its Q3 2015 Release announcing its Q3 2015 financial results, attached as Ex. 99.1 to its November 19, 2015 Form 6-K.

In the Q3 2015 Release, Nikolas Tavlarios stated "Aegean Marine's market leadership position and **strong financial performance** provide a solid foundation for continued growth and diversification."

283.    In the Q3 3015 Release, Gianniotis stated "We delivered strong financial results in the quarter as a result of our differentiated and diverse strategy, financial flexibility and **solid balance sheet that can support profitability over the long-term**."

284.    Analysts responded favorably to Aegean's Q3 2015 results.  In a November 20, 2015 report, a BB&T analyst stated "ANW reported Q3'15 operating EPS of $0.25 vs. $0.20 last year, ahead of our estimate of $0.20 and consensus of $0.22 …. Aegean reported solid Q3'15 results that were highlighted by a 14.5% increase in volumes, while a leaner cost structure further enabled the company to deliver better-than expected results. We believe this quarter is further indication of not only management's ability to leverage and execute its growth strategy (particularly in light of lingering macro competitive pressures), but also the volume growth on the horizon for Aegean given the low bunker price environment (enabling shipowners to purchase larger stems of fuel). …   Additionally, given the company's strong liquidity profile ($115M of cash; $1.3B in available credit facilities; strong FCF potential), we believe ANW is well positioned to explore both strategic bolt-on expansions as they present themselves, …"  In a November 19, 2015 report, a Jefferies analyst stated "This afternoon, Aegean Marine reported 3Q15 EPS of $0.25, which topped both Street consensus of $0.22 and our estimate of $0.19 on strong sales volumes and lower than expected fuel costs and opex …. We reiterate our Buy rating …."

285.    On March 16, 2016, after the market closed, Aegean issued its Q4 2015 Release announcing its Q4 and FY 2015 financial results, attached as Ex. 99.1 to March 16, 2016 Form 6-K.  In the Q4 2015 Release, Nikolas Tavlarios stated "***Our results demonstrate the merits of***

*Aegean's unique operating strategy* and the opportunistic steps we continuously take to position the company for growth, despite industry headwinds.  During the year we leveraged our expanding geographic footprint and diversified business model to *deliver strong financial and operational results*, including record sales volumes."

286.    In that same Q4 2015 Release, Gianniotis stated, "With a *strong balance sheet and with significant financial flexibility*, Aegean is competitively positioned to deliver returns to shareholders in a variety of market conditions."

287.    A Letter to Shareholders appended to the Company's 2015 Corporate Annual Report, signed by Georgiopoulos, Nikolas Tavlarios and Gianniotis, touted their solid performance and track record of profitability:

> DURING 2015, WE CONTINUED TO SUCCESSFULLY EXECUTE OUR STRATEGY OF STRENGTHENING OUR GLOBAL OPERATIONS AND IMPROVING OUR FINANCIAL PERFORMANCE. WE BELIEVE THE STEPS WE ARE TAKING ARE POSITIONING AEGEAN FOR LONG-TERM SUCCESS. Throughout the year, we stayed true to our core values of reliability, safety and customer service and succeeded in what we set out to do—deliver results. We focused on strategic expansion and on our promise of providing customers with faster, more efficient and affordable alternatives in regions that are currently underserved. This focus paid off; *we extended our track record of profitability and growth*, and identified opportunities to diversify our platform. We are pleased to report that *Aegean delivered strong financial results for the year,* including adjusted basic and diluted earnings per share of $0.84 and adjusted EBITDA of $116.2 million, a year-over-year increase of approximately 6.3% and 13.7%, respectively. *Our solid performance and successful execution in the current environment continue to set us apart from our peers …. Our unique business model is built with the flexibility to adjust to market conditions due to our cross segment diversification*. As such, we were able to successfully navigate an ever-changing marketplace, and believe we are positioned to continue delivering strong financial and operational results.

288.    Analysts responded favorably to Aegean's Q4 2015 results.  In a March 17, 2016 report, a BB&T analyst stated "ANW reported Q4'15 operating EPS of $0.25 vs. $0.22 last year, ahead of our estimate of $0.20, … [W]e'd point to ANW's *strong balance sheet* … and FCF … which we believe provides the company a competitive advantage in both its operating and capital

allocation strategy (i.e. both expansion and other reinvestment opportunities). We remain buyers of ANW …."  In a March 17, 2016 report, a Jefferies analyst stated "Yesterday after the market close, Aegean Marine reported adjusted 4Q15 EPS of $0.25 which was in-line with both Street consensus and our estimate of $0.25 …. We reiterate our Buy rating …."

289.    On May 24, 2016, after the market closed, Aegean issued its Q1 2016 Release announcing its Q1 2016 financial results, attached as Ex. 99.1 to its May 24, 2016 Form 6-K.  In the Q1 2016 Release, Nikolas Tavlarios stated "***Despite this economic headwind, our unique business model enabled Aegean to capitalize on growth*** opportunities across our global platform …."

290.    In the Q1 2016 Release, Gianniotis stated "We are proud to have achieved our ***21st consecutive quarter of profitability***.  We continue to take decisive actions to ***maintain our strong financial position and significant liquidity*** in the current challenging environment.…  ***We have a track record of maintaining a strong balance sheet***, responsibly managing our debt and successfully and quickly de-levering."

291.    Analysts responded favorably to Aegean's Q1 2016 results.  In a May 25, 2016 report, a BB&T analyst stated "ANW reported Q1'16 EPS of $0.24 vs. $0.25 last year, above our estimate of $0.22 … Aegean reported Q1'16 results that were above our expectations driven by an impressive 44% yr/yr growth in volumes (the highest in five years), despite a weak shipping environment…. ANW's ***strong balance sheet*** … and FCF … provides the company a competitive advantage in both its operating and capital allocation strategy. We reiterate our Buy rating …."

292.    On August 10, 2016, after the market closed, Aegean issued its Q2 2016 Release announcing its Q2 2016 financial results, which was attached to its August 10, 2016 Form 6-K.  In

the Q2 2016 Release, Nikolas Tavlarios stated "***We generated strong operational and financial results in the quarter*** …."

293.    In the Q2 2016 Release, Gianniotis stated "***Financial flexibility and a strong balance sheet remain important differentiators for our business***….   We have and intend to continue to actively manage our business while de-levering and ***strengthening our balance sheet*** to drive results for all Aegean shareholders."

294.    During the August 10, 2016 Q2 2016 Conference Call, Gianniotis stated that the Company's "***strong balance sheet***" included "***high-quality receivables*** … built on ***strong credit controls and favorable sales terms*** that have yielded only $500,000 in bad debt write-offs or nearly [ph] $40 billion in sales over the past years, the past 10 years."

295.    Also, during the August 10, 2016 Q2 2016 Conference Call, an analyst from Stifel asked Georgiopoulos about what caused an increase in receivables: "My next question relates to the working capital, and obviously you saw the receivables and inventories go up a little bit, which absorbed a lot of the cash flow.  Is that a function of higher oil prices and – or higher bunker prices and simply more receivables in inventory, or are you sort of continuing to add to the platform so to speak?"  Georgiopoulos responded, "I mean it is a couple of things, it is more – it's ***higher oil prices,*** and also we increased our inventories as we were moving oil around two new ports that we are servicing."

296.    Analysts responded favorably to Aegean's Q2 2016 results.  In an August 10, 2016 report, a Jefferies analyst stated "Aegean reported adjusted 2Q16 EPS of $0.32, which was well above both Street consensus of $0.23 and our estimate of $0.24 as sales volumes of 4.1 million metric tons and a gross spread of $20.90 were both better than expected."

297.    On November 16, 2016, after the market closed, Aegean issued its Q3 2016 Release.  In the Q3 2016 Release, Nikolas Tavlarios stated "*We delivered another quarter of solid results* against a backdrop of slowness in the container segment and volatile commodity markets.  Despite these headwinds, *we continue to achieve profitability* and strong volumes with our fourth consecutive quarter of selling more than 4 million metric tons of bunker fuel."

298.    Analysts responded favorably to Aegean's Q3 2016 results.  In a November 17, 2016 report, a Jefferies analyst stated "Yesterday after the market close, Aegean Marine reported adjusted 3Q16 EPS of $0.36 which topped both Street consensus of $0.33 and our estimate of $0.34 as record sales volumes of over 4.25 million metric tons offset the slightly lower gross spread of $18.60 …. We reiterate our Buy rating …."

299.    On March 1, 2017, after the market closed, Aegean issued Q4 2016 Release announcing its Q4 and FY 2016 financial results, attached as Ex. 99.1 to its March 1, 2017 Form 6-K.  In the Q4 2016 Release, Nikolas Tavlarios stated "The fourth quarter marked the end of *another strong year for Aegean*, despite volatile commodity markets and increased competition. *Our flexible business model continued to enable Aegean to capitalize on growth opportunities* across our unique platform."

300.    In the Q4 2016 Release, Gianniotis stated "*Our solid results and accomplishments during the quarter demonstrate the long-term potential of our financial strategy*.  During the fourth quarter we continued our focus on driving higher margins and profitable volume and improved our financial strength.  *We have maintained a strong balance sheet* and are confident our flexibility will support Aegean's continued success."

301.    A Letter to Shareholders appended to the Company's 2016 Corporate Annual Report, signed by Georgiopoulos, Nikolas Tavlarios and Gianniotis, stated:

2016 was a milestone year for Aegean Marine as we celebrated our 10-year anniversary as a public company. ***Since our IPO, we have strengthened our global platform and strategically expanded in new markets while delivering consistent growth and shareholder value***. Over the years Aegean has grown from a local regional supplier into a world-wide leader in the physical supply and marketing of marine fuel.  We have evolved into a sophisticated enterprise with delivery logistics, integrated supply and trading, a growing retail sales channel and diversified revenue streams …. While our business has evolved over the years, our commitment to serving our customers and enhancing value for our shareholders has not.  As we look back over the past year, we are proud of our solid results and our ability to execute on our strategy all while ***delivering record financial and operational results***, including adjusted EBITDA of $135.2 million, adjusted net income of $61.4 million and sales volumes of 16.5 million metric tons…. We are proud of our continued ***financial strength and flexibility and the steadfast support of our banking group***…. The Company's ***unique business model allows us to respond quickly to market fluctuations and capitalize on increased demand as evidenced by Aegean's consistent growth and stable financial performance***. We are committed to achieving long-term success and will continue to take proactive steps to ensure Aegean continues to excel.

302.    Analysts responded favorably to Aegean's Q4 2016 results.  In a March 2, 2017 report, a Jefferies analyst stated "Yesterday after the market close, Aegean Marine reported adjusted 4Q16 EPS of $0.41 which topped Street consensus of $0.39 …. Balance sheet improvement already positively impacting results ....  We reiterate our Buy rating …."

303.    On May 23, 2017, after the market closed, Aegean issued its Q1 2017 Release announcing its Q1 2017 financial results.  In the Q1 2017 Release, Nikolas Tavlarios stated "Our results in the quarter were impacted by increased competition across operations and continued challenging market dynamics.  ***These results do not reflect the overall strength of our business or our strong track record of delivering consistent growth and stable financial results.***  To position Aegean for continued success, we are actively managing our business and taking decisive action to improve performance despite industry headwinds."

304.    In the Q1 2017 Release, Gianniotis stated "During the quarter, ***we maintained our financial flexibility and balance sheet strength***, as we have done throughout various market conditions."

305.    On August 10, 2017, after the market closed, Aegean issued its Q2 2017 Release announcing its Q2 2017 financial results, which was attached to its August 10, 2017 Form 6-K.  In the Q2 2017 Release, McIlroy stated "Aegean achieved a ***solid performance in the second quarter of 2017***…. [W]e reduced operational expenses and improved our profitability."

306.    In the Q2 2017 Release, Gianniotis stated "During the quarter, we improved our profit margin and reduced our operating expenses.  As a result, we achieved a 2.4% increase in Gross Profit, a 10.0% increase in adjusted EBITDA, a 16.6% increase in adjusted Operating Income and a 22.3% increase in adjusted Net Income."

307.    In an August 11, 2017 report, a Jefferies analyst stated "Yesterday after the market close, Aegean reported 2Q17 EPS of $0.04 which topped our estimate of $0.02 due to higher than expected sales volumes and lower than expected operating expenses …. We reiterate our Buy rating …."

308.    On November 15, 2017, after the market closed, Aegean issued its Q3 2017 Release announcing its Q3 2017 financial results, attached as Ex. 99.1 to its November 15, 2017 Form 6-K. In the Q3 2017 Release, Gianniotis stated "We believe that as we continue to rationalize our global business in this competitive market, ***our balance sheet strength and geographic mix will differentiate Aegean from competitors*** that do not have the benefit of our broad network and solid capitalization."

309.    In a November 16, 2017 report, a Jefferies analyst stated "With Aegean expected to generate significant EBITDA without any material capex obligations, and with the Company possessing its strongest balance sheet in many years coupled with minimal refinancing risk in 2018, we believe Aegean has a number of shareholder value creating options at its disposal that it

can pursue including an increase to the Company's dividend and/or share buybacks in the coming quarters."

310. The statements by Nikolas Tavlarios, Gianniotis, Georgiopoulos, and McIlroy in ¶¶253-256, 258-260, 263-265, 267-270, 272-274, 276-277, 279-283, 285-287, 289-290, 292-295, 297, 299-301, 303-306, 308, were materially false and misleading because:

(a) the Company's business model was not dynamic or uniquely situated to support growth and profitability in difficult economic conditions; instead, the business model was rife with fraud including accounting improprieties and fraudulent misappropriations, which resulted in substantially inflated revenues and profits and caused the Company's assets and shareholder equity to be overstated as described in ¶¶148-155, 228-238;

(b) the Company's purported track record of profitability and growth and strong financial results were based on fraudulent commercial transactions with no economic substance with bogus counterparties, which admittedly inflated the Company's revenues and profits throughout the Class Period as described in ¶¶148-155;

(c) the Company's balance sheet was not strong or solid and the Company was not in a strong financial position because its balance sheets overstated the Company's assets by including accounts receivable with no value from fraudulent commercial transactions; fuel prepayments, which were simply misappropriated funds as described in ¶¶148-177, 232-233, 237-238; and

(d) the value of the Fujairah Facility was grossly overstated because its costs reflected misappropriated funds as described in ¶¶149-171.

**G.      Materially False and Misleading Statements Concerning the Company's Financial Ability to Repurchase the Founder's Shares**

311.      On August 17, 2016, before the market opened, the Company issued its August 17, 2016 Press Release announcing that "an independent committee" of the Board had authorized the repurchase of the 11,303,031 million shares currently owned by the Company's Founder.

312.      In this August 17, 2016 Release, Nikolas Tavlarios stated "We believe this sizeable repurchase of the Company's shares underscores the Board's confidence in Aegean's prospects, and will provide meaningful and immediate earnings accretion for all Aegean shareholders…. *We are fortunate to have a solid balance sheet and strong free cash flow, which provide us the opportunity to repurchase shares while continuing to invest in our business to drive continued growth and shareholder value*."

313.      On August 25, 2016, a *TradeWinds.com* article concerning the repurchase quoted Nikolas Tavlarios as stating, "It's something [Melisanidis] wanted to do.  We were able to find an appropriate point to do it.  *The company had good strength on its balance sheet*…. It worked out well for him, for us and for the investors.  Everyone wins."

314.      The statements by Nikolas Tavlarios concerning the strength of the Company's balance sheet to support the repurchase of the Founder's stake in the Company were materially false and misleading because the Company's balance sheets could not support such purchase.  As a result of the repurchase, the Company (a) violated covenants in its 2013 Credit Facility; (b) was forced to take a loan of $20 million from a company related to the Founder; and (c) the Company was forced to engage in a dilutive offering of Convertible Notes to raise cash to pay down a $40 million debt.  The Convertible Note offering diluted current shareholder and caused shares to fall 14%.

H.    **Materially False and Misleading Statements Concerning the HEC Acquisition**

315.    As noted above, On February 20, 2018, after the market closed, Aegean issued its February 20, 2018 Press Release announcing the proposed HEC Acquisition.  The press release stated that "[t]he acquisition was unanimously approved by the Aegean Board upon the recommendation of a special committee of independent directors (the 'Special Independent Committee').  In making its recommendation, the Special Independent Committee consulted with its independent financial advisor, Clarksons Platou Securities, Inc. ('Clarksons Platou Securities') and outside legal counsel.  The acquisition does not require the approval of Aegean's shareholders."

316.    In the same press release, Papanicolaou, Chairman of the Board of Aegean, stated "The acquisition of H.E.C., a world leader in its field, is our first decisive step in the direction of **combining higher profitability for our shareholders** with environmental sustainability and social accountability."

317.    In the same press release, McIlroy stated "The acquisition of H.E.C. **enables Aegean to pursue a complementary high margin business with global growth opportunities**, while simultaneously enabling the group to continue the optimization of its global asset base and infrastructure. The combination of these two companies creates a leading service provider to the maritime industry that not only supplies the fuel that enables world trade, but now with H.E.C., cares for the waste created by that trade and in doing so, safeguards our environment."

318.    During a February 21, 2018, Conference Call to discuss the HEC Acquisition, McIlroy touted the transaction stating:

> Aegean's board and management have been executing on a strategy to optimize our global asset base and infrastructure, while **pursuing accretive and higher margin growth opportunities. We believe that this transaction is exactly within this framework, opening the combined company to growth opportunities** in the

environmental services market, as well as creating the potential for synergies within our existing network. … The acquisition was unanimously approved by the Aegean board upon the recommendation of a special committee of independent directors. In making its recommendation, the Special Independent Committee consulted with its *independent financial advisor, Clarksons Platou Securities, Inc*., Clarksons Platou Securities, and outside legal counsel. The acquisition does not require the approval of Aegean's shareholders. This transaction positions Aegean to ramp up its growth profile and diversify its revenue growth. … *The synergies between Aegean and H.E.C. provide a very compelling strategic rationale*. H.E.C.'s growth strategy is consistent with Aegean's model. H.E.C. not only offers additional recurring revenue streams, but it also capitalizes on strong industry tailwinds, all the while forming a strong combined platform to expedite growth for both segments. We believe this complementary structure will materialize into significant shareholder value…. *I mean the highly synergistic nature of this transaction can't be underestimated.* And one thing is, I mean, clearly we've come out of a very difficult year in 2017, which is evident in the results which we've seen up to date. And one of the dialogues that we've been having with all stakeholders in the business is the need for the company to preserve value, build shareholder value, but also protect the asset base of the company…. *So, I think that from our side of things this is a great way of adding shareholder value*. … There's a business that we're buying as part of that transaction and the business is what's extremely attractive. As part of the collateral of that transaction having Mr. Melisanidis back is actually something that from a management standpoint can be viewed in an advantageous way. *It's very – very comforting to our banks and to our various different stakeholders that we have strong sponsorship in a large shareholder that has significant interest in the business*, and I think that that's something that is sometimes lost when folks look at these types of transactions and the like. So, at the end of the day, we see this as a positive and we highlight it as one of the key attributes of the deal.

319.   In the March 7, 2018 Press Release, issued after the market closed, the Company reiterated the financial and operational benefits of the HEC Acquisition.  In this press release, McIlroy stated, "With uncertainty expected to persist, our board of directors and management took steps to enhance our expense and asset optimization efforts while also enabling *Aegean to return to profitable and sustainable growth*….  The Board has determined that this transaction is in the best interest of Aegean shareholders and *we are confident that with HEC, we can achieve growth significantly greater than what either company could achieve on a standalone basis*."

320.   The statements concerning the HEC Acquisition by Papanicolaou and McIlroy in ¶¶316-319, were materially false and misleading because the HEC Acquisition was not intended

to enable Aegean to achieve growth or higher profitability.  Instead, the proposed HEC Acquisition was a last ditch effort by the Founder and Aegean's current management and Board to conceal the Massive Fraudulent Scheme, as described in ¶¶191-213.  Moreover, the Founder exercised *de facto* control over Aegean and stood on both sides of the transaction, and the price of HEC was over 3 times the value of HEC.

## VIII.  THE AUDIT COMMITTEE DEFENDANTS INTENTIONALLY AND/OR RECKLESSLY CAUSED AEGEAN TO ISSUE MATERIALLY FALSE AND MISLEADING STATEMENTS IN FURTHERANCE OF THE MASSIVE FRAUDULENT SCHEME

321.    The Audit Committee Defendants were responsible for directing and overseeing the Company's financial reporting processes and internal controls, as well as the retention, review and payment of outside auditors.  As noted below, in the discharge of their duties, the Audit Committee Defendants were responsible for and were aware of or recklessly disregarded numerous facts.  But for this knowing and/or reckless disregard, they necessarily would have (a) discovered the scheme carried out by the Officer Defendants; and (b) prevented the Company from issuing false and misleading statements to the investing public.  In reality, however, the Audit Committee Defendants were little more than a "rubber stamp," thereby permitted the Officer Defendants to do as they pleased, causing the systemic and pervasive fraudulent scheme to continue unchecked. The Audit Committee Defendants' intentional and/or reckless discharge of their responsibilities directly caused Aegean to issue false and misleading statements alleged herein and was a direct and proximate cause of the harm suffered by the Class.

322.    According to the Company's Form 20-F filings with the SEC, the Audit Committee Defendants were charged with the following responsibilities:

(a) 2014 Form 20-F

Our audit committee is comprised of three independent members of our board of directors. The committee is responsible for, among other things, making

117

recommendations concerning the engagement of our independent public accountants, reviewing with the independent public accountants the plans and results of the audit engagement, approving professional services provided by the independent public accountants, reviewing the independence of the independent public accountants, considering the range of audit and non-audit fees and reviewing the adequacy of our internal accounting controls.

(b) <u>2015 and 2016 Form 20-Fs</u>

Our audit committee is comprised of three independent members of our board of directors. The committee is responsible for, among other things, (i) the appointment, replacement, compensation, evaluation and oversight of the work of the independent auditors to be retained to audit our annual consolidated financial statements and review our quarterly consolidated financial statements, (ii) reviewing the annual audit consolidated financial statements and quarterly consolidated financial statements and discussing them with management and the independent auditors; and (iii) providing oversight to our accounting and financial reporting principles, policies, controls, procedures and practices. Our audit committee is comprised of Messrs. Konomos, Koutsomitopoulos and Papanicolaou. Mr. Konomos serves as the chairman of the audit committee.

323.    Based on all the related-party transactions, Melisanidis' criminal and regulatory proceedings and his continued exercise of control and sale of all of his shares, there is no reasonable excuse due to neglect or inadvertent oversight that the Audit Committee Defendants can offer for having failed to prevent the Massive Fraudulent Scheme.

324.    Indeed, the Audit Committee Defendants, by virtue of their role on the Audit Committee, had in their possession extensive information that should have, and but for their recklessness would have, caused them to unearth and stop the Massive Fraudulent Scheme.  Thus, but for their intentional and/or reckless discharge of their duties, Aegean could not and would not have issued the false and misleading statements alleged herein.  The Audit Committee Defendants' recklessness, is therefore, a direct and proximate cause of the harm to Class members.

325.    The facts revealing the intentional and/or reckless misconduct by the Audit Committee Defendants include the following:

(a)     **Materiality of the financial fraud.**  The sheer materiality of the falsehood contained in the consolidated financial statements (which include $200 million in bogus account receivables, $300 million in misappropriated cash and the $100 million share repurchase) raise a strong inference of the Audit Committee Defendants' recklessness.

(b)     **Knowledge of Deficient Internal Controls.**  The Audit Committee Defendants knew or were reckless in not knowing that Aegean's financial and accounting internal controls were inadequate.  From the Company's IPO, the Audit Committee Defendants were well aware of (i) the Founder's checkered past, which resulted in his resignation as CEO of the Company and the appointment of a new Principal Executive Officer with separate executive offices in New York to oversee financial and other reporting functions; (ii) the Founder's numerous related-party transactions with the Company; (iii) the Founder's control exercised over the Company through his stake in the Company, relationships with officers and directors; (iv) his control over the Company's headquarters and his proximity to the offices of the Company's senior managers; (v) the Founder's access to and control over the Company's electronic and physical files; and (vi) prior internal control weakness identified in Aegean's 2014 Form 20-F, which included problems with the "control over preparation and review of bank reconciliations" and "an absence of an effectively-designed control to identify and disclose transactions with new related parties."  Indeed, the Massive Fraudulent Scheme was rife with illicit related-party transactions,

as the Company has admitted.  For example, the fraud associated with the $200 million in accounts receivable were with a mere four bogus shell companies controlled by the Founder and the $300 million misappropriation also involved companies controlled by related parties.

(c)     **Participation in the HEC Acquisition**.  The participation of the Audit Committee Defendants in the HEC Acquisition, which attempted to move approximately $200 million of the Company's account receivables off of the Company's books and thwart the attempts of the Activist Investors to effect the appointment of new, independent directors raises a strong inference that the Audit Committee engaged in intentional and/or reckless conduct.

(d)     **Removal of the Audit Committee Defendants and Discovery of Fraud.** The removal of the Audit Committee Defendants from their positions on the Audit Committee further supports an inference that they were not fulfilling their responsibilities in that capacity.  Further, the quick discovery of fraud by the Reconstituted Audit Committee within weeks after the Audit Committee Defendants were removed from their positions demonstrates that the accounting fraud was easily discoverable and that, but for the intentional or and/or recklessness of the Audit Committee Defendants, the fraudulent activities could have been discovered and stopped.

IX.     **ADDITIONAL ALLEGATIONS OF SCIENTER**

326.    As discussed above and in the following paragraphs, numerous facts give rise to a strong inference that Defendants knew or were reckless in not knowing that their statements were materially false and misleading and that they were acting in furtherance of a scheme to defraud.

327.    First, the Company admits that "members of senior management" participated in the Massive Fraudulent Scheme, which included the booking of $200 million in bogus account receivables, the misappropriation of $300 million of Aegean cash and assets, fraudulent accounting entries and fictitious documentation designed to conceal the misconduct, which is conclusive evidence of scienter.  Further, the Company stated that all current employees who directed the scheme, which involved the creation of falsified and forged documents, were terminated.  While the Company did not disclose which members of senior management were terminated, each of the Officer Defendants was no longer at the Company by the end of 2018.

328.    Second, the Company has revealed that the U.S. Attorney's Office for the Southern District of New York has issued a grand jury subpoena in connection with suspected felonies at Aegean.

329.    Third, according to the Company, its efforts to access all relevant emails and other electronic data stored on the Company's server "were and continue to be obstructed as a result of, among other things, the threats of retaliation against Company personnel, and at least one attempt to delete and permanently erase documents from the Company's server through the remote installation of data deletion software by a person with administrator access."  On June 22, 2018, following a complaint by the Founder and related parties, the Hellenic Data Privacy Authority ("HDPA") issued a provisional order, which prohibited the review or use of emails and other files

that were collected from the Company's Piraeus, Greece server in connection with the Audit Committee's investigation.

330.   Fourth, the Company acknowledged that its Founder "exerted significant control over Company personnel and assets through various inappropriate means, including threats of economic retaliation and physical violence."  Also, the Company acknowledged that the Founder "continues to have access to and control over the Company's electronic and physical files."  A October 31, 2018 *Financial Times* article stated that Melisanidis was a "hands-on manager according to other members of Greece's shipping community" and ran Aegean despite his title.

331.   Fifth, the Company, in its bankruptcy filings, acknowledged that there were potential "claims and causes of action relating to misstated accounting records, fraudulent misappropriation of funds by Dimitris Melisanidis, claims against auditors and other professionals related to misappropriation of funds, any related conspiracy to defraud AMPNI or investors in AMPNI …."

332.   Sixth, the Company Defendants profited handsomely from the Massive Fraudulent Scheme.  While Aegean was not subject to insider trading reporting, there is some information regarding significant selling by certain Defendants.  The Founder personally profited from his sale of his stake in Aegean for $100 million at artificially inflated prices.  John Tavlarios sold a portion of his stake in the Company during the Class Period.  Moreover, Defendants Fokas and Giannoitis purport to have sold $1 million of stock at the same time as the Founder's sale of shares to the Company.  Defendant John Tavlarios also sold shares of Aegean during the Class Period.  Moreover, Aegean paid its non-executive directors $300,000 in 2016.  Fokas and Gianniotis purportedly profited through their relationship with the Founder.  Fokas was appointed to serve as Vice Chairman of the Board of OPAP (a company owned in part by the Founder), and Fokas' law

practice was purportedly engaged by other entities controlled by the Founder. Gianniotis purportedly has been engaged in the financing of other of the Founder's companies.

333.    Seventh, during the Class Period, the Company conducted the private placement and public offering of convertible notes. These offerings were essential to bolster the Company's liquidity because the Company's balance sheets were grossly misstated. The Company was further motivated to keep the value of the Company's common stock artificially inflated because the value of the convertible notes was tied to the price at which Aegean common shares traded.

334.    Eighth, the proposed HEC Acquisition also strongly supports an inference of scienter. The Founder, Aegean's senior management and the Board approved the HEC Acquisition in response to an Aegean investors group's proposal to add three independent directors to the Board. The principal purpose of the HEC Acquisition was to thwart the threat of the appointment of a group of independent directors to the Board who could (and who did) easily discover that there was a Massive Fraudulent Scheme. The HEC Acquisition overvalued HEC by at least 300% and would have allowed the Founder to take a 33% equity stake in the Company and designate three additional directors including his son to the Board. Senior management's support and the Board's ratification of the HEC Acquisition, which was subsequently terminated after an investor group initiated a lawsuit to halt the transaction, supports a strong inference of scienter.

335.    Ninth, the removal of the Audit Committee Defendants from the Company's Audit Committee after new Board members were installed supports an inference that those members were inadequate, lacked independence or were compromised in conducting an internal investigation of the Company's finances.

336.    Tenth, the replacement of Gianniotis, the Company's CFO, after the litigation concerning the HEC Acquisition was terminated, coupled with his long-term relationship with the Founder, supports an inference of scienter.

337.    Eleventh, Aegean's President Nikolas Tavlarios shared office space with in New York with Georgiopoulos and his older brother John Tavlarios.  Konomos also shared space in Aegean's New York office.

338.    Twelfth, the Company admitted in the November 24, 2006 IPO Prospectus that Defendants Melisanidis (with his majority ownership) along with Georgiopoulos and John Tavlarios (collectively, with 13.8% ownership), through their respective companies, would "**control [the] Company**" and might not "act in the best interests of [the] shareholders."  Indeed, even though some shares were sold by these Defendants prior to and after the Class Period began, the Company still acknowledged in their 2013 Form F-20, that Melissanidis and Georgiopoulos with their 22.3% and 10.8% respective holdings of the Company's stock continued to "***have the power to exert considerable influence over [Aegean's] actions***, including the election of our directors, the adoption or amendment of provisions in our amended and restated articles of incorporation and bylaws and approval of possible mergers, amalgamations, control transactions and other significant corporate transactions…. So long as Messrs. Melisanidis and Georgiopoulos continue to own a significant amount of our equity, ***even though such amount represents less than 50% of our voting power, they will continue to be able to exercise considerable influence over our decisions***."  Moreover, on May 27, 2015, the Board of Aegean revised the Company's Amended and Restated ByLaws, to reduce the quorum requirement for stockholders' meetings to

one-third, from a majority of the outstanding shares, thereby providing Melisanidis, Georgiopoulos and John Tavlarios with shareholder power.[98]

## X. THE ACCOUNTANTS KNOWINGLY AND/OR RECKLESSLY VIOLATED THE EXCHANGE ACT BY FAILING TO COMPLY WITH AUDITING STANDARDS IN ISSUING CLEAN AUDIT REPORTS THAT CONTAINED MATERIALLY FALSE AND MISLEADING STATEMENTS TO THE INVESTING PUBLIC

339.   The Auditor Defendants were required to comply with applicable auditing standards when performing their audits during the Class Period.  As described herein in the Complaint, the Auditor Defendants intentionally and/or recklessly violated those professional standards and thereby provided clean audit opinions that allowed the Company Defendants to perpetrate the Massive Fraudulent Scheme.  Accordingly, the Auditor Defendants issued audit opinions that contained false and misleading statements.  Each Auditor Defendant also performed undisclosed additional work for Aegean beyond year-end auditing or assistance with quarterly financials.

### A.   The Auditors were Bound to Comply with Applicable Accounting Standards

340.   Public investors, creditors and others rely on independent, registered public accounting firms to audit financial statements and assess internal controls when deciding whether to invest in, or to do business with, a public company.  As such, the Supreme Court has described the role of an independent auditor as that of a "public watchdog," established to improve the reliability of financial statements, enhance the credibility of those statements and thereby, support the capital markets.  *United States v. Arthur Young & Co.,* 465 U.S. 805 (1984).

341.   To oversee independent auditors, SOX established the PCAOB.  The PCAOB is given the responsibility to establish professional audit standards applicable to audits of certain

---

[98] June 18, 2015 Form 6-K, Ex. 1.

publicly-traded companies, including Aegean (the "PCAOB Standards").  Since 2004, the PCAOB has required that foreign issuer auditors register with the PCAOB.  The introduction of this requirement by the PCAOB had the effect of compelling accounting firms, such as Deloitte and PwC, to provide greater oversight and control over their respective foreign issuer auditors in order to protect their valuable brand names.  The consequence of this new PCAOB requirement and the heightened oversight that resulted was to create – or at least to heighten – an agency relationship, *de facto* and *de jure*, by and among those Deloitte and PwC affiliated entities, providing oversight over their respective network of affiliated member foreign issuer auditors.

342.    PCAOB Standards are intended to "provide a measure of audit quality and the objectives to be achieved in an audit."[99]  Prior to December 31, 2016, PCAOB Standards consisted of two types of equally authoritative auditing standards: (a) standards originally issued by the Auditing Standards Board ("ASB") of the American Institute of Certified Public Accountants ("AICPA"), adopted by the PCAOB, collectively referred to as "AU;" and (b) standards issued by the Board referred to as "AS."  Effective December 31, 2016, these standards were reorganized, grouped into the following five topical categories and referenced with an "AS" prefix:

> (a)    General Auditing Standards – Standards on broad auditing principles, concepts, activities and communications;
>
> (b)    Audit Procedures – Standards for planning and performing audit procedures and for obtaining audit evidence;
>
> (c)    Auditor Reporting – Standards for auditors' reports;
>
> (d)    Matters Relating to Filings Under Federal Securities Laws – Standards on certain auditor responsibilities relating to SEC filings for securities offerings and reviews of interim financial information; and

---

[99] AU 150.01.

(e)    Other Matters Associated with Audits – Standards for other work performed in conjunction with an audit of an issuer. [100]

343.    PCAOB Standards state that the objective of a financial statement audit is the expression of an opinion on the fairness with which the audited financial statements present, in all material respects, the financial position, results of operations, and the cash flows of the reporting entity, in conformity with GAAP.[101]

344.    To achieve this objective, the Auditor Defendants were responsible for planning and performing its financial statement audit to obtain "reasonable assurance"[102] about whether Aegean's consolidated financial statements were free of material misstatement under GAAP, including misstatements caused by fraud.[103]  During the Class Period, Aegean had two principal "independent" accountants, Deloitte Greece and PwC Greece.

345.    To identify the risks of material misstatements, the PCAOB Standards identified below require auditors to perform the procedures identified in those standards.

346.    PCAOB Standards AS 12.07 - 12.17 (AS 2110.07 - 2110.17, eff. Dec. 31, 2016) require an auditor to obtain a sufficient understanding of the company and its environment, including steps to "understand the events, conditions, and company activities that might reasonably be expected to have a significant effect on the risks of material misstatement."

347.    PCAOB Standards AS 12.18 - 12.40 (AS 2110.18 - 2110.40, eff. Dec. 31, 2016) require an auditor to obtain an understanding of internal controls over financial reporting to

---

[100] Reorganization of PCAOB Auditing Standards and Related Amendments to PCAOB Standards and Rules, PCAOB Release No. 2015-002 (Mar. 31, 2015), https://pcaobus.org/Rulemaking/Docket040/Release_2015_002_Reorganization.pdf ("PCAOB Release No. 2015-002").

[101] AU 110.01 (AS 1001.01, eff. Dec. 31, 2016).

[102] AU 110.02 (AS 1001.02, eff. Dec. 31, 2016).

[103] *Id.*

(a) identify the types of potential misstatements, (b) assess the factors that affect the risks of material misstatement, and (c) design further audit procedures.  An auditor's understanding of internal controls over financial reporting includes evaluating the design of controls that are relevant to the audit and determining whether the controls have been implemented.  In this regard, an auditor is required to evaluate the extent to which existing control deficiencies are indicative of a fraud risk factor.

348.    PCAOB Standards AS 12.46 - 12.71 (AS 2110.46 - 2110.71, eff. Dec. 31, 2016) require an auditor to perform audit procedures designed to identify areas that might represent specific risks relevant to the audit, including the existence of unusual transactions and events, and amounts, ratios and trends that warrant investigation.

349.    PCAOB Standards AS 13.08 and AS 13.13 (AS 2301.08 and AS 2301.13, eff. Dec. 31, 2016) require the auditor to design and perform the audit procedures in a manner that are specifically responsive to evident risks of material misstatement for each relevant assertion of each significant account and disclosure, including fraud risk.

350.    PCAOB Standards AS 18.03 and AS 18.14 - 18.17 (AS 2410.03 and AS 2410.14 - 2410.17, eff. Dec. 31, 2016) require the auditor to perform procedures to obtain an understanding of the company's relationships and transactions with its related parties that might reasonably be expected to affect the risk of material misstatement of the financial statements including whether related-party transactions have been properly accounted for and disclosed.  These standards require the auditor to evaluate whether the company has properly identified its related parties and relationships and transactions with related parties.  This evaluation requires the auditor to perform procedures that test the accuracy and completeness of the related parties and the relationships and

transactions with related parties identified by the company, taking into account the information gathered during the audit.

351.    PCAOB Standards AU 342.04 and AU 342.09 - 342.10 (AS 2501.04 and AS 2501.09 - 2501.10, eff. Dec. 31, 2016) require the auditor to evaluate the "reasonableness of accounting estimates" made by the company in the "context of the financial statements taken as a whole."   The auditor should consider various factors, including "[d]eviations from historical patterns."  Further, the auditor should "obtain an understanding of how [the company] developed the estimate" and, based on that, (a) "[r]eview and test the process used by management to develop the estimate"; (b) [d]evelop an independent expectation of the estimate to corroborate the reasonableness of [the company's] estimate"; and (c) "[r]eview subsequent events or transactions occurring prior to the date of the auditor's report."

352.    PCAOB Standard AU 110.01 (AS 1001.01, eff. Dec. 31, 2016) requires adherence to the objective of a financial statement audit consisting of the expression of an opinion on the fairness with which the financial statements present, in all material respects, the financial position, results of operations and the cash flows of the reporting entity, in conformity with GAAP.

353.    PCAOB Standards AU 230.01 and AU 230.07 - 230.09 (AS 1015.01 and AS 1015.07 - 1015.09, eff. Dec. 31, 2016) and AU 316.13 (AS 2401.13, eff. Dec. 31, 2016) impose upon auditors the responsibility of applying "due professional care," including the appropriate "professional skepticism."  Professional skepticism requires the auditors to maintain a questioning mind and critically assess the audit evidence it obtains.  In this regard, PCAOB Standards expressly require that the auditors should not be satisfied with less than persuasive evidence beyond simply a belief that management is honest.

354.     PCAOB Standards AS 15.04 and AS 15.29 (AS 1105.04 and AS 1105.29, eff. Dec. 31, 2016) and AS 14.08 (AS 2810.08, eff. Dec. 31, 2016) also prohibit an auditor from issuing any unqualified opinion when it fails to gather sufficient appropriate audit evidence necessary to support its opinion.  When audit evidence obtained from one source is inconsistent with that from another, or if the auditor has doubts regarding the reliability of audit evidence, auditors are required to perform additional procedures necessary to resolve the matter.

355.     PCAOB Standard AU 316 (AS 2401, eff. Dec. 31, 2016) establishes that the auditors' responsibility for identifying and responding to risks of material misstatement extended to those risks arising from fraud.

356.     PCAOB Standards AU 316.66 – 316.67A (AS 2401.66 - 2401.67A, eff. Dec. 31, 2016) and AS 18.05 and AS 18.11 (AS 2410.05 and AS 2410.11, eff. Dec. 31, 2016) require, as applicable, that auditors understand the business rationale for significant unusual transactions including corresponding related-party transactions and evaluate whether the rationale – or lack of rationale – suggest that the transaction may have been entered into to engage in fraudulent financial reporting or conceal the misappropriation of assets.  In understanding the business rationale for significant unusual transactions, the auditors are required, in part, to consider whether:

(a)     The transactions involved related parties or relationships or transactions with related parties previously undisclosed;

(b)     The transactions involved other parties that lacked the financial capability to support the transaction without assistance;

(c)     The transactions lacked commercial or economic substance, or were part of a larger series of connected, linked, otherwise interdependent arrangements

that lack commercial or economic substance individually or in the aggregate; and

(d) The transactions occurred with a party that falls outside the definition of a related party (as defined by the accounting principles applicable to that company), with either party able to negotiate terms that may not be available for other, more clearly independent, parties on an arms'-length basis.

357.   PCAOB Standard AS 5 (AS 2201, eff. Dec. 31, 2016) establishes the auditor's responsibility when engaged to perform an audit of internal controls over financial reporting that is integrated with an audit of financial statements.  The objective of this type of audit is to express an opinion on the effectiveness of the company's internal controls over financial reporting.  In doing so, auditors are required to plan and perform its audit to obtain appropriate evidence that is sufficient to obtain reasonable assurance about whether material weaknesses exist in a company's internal controls over financial reporting.  A material weakness is a deficiency, or a combination of deficiencies, in internal controls over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.

358.   When planning and performing an audit of internal controls over financial reporting, PCAOB Standard AS 5.14 (AS 2201.14, eff. Dec. 31, 2016) requires that the auditor take into account the results of his or her fraud risk assessment and evaluate whether the company's controls sufficiently address identified risks of material misstatement due to fraud.  PCAOB Standards identify controls that may address these risks, including:

(a) Controls over significant transactions that are outside the normal course of business for the company or that otherwise appear to be unusual due to their

timing, size, or nature ("significant unusual transactions"), particularly those that result in late or unusual journal entries;

(b)  Controls over related-party transactions; and

(c)  Controls that mitigate incentives for, and pressures on management to falsify or inappropriately manage financial results.

359.  PCAOB Standards AS 5.15 and AS 5.65 – 5.69 (AS 2201.15 and AS 2201.65 – 2201.69, eff. Dec. 31, 2016) require the auditor to consider identified deficiencies in controls, including controls designed to prevent or detect fraud, when developing its response to risks of material misstatement during the financial statement audit.

**B.    The Auditor Defendants Knew and/or were Reckless in Ignoring a Series of Red Flags in Issuing their Respective Clean Audit Opinions**

360.    Throughout the Class Period, there were a series of significant red flags ("Red Flags") regarding the Massive Financial Fraud that the Auditor Defendants knew or were reckless in not knowing.  These Red Flags relate to several different issues including that (a) Melisanidis had a prior criminal background, but yet exercised significant control over the Company; (b) Aegean entered into a series of significant related-party transactions involving entities owned and/or affiliated with Melisanidis that were questionable; (c) accounts receivable for the period 2014-2017 were vastly outpacing sales, strongly indicating the existence of escalating unpaid receivables, and receivables from entities owned and/controlled by Melisanidis and other control persons were delinquent; (d) the Company paid $100 million to Melisanidis to purchase his Aegean shares (which represented 22% of the Company's outstanding shares) when the payment caused a liquidity crisis for the Company; and (e) Deloitte Greece and Aegean reported material weaknesses prior to the issuance of the 2014 Form 20-F, including one related to the lack of controls for identifying related parties, but then continued to issue clean audit reports.

361.    In assessing "client risk," Deloitte Greece has stated that it considers: "management characteristics and integrity," "organization and management structure," "nature of the business," "business environment," "financial results," "business relationships and related parties" and "prior knowledge and experience."   Deloitte Greece PCAOB Form 1, Ex. 4.1. Accordingly, by Deloitte Greece's own criteria, the Aegean engagement posed "much greater than normal" risk from the outset.

362.    As identified below, the Red Flags, whether considered individually or in the aggregate, placed the Auditor Defendants on notice of the facts ultimately revealed by the Company's Reconstituted Audit Committee in its November 2, 2018 Form 6-K filing with the SEC.

### 1.    Melisanidis' Criminal Background and Control: Red Flag Nos. 1 and 2

363.    The Auditor Defendants knew or were reckless in not knowing that the Founder had a criminal background and exercised significant control over Aegean, despite the Company Defendants' efforts to conceal this control over the Company.

### a)    Red Flag No. 1 (Melisanidis' Criminal Background)

364.    Melisanidis has a history of allegations and findings of criminal misconduct, which was known to the Auditor Defendants.  Indeed, the Company's SEC filings outlined this history starting in the IPO filings, which included Deloitte Greece's audit opinions.

365.    For example, according to Aegean's November 24, 2006 IPO Prospectus, in 1999 and 2000, Melisanidis was charged with felony crimes and misdemeanors numerous times including for "false certifications, forgery, use of forged documents, and trafficking in contraband" in connection with sham refueling operations.  In some instances, he was acquitted and in other found guilty:

Our founder and largest shareholder, Dimitris Melisanidis, has played a key role in the development and success of our business. Mr. Melisanidis is a prominent figure in Greece and has been the subject of a variety of proceedings, including two felony and four misdemeanor cases brought in 1999 and 2000 alleging illegal fuel trading, and a felony case brought by the counterparty to a commercial dispute alleging embezzlement, all resulting in acquittal. Mr. Melisanidis was also subject to a 1988 misdemeanor case alleging complicity in bribery of a civil servant in connection with obtaining a drivers license for a student at a time when Mr. Melisanidis operated a driving school and a 1980 misdemeanor case alleging bribery of two players in an amateur soccer game. These matters resulted in convictions and fines of approximately $928 and $2,330 (in U.S. dollars at the time)

…

*Petroleum Bunkering & Supply*. During the 1990s, the Greek customs authorities investigated industry-wide allegations of sham bunkering transactions intended to avoid customs duties and taxes by diverting into the domestic Greek oil market duty free fuel intended for "transit" vessels stopping at Greek ports only for refueling. This investigation resulted in felony cases against a number of defendants. In 1999 and 2000, Mr. Melisanidis was charged in two felony cases relating to events which allegedly took place in 1994 and 1995 involving multiple instances of false certifications, forgery, use of forged documents and trafficking in contraband. These indictments alleged that Mr. Melisanidis distributed duty free fuel intended for transit vessels into the Greek domestic oil market through sham vessel refueling operations, and that he collaborated with customs officials to falsify certificates showing that duty free fuel was delivered to the transit vehicles. The alleged damages based on the amount of taxes and customs duties evaded totaled approximately $1.8 million (in U.S. dollars at that time) for the two cases. The cases resulted in the acquittal of Mr. Melisanidis ….

During the same period, Mr. Melisanidis was also charged with four separate misdemeanors substantially similar to those described above, based on acts alleged to have taken place in 1993 and 1994. The alleged damages in these cases based on the amount of taxes allegedly evaded totaled approximately $669,000 (in U.S. dollars at that time), and the cases were prosecuted as misdemeanors due to the lower amount of damages alleged. In two of these cases, Mr. Melisanidis was acquitted at the trial court level. In the other two cases, Mr. Melisanidis was convicted by the trial court, which found that certain documents presented by Mr. Melisanidis were false and incomplete and concluded that certain transit vessels were not bunkered. Mr. Melisanidis appealed the two convictions, and after a full retrial by the appellate court, Mr. Melisanidis was unanimously acquitted in both cases. The Supreme Court of Greece unanimously denied the prosecutor's appeal of one acquittal as untimely, and the prosecution did not appeal the other acquittal.

In connection with these six proceedings, nine administrative actions were brought by the Greek customs authorities against Mr. Melisanidis for the collection of taxes

134

and customs duties due. Two of these cases were decided in favor of Mr. Melisanidis and the remaining ones against him.  All of these cases are being appealed and involve an aggregate amount at issue of approximately $9.5 million (in U.S. dollars at that time) plus potential penalty interest.

In 1999, Mr. Melisanidis was charged with the misdemeanor of violating a government order by continuing to operate a warehouse which had been ordered closed by the Greek authorities in 1995. Without his appearance and participation in the proceedings, he was convicted and sentenced to 30-days imprisonment. However, under Greek law, all sentences of imprisonment for two years or less are automatically converted into monetary fines, and longer sentences of up to three years may, at the discretion of the court, also be converted into monetary fines. Consequently, the sentence of 30-days imprisonment was automatically converted to a monetary fine of approximately $149 (in U.S. dollars at that time). In March 2006, Mr. Melisanidis filed a motion for retrial on the grounds that at that time, he was not a director of the company responsible for the warehouse. This motion for retrial was heard on November 23, 2006 and a decision is expected to follow.

In 2000, in connection with a labor dispute resulting from the death of a worker due to an explosion on a tanker that was allegedly owned by a company of which Mr. Melisanidis was a representative, the dock workers union filed a criminal complaint against Mr. Melisanidis charging him with the misdemeanors of slander and the making of threats of violence. In 2003, at trial, the union's president withdrew the complaint and the charges against Mr. Melisanidis were dropped.

In 2002, Mr. Melisanidis was charged in a proceeding initiated by a criminal complaint filed in 1992 by the counterparty to a commercial transaction involving the sale of petroleum with the felony of embezzlement relating to the commercial transaction. The indictment alleged that, in 1990 and 1991, a company of which Mr. Melisanidis was a representative agreed to sell fuel on behalf of the counterparty, to hold the proceeds of such sales in a separate bank account and to manage the funds to pay for fuel required by the counterparty's ships. The indictment further alleged that approximately $3.8 million (in U.S. dollars at that time) was unlawfully withheld from the counterparty. Prior to the criminal trial, Mr. Melisanidis reached a settlement with the counterparty in the commercial transaction. After hearing the evidence, including a statement from the attorney for the complainant counterparty that the dispute had been settled out of court and that the counterparty had no further claims against the defendants, the court acquitted Mr. Melisanidis.

*Driving School.*  In 1970, Mr. Melisanidis founded a network of driving schools in Greece which he managed through 1989. In connection with the conduct of this business, Mr. Melisanidis was found guilty in 1988 of the misdemeanors of (a) complicity in bribery for facilitating payments from a driving student to a civil servant and (b) instigating the civil servant to issue a false certification with respect

to the testing of such driving student. These acts were alleged to have taken place in 1984. This decision was upheld on appeal. The Supreme Court of Greece reversed Mr. Melisanidis' conviction on charge (b) above, but upheld the conviction on charge (a) above. Mr. Melisanidis' one-year sentence of imprisonment resulting from this conviction was converted to a monetary fine of approximately $928 (in U.S. dollars at that time). In an administrative action in 1993, Mr. Melisanidis' driver instructor license was revoked as a result of his conviction by the appellate court. In 1995, following the Supreme Court's reversal of Mr. Melisanidis' conviction on charge (b) above, Mr. Melisanidis driver instructor license was reinstated. Mr. Melisanidis was also convicted of regulatory violations in 1989 involving an employee of the driving school conducting lessons without an instructors license and operating a vehicle without a drivers license.

*Professional and Amateur Soccer.*    Mr. Melisanidis has been prominently involved with professional soccer clubs in Greece for many years, including as owner of an indirect stake in, and managing director and chairman of, the AEK professional soccer team from 1992 through 1995. In 1999 he was involved in a physical altercation with George Vardinoyannis, the owner of a rival team and oil and shipping businesses. As a result of this incident, Mr. Melisanidis was fined approximately $661 (in U.S. dollars at that time) and both he and Mr. Vardinoyannis were banned for one month from entering soccer stadiums by an athletic judge. During the same year, Mr. Melisanidis was involved in another physical altercation with Giannis Bethanis, a Greek Football Association official, as a result of which the Association fined Mr. Melisanidis approximately $1,651 (in U.S. dollars at that time), fined AEK approximately $3,303 (in U.S. dollars at that time) and banned Mr. Melisanidis from serving as a member of AEK's board of directors for three months.

In 1982, Mr. Melisanidis was convicted of the misdemeanor of bribing two players in an amateur soccer game that had occurred in 1980. The conviction resulted in a five month sentence which was converted to a monetary fine of approximately $2,330 (in U.S. dollars at that time), which was upheld on appeal.

366.    In subsequent SEC filings through 2010, including the 2007 Form 20-F and subsequent annual Form 20-F filings, the Company reiterated some of this information and provided some updates regarding the pending matters noted above.  Concerns over the actions of Melisanidis continued to arise well-after the IPO.  In its October 18, 2013 Prospectus Supplement, the Company stated "Melisanidis is a prominent figure in Greece and has been the subject of a variety of proceedings, which we have described in previous filings with the SEC.  ***More recently,***

*one Greek weekly has raised questions about Mr. Melisanidis and supposed influence with key state employees and other business practices*."

367.    In 2013, as part as a massive privatization program resulting from the Greek financial crisis, the Greek government set out to sell a 33% stake in its state-controlled gaming company called OPAP.  The €650 million winning bidder was an investment fund called Emma Delta, which was headed by Melisanidis.  The acquisition was controversial for numerous reasons. First, Emma Delta was the only bidder.  Second, Stelios Stavridis, Chairman of Greece's privatization agency, was forced to resign following a report that he had used the private jet belonging to Melisanidis to go on holiday while finalizing the sale of OPAP to Emma Delta.  Third, OPAP's chief executive, Costas Louropoulos, complained that Melisanidis pressured Louropoulos not to take actions that Melisanidis felt were not in his best interests and threatened to "take [Louropoulos's] head off," according to the *Financial Times*.[104]

368.    According to the RBM Lawsuit: (a) in 2013, Melisanidis reportedly threatened to kill a reporter and his family; (b) in 2014, Melisanidis was summoned by authorities to answer questions regarding allegations that he ordered an attack on a soccer referee; and (c) in 2017, several of Melisanidis' Aegean entities were implicated in a scheme involving shipping companies

---

[104]*See* Kerin Hope, *Greece's privatization of OPAP faces investigation*, Financial Times (Feb. 4, 2014), https://www.ft.com/content/5828c7d6-8cf6-11e3-ad57-00144feab7de; Abed Alloush, *FT: "Greece's privatization of OPAP faces investigation"*, GreekReporter.com (Feb. 6, 2014), https://greece.greekreporter.com/2014/02/06/ft-greeces-privatization-of-opap-faces-investigation/; *Greek privatization chief dismissed over holiday flight*, Reuters (Aug. 18, 2013), https://www.reuters.com/article/us-malaysia-politics-1mdb-auditors/malaysia-probing-audit-firms-conduct-in-1mdb-scandal-idUSKCN1PK079; RBM Complaint; Kerin Hope, *Greece faces collapse of second key privatization*, Financial Times (June 27, 2013), https://www.ft.com/content/2741ce06-df31-11e2-881f-00144feab7de#axzz2uW9e5fH9.

paying bribes to Brazil's state-owned oil company, Petróleo Brasileiro S.A. (also known as "Petrobas"), which was the subject of a $2.95 billion settlement in a securities fraud class action.[105]

369.    As the excerpts and contentions cited above reveal, in addition to his being prone to violent outbursts, Melisanidis has been the subject of extensive criminal and regulatory proceedings and, while there have been acquittals and some appellate rulings in his favor overturning trial court convictions along the way, the staggering breadth and scope of his interactions with the authorities over the past 25 years – particularly those involving his business interests in the petroleum shipping industry – should have been an obvious Red Flag to the Auditor Defendants.

370.    As noted above, the Company's initial efforts to become a public company failed presumably because of the Founder's history.  Thus, in 2006, the Company structured its management team so that the Founder did not remain an executive after the IPO, purportedly to provide credibility to the Company and obtain approval to become a public company.  As discussed, a "Framework Agreement" was proposed in SEC filings in support of the Company's IPO whereby Melisanidis agreed to step down from the Board and would be precluded from joining the Board or naming directors that would serve as Board Chairman or Chairman of the Audit and Nominating Committees.  Others were given key management roles and Melisanidis

---

[105] *See* Nikolas Leontopoulos, *SEC filings shed light on Greek billionaire's legal past*, The Press Project (Feb. 24, 2014), https://www.thepressproject.gr/article/57229/Melissanidis; Elektra Kotsoni, *A Greek Oil Baron Wants to Blow Me Up in My Sleep*, Vice (Feb. 6, 2013), https://www.vice.com/sv/article/av8xv5/unfollow-magazine-oil-smuggling-aegean-oil; Philip Chrysopoulos, *Prosecutor Calls Greek Soccer Chiefs Over Violent Attack on Referee*, Greek Reporter (Nov. 17, 2014), https://greece.greekreporter.com/2014/11/17/prosecutor-calls-greek-soccer-chiefs-over-violent-attack-on-referee/; Rodrigo Russo and Ben Lucas, *Greek shipping companies Aegean and Tsakos dragged into Petrobras corruption probe*, mLex Markt Insights (Aug. 22, 2017), https://mlexmarketinsight.com/insights-center/editors-picks/anti-bribery-and-corruption/latin-america/greek-shipping-companies-aegean-and-tsakos-dragged-into-petrobras-corruption-probe.

assumed the title of Head of Corporate Development.  Moreover, Melisanidis agreed that the Company should establish its principal executive offices responsible for financial reporting and control functions, including preparation of reports to the SEC, in the United States, rather than Greece.

**b)**     **Red Flag No. 2 (Melisanidis' Control Over Aegean)**

371.     While the Company represented that Melisanidis was only Head of Corporate Development and later a consultant, there are significant facts demonstrating that the Founder continued to, and was allowed to, exercise significant control over Aegean.  There were a series of Red Flags regarding his power to exercise control.

372.     According to the RBM Lawsuit, Aegean and a number of Melisanidis-owned companies operated out of the same building in Greece, which is owned by Melisanidis. Melisanidis' personal office was located next to those of Aegean's General Counsel and its CFO. On information and belief, Aegean employees in Greece also work for Melisanidis' other companies, though their salaries are paid by Aegean.

373.     According to the investigation of Aegean's Reconstituted Audit Committee, Melisanidis had access to and control over the Company's electronic and physical files.

374.     Following the September 2016 buyback transaction of all of Melisanidis' shares described herein, and despite his having stepped down as Head of Corporate Development at that time, Melisanidis continued to be listed on Aegean's organizational chart as a "Corporate Consultant' at the same level as then-President and CEO, Nikolas Tavlarios.

375.     Moreover, on May 27, 2015 to further strengthen Melisanidis' exercise of control, the Board of Aegean revised the Company's Amended and Restated Bylaws, to reduce the quorum

requirement for stockholders' meetings to one-third, from a majority of the outstanding shares.
The Bylaws were changed as follows:

> Article II, Section 6 of the Amended and Restated Bylaws of Aegean Marine
> Petroleum Network Inc. is hereby amended, effective May 27, 2015, as follows:
>
> "Section 6. **Quorum**:
>
> At all meetings of shareholders, except as otherwise expressly provided by law,
> there must be present either in person or by proxy shareholders of record holding
> at least ~~a majority~~ **one third** of the shares issued and outstanding and entitled to
> vote at such meetings in order to constitute a quorum, …[106]

376.   The Reconstituted Audit Committee has revealed that an affiliate, no doubt Melisanidis, did maintain significant control over the Company from prior to the Class Period through the summer of 2018.  On information and belief based on Aegean's November 2, 2018 Form 6-K, Melisanidis continued to exert significant control over Company personnel and assets through various inappropriate means, including threats of economic retaliation and physical violence.

377.   It is more than a fair inference that if the Auditor Defendants had been onsite at the Athens office of Aegean for any period of time during their auditing work, they could not have failed but to have observed Melisanidis' office and its proximity to Giannotis' office and the obvious marker this would have conveyed demonstrating his continuing presence, on-site influence and control.  If, on the other hand, the Auditor Defendants conducted their auditing work in New York, which was, as required by the Company's articles, the location of the Company's financial reporting, then there can be little question of active involvement by the U.S. Auditor Defendant entities.

---

[106] June 18, 2015 Form 6-K, Ex. 1.

378.     Thus, the fact that Melisanidis owned the premises that Aegean leased from him, that Melisanidis maintained an office on the premises and that he had access to and control over the Company's electronic and physical files were Red Flags that the Auditor Defendants intentionally or recklessly ignored in discharging their auditing duties under applicable accounting standards.

379.     The Founder's criminal background coupled with his exercise of control constituted significant Red Flags.  In ignoring these Red Flags when conducting their audits, the Auditor Defendants intentionally and/or recklessly violated the PCAOB Standards described *infra*, specifically those standards: (a) requiring an understanding of the transaction at issue (AS 12.07 - 12.17 (AS 2110.07 - 2110.17, eff. Dec. 31, 2016)); (b) requiring an appropriate audit response to risks of material misstatement, including fraud risk (AS 13.08 and AS 13.13 (AS 2301.08 and AS 2301.13, eff. Dec. 31, 2016)); (c) applicable to related-party transactions (AS 18.03 and AS 18.14 - 18.17 (AS 2410.03 and AS 2410.14 - 2410.17, eff. Dec. 31, 2016)); (d) requiring due care and professional skepticism (AU 230.01 and AU 230.07 - 230.09 (AS 1015.01 and AS 1015.07 - 1015.09, eff. Dec. 31, 2016) and AU 316.13 (AS 2401.13, eff. Dec. 31, 2016)); (e) applicable to significant unusual transactions (AU 316.66 – 316.67A (AS 2401.66 - 2401.67A, eff. Dec. 31, 2016) and AS 18.05 and AS 18.11 (AS 2410.05 and AS 2410.11, eff. Dec. 31, 2016)); (f) regarding sufficiency of audit evidence obtained, including the questionable reliability of audit evidence received (AS 15.04 and AS 15.29 (AS 1105.04 and AS 1105.29, eff. Dec. 31, 2016), and AS 14.08 (AS 2810.08, eff. Dec. 31, 2016)); and (g) regarding the audit of internal controls over financial reporting (AS 5.14 - 5.15 and AS 5.65 - 5.69 (AS AS 2201.14 - 2201.15 and AS 2201.65 - 2201.69, eff. Dec. 31, 2016)).

### 2.    Related-Party Transactions and Control: Red Flag Nos. 3 - 6

380.    The Auditor Defendants knew or were reckless in not knowing that the Founder orchestrated a series of related-party transactions in order to misappropriate monies from Aegean.

### a)    Red Flag No. 3 (Substantial Related-Party Transaction Involving Melisanidis that was the Primary Means for the $300 Million Misappropriation of Company Assets)

381.    As noted above, Melisanidis orchestrated a scheme in July 2010 between a company he beneficially owned and controlled, AOTC, and Aegean resulting in Aegean acquiring AOTC as a subsidiary.  AOTC's only asset was a twenty-five-year lease on property in Fujairah, UAE.  Through that acquisition, Aegean assumed the lease.  Suspiciously, Melisanidis received no consideration in exchange for his transfer of all shares in AOTC.  *See* 2012 Form 20-F; 2010 Form 20-F for the FY ended December 31, 2010, filed with the SEC on April 6, 2011.

382.    Following that acquisition, Aegean paid for the construction of the Fujairah Facility through use of another company, OilTank also operating in the UAE, to oversee the construction work which, initially, was estimated to cost $105 million.  OilTank had been established on March 15, 2010 in the Marshall Islands and, on information and belief based on the Reconstituted Audit Committee findings, is owned and/or controlled by Melisanidis.  Some two weeks later, on March 31, 2010, OilTank signed a contract with AOTC for OilTank's oversight of the construction of the Fujairah terminal, despite having had no prior experience in constructing fuel stations.  *See* November 2, 2018 Press Release; 2010 Form 20-F.

383.    This project was substantial not only in terms of cost, but also in terms of size. When it was completed in 2014, the oil storage facility had a storage capacity of 465,000 cubic meters and represented 40.1% and 43.3% of the Company's aggregated storage capacity as of December 31, 2015 and 2016, respectively.  Further, it was substantial in that Aegean had paid

over $200 million for construction and other related costs for the project, almost $100 million more than the Company had estimated in the Company's 2012 Form 20-F.  *See* 2012 Form 20-F; 2014 Form 20-F; 2015 Form 20-F; 2016 Form 20-F.

384.    The fact that Melisanidis exercised control over both Aegean and AOTC, that Melisanidis stood on both sides of the transaction, that the project would comprise nearly one-half of Aegean's total storage space and that the costs were so high were all were significant Red Flags that placed, or should have placed, the Auditor Defendants on notice of the Company's false financials and Melisanidis' misappropriation of funds.

385.    As it turned out, payments from Aegean to OilTank continued for many years after the completion of the Fujairah Facility.  On information and belief, the audits to date indicate that from July 2015 to January 2018, Aegean transferred $185.3 million.  And, as the Recomposed Audit Committee concluded, "$300 million of the Company cash and assets were misappropriated" principally through a March 31, 2010 contract [the Fujairah Facility project] with OilTank, a company controlled by a former "affiliate" of the Company.

386.    As should have been clearly apparent to the Auditor Defendants, this was nothing more than a scheme by Melisanidis to misappropriate Company assets through payments to OilTank.  Additionally, by at least 2016, following when Melisanidis announced his intention to sell off his entire shareholdings and when substantial cost overruns for the Fujairah Facility project were then known, it should have been apparent to the Auditor Defendants that this transaction was also used as a scheme by Melisanidis ultimately to cash out all of his shares at a premium.  That this transfer of AOTC was for no consideration by a related party was a clear signal to the Auditor Defendants that this was a transaction that should have been thoroughly examined.

387.    At a minimum, the fact of Melisanidis' prior ownership and control of AOTC, that the Company through AOTC operated as the paymaster for OilTank on this project, that OilTank operates in the UAE and has no public transparency and that there were substantial cost overruns, were all compelling enough reasons, standing on their own, for the Auditor Defendants to have closely examined the contracts/pricing involved in this construction project and to have inquired in more depth concerning Melisanidis' control over, and connections to, OilTank.

388.    In ignoring these Red Flags when conducting their audits, the Auditor Defendants intentionally and/or recklessly violated the PCAOB Standards described *infra*, specifically those standards: (a) requiring an understanding of the transaction at issue (AS 12.07 - 12.17 (AS 2110.07 - 2110.17, eff. Dec. 31, 2016)); (b) requiring an appropriate audit response to risks of material misstatement, including fraud risk (AS 13.08 and AS 13.13 (AS 2301.08 and AS 2301.13, eff. Dec. 31, 2016)); (c) applicable to related-party transactions (AS 18.03 and AS 18.14 - 18.17 (AS 2410.03 and AS 2410.14 - 2410.17, eff. Dec. 31, 2016)); (d) requiring due care and professional skepticism (AU 230.01 and AU 230.07 - 230.09 (AS 1015.01 and AS 1015.07 - 1015.09, eff. Dec. 31, 2016) and AU 316.13 (AS 2401.13, eff. Dec. 31, 2016)); (e) applicable to significant unusual transactions (AU 316.66 – 316.67A (AS 2401.66 - 2401.67A, eff. Dec. 31, 2016) and AS 18.05 and AS 18.11 (AS 2410.05 and AS 2410.11, eff. Dec. 31, 2016)); (f) regarding sufficiency of audit evidence obtained, including the questionable reliability of audit evidence received (AS 15.04 and AS 15.29 (AS 1105.04 and AS 1105.29, eff. Dec. 31, 2016), and AS 14.08 (AS 2810.08, eff. Dec. 31, 2016)); and (g) regarding the audit of internal controls over financial reporting (AS 5.14 - 5.15 and AS 5.65 - 5.69 (AS AS 2201.14 - 2201.15 and AS 2201.65 - 2201.69, eff. Dec. 31, 2016)).

**b)** **Red Flag No. 4 (Marine Fuel Supply Service Agreement with Affiliate Aegean Oil S.A. Owned by Melisanidis Family)**

389.     The Company was also party to a highly questionable April 1, 2005 marine fuel supply service agreement with Aegean Oil S.A., another company owned and controlled by the Melisanidis family.  During all relevant times, Melisanidis controlled Aegean Oil S.A.  Indeed, the Company itself has acknowledged in its 2015 Form 20-F that Melisanidis may be deemed to be a control person of Aegean Oil S.A. under the U.S. Securities laws.  This agreement provided highly favorable terms, as described below.

390.     During 2015-2016, Aegean Oil S.A. was engaged in the downstream gasoline market in Greece and was licensed as both a trader and physical supplier of marine petroleum products in Greece.  *See* 2015 Form 20-F; 2016 Corporate Annual Report.

391.     In its 2015 Form 20-F filing, Aegean describes its agreement with Aegean Oil S.A. to buy minimum amounts of marine petroleum products from Aegean Oil S.A. at a mark-up over cost, with a hefty 10% penalty imposed on late payments and secured by a letter of credit (at Aegean's cost).  The agreement provides, in relevant part, as follows:

> Under the terms of this Agreement, Aegean Oil sells and delivers marine petroleum products to our customers within Greek territorial waters.  Under the agreement, as amended and supplemented, **we must purchase a minimum, and Aegean Oil must sell up to a maximum**, quantity of marine petroleum products.  Aegean Oil sells the marine petroleum products at an amount equal to its purchase costs from selected Greek refineries plus a margin.  Payments are made within 30 calendar days from the date of receipt of the invoices, **with a penalty of 10% imposed on late payments**.  Under this agreement, **we are required to provide security by way of a standby letter of credit** or other mutually acceptable guarantee in relation to any outstanding balance.  This agreement terminated on March 31, 2015 and was renewed until December 31, 2015, …

392.     During the years ended December 31, 2015, 2014 and 2013, Aegean purchased marine petroleum products from Aegean Oil S.A. in the following significant amounts: $134 million, $342.7 million, and $414.7 million, respectively.  In addition, Aegean derived other

significant revenue from its affiliation with Aegean Oil S.A., including revenue from several of Aegean's vessels that were employed under contract with Aegean Oil S.A.  *See* 2015 Form 20-F.

393.    The related-party affiliation of Aegean Oil S.A. to Melisanidis and his family members, Aegean Oil S.A.'s significant dealings with Aegean, the highly favorable contractual terms and the volume of payments made by Aegean to Aegean Oil S.A. all constituted Red Flags that could not have been ignored under any circumstance.

394.    The foregoing factors, either individually or in their aggregate, were all Red Flags that the Auditor Defendants intentionally or recklessly ignored in discharging their auditing duties under applicable accounting standards.  In ignoring these Red Flags when conducting their audits, the Auditor Defendants intentionally and/or recklessly violated the PCAOB Standards described *infra*, specifically those standards: (a) requiring an understanding of the transaction at issue (AS 12.07 - 12.17 (AS 2110.07 - 2110.17, eff. Dec. 31, 2016)); (b) requiring an appropriate audit response to risks of material misstatement, including fraud risk (AS 13.08 and AS 13.13 (AS 2301.08 and AS 2301.13, eff. Dec. 31, 2016)); (c) applicable to related-party transactions (AS 18.03 and AS 18.14 - 18.17 (AS 2410.03 and AS 2410.14 - 2410.17, eff. Dec. 31, 2016)); (d) requiring due care and professional skepticism (AU 230.01 and AU 230.07 - 230.09 (AS 1015.01 and AS 1015.07 - 1015.09, eff. Dec. 31, 2016) and AU 316.13 (AS 2401.13, eff. Dec. 31, 2016)); (e) applicable to significant unusual transactions (AU 316.66 – 316.67A (AS 2401.66 - 2401.67A, eff. Dec. 31, 2016) and AS 18.05 and AS 18.11 (AS 2410.05 and AS 2410.11, eff. Dec. 31, 2016)); (f) regarding sufficiency of audit evidence obtained, including the questionable reliability of audit evidence received (AS 15.04 and AS 15.29 (AS 1105.04 and AS 1105.29, eff. Dec. 31, 2016), and AS 14.08 (AS 2810.08, eff. Dec. 31, 2016)); and

(g) regarding the audit of internal controls over financial reporting (AS 5.15 and AS 5.65 - 5.69 (AS 2201.15 and AS 2201.65 - 2201.69, eff. Dec. 31, 2016)).

**c)**   **Red Flag No. 5 (Service Agreements with Affiliate Aegean V Owned by Melisanidis Family)**

395.     As disclosed in Aegean's 2014 Form 20-F, in 2011, Aegean entered into separate contracts with Aegean V, which was owned and controlled by relatives of Melisanidis, pursuant to which two of the Company's vessels, the Amorgos and the Karpathos, provided freight services to Aegean V.   As reported by the Company, aggregate revenue for each of the years ended December 31, 2014 and 2013 was $1.8 million and $8.8 million respectively.

396.     The fact that Melisanidis orchestrated these contracts with Aegean V, to the benefit of Melisanidis and his family members, constituted a Red Flag.   In ignoring these Red Flags when conducting their audits, the Auditor Defendants intentionally and/or recklessly violated the PCAOB Standards described *infra*, specifically those standards: (a) requiring an understanding of the transaction at issue (AS 12.07 - 12.17 (AS 2110.07 - 2110.17, eff. Dec. 31, 2016)); (b) applicable to related-party transactions (AS 18.03 and AS 18.14 - 18.17 (AS 2410.03 and AS 2410.14 - 2410.17, eff. Dec. 31, 2016)); (c) requiring an appropriate audit response to risks of material misstatement, including fraud risk (AS 13.08 and AS 13.13 (AS 2301.08 and AS 2301.13, eff. Dec. 31, 2016)); (d) requiring due care and professional skepticism (AU 230.01 and AU 230.07 - 230.09 (AS 1015.01 and AS 1015.07 - 1015.09, eff. Dec. 31, 2016) and AU 316.13 (AS 2401.13, eff. Dec. 31, 2016)); (e) applicable to significant unusual transactions (AU 316.66 – 316.67A (AS 2401.66 - 2401.67A, eff. Dec. 31, 2016) and AS 18.05 and AS 18.11 (AS 2410.05 and AS 2410.11, eff. Dec. 31, 2016)); (f) regarding sufficiency of audit evidence obtained, including the questionable reliability of audit evidence received (AS 15.04 and AS 15.29 (AS 1105.04 and AS 1105.29, eff. Dec. 31, 2016), and AS 14.08 (AS 2810.08, eff. Dec. 31,

147

2016)); and (g) regarding the audit of internal controls over financial reporting (AS 5.14 - 5.15 and AS 5.65 - 5.69 (AS AS 2201.14 - 2201.15 and AS 2201.65 - 2201.69, eff. Dec. 31, 2016)).

### d)   Red Flag No. 6 (Using Aegean to Pay Expenses to Firm Owned by Insiders Melisanidis, Georgiopoulos and Tavlarios)

397.   This Red Flag consists of an agreement, originating in 2006 and in effect during the Class Period, which required the registration of securities held and/or controlled by insiders/affiliates of Aegean, including Melisanidis, Georgiopoulos and Nikolas Tavlarios be paid for at Aegean's expense.

398.   Leveret was Aegean's sole shareholder as of September 29, 2005 (others acquired Aegean shares in the subsequent months).  During all times relevant, Melisanidis controlled and was the dominant shareholder of Leveret.  Aegean had been formed in June 2006 for the purpose of acquiring all of the outstanding shares of certain companies owned, directly and indirectly, by Leveret for use by Aegean in its business operations.[107]  *See* 2015 Form 20-F.

399.   On December 13, 2006, the Company entered into a Registration Rights agreement with Leveret and AMPNInvest LLC ("AMPNInvest") (another shareholder of the Company at that time), among others, that required the Company to register the shares of common stock held by Leveret and Messrs. Georgiopoulos and Nikolas Tavlarios (successors-in-interest to AMPInvest) up to an aggregate of three times under the Securities Act of 1933.  All expenses of those registration efforts were to be borne by the Company.  Georgiopoulos and Nikolas Tavlarios owned respectively 5,420,250 and 515,000 common shares entitled to those registration rights.  On

---

[107] Prior to the initial offering, the Company had 28,035,000 shares of common stock outstanding. On December 13, 2006, the Company completed an IPO for an additional 14,375,000 shares of common stock; on January 27, 2010, a further public offering of an additional 4,491,000 shares of common stock was made.  On May 19, 2010, the Company acquired from Leverett 1,000,000 shares of the Company's stock.  *See* 2015 Form 20-F.

October 31, 2014, Leveret contributed its entire shareholdings of 10,088,031 common shares to Leskira, a Cypriot corporation controlled by Melisanidis.  *See* 2015 Form 20-F.

400.    That Melisanidis controlled Leveret and that he could time the sale of his shares and that his closest associates were all Red Flags that the Auditor Defendants intentionally or recklessly ignored in discharging their auditing duties.   In ignoring these Red Flags when conducting their audits, the Auditor Defendants intentionally and/or recklessly violated the PCAOB Standards described *infra*, specifically those standards: (a) requiring an understanding of the transaction at issue (AS 12.07 - 12.17 (AS 2110.07 - 2110.17, eff. Dec. 31, 2016)); (b) requiring an appropriate audit response to risks of material misstatement, including fraud risk (AS 13.08 and AS 13.13 (AS 2301.08 and AS 2301.13, eff. Dec. 31, 2016)); (c) applicable to related-party transactions (AS 18.03 and AS 18.14 - 18.17 (AS 2410.03 and AS 2410.14 - 2410.17, eff. Dec. 31, 2016)); (d) requiring due care and professional skepticism (AU 230.01 and AU 230.07 - 230.09 (AS 1015.01 and AS 1015.07 - 1015.09, eff. Dec. 31, 2016) and AU 316.13 (AS 2401.13, eff. Dec. 31, 2016)); (e) applicable to significant unusual transactions (AU 316.66 – 316.67A (AS 2401.66 - 2401.67A, eff. Dec. 31, 2016) and AS 18.05 and AS 18.11 (AS 2410.05 and AS 2410.11, eff. Dec. 31, 2016)); (f) regarding sufficiency of audit evidence obtained, including the questionable reliability of audit evidence received (AS 15.04 and AS 15.29 (AS 1105.04 and AS 1105.29, eff. Dec. 31, 2016), and AS 14.08 (AS 2810.08, eff. Dec. 31, 2016)); and (g) regarding the audit of internal controls over financial reporting (AS 5.14 - 5.15 and AS 5.65 - 5.69 (AS AS 2201.14 - 2201.15 and AS 2201.65 - 2201.69, eff. Dec. 31, 2016)).

3.  **Escalating Receivables and Defaults, Including by Related Entitles: Red Flag Nos. 7- 10**

a)  **Red Flag No. 7 (Escalating Receivables)**

401.  Escalating receivables were a Red Flag because they signaled that significant amounts were past due and mounting.  As auditors, the Auditor Defendants would have had access to the Company's accounts receivables aging reports, which would have revealed the scope and the source of the mounting accounts receivables, some of which relate to receivables with related parties.

402.  Aegean's consolidated financial statements, included in their annual Form 20-F filings and the March 7, 2018 Form 6-K included the following reported revenues, accounts receivable and allowance for bad debt as of each of the Company's financial reporting periods: December 31, 2017, December 31, 2016 and December 31, 2015:[108]

| ($) amounts in thousands | As of (or for) FY 12/31/17 | As of (or for) FY12/31/16 | As of (or for) FY12/31/15 |
|---|---|---|---|
| *Consolidated Statement of Income* | | | |
| Revenue | $5,674,287 | $4,076,219 | $4,231,654 |
| *Consolidated Balance Sheets* | | | |
| Trade Accounts Receivable, Gross | $638,037 | $512,398 | $317,152 |
| Allowance for Doubtful Accounts | ($11,179) | ($8,647) | ($7,278) |
| Net, Trade Accounts Receivable | $626,858 | $503,751 | $309,874 |

403.  As later revealed by Aegean's Reconstituted Audit Committee following its investigation, the Company has acknowledged that approximately $200 million of accounts receivable balances as of December 31, 2017 were uncollectible, required write-off and were

---

[108]  Numbers are stated in thousands of U.S. dollars except EPS.

overstated.[109]  Further, that same investigation has acknowledged that the transactions underlying its reported receivables "lacked economic substance as the [four] counterparties were shell companies with no material assets or operations and were owned or controlled by former employees or affiliates of the Company."[110]

404.    Aegean has also acknowledged that accounts receivable from these same four "shell" counterparties existed during prior periods and approximated $172 million as of December 31, 2016 and $85 million as of December 31, 2015.[111]  This means that a significant portion of the receivables shown on the Company's consolidated financial statements were actually receivables from the four counterparties, and were materially increasing from FY 2015 to the end of FY 2016. The receivables reported by Aegean were, in turn, materially significant and approximated 27% and 34% of Aegean's net reported trade accounts receivable at December 31, 2015 and 2016, respectively.[112]  Further, the receivables from the four counterparties approximated 6% and 11% of Aegean's total assets reported as of December 31, 2015 and 2016, respectively.[113]

405.    Given the size of these receivables, that they were escalating at a rapid pace, that they were from four counterparties, that they were likely past due and that the Auditor Defendants were clearly familiar with the related-party transactions involving the Company and Melisanidis and other entities in the UAE controlled and/or affiliated with Melisanidis, it would have been

---

[109] Under relevant GAAP, revenue may only be recognized when it is earned and realizable. Revenue is generally "earned" and "realizable" only when all of the following criteria are met: (a) persuasive evidence of an arrangement exists; (b) delivery has occurred or services have been rendered; (c) the seller's price to the buyer is fixed or determinable; and (d) collectability is reasonably assured.  ASC 605-10-S99.

[110] November 2, 2018 Press Release.

[111] June 4, 2018 Form 6-K.

[112] 2015 Form 20-F; 2016 Form 20-F; June 4, 2018 Form 6-K.

[113] *Id.*

fundamental under applicable accounting principles for the Auditor Defendants to have examined whether any of the four counterparties had any economic substance.

406.    Another clear example of the escalating receivables as a portent of fraud that the Auditor Defendants intentionally and/or recklessly ignored is the fact that sales were declining while accounts receivables were increasing between 2015 and 2016.  Specifically, revenues (sales) declined by nearly $200 million but, accounts receivable increased by nearly $200 million for the same period, thus placing the Auditor Defendants on clear notice that there was likely a severe and existing problem involving past due amounts, and likely involving related parties.  At that point, a simple inquiry examining the source(s) and collectability of those account receivables would have revealed the shell companies and sham transactions that were later discovered by the Reconstituted Audit Committee and reported upon in its November 2, 2018 Form 6-K filing.

407.    The foregoing factors, either individually or in their aggregate, were all Red Flags. In ignoring these Red Flags when conducting their audits, the Auditor Defendants intentionally and/or recklessly violated the PCAOB Standards described *infra*, specifically those standards: (a) requiring an understanding of the transaction at issue (AS 12.07 - 12.17 (AS 2110.07 - 2110.17, eff. Dec. 31, 2016)); (b) requiring an appropriate audit response to risks of material misstatement, including fraud risk (AS 13.08 and AS 13.13 (AS 2301.08 and AS 2301.13, eff. Dec. 31, 2016)); (c) applicable to related-party transactions (AS 18.03 and AS 18.14 - 18.17 (AS 2410.03 and AS 2410.14 - 2410.17, eff. Dec. 31, 2016)); (d) relating to accounting estimates (AU 342.04 and AU 342.09 - 342.10 (AS 2501.04 and AS 2501.09 - 2501.10, eff. Dec. 31, 2016)); (e) requiring due care and professional skepticism (AU 230.01 and AU 230.07 - 230.09 (AS 1015.01 and AS 1015.07 - 1015.09, eff. Dec. 31, 2016) and AU 316.13 (AS 2401.13, eff. Dec. 31, 2016)); (f) applicable to significant unusual transactions (AU 316.66 – 316.67A (AS 2401.66 - 2401.67A,

eff. Dec. 31, 2016) and AS 18.05 and AS 18.11 (AS 2410.05 and AS 2410.11, eff. Dec. 31, 2016));

and (g) regarding sufficiency of audit evidence obtained, including the questionable reliability of

audit evidence received (AS 15.04 and AS 15.29 (AS 1105.04 and AS 1105.29, eff. Dec. 31,

2016), and AS 14.08 (AS 2810.08, eff. Dec. 31, 2016)).

**b)**      **Red Flag No. 8 (Non-payment for Sales to Aegean Shipping Owned by Melisanidis Family)**

408.  Aegean also conducted sales transactions with a firm called Aegean Shipping

consisting of various vessel-owning companies, generically described by Aegean as "Aegean

Shipping."  Aegean Shipping was owned and controlled by members of Melisanidis' family.

Indeed, the Company itself has acknowledged in its 2015 Form 20-F that under the U.S. securities

laws Melisanidis may be deemed to be a control person of Aegean Shipping.  The Red Flag here

is that Aegean Shipping had not paid Aegean for over one year.

409.  The non-payment by the affiliated Melisanidis Aegean Shipping entities is revealed

in Aegean's own 2015 and 2016 Form 20-F filings ***showing roughly a doubling of accounts

receivable over corresponding sales for each of 2015 and 2016***.  Aegean's 2015 Form 20-F

indicated that sales of marine petroleum products to Aegean Shipping for 2015 were $1.7 million,

while accounts receivable for the same period were $3.5 million:

> Our sales of marine petroleum products to Aegean Shipping for the years ended
> December 31, 2015, 2014 and 2013 amounted to $1.7 million, $7.7 million and
> $7.8 million, respectively. **The amounts due from Aegean Shipping for sales of
> marine petroleum products for the year ended December 31, 2015 and 2014
> amounted to $3.5 million and $12.2 million, respectively.**

410.  Similarly, according to Aegean's 2016 Form 20-F, accounts receivables were well

in excess over sales, indicating a carryforward of amounts due from prior periods.  This escalation

of accounts receivable over sales reveals that Aegean had not been paid for over one year in

connection with its sales to Aegean shipping entities.  For example, Aegean's 2016 Form 20-F

153

shows sales to Aegean Shipping in the amount of $1.49 million, and trade receivables from Aegean

Shipping of $2.487 million:

> … The Company's sales of marine fuel and lubricants to Aegean Shipping for the years ended December 31, 2016, 2015 and 2014, amounted to $1,490, $1,724 and $7,653, respectively, and are included under related companies' revenues in the accompanying consolidated statements of income.

> As at December 31, 2016 and 2015, the amounts due from Aegean Shipping for sales of marine petroleum products were $2,487 and $3,542 respectively, and are included under trade receivables from related companies in the accompanying consolidated balance sheets.

411. The fact that agreements of this magnitude had been entered into with Aegean

Shipping – an entity owned and controlled by Melisanidis and his family members – where delays

were occurring on payments owed to Aegean (delayed accounts receivable) was a Red Flag that

the Auditor Defendants intentionally and/or recklessly ignored in discharging their auditing duties

under applicable standards. In ignoring these Red Flags when conducting their audits, the Auditor

Defendants violated the PCAOB Standards described *infra*, specifically those standards:

(a) requiring an understanding of the transaction at issue (AS 12.07 - 12.17 (AS 2110.07 - 2110.17,

eff. Dec. 31, 2016)); (b) requiring an appropriate audit response to risks of material misstatement,

including fraud risk (AS 13.08 and AS 13.13 (AS 2301.08 and AS 2301.13, eff. Dec. 31, 2016));

(c) applicable to related-party transactions (AS 18.03 and AS 18.14 - 18.17 (AS 2410.03 and

AS 2410.14 - 2410.17, eff. Dec. 31, 2016)); (d) relating to accounting estimates (AU 342.04 and

AU 342.09 - 342.10 (AS 2501.04 and AS 2501.09 - 2501.10, eff. Dec. 31, 2016)); (e) requiring

due care and professional skepticism (AU 230.01 and AU 230.07 - 230.09 (AS 1015.01 and

AS 1015.07 - 1015.09, eff. Dec. 31, 2016) and AU 316.13 (AS 2401.13, eff. Dec. 31, 2016));

(f) applicable to significant unusual transactions (AU 316.66 – 316.67A (AS 2401.66 - 2401.67A,

eff. Dec. 31, 2016) and AS 18.05 and AS 18.11 (AS 2410.05 and AS 2410.11, eff. Dec. 31, 2016));

and (g) regarding sufficiency of audit evidence obtained, including the questionable reliability of audit evidence received (AS 15.04 and AS 15.29 (AS 1105.04 and AS 1105.29, eff. Dec. 31, 2016), and AS 14.08 (AS 2810.08, eff. Dec. 31, 2016)).

### c)   Red Flag No. 9 (Defaulting Payments to AOTC by UAE Firms)

412.   The Auditor Defendants were on notice by at least 2014 that there were serious Red Flags concerning the ability of the Company's subsidiary, AOTC, to enforce and to collect upon its obligations with contracting firms in the UAE to which AOTC was providing storage facility services.   The following examples, known to Auditor Defendants at that time, included the following:

> (a)   AOTC had provided storage facilities through agreements to Alco Shipping Services LLC and to Alco Fuel Trading LLC, two UAE companies (collectively, "Alco").   AOTC contended in legal proceedings brought in the High Court of London that Alco had failed to pay $450,000.   Following efforts to effect service of process in the UAE, both the UK Foreign and Commonwealth Offices returned service of process request with the documents unserved due to the fact that Alco had moved offices.   *See* August 10, 2016 Form 6-K.

> (b)   Similarly, AOTC had also provided storage facilities through agreements, *circa* December 2014, to the House of Gas Trading DMCC ("House of Gas").   AOTC contended that, in breach of various agreements, House of Gas failed to deliver any products and failed to pay invoices in the sum of $882,000.   As of August 10, 2016, the date of the Company's 2016 Form

155

6-K, the UK Foreign and Commonwealth Offices had not returned service of the process request. *See id.*

413.    Given the relationship of AOTC to Melisanidis, that AOTC was a subsidiary of the Company, that Melisanidis continued to control AOTC, as described above in connection with Red Flag No. 1, and that defaults of this magnitude involving these three UAE firms had occurred, these were Red Flags that the Auditor Defendants intentionally or recklessly ignored thereby disabling themselves from being informed of risks or problems requiring their attention.

414.    In ignoring these Red Flags when conducting their audits, the Auditor Defendants intentionally and/or recklessly violated the PCAOB Standards described *infra*, specifically those standards: (a) requiring an understanding of the transaction at issue (AS 12.07 - 12.17 (AS 2110.07 - 2110.17, eff. Dec. 31, 2016)); (b) requiring an appropriate audit response to risks of material misstatement, including fraud risk (AS 13.08 and AS 13.13 (AS 2301.08 and AS 2301.13, eff. Dec. 31, 2016)); (c) applicable to related-party transactions (AS 18.03 and AS 18.14 - 18.17 (AS 2410.03 and AS 2410.14 - 2410.17, eff. Dec. 31, 2016)); (d) relating to accounting estimates (AU 342.04 and AU 342.09 - 342.10 (AS 2501.04 and AS 2501.09 - 2501.10, eff. Dec. 31, 2016)); (e) requiring due care and professional skepticism (AU 230.01 and AU 230.07 - 230.09 (AS 1015.01 and AS 1015.07 - 1015.09, eff. Dec. 31, 2016) and AU 316.13 (AS 2401.13, eff. Dec. 31, 2016)); and (f) applicable to significant unusual transactions (AU 316.66 – 316.67A (AS 2401.66 - 2401.67A, eff. Dec. 31, 2016) and AS 18.05 and AS 18.11 (AS 2410.05 and AS 2410.11, eff. Dec. 31, 2016)).

### d)      Red Flag No. 10 (Delinquencies by GMC Corporation)

415.    For the FY 2010-2011, Defendant Deloitte U.S. served as the auditor for GMC, a shipping company founded by Georgiopoulos and with which he continued on as a director.

Simultaneously, Deloitte Greece was serving as the auditor for Aegean.  As described below, there were a series of transactions between GMC and Aegean pursuant to which Aegean was not being paid, there were interlocking directorships and the sharing of facilities – all at a time when GMC was experiencing severe financial losses.   These should have been Red Flags for the Auditor Defendants in terms of how those related-party affiliations affected Aegean's collection of its receivables.

416.   Throughout its engagement, Deloitte U.S. should have been aware of potential conflicts of interest posed by the Deloitte Greece engagement with Aegean.  First, GMC's filings with the SEC disclosed that GMC was engaged in related-party transactions with Aegean.  Second, Deloitte U.S. and Deloitte Greece would have known about each other's engagements because DTTL maintained an international restricted entity list ("IREL"), which includes all public attest clients and SEC restricted entities, on behalf of its member firms to ensure the independence of its member firms.  *See* Ex. 4.1 to Deloitte Greece PCAOB Form 1.

417.   According to the audit opinion issued by Deloitte U.S., which was included in the Annual Report Pursuant to Section 13 or 15(D) of the Securities Exchange Act of 1934 ("Form 10-K") for the FY ended December 31, 2011, filed with the SEC by GMC on March 15, 2012 ("GMC 2011 Form 10-K"), Deloitte U.S., after noting that GMC had filed for protection under Chapter 11 of the U.S. Bankruptcy Code, stated that "the Company's recurring losses from operations and negative working capital raise substantial doubt about the Company's ability to continue as a going concern."

418.   The related-party section in the GMC 2011 Form 10-K describes the following related-party transactions involving GMC, Georgiopoulos and Aegean: (a) that accounts payable balances in the millions for 2011 and 2010 were owed to Aegean from GMC for bunkers and

lubricating oils supplied to GMC by Aegean; (b) that Georgiopoulos was the chairman of Aegean's Board and Konomos was simultaneously a member of the Board of both GMC and Aegean; and (c) that GMC shared office space with Aegean in New York City.  According to the Form 10-K for the FY ended December 31, 2008, filed with the SEC on March 2, 2009 by GMC, Aegean paid GMC $98,000 for use of GMC's Company aircraft in 2007.  Interestingly, this related-party transaction was not disclosed in Aegean's Form 20-F's for either the FY ended December 31, 2007 or 2008.

419.   The facts that there was an interlocking set of directorships involving Georgiopoulos and Konomos, who both simultaneously sat on the boards of GMC and Aegean, and that there were financial transactions between both entities including that Aegean was not being paid by GMC for products, which Aegean had supplied to GMC, were all Red Flags for Deloitte U.S. and Deloitte Greece in terms of how those related-party affiliations affected Aegean's collection of its receivables.  This is particularly so given that two affiliated Deloitte auditing firms, Deloitte Greece and Deloitte U.S., were on both sides of the sale/purchase transactions involving their respective clients, Aegean and GMC.

420.   As such, given the foregoing, the Deloitte Defendants knowingly or recklessly ignored their auditing duties under applicable accounting standards.  In ignoring these Red Flags when conducting their audits, the Auditor Defendants intentionally and/or recklessly violated the PCAOB Standards described *infra*, specifically those standards: (a) requiring an understanding of the transaction at issue (AS 12.07 - 12.17 (AS 2110.07 - 2110.17, eff. Dec. 31, 2016)); (b) applicable to related-party transactions (AS 18.03 and AS 18.14 - 18.17 (AS 2410.03 and AS 2410.14 - 2410.17, eff. Dec. 31, 2016)); (c) requiring an appropriate audit response to risks of material misstatement, including fraud risk (AS 13.08 and AS 13.13 (AS 2301.08 and AS 2301.13,

eff. Dec. 31, 2016)); (d) requiring due care and professional skepticism (AU 230.01 and AU 230.07 - 230.09 (AS 1015.01 and AS 1015.07 - 1015.09, eff. Dec. 31, 2016) and AU 316.13 (AS 2401.13, eff. Dec. 31, 2016)); (e) applicable to significant unusual transactions (AU 316.66 – 316.67A (AS 2401.66 - 2401.67A, eff. Dec. 31, 2016) and AS 18.05 and AS 18.11 (AS 2410.05 and AS 2410.11, eff. Dec. 31, 2016)); (f) regarding sufficiency of audit evidence obtained, including the questionable reliability of audit evidence received (AS 15.04 and AS 15.29 (AS 1105.04 and AS 1105.29, eff. Dec. 31, 2016), and AS 14.08 (AS 2810.08, eff. Dec. 31, 2016)); and (g) regarding the audit of internal controls over financial reporting (AS 5.14 - 5.15 and AS 5.65 - 5.69 (AS AS 2201.14 - 2201.15 and AS 2201.65 - 2201.69, eff. Dec. 31, 2016)).

**4.     Melisanidis' Maneuvers to Unload All of His Aegean Shares: Red Flag Nos. 11 - 12**

**a)     <u>Red Flag No. 11 (Company Repurchases All of Melisanidis' Shares)</u>**

421.    As noted above, in August 2016, a specific committee of Aegean's Board (presumably the outside directors) approved a transaction to repurchase Melisanidis' interest for $8.81 per share or approximately $100 million.  The Company completed that purchase on September 15, 2016.  As noted, this sale was effectively insider trading whereby the Company Defendants allowed the Company to repurchase shares at inflated prices from its major control person rather than conducting a buy-back of shares from all investors.

422.    This sale combined with Melisanidis' well-known and extensive interests in companies related to and/or affiliated with Aegean was a Red Flag.  In ignoring these Red Flags when conducting their audits, the Auditor Defendants intentionally and/or recklessly violated the PCAOB Standards described *infra*, specifically those standards: (a) requiring an understanding of the transaction at issue (AS 12.07 - 12.17 (AS 2110.07 - 2110.17, eff. Dec. 31, 2016)); (b) requiring an appropriate audit response to risks of material misstatement, including fraud risk

(AS 13.08 and AS 13.13 (AS 2301.08 and AS 2301.13, eff. Dec. 31, 2016)); (c) applicable to related-party transactions (AS 18.03 and AS 18.14 - 18.17 (AS 2410.03 and AS 2410.14 - 2410.17, eff. Dec. 31, 2016)); (d) requiring due care and professional skepticism (AU 230.01 and AU 230.07 - 230.09 (AS 1015.01 and AS 1015.07 - 1015.09, eff. Dec. 31, 2016) and AU 316.13 (AS 2401.13, eff. Dec. 31, 2016)); (e) applicable to significant unusual transactions (AU 316.66 – 316.67A (AS 2401.66 - 2401.67A, eff. Dec. 31, 2016) and AS 18.05 and AS 18.11 (AS 2410.05 and AS 2410.11, eff. Dec. 31, 2016)); and (f) and regarding sufficiency of audit evidence obtained, including the questionable reliability of audit evidence received (AS 15.04 and AS 15.29 (AS 1105.04 and AS 1105.29, eff. Dec. 31, 2016), and AS 14.08 (AS 2810.08, eff. Dec. 31, 2016)).

423.    The fact that the Bylaws had been changed less than one year earlier in advance of this repurchase guaranteeing any shareholder approval should have been an even more compelling reason for the Auditor Defendants to have explored in depth the bases for this transaction including all of the affiliated and related-party transactions between Melisanidis and Aegean, and his interest in cashing out his entire shareholdings.

### b)    Red Flag No. 12 (The Repurchase of Melisanidis' Shares Caused a Liquidity Crisis for the Company)

424.    As noted above, when the Company announced the repurchase of Melisanidis' shares, Nikolas Tavlarios touted that "***We are fortunate to have a solid balance sheet and strong free cash flow, which provide us the opportunity to repurchase shares while continuing to invest in our business to drive continued growth and shareholder value.***"  *See* August 17, 2016 Press Release.  He also explained in an August 25, 2016, a *TradeWinds.com* article that "[i]t's something [Melisanidis] wanted to do.  We were able to find an appropriate point to do it.  ***The company had good strength on its balance sheet***…. It worked out well for him, for us and for the investors.

Everyone wins."  However, this was not true because the repurchase resulted in a liquidity crisis at the Company and caused it to breach its loan covenants.  As described above, this liquidity crisis led the Company to engage in the following transactions: (a) the Company borrowed $20 million from an affiliate of Melisanidis at a significant interest rate; and (b) in order to shore up its balance sheet, the Company was forced to dilute current shareholders by issuing $172.5 million of 4.25% Convertible Unsecured Senior Notes due 2021.

425.    The fact that Melisanidis demanded the repurchase, the fact that the Company lied about its liquidity to pay the $100 million to Melisanidis and the fact the repurchase resulted in the liquidity crisis that caused the Company to borrow money from a Melisanidis company at an inflated interest rate and issue convertible notes also constituted a significant Red Flag for the Auditor Defendants.  In ignoring these Red Flags when conducting their audits, the Auditor Defendants intentionally and/or recklessly violated the PCAOB Standards described *infra*, specifically those standards: (a) requiring an understanding of the transaction at issue (AS 12.07 - 12.17 (AS 2110.07 - 2110.17, eff. Dec. 31, 2016)); (b) requiring an appropriate audit response to risks of material misstatement, including fraud risk (AS 13.08 and AS 13.13 (AS 2301.08 and AS 2301.13, eff. Dec. 31, 2016)); (c) applicable to related-party transactions (AS 18.03 and AS 18.14 - 18.17 (AS 2410.03 and AS 2410.14 - 2410.17, eff. Dec. 31, 2016)); (d) requiring due care and professional skepticism (AU 230.01 and AU 230.07 - 230.09 (AS 1015.01 and AS 1015.07 - 1015.09, eff. Dec. 31, 2016) and AU 316.13 (AS 2401.13, eff. Dec. 31, 2016)); (e) applicable to significant unusual transactions (AU 316.66 – 316.67A (AS 2401.66 - 2401.67A, eff. Dec. 31, 2016) and AS 18.05 and AS 18.11 (AS 2410.05 and AS 2410.11, eff. Dec. 31, 2016)); and (f) regarding sufficiency of audit evidence obtained, including the questionable reliability of

audit evidence received (AS 15.04 and AS 15.29 (AS 1105.04 and AS 1105.29, eff. Dec. 31, 2016), and AS 14.08 (AS 2810.08, eff. Dec. 31, 2016)).

     **5.**     **Material Weaknesses and Misstatements: Red Flag No. 13**

     **a)**     **<u>Red Flag No. 13 (Material Weaknesses in Internal Controls Identified in 2014 Form 20-F)</u>**

426.     On May 15, 2015, Aegean identified two material weaknesses in the Company's internal controls over financial reporting, which were reported in the Company's 2014 Form 20-F. The first material weakness was that the Company's controls over the preparation and review of bank reconciliations, which did not operate effectively. The second material weakness was that there was an absence of an effectively-designed control to identify and disclose transactions with new related parties:

> Management, with the participation of our President and Principal Executive Officer and Chief Financial Officer, assessed the effectiveness of the design and operation of our internal control over financial reporting pursuant to Rule 13a-15 of the Exchange Act as of December 31, 2014. Based upon that evaluation, our management concluded that as of December 31, 2014, our internal control over financial reporting was not effective due to material weaknesses noted below:
>
> …
>
> Management identified the following material weaknesses in our internal control over financial reporting:
>
> a)  Our controls over the preparation and review of bank reconciliations did not operate effectively and, as a result, we failed to identify an overstatement of cash and cash equivalents and short-term borrowings caused by a transfer payment within the Company that could not be processed by the bank.
>
> …
>
> b)  There was an absence of an effectively-designed control to identify and disclose transactions with related parties.

427.     The audit opinion prepared by Deloitte Greece for FY 2014, dated May 15, 2015, included in Aegean's 2014 Form 20-F, covering Aegean's financials noted that the Company's internal control over final reporting as of December 31, 2014 expressed an adverse opinion on the

Company's internal controls over financial reporting because of material weaknesses.  Similarly, in the audit opinion prepared by Deloitte Greece for FY 2014, dated May 15, 2015, also included in Aegean's 2014 Form 20-F, covering Aegean's internal controls over financial reporting, Deloitte Greece stated that it had identified the following material weaknesses:

> The following material weaknesses have been identified and included in management's assessment: The control over preparation and review of bank reconciliations did not operate effectively.  There was also an absence of an effectively-designed control to identify and disclose transactions with new related parties.  These material weaknesses were considered in determining the nature, timing, and extent of audit tests applied in our audit of the consolidated financial statements as of and for the year ended December 31, 2014 of the Company and this report does not affect our report on financial statements.

428.    One year later, in an audit opinion for FY 2015, dated April 28, 2016, included in Aegean's 2015 Form 20-F, Deloitte Greece, issued its opinion as to Aegean's consolidated financial statements giving a clean opinion as to Aegean's consolidated financial statements (and its subsidiaries) as of December 31, 2015 and 2014.  Similarly, in a companion audit opinion FY 2015, dated April 28, 2016, also included in Aegean's 2015 Form 20-F, covering internal controls Deloitte Greece also provided a clean opinion concerning the Company's internal controls over financial reporting as of December 31, 2015.

429.    In an audit opinion prepared by PwC Greece FY 2016, dated May 16, 2017, included in Aegean's 2016 Form 20-F, covering both consolidated financial statements and internal controls, PwC Greece delivered a clean opinion, stating in relevant part, the following:

> In our opinion, the accompanying consolidated balance sheet and the related consolidated statement of income, of  stockholders' equity, and of cash flows present fairly, in all material respects, the financial position of Aegean Marine Petroleum Network Inc. and its subsidiaries (the "Company") at December 31, 2016, and the results of their operations and  their cash flows for the year ended December 31, 2016 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control  over financial reporting as of December 31, 2016, based on criteria established in Internal Control — Integrated

Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

430.    The discussion in Aegean's 2015 Form 20-F indicated that the material weaknesses resulting in "classification errors" that had existed as of December 31, 2014, had since been remediated and, according to management with the participation of the President, the Principal Executive Officer and the CFO effective internal controls over financial reporting was in place as of December 31, 2015:

> Our management, with the participation of our President and Principal Executive Officer and Chief Financial Officer, evaluated the effectiveness of the design and operation of our disclosure controls and procedures and concluded that as of December 31, 2015, the Company maintained, in all material respects, effective internal control over financial reporting.

> However, our management, with the participation of our President and Principal Executive Officer and Chief Financial Officer, in evaluating the effectiveness of the design and operation of our disclosure controls and procedures, concluded that as of December 31, 2014, our internal control over financial reporting was not effective due to material weaknesses in our internal controls over financial reporting.  These material weaknesses resulted in classification errors that were identified subsequent to the issuance of our earnings release for the three months and year ended December 31, 2014.  The classification errors were corrected in our audited consolidated balance sheet, statement of income and statement of cash flows for the fiscal year ended December 31, 2014, which are included in this annual report.

> Although we have remediated these material weaknesses in our internal control over financial reporting, additional determinations that there are material weaknesses in the effectiveness of our material controls and procedures would reduce our ability to obtain financing or could increase the cost of any financing we obtain and would require additional expenditures to comply with applicable requirements.

431.    The members of the team that reviewed the material weaknesses and classification errors and who concluded that such errors had been remediated included both Melisanidis, the Founder of the Company who owned/controlled 22% of the shares of the Company at the time, and Georgiopoulos who owned 10.8%.  *See* 2015 Form 20-F.

432.    The fact that one of the material weaknesses identified by the Company was the absence of an effectively-designed control to identify and disclose transactions with new related parties, that Melisanidis beneficially owned and controlled numerous entities doing business with the Company and that the Company repurchased all of Melisanidis' share-holdings under the circumstances described above were all Red Flags for the Auditor Defendants.  In ignoring these Red Flags when conducting their audits, the Auditor Defendants intentionally and/or recklessly violated the PCAOB Standards described *infra*, specifically those standards: (a) requiring an understanding of the transaction at issue (AS 12.07 - 12.17 (AS 2110.07 - 2110.17, eff. Dec. 31, 2016)); (b) requiring an appropriate audit response to risks of material misstatement, including fraud risk (AS 13.08 and AS 13.13 (AS 2301.08 and AS 2301.13, eff. Dec. 31, 2016)); (c) applicable to related-party transactions (AS 18.03 and AS 18.14 - 18.17 (AS 2410.03 and AS 2410.14 - 2410.17, eff. Dec. 31, 2016)); (d) requiring due care and professional skepticism (AU 230.01 and AU 230.07 - 230.09 (AS 1015.01 and AS 1015.07 - 1015.09, eff. Dec. 31, 2016) and AU 316.13 (AS 2401.13, eff. Dec. 31, 2016)); (e) applicable to significant unusual transactions (AU 316.66 – 316.67A (AS 2401.66 - 2401.67A, eff. Dec. 31, 2016) and AS 18.05 and AS 18.11 (AS 2410.05 and AS 2410.11, eff. Dec. 31, 2016)); (f) notice regarding the questionable reliability of audit evidence received (AS 15.04 and AS 15.29 (AS 1105.04 and AS 1105.29, eff. Dec. 31, 2016), and AS 14.08 (AS 2810.08, eff. Dec. 31, 2016)); and (g) regarding sufficiency of audit evidence obtained, including the questionable reliability of audit evidence received (AS 15.04 and AS 15.29 (AS 1105.04 and AS 1105.29, eff. Dec. 31, 2016), and AS 14.08 (AS 2810.08, eff. Dec. 31, 2016)).

433.   Below is a summary chart of some of the key selected related parties referenced

above:

| SELECTED RELATED PARTY TRANSACTIONS WITH AEGEAN | | |
|---|---|---|
| **Firm** | **Ownership/Control** | **Transaction(s)** |
| Aegean Oil Terminal Corporation | Controlled by Melisanidis | • Melisanidis transferred all shares to AMPI in 2010 for no consideration.  AOTC, as a subsidiary, obtains loans from banks, with guarantees from Aegean, to pay OilTank to supervise construction of Fujairah Facility. |
| Aegean Oil, S.A. | Controlled by Melisanidis | • Exclusive marine fuel supply service agreement with Aegean with above-market pricing terms. |
| Aegean Shipping Management S.A. | Controlled by Melisanidis | • Purchased marine fuel and lubricants from Aegean. |
| Aegean V | Controlled by Melisanidis | • Aegean vessels provided freight services pursuant to a bunkering agreement. |
| Aegean VIII | Controlled by Melisanidis | • Aegean vessels provided freight services pursuant to a bunkering agreement. |
| Aegean Warehouse | Controlled by Melisanidis | • Leased Greece headquarters to Aegean |
| Genco Shipping & Trading Limited | Georgiopoulos former Chairman of Genco<br><br>Auditor:<br>Deloitte U.S. | • Purchased lubricating oils from Aegean for vessels in its fleets. |
| General Maritime Corporation (a/k/a Gener8 or GMC) | Georgiopoulos Chairman and CEO of GMC; John Tavlarios COO of GMC; Konomos former Director of GMC<br><br>Auditor:<br>Deloitte U.S. | • Purchased marine fuel and lubricants from Aegean.<br>• Leased NY office space to Aegean. |
| Spyridon Fokas Law Firm | Controlled by Fokas | • Legal services rendered by law firm to Aegean. |
| Grady Properties Corporation S.A. | Controlled by Melisanidis | • October 2016 bridge-loan to Aegean at high interest rate made in response to liquidity crisis caused by Melissanidis share repurchase. |

| SELECTED RELATED PARTY TRANSACTIONS WITH AEGEAN | | |
|---|---|---|
| Hellenic Environmental Center | Controlled by Melisanidis | • Vessels chartered to HEC by Aegean at below market rates. |
| Melco S.A. | Controlled by Melisanidis | • Purchased marine petroleum products from Aegean. |
| OilTank Engineering & Consulting Ltd. | Controlled by Melisanidis | • Contract concerning construction of the Fujairah Facility.  Alleged conduit for misappropriation of millions of dollars. |

**C.     These Red Flags Support a Strong Inference That the Auditor Defendants Intentionally and/or Recklessly Violated the Accounting Standards They were Bound to Follow**

434.    PCAOB Standards required that the Auditor Defendants during all times complained of herein perform procedures necessary to identify, and respond to, risks that Aegean's financial statements could be materially misstated.  The Auditor Defendants intentionally and/or recklessly ignored these standards by failing to take into account specific risks including the existence of unusual transactions, and those involving insider/related/affiliated party transactions, various inconsistencies and other amounts/ratios as described in more detail above under the Red Flags discussion.

435.    Of particular note, despite the heightened risks from each of these Red Flags, the Auditor Defendants failed to take actions that they should have taken, all of which resulted in the issuance of false and misleading audit opinions (as discussed below) and resulting in damages to the Class members.  The actions taken should have included gathering sufficient appropriate audit evidence in response to these significant risks of material misstatement, including fraud risks and risks associated with the accounting for, and disclosure of, material related-party transactions, as required by the PCAOB Standards set forth above.  Had the Auditor Defendants taken such steps, the audit evidence would have demonstrated the existence of material violations of GAAP in Aegean's financials, the issuance of false and misleading statements by Aegean and the existence

of undisclosed material weaknesses associated with the Company's financial reporting controls relating to accounts receivable, revenues and related-party transactions.

436.    Importantly, there are additional facts that support a strong inference that the Deloitte Defendants failed to perform their audits in accordance with PCAOB Standards and guidelines.  Indeed, the PCAOB itself identified Deloitte Greece's failure and PwC's failure to comply with these applicable standards in its audits during the Class Period.

437.    On September 28, 2017, the PCAOB issued its September 28, 2017 Inspection Report describing significant deficiencies involving Deloitte Greece following an inspection of the primary procedures of two of its ten issuer audit clients and of one additional audit engagement in which it played a role but was not the principal auditor.   This inspection occurred from November 7, 2016 to November 18, 2016.[114]

438.    The PCAOB Sept. 28, 2017 Inspection Report, at 4, defines the term "Primary Procedures" to include "field work, other review of audit work papers, and the evaluation of the Firm's [Deloitte Greece's] quality control policies and procedures through review of documentation and interviews of Firm personnel."

439.    The PCAOB Sept. 28, 2017 Inspection Report, at 4, states that these reviews were intended to identify whether deficiencies existed in the reviewed audit work, and whether such deficiencies indicated defects or potential defects in the firm's system of quality control over audit work.  In addition, the inspection included a review of policies and procedures related to certain quality control processes of the firm that could be expected to affect audit quality.

---

[114] 2016 PCAOB Inspection of Deloitte Certified Public Accountants S.A., PCAOB Release No. 104-2017-173 (Sept. 28, 2017) ("PCAOB Sept. 28, 2017 Inspection Report"), https://pcaobus.org/Inspections/Reports/Documents/104-2017-173-Deloitte-Greece.pdf.

440.    The PCAOB Sept. 28, 2017 Inspection Report states that "[t]he inspection team identified matters that it considered to be deficiencies in the performance of the work it reviewed." While specifics of the findings are redacted, "[i]dentified deficiencies in the audit that exceed a significance thresholding … are summarized in the public portion of the inspection report."  Here, the public portions are telling.

441.    Most notably, according to Part 1 of the PCAOB Sept. 28, 2017 Inspection Report, at 5, under the title "INSPECTION PROCEDURES AND CERTAIN OBSERVATIONS," some of the deficiencies were very significant:

> One of the deficiencies identified was of such significance that it appeared to the inspection team that the Firm, at the time it issued its audit report, had not obtained sufficient appropriate audit evidence to support its opinion about whether the issuer had maintained, in all material respects, effective internal control over financial reporting ("ICFR").  In other words, in this audit, the auditor issued an opinion without satisfying its fundamental obligation to obtain reasonable assurance about whether the issuer maintained effective ICFR.

> …

> The audit deficiency that reached this level of significance is described below.

> Issuer A

> The failure, in an audit of ICFR, to identify, and test controls that addressed, a risk of material misstatement due to fraud (AS 2110.65; AS 2201.39).[115]

442.    The PCAOB Sept. 28, 2017 Inspection Report, at 5, further stated that, among other things, this particular deficiency was so significant that the audit should not have been issued:

> [A]n auditor's failure to obtain the reasonable assurance that the auditor is required to obtain is a serious matter.  ***It is a failure to accomplish the essential purpose of the audit, and it means that, based on the audit work performed, the audit opinion should not have been issued.***

---

[115] *See* PCAOB Sept. 28, 2017 Inspection Report at 5. AS 2110 is the Auditing Standard for "Identifying and Assessing Risks of Material Misstatement," and AS 2201 is the Auditing Standard governing "An Audit of Internal Control Over Financial Reporting That is Integrated with An Audit of Financial Statements."

443.    Pursuant to the applicable statute and rules, the PCAOB had provided Deloitte Greece with an opportunity to review and comment on a draft of the PCAOB Sept. 28, 2017 Inspection Report for a period of at least 30 days prior to finalizing its report, but, according to the PCAOB, Deloitte Greece did not provide a timely written response.  Whether Deloitte Greece provided a later written response to a prior draft of its report is currently unknown, as that record, as of the date of this filing, has not been made public.  What is known, however, is that in June 2017, some three months prior to public release of the finalized PCAOB Sept. 28, 2017 Inspection Report, Georgiopoulos (Chairman) and Tavlarios (President) both stepped down from the Company.

444.    While the PCAOB Sept. 28, 2017 Inspection Report, resulting from its November 2016 inspection, does not specifically identify which audit clients were the subject of the audits it investigated, the facts support a strong inference that Aegean was the subject of the investigation and significant findings, *e.g.*, failing an audit to identify and test controls that addressed a risk of material misstatement due to fraud.  This is so for the following reasons: (a)  the PCAOB Sept. 28, 2017 Inspection Report reveals that there were ten issuer audit reports performed by Deloitte Greece for 2016; (b) none of the other 9 issuers (identified in Deloitte Greece's Annual Report on Form 2 filed with the PCAOB during the relevant period) appear to have reported any misstatements; and (c) this finding by the PCAOB that Deloitte Greece had failed to test controls that addressed a risk of material misstatement due to fraud was consistent with the disclosures in Aegean's 2014 Form 20-F that (i) the Company's controls over the preparation and review of bank reconciliations did not operate effectively; and (ii) there was an absence of an effectively-designed control to identify and disclose transactions with new related parties.

445.    In any event, even if the PCAOB did not review Deloitte Greece's audit work in connection with Aegean, it still demonstrates that Deloitte Greece did not comply with auditing standards in the audits that were investigated during the relevant time frame.

446.    The PCAOB also issued a similar Inspection Report for PwC Greece, finding that PwC Greece also failed to perform its audits in accordance with PCAOB standards and guidelines. In a September 29, 2016 PCAOB Inspection Report of PwC (defined below), which included reviews of portions of two issuer audits performed by PwC Greece as well as audit work on one other issuer audit engagement where PwC Greece played a role but was not the principal auditor. The inspection occurred from November 9, 2015 to November 20, 2015.[116]

447.    The PCAOB Inspection Report of PwC Greece identified significant deficiencies. At the time PwC Greece issued its audit report it, had not obtained sufficient appropriate audit evidence to support its opinion about whether the issuer maintained, in all material respects, effective internal controls over financial reporting.  In other words, in this audit; the auditor issued an opinion without satisfying its fundamental obligation to obtain reasonable assurance about whether the issuer maintained effective internal controls over financial reporting.  The Inspection Report further explained:

> [A]n auditor's failure to obtain the reasonable assurance that the auditor is required to obtain is a serious matter.  **It is a failure to accomplish the essential purpose of the audit, and it means that, based on the audit work performed, the audit opinion should not have been issued.**

448.    These serious and significant issues included (a) the failure, in an audit of internal controls over financial reporting, to perform sufficient procedures to test the design and operating

---

[116] 2015 PCAOB Inspection of PricewaterhouseCoopers Auditing Company SA, PCAOB Release No. 104-2016-206 (Sept. 29, 2016) ("PCAOB Inspection Report of PwC Greece"), https://pcaobus.org/Inspections/Reports/Documents/104-2016-206-PwC-Greece.pdf.

effectiveness of controls over the occurrence and allocation of revenue; and (b) the failure, in an audit of internal controls over financial reporting, to perform sufficient procedures to test the design and operating effectiveness of controls over the valuation of fixed assets.  In response to the PCAOB's Inspection Report, PwC Greece provided assurance "that we will address the observations raised in the Report in a thorough manner."  Following an evaluation PwC Greece stated it took "appropriate actions under both PCAOB standards and our own policies."

449.   Similar to Deloitte Greece, even if the PCAOB did not review PwC Greece's audit work in connection with Aegean, it still demonstrates that PwC Greece did not comply with auditing standards in the audits that were investigated during the relevant time frame, which represent some of only a handful of the audits PwC Greece conducted during this period.

450.   The consequence of the failure by the Auditor Defendants to have followed applicable PCAOB Standards, as they were bound to follow, was to exaggerate Aegean's true financial condition by showing false financial success and growth, while scheme-participants profited from their misconduct.  As a consequence, the Auditor Defendants intentionally or recklessly disregarded that Aegean's consolidated financial statements were false and misleading as discussed in more detail above.  Indeed, the consolidated financial statements were materially impacted by each of the three categories of wrongful conduct identified below ($300 million misappropriation; $200 million of Uncollectible Accounts Receivable; and prepayments for future oil deliveries that were never made):

> (a)    **Balance Sheet Accounts Impacted by $300MM Misappropriation**:  As alleged in ¶¶156-171, 232-233, 237-238, the following balance sheet accounts were – and still are – impacted by the misappropriation of up to $300 million of company cash and other assets through the fraudulent

activities, principally related to the Fujairah Facility: (i) Fixed Assets; (ii) Accumulated Depreciation; and (iii) Stockholders' Equity.

(b)     **Income Statement Accounts Impacted by $300MM Misappropriation**: As alleged in ¶¶156-171, 230-231, 235-236, the following income statement accounts were – and still are – impacted by the misappropriation of up to $300 million of company cash and other assets through fraudulent activities, principally related to the Fujairah Facility: (i) Operating Expenses; (ii) Income before Income Taxes; (iii) Net Income; and (iv) Earnings per Share.

(c)     **Balance Sheet Accounts Impacted by $200MM Uncollectible Accounts Receivable**: As alleged in ¶¶148-155, 232-233, 237-238, the following balance sheet accounts were – and still are – impacted by the $200 million in uncollectible accounts receivables: (i) Accounts Receivable; (ii) Allowance for Doubtful Accounts; and (iii) Stockholders' Equity.

(d)     **Income Statement Accounts Impacted by $200MM Uncollectible Accounts Receivable:** As alleged in ¶¶148-155, 230-231, 235-236, the following income statements accounts were – and still are – impacted by the $200 million in uncollectible accounts receivable: (i) Revenue; (ii) Gross Profit; (iii) Operating Income; (iv) Operating Expenses; (v) Income before Income Taxes; (vi) Net income; and (vii) Earnings per Share.

(e)     **Balance Sheet Accounts Impacted by Prepayment for Future Oil Deliveries Never Made:** As alleged in ¶¶172-177, 232-233, 237-238, the following balance sheet accounts were – and still are – impacted by the

173

recording of prepayments of future oil deliveries that were never made: (i)

Prepaids and Other Assets; and (ii) Stockholders' Equity.

(f)     **Income Statement Accounts Impacted by Prepayment for Future Oil**

**Deliveries Never Made**: As alleged in ¶¶172-177, 230-231, 235-236, the

following income statement accounts were – and still are – impacted by the

recording of prepayments of future oil deliveries that were never made: (i)

Operating Expenses; (ii) Income before Income Taxes; (iii) Net income; and

(iv) Earnings per Share.

**D.      In Intentionally and/or Recklessly Violating the Audit Accounting Standards, the Auditor Defendants Issued Audit Opinions that Contained False and Misleading Statements**

451.    Because they intentionally and/or recklessly failed to perform their audit in

compliance with the PCAOB Standards, the Auditor Defendants' clean audit opinions contained

false and misleading statements and allowed the Company Defendants to perpetrate the Massive

Fraudulent Scheme to cause investors to purchase Aegean stock at inflated prices.

**1.      Fiscal Year 2013**

452.    Deloitte Greece included its 2013 audit opinion, dated April 25, 2014, concerning

Aegean's consolidated financial statements in Aegean's 2013 Form 20-F.  In opining that the

consolidated financial statements present fairly, in all material respects, the financial position of

Aegean and its subsidiaries as of December 31, 2013 and 2012, and were in conformity with all

accounting principles generally accepted in the United States, Deloitte Greece stated the following:

> To the Board of Directors and Stockholders of Aegean Marine Petroleum
> Network, Inc.  Majuro, Republic of the Marshall Islands
>
> We have audited the accompanying consolidated balance sheets of Aegean Marine
> Petroleum Network, Inc. and  subsidiaries (the "Company") as of December 31,
> 2013 and 2012, and the related consolidated statements of income,  stockholders'

equity, and cash flows for each of the three years in the period ended December 31, 2013. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

**[1] We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)**. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. **[2] We believe that our audits provide a reasonable basis for our opinion**.

**[3] In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Aegean Marine Petroleum Network, Inc. and its subsidiaries as of December 31, 2013 and 2012, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2013, in conformity with accounting principles generally accepted in the United States of America**.

**[4] We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2013, based on the criteria established in *Internal Control—Integrated Framework (1992)* issued by the Committee of Sponsoring Organizations of the Treadway Commission** and our report dated April 25, 2014 expressed an unqualified opinion on the Company's internal control over financial reporting.

/s/ Deloitte Hadjipavlou Sofianos & Cambanis S.A. Athens, Greece
April 25, 2014

The bracketed numbers above, *i.e.*, [1], identify the statements discussed below.

453.    The foregoing statements from the 2013 audit opinion described in the immediately preceding paragraph and identified as Statements [1] – [4], concerning Aegean's consolidated financial statements, were materially false and misleading statements of actual fact because:

(a)    As they knew or were reckless in not knowing, the Deloitte Defendants did not conduct their audit of the Company's financials in accordance with applicable PCAOB Standards for the reasons set forth in ¶¶340-450.

Accordingly, the Deloitte Defendants' Statement [1], that they conducted their audit of the Company's financials in accordance with applicable PCAOB Standards, was a materially false and misleading statement of an actual fact.

(b)     As they knew or were reckless in not knowing, the Deloitte Defendants' audit did not provide a reasonable basis to issue their clean audit opinion on the Company's financials for the reasons set forth in ¶¶340-450. Accordingly, the Deloitte Defendants' Statement [2], that they had a reasonable basis for their audit opinion, was a materially false and misleading statement of an actual fact.

(c)     As they knew or were reckless in not knowing, Aegean's consolidated financial statements did not fairly represent the financial picture of the Company and were not in compliance with GAAP as set forth in ¶¶214-240, 310.   Accordingly, the Deloitte Defendants' Statement [3] was a materially false and misleading statement of an actual fact.

(d)     As they knew or were reckless in not knowing, the Deloitte Defendants did not audit Aegean's internal controls over financial reporting in accordance with the standards of the PCAOB for the reasons set forth in ¶¶340-450. Accordingly, the Deloitte Defendants' Statement [4], that they conducted their audit of the Company's internal controls in accordance with the "standards of the [PCAOB]" was a materially false and misleading statement of an actual fact.

454.    Deloitte Greece also included its 2013 audit opinion, dated April 25, 2014, concerning Aegean's internal controls in Aegean's 2013 Form 20-F.  In opining that there were effective internal controls over financial reporting, as of December 13, 2013, in accordance with the standards of the PCAOB, Deloitte Greece stated the following:

> To the Board of Directors and Stockholders of Aegean Marine Petroleum Network, Inc. Majuro, Republic of the Marshall Islands
>
> We have audited the internal control over financial reporting of Aegean Marine Petroleum Network, Inc. and subsidiaries  (the "Company") as of December 31, 2013, based on criteria established in Internal Control — Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission. As described in the Management's Annual Report on Internal Control over Financial Reporting, management excluded from its assessment  the internal control over financial reporting at Hess's U.S. East Coast operations (the "US East Coast Business"), which was acquired on December 18, 2013, and whose financial statements constitute 2.8% and 8.7% of consolidated net and total assets, respectively, as of December 31, 2013, and 0.5% of revenues and 1.7% of net income of the consolidated financial statement amounts for the period December 18, 2013 to December 31, 2013. Accordingly, our audit did not include the internal control over financial reporting at the US East Coast Business. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report on Internal Control  over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.
>
> **[1] We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective  internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other  procedures as we considered necessary in the circumstances. [2] We believe that our audit provides a reasonable basis for our opinion**.
>
> A company's internal control over financial reporting is a process designed by, or under the supervision of, the  company's principal executive and principal financial officers, or persons performing similar functions, and effected by  the

177

company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

**[3] In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2013, based on the criteria established in Internal Control — Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission**.

**[4] We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements as of and for the year ended December 31, 2013 of the Company** and our report dated April 25, 2014 expressed an unqualified opinion on those financial statements.

/s/ Deloitte Hadjipavlou Sofianos & Cambanis S.A.
Athens, Greece
April 25, 2014

The bracketed numbers above, *i.e.*, [1], identify the statements discussed below.

455.    The foregoing statements from the 2013 audit opinion described in the immediately preceding paragraph and identified as Statements [1] – [4], concerning Aegean's internal controls over financial reporting, were materially false and misleading statements of actual fact because:

(a)     As they knew or were reckless in not knowing, the Deloitte Defendants did not conduct their audit of internal controls over financial resources in accordance with applicable PCAOB Standards or obtain the requisite reasonable assurances for the reasons set forth in ¶¶340-450.  Accordingly, the Deloitte Defendants' Statement [1] stating how they conducted their audit in accordance with applicable PCAOB Standards, was a materially false and misleading statement of an actual fact.

(b)     As they knew or were reckless in not knowing, the Deloitte Defendants' audit did not provide a reasonable basis to issue their clean audit opinion for the reasons set forth in ¶¶340-450.   Accordingly, the Deloitte Defendants' Statement [2], that they had a reasonable basis for their audit opinion, was a materially false and misleading statement of an actual fact.

(c)     As they knew or were reckless in not knowing, Company did not maintain effective internal controls over financial reporting as of  December 31, 2013, for the reasons set forth in ¶¶241-248, 310.  Accordingly, the Deloitte Defendants' Statement [3], stating that the Company did maintain effective internal controls was a materially false and misleading statement of an actual fact.

(d)     As they knew or were reckless in not knowing, the Deloitte Defendants did not conduct their audit of the Company's financials in accordance with applicable PCAOB Standards for the reasons set forth in ¶¶340-450. Accordingly, the Deloitte Defendants' Statement [4], that they conducted their audit of the Company's financials in accordance with applicable

PCAOB Standards, was a materially false and misleading statement of an

actual fact.

456.    Further, the consolidated financial statements as well as the audit reports prepared

by Deloitte Greece appearing in the Company's 2013 Form 20-F were incorporated by reference

in the Offering Documents filed in connection with Aegean's Convertible Senior Unsecured Notes

bond offering:

> The consolidated financial statements incorporated in this prospectus by reference from the Company's Annual Report on Form 20-F for the year ended December 31, 2013 and the effectiveness of the Company's internal control over financial reporting have been audited by Deloitte, Hadjipavlou, Sofianos & Cambanis S.A., an independent registered public accounting firm, as stated in its reports which are incorporated herein by reference.  Such financial statements have been so incorporated in reliance upon the reports of such firm given upon their authority as experts in accounting and auditing.

457.    Accordingly, Deloitte Greece's statements in connection with its audit opinions

incorporated by reference in the Offering Documents filed in connection with Aegean's

Convertible Senior Unsecured Notes bond offering were materially false and misleading for the

same reasons as set forth in ¶¶453-455, above.

## 2.    Fiscal Year 2014

458.    Deloitte Greece included its 2014 audit opinion, dated May 15, 2015, concerning

Aegean's consolidated financial statements in Aegean's 2014 Form 20-F.  In opining that the

consolidated financial statements present fairly, in all material respects, the financial position of

Aegean and its subsidiaries as of December 31, 2014 and 2013, and that they were in conformity

with all accounting principles generally accepted in the United States, but noting that it was

expressing an adverse opinion on the Company's internal controls over financial reporting because

of material weaknesses, Deloitte Greece stated the following:

> To the Board of Directors and Stockholders of Aegean Marine Petroleum Network, Inc.  Majuro, Republic of the Marshall Islands

We have audited the accompanying consolidated balance sheets of Aegean Marine Petroleum Network, Inc. and subsidiaries  (the "Company") as of December 31, 2014 and 2013, and the related consolidated statements of income, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2014. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

**[1] We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)**. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts  and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. **[2] We believe that our audits  provide a reasonable basis for our opinion.**

**[3] In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Aegean  Marine Petroleum Network, Inc. and its subsidiaries as of December 31, 2014 and 2013, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2014, in conformity with accounting principles generally accepted in the United States of America**.

**[4] We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States),  the Company's internal control over financial reporting as of December 31, 2014**, based on the criteria established in *Internal  Control—Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission  and our report dated May 15, 2015 expressed an adverse opinion on the Company's internal control over financial reporting  because of material weaknesses.

/s/ Deloitte Hadjipavlou Sofianos & Cambanis S.A.
Athens, Greece
May 15, 2015

The bracketed numbers above, *i.e.*, [1], identify the statements discussed below.

459.    The foregoing statements from the 2014 audit opinion described in the immediately preceding paragraph and identified as Statements [1] – [4], concerning Aegean's consolidated financial statements, were materially false and misleading statements of actual fact because:

(a)     As they knew or were reckless in not knowing, the Deloitte Defendants did not conduct their audit of the Company's financials in accordance with applicable PCAOB Standards for the reasons set forth in ¶¶340-450. Accordingly, the Deloitte Defendants' Statement [1], that they conducted their audit of the Company's financials in accordance with applicable PCAOB Standards, was a materially false and misleading statement of an actual fact.

(b)     As they knew or were reckless in not knowing, the Deloitte Defendants' audit did not provide a reasonable basis to issue their clean audit opinion for the reasons set forth in ¶¶340-450.   Accordingly, the Deloitte Defendants' Statement [2], that they had a reasonable basis for their audit opinion, was a materially false and misleading statement of an actual fact.

(c)     As they knew or were reckless in not knowing, Aegean's consolidated financial statements did not fairly represent the financial picture of the Company and were not in compliance with GAAP as set forth in ¶¶214-240, 310.   Accordingly, the Deloitte Defendants' Statement [3] was a materially false and misleading statement of an actual fact.

(d)     As they knew or were reckless in not knowing, the Deloitte Defendants did not audit Aegean's internal controls over financial reporting in accordance with the standards of the PCAOB for the reasons set forth in ¶¶340-450. Accordingly, the Deloitte Defendants' Statement [4], that they conducted their audit regarding the Company's internal controls, was a materially false and misleading statement of an actual fact.

460.   Deloitte Greece also included its 2014 audit opinion, dated May 15, 2015, concerning Aegean's internal controls in Aegean's 2014 Form 20-F, which while noting two material weaknesses, misleadingly continued to state that it had conducted its audit in accordance with PCAOB Standards:

> To the Board of Directors and Stockholders of Aegean Marine Petroleum Network, Inc.  Majuro, Republic of the Marshall Islands
>
> We have audited the internal control over financial reporting of Aegean Marine Petroleum Network, Inc. and subsidiaries (the  "Company") as of December 31, 2014, based on criteria established in *Internal Control — Integrated Framework (2013)*  issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.
>
> **[1] We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States)**.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and  operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances.  **[2] We believe that our audit provides a reasonable basis for our opinion.**
>
> A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's  principal executive and principal financial officers, or persons performing similar functions, and effected by the company's  board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting  principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company  are being made only in

accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The following material weaknesses have been identified and included in management's assessment: The control over preparation and review of bank reconciliations did not operate effectively. There was also an absence of an effectively-designed control to identify and disclose transactions with new related parties**.** These material weaknesses were considered in determining the nature, timing, and extent of audit tests applied in our audit of the consolidated financial statements as of and for the year ended December 31, 2014 of the Company and this report does not affect our report on such financial statements.

In our opinion, because of the effect of the material weaknesses identified above on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2014, based on the criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

**[3] We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements as of and for the year ended December 31, 2014 of the Company** and [3] our report dated May 15, 2015 expressed an unqualified opinion on those financial statements.

/s/ Deloitte Hadjipavlou Sofianos & Cambanis S.A.
Athens, Greece
May 15, 2015

The bracketed numbers above, *i.e.*, [1], identify the statements discussed below.

461.    The foregoing statements from the 2014 audit opinion described in the immediately preceding paragraph and identified as Statements [1] – [3], concerning Aegean's internal controls over financial reporting, were materially false and misleading

(a)     As they knew or were reckless in not knowing, the Deloitte Defendants did not conduct their audit of the Company's internal controls over financial reporting in accordance with applicable PCAOB Standards or obtain the requisite reasonable assurances for the reasons set forth in ¶¶340-450. Accordingly, the Deloitte Defendants' Statement [1], stating how they conducted their audit in accordance with applicable PCAOB Standards, was a materially false and misleading statement of an actual fact.

(b)     As they knew or were reckless in not knowing, the Deloitte Defendants' audit did not provide a reasonable basis to issue their clean audit opinion over financial reporting for the reasons set forth in ¶¶340-450. Accordingly, the Deloitte Defendants' Statement [2], that they had a reasonable basis for their audit opinion, was a materially false and misleading statement of an actual fact.

(c)     As they knew or were reckless in not knowing, the Deloitte Defendants did not conduct their audit of the Company's financials in accordance with applicable PCAOB Standards for the reasons set forth in ¶¶340-450. Accordingly, the Deloitte Defendants' Statement [3], that they conducted their audit of the Company's financials in accordance with applicable PCAOB Standards, was a materially false and misleading statement of an actual fact.

3.     **Fiscal Year 2015**

462.    Deloitte Greece included its 2015 audit opinion, dated April 28, 2016, concerning Aegean's consolidated financial statements in Aegean's 2015 Form 20-F.  In opining that the consolidated financial statements present fairly, in all material respects, the financial position of Aegean and its subsidiaries as of December 31, 2015 and 2014 and that they were in conformity with all accounting principles generally accepted in the United States, Deloitte Greece stated the following:

> To the Board of Directors and Stockholders of Aegean Marine Petroleum Network, Inc.  Majuro, Republic of the Marshall Islands
>
> We have audited the accompanying consolidated balance sheets of Aegean Marine Petroleum Network, Inc. and subsidiaries (the "Company") as of December 31, 2015 and 2014, and the related consolidated statements of income, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2015. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.
>
> **[1] We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).** Those standards require that we plan and perform the audit to  obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles  used and significant estimates made by management, as well as evaluating the overall financial  statement presentation. **[2] We believe that our audits provide a reasonable basis for our opinion.**
>
> **[3] In our opinion, such consolidated financial statements present fairly, in all material respects, the  financial position of Aegean Marine Petroleum Network, Inc. and its subsidiaries as of December 31, 2015 and 2014, and the results of their operations and their cash flows for each of the three  years in the period ended December 31, 2015, in conformity with accounting principles generally  accepted in the United States of America.**
>
> **[4] We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of  December 31, 2015, based on the criteria established in *Internal Control—Integrated Framework  (2013)***

**issued by the Committee of Sponsoring Organizations of the Treadway Commission** an our report dated April 28, 2016 expressed an unqualified opinion thereon.

/s/ Deloitte Hadjipavlou Sofianos & Cambanis S.A.
Athens, Greece
April 28, 2016

The bracketed numbers above, *i.e.*, [1], identify the statements discussed below.

463.     The foregoing statements from the 2015 audit opinion described in the immediately preceding paragraph and identified as Statements [1] – [4], concerning Aegean's consolidated financial statements, were materially false and misleading statements of actual fact because:

(a)     As they knew or were reckless in not knowing, the Deloitte Defendants did not conduct their audit of the Company's financials in accordance with applicable PCAOB Standards for the reasons set forth in ¶¶340-450. Accordingly, the Deloitte Defendants' Statement [1], that they conducted their audit of the Company's financials in accordance with applicable PCAOB Standards, was a materially false and misleading statement of an actual fact.

(b)     As they knew or were reckless in not knowing, the Deloitte Defendants' audit did not provide a reasonable basis to issue their clean audit opinion for the reasons set forth in ¶¶340-450.   Accordingly, the Deloitte Defendants' Statement [2], that they had a reasonable basis for their audit opinion, was a materially false and misleading statement of an actual fact.

(c)     As they knew or were reckless in not knowing, Aegean's consolidated financial statements did not fairly represent the financial picture of the Company and were not in compliance with GAAP as set forth in ¶¶214-

187

240, 310.  Accordingly, the Deloitte Defendants' Statement [3] was a materially false and misleading statement of an actual fact.

(d)     As they knew or were reckless in not knowing, the Deloitte Defendants did not audit Aegean's internal controls over financial reporting in accordance with the standards of the PCAOB for the reasons set forth in ¶¶340-450. Accordingly, the Deloitte Defendants' Statement [4] that they conducted their audit of the Company's internal controls in accordance with the standards of the PCAOB was a materially false and misleading statement of an actual fact.

464.    Deloitte Greece also included its 2015 audit opinion, dated April 28, 2016, concerning Aegean's internal controls in Aegean's 2015 Form 20-F.  In opining that there were effective internal controls over financial reporting, as of December 31, 2015, in accordance with the standards of the PCAOB, Deloitte Greece stated the following:

> To the Board of Directors and Stockholders of Aegean Marine Petroleum Network, Inc. Majuro, Republic of the Marshall Islands
>
> We have audited the internal control over financial reporting of Aegean Marine Petroleum Network, Inc. and subsidiaries (the "Company") as of December 31, 2015, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.
>
> **[1] We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States).** Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and

evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. **[2] We believe that our audit provides a reasonable basis for our opinion.**

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

**[3] In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2015, based on the criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission**.

**[4] We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements as of and for the year ended December 31, 2015 of the Company** and our report dated April 28, 2016 expressed an unqualified opinion on those financial statements.

/s/ Deloitte Hadjipavlou Sofianos & Cambanis S.A.
Athens, Greece
April 28, 2016

The bracketed numbers above, *i.e.*, [1], identify the statements discussed below.

465.    The foregoing statements from the 2015 audit opinion described in the immediately preceding paragraph and identified as Statements [1] – [4], concerning Aegean's internal controls over financial reporting were materially false and misleading

(a)    As they knew or were reckless in not knowing, the Deloitte Defendants did not conduct their audit of the Company's internal controls in accordance with applicable PCAOB Standards or obtain the requisite reasonable assurances for the reasons set forth in ¶¶340-450.  Accordingly, the Deloitte Defendants' Statement [1], that they conducted their audit of the Company's internal controls in accordance with applicable PCAOB Standards, was a materially false and misleading statement of an actual fact.

(b)    As they knew or were reckless in not knowing, the Deloitte Defendants' audit did not provide a reasonable basis to issue their clean audit opinion for the reasons set forth in ¶¶340-450.   Accordingly, the Deloitte Defendants' Statement [2], that they had a reasonable basis for their audit opinion, was a materially false and misleading statement of an actual fact.

(c)    As they knew or were reckless in not knowing, the Company did not maintain effective internal controls over financial reporting as of December 31, 2015, for the reasons set forth in ¶¶241-248, 310. Accordingly, the Statement [3], that the Company did maintain effective internal controls, was a materially false and misleading statement of actual fact.

(d)     As they knew or were reckless in not knowing, the Deloitte Defendants did not conduct their audit in accordance with applicable PCAOB Standards for the reasons set forth in ¶¶340-450.  Accordingly, the Deloitte Defendants' Statement [4], that they conducted their audit in accordance with applicable PCAOB Standards, is a materially false and misleading statement of an actual fact.

### 4.     Fiscal Year 2016

466.     After the market close on June 24, 2016, Aegean issued a Form 6-K, filed with the SEC on June 24, 2016, announcing that, on June 20, 2016, it had "appointed PricewaterhouseCoopers S.A. ('PwC') as the Company's independent auditor for the FY ending December 31, 2016, and dismissed Deloitte Hadjipavlou Sofianos & Cambanis S.A. ('Deloitte') as the Company's independent auditor. The Company's appointment of PwC and dismissal of Deloitte was approved by the audit committee of the Board of the Company (the 'Audit Committee')" (emphasis in original).  As the successor auditor, PwC Greece had a duty under professional standards to adhere to policies and procedures that provided the firm with reasonable assurance that risks associated with its audit services were appropriately considered and minimized the likelihood of being associated with a client whose management lacked integrity.[117]  PwC Greece's responsibilities included making sufficient inquiries with Deloitte Greece to determine whether to accept the Aegean audit engagement, including understanding the reasons for changing auditors and understanding the nature of the Company's relationships with related parties and significant unusual transactions.  Given the significant number of related-party transactions detailed in the Form 20-Fs in the years preceding PwC Greece's appointment, that duty to inform

_____

[117] PCAOB QC 20.14 - 20.15 (Quality Control Standards).

itself necessarily should have extended to ongoing relationships and transactions, including those commencing no later than 2010.

467.    PwC Greece included its 2016 audit opinion, dated May 16, 2017, concerning Aegean's consolidated financial statements and controls in Aegean's 2016 Form 20-F.   In opining that the consolidated financial statements and internal controls present fairly, in all material respects, the financial position of Aegean and its subsidiaries as of December 31, 2016, and that they were in conformity with all accounting principles generally accepted in the United States, PwC Greece stated the following:

> To the Shareholders and Board of Directors of Aegean Marine Petroleum Network Inc.:
>
> **[1] In our opinion, the accompanying consolidated balance sheet and the related consolidated statement of income, of  stockholders' equity, and of cash flows present fairly, in all material respects, the financial position of Aegean Marine Petroleum Network Inc. and its subsidiaries (the "Company") at December 31, 2016, and the results of their operations and  their cash flows for the year ended December 31, 2016 in conformity with accounting principles generally accepted in the  United States of America. [2] Also in our opinion, the Company maintained, in all material respects, effective internal control  over financial reporting as of December 31, 2016, based on criteria established in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).** The Company's  management is responsible for these financial statements, for maintaining effective internal control over financial reporting  and for its assessment of the effectiveness of internal control over financial reporting, included in "Management's annual report on internal control over financial reporting" appearing in Item 15(b) of the Company's 2016 Annual Report on Form  20-F. Our responsibility is to express opinions on these financial statements and on the Company's internal control over financial reporting based on our integrated audit. **[3] We conducted our audit in accordance with the standards of the Public  Company Accounting Oversight Board (United States).** Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audit of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement

presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. **[4] We believe that our audit provides a reasonable basis for our opinions**.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ PricewaterhouseCoopers S.A.
Athens, Greece
May 16, 2017

The bracketed numbers above, *i.e.*, [1], identify the statements discussed below.

468.    The foregoing statements from the 2016 audit opinion described in the immediately preceding paragraph and identified as Statements [1] – [4], concerning Aegean's consolidated financial statements, were materially false and misleading statements of actual fact because:

> (a)    As they knew or were reckless in not knowing, Aegean's consolidated financial statements did not fairly represent the financial picture of the Company and were not in compliance with GAAP as set forth in ¶¶214-

240, 310.   Accordingly, the PwC Defendants' Statement [1] was a materially false and misleading statement of an actual fact.

(b)      As they knew or were reckless in not knowing, the Company did not maintain effective internal controls over financial reporting as of December 31, 2016 as set forth in ¶¶241-248, 310.   Accordingly, the Statement [2], that the Company did maintain effective internal controls, was a materially false and misleading statement of actual fact.

(c)      As they knew or were reckless in not knowing, the PwC Defendants did not conduct their audit in accordance with applicable PCAOB Standards for the reasons set forth in ¶¶340-450.   Accordingly, the PwC Defendants' Statement [3], that they conducted their audit in accordance with applicable PCAOB Standards, was a materially false and misleading statement of an actual fact.

(d)      As they knew or were reckless in not knowing, the PwC Defendants' audit did not provide a reasonable basis to issue their clean audit opinion for the reasons set forth in ¶¶340-450.   Accordingly, the PwC Defendants' Statement [4], that they had a reasonable basis for their audit opinion, was a materially false and misleading statement of an actual fact.

469.   In that same 2016 Form 20-F, Deloitte Greece also included – and reiterated – its 2015 audit opinion concerning Aegean's consolidated financial statements that were previously included in Aegean's 2015 Form 20-F (*see* ¶462), except for the last paragraph which was omitted. In opining that the consolidated financial statements present fairly, in all material respects, the financial position of Aegean and its subsidiaries as of December 31, 2015, and that they were in

conformity with all accounting principles generally accepted in the United States, Deloitte Greece

stated the following:

> To the Board of Directors and Stockholders of Aegean Marine Petroleum
> Network, Inc. Majuro, Republic of the Marshall Islands
>
> We have audited the accompanying consolidated balance sheets of Aegean Marine
> Petroleum Network, Inc. and subsidiaries (the "Company") as of December 31,
> 2015, and the related consolidated statements of income, stockholders' equity, and
> cash flows for each of the two years in the period ended December 31, 2015. These
> financial statements are the responsibility of the Company's management. Our
> responsibility is to express an opinion on these financial statements based on our
> audits.
>
> **[1] We conducted our audits in accordance with the standards of the Public
> Company Accounting Oversight Board (United States)**. Those standards require
> that we plan and perform the audit to obtain reasonable assurance about whether
> the financial statements are free of material misstatement. An audit includes
> examining, on a test basis, evidence supporting the amounts and disclosures in the
> financial statements. An audit also includes assessing the accounting principles
> used and significant estimates made by management, as well as evaluating the
> overall financial statement presentation. **[2] We believe that our audits provide a
> reasonable basis for our opinion**.
>
> **[3] In our opinion, such consolidated financial statements present fairly, in all
> material respects, the financial position of Aegean Marine Petroleum
> Network, Inc. and its subsidiaries as of December 31, 2015, and the results of
> their operations and their cash flows for each of the two years in the period
> ended December 31, 2015, in conformity with accounting principles generally
> accepted in the United States of America**.
>
> /s/ Deloitte Certified Public Accountants S.A.
> Athens, Greece
> April 28, 2016 (May 16, 2017 as to the effects of the adoption of the new accounting
> guidance on the presentation of debt issuance costs and the recording of a provision
> for income tax as described in Note 1.)

The bracketed numbers above, *i.e.*, [1], identify the statements discussed below.

470.    The foregoing statements from the 2016 audit opinion described in the immediately

preceding paragraph and identified as Statements [1] – [4], concerning Aegean's consolidated

financial statements, were materially false and misleading statements of actual fact because:

(a)     As they knew or were reckless in not knowing, the Deloitte Defendants did not conduct their audit of the Company's financials in accordance with applicable PCAOB Standards for the reasons set forth in ¶¶340-450. Accordingly, the Deloitte Defendants' Statement [1], that they conducted their audit of the Company's financials in accordance with applicable PCAOB Standards, was a materially false and misleading statement of an actual fact.

(b)     As they knew or were reckless in not knowing, the Deloitte Defendants' audit did not provide a reasonable basis to issue their clean audit opinion for the reasons set forth in ¶¶340-450.   Accordingly, the Deloitte Defendants' Statement [2], that they had a reasonable basis for their audit opinion, was a materially false and misleading statement of an actual fact.

(c)     As they knew or were reckless in not knowing, Aegean's consolidated financial statements did not fairly represent the financial picture of the Company and were not in compliance with GAAP as set forth in ¶¶214-240, 310.   Accordingly, the Deloitte Defendants' Statement [3] was a materially false and misleading statement of actual fact.

## XI.   <u>LOSS CAUSATION</u>

471.   During the Class Period, Defendants engaged in a scheme to deceive the market and artificially inflate the price of the Company's securities, which operated as a fraud and deceit on purchasers of the Company's securities.   At all times relevant, Defendants issued materially false and misleading statements or omissions regarding the Company's financial results and the strength of its balance sheet, concealed the misappropriation of hundreds of millions of dollars of

Case 1:18-cv-04993-NRB   Document 81   Filed 02/01/19   Page 205 of 229


Aegean cash and assets, concealed gross internal control failures and took other acts in furtherance of the scheme. This Massive Fraudulent Scheme and the materially false and misleading statements caused the Company's securities to be artificially inflated during the Class Period. Plaintiff and Class members purchased Aegean securities at those artificially inflated prices

472.    True facts about the Company's financial performance and economic condition were partially revealed to the market in a series of disclosures. Each disclosure only partially revealed the truth and the fraud through the end of the Class Period.

473.    Throughout the Class Period, pricing for Aegean's 4.00% Convertible Unsecured Senior Notes Due 2018 and 4.25% Convertible Unsecured Senior Notes Due 2021 (the "Convertible Notes") were available through Bloomberg's Evaluated Pricing Service ("BVAL"). According to *Bloomberg*, BVAL is "an independent information source that draws on market data contributed from thousands of market participants. [BVAL] uses this broad global data set of market observations together with market-leading analytics and terms and conditions databases to produce objective third-party price valuations." Throughout the Class Period, the intrinsic value of the 4.00% Convertible Unsecured Senior Notes due 2018 and 4.25% Convertible Unsecured Senior Notes Due 2021 depended upon the price of Aegean stock because the Convertible Notes were convertible into Aegean stock. The factors which affected the value of Aegean stock would be incorporated into an assessment of the value of the Convertible Notes. BVAL pricing for Aegean convertible represents $1,000 face value of the notes.

474.    On December 13, 2016, the Company revealed that its balance sheets were not strong enough to support the $100 million repurchase of the Company's shares. In fact, the Company disclosed that it had violated the terms of its 2013 Credit Facility and that it would have to raise capital by selling $150 million of Convertible Notes to improve liquidity (and which would

dilute current shareholders) and cover a $40 million payment for its 2013 Credit Facility. In response to this news, Aegean common shares fell from $12.20 to close at $10.45 per share (a decline of 14% or $1.75 per share) on December 14, 2016, on heavy volume. The BVAL price of the Aegean 4.00% Convertible Unsecured Senior Notes due 2018 fell from $107.728 on December 13, 2016 to $105.504 (a decline of 2.06% or $2.224) on December 14, 2016.

475.    On February 20, 2018, after the market closed, the Company surprised the market and announced that it had entered into a transaction to acquire HEC, a closely-related company owned by the Founder and his family, for consideration totaling $367 million, an amount considered to be three times the fair value of HEC. In the deal, the Founder and his family would receive 33% of the outstanding stock of Aegean and would designate three nominees (including the Founder's son) for appointment to the Board and recommend an independent nominee to the Board. The revelation of this deal was startling to the market. A Stifel analyst noted that the proposed transaction "takes the cake" in terms of questionable deals, adding "it is hard to even fathom how any transaction could possibly be worse [and] at the worst possible time … to the one person in the world the company should most avoid dealing with."

476.    In response to this news, shares of Aegean fell from $4.45 to close on February 21, 2018, at $2.75 per share (a decline of $1.70, or 38%), on heavy volume. On February 22, 2018, shares fell further to close at $2.55 per share (a decline of $0.20, or 7%), on heavy volume. BVAL pricing of Aegean 4.00% Convertible Unsecured Senior Notes due 2018 fell from $96.997 on February 20, 2018 to $94.236 (a decline of 2.85% or $2.761) on February 21, 2018. BVAL pricing of Aegean 4.25% Convertible Unsecured Senior Notes Due 2021 fell from $70.65 on February 20, 2018 to $61.717 (a decline of 12.64% or $8.933) on February 21, 2018.

477.    On June 4, 2018, after the market closed, the Company disclosed in its June 4, 2018
Press Release that: (a) the Audit Committee had been replaced in its entirety; (b) approximately
$200 million of accounts receivable owed to the Company as of December 31, 2017 would need
to be written off and that the transactions giving rise to the receivables were "without economic
substance and improperly accounted for in contravention of the Company's normal policies and
procedures"; (c) the Audit Committee would recommend that Aegean pursue claims against
individuals and entities involved in these transactions; (d) the Company would identify weaknesses
in the Company's internal controls and remedy such weaknesses; (e) "a number of individuals
employed by the Company across multiple functions who are believed to have been involved in
the transactions have been terminated or placed on administrative leave pending the outcome of
the investigation"; and (f) the Reconstituted Audit Committee's preliminary finding had been
reported to the SEC and DOJ.

478.    In response to this news, Aegean common shares fell from $2.85 to close at $0.70
per share (a 75% decline) on June 5, 2018, on heavy volume.  BVAL pricing of Aegean 4.00%
Convertible Unsecured Senior Notes due 2018 fell from $95.223 on June 4, 2018 to $52.244 (a
decline of 45.14% or $42.979) on June 5, 2018.  BVAL pricing of Aegean 4.25% Convertible
Unsecured Senior Notes Due 2021 fell from $71.256 on June 4, 2018 to $25.569 on June 5, 2018
(a decline of 64.12% or $45.687).

479.    In the November 2, 2018 Press Release, Aegean admits (a) that the Company had
engaged in bogus commercial transactions with shell companies owned or controlled by former
employees or affiliates of the Company with no material assets or operations and improperly
booked accounts receivable from these transactions occurring in 2015, 2016 and 2017, totaling
approximately $200 million; (b) that nearly $300 million of the Company's cash and assets were

misappropriated principally through a March 31, 2010 contract with OilTank, a company controlled by a "former affiliate" of the Company, to oversee the construction of the Fujairah Facility in the UAE; and (c) that the Company engaged in the prepayment for future oil deliveries, which were never made and other actions to defraud since as early as 2010.  The Company stated that it expected the financial impact on restated periods "to be material and believes that the revenues and earnings of the Company were substantially overstated in the years 2015, 2016 and 2017," and that material weaknesses in the Company's internal controls over financial reporting existed as of December 31, 2015, 2016 and 2017, and consequently, management's annual report on internal controls over financial reporting as of December 31, 2015 and 2016 included in the Company's annual Form 20-F filings and also for the 2017 interim results should no longer be relied upon.  Further, given that the acknowledged misappropriation of Aegean's cash and other assets through fraudulent activities occurred "as early as 2010," and because there are no current interim restatements or corrections issued for successive years through the June 2018 revelations, Aegean's financial statements for (a) the FY ended December 31, 2010, 2011, 2012, 2013, 2014, 2015 and 2016 included in the Company's annual Form 20-F filings; and (b) each of the respective interim reporting periods between March 31, 2010 and December 31, 2017 included in the Company's Quarterly Reports on Form 6-K, were all materially false, misleading and unreliable. The employees who directed the scheme, which involved the creation of falsified and forged documents, including bank statements, audit confirmations, contracts, invoices and third-party certifications, among others, were terminated.  The Company also revealed that it received a grand jury subpoena from the U.S. Attorney's Office for the Southern District of New York in connection with suspected felonies.

480.    In response to this news, shares fell from $0.92 per share to $0.66 per share (or 29%), on November 5, 2018, until trading was halted pending news.  Then, on November 6, 2018, the Company announced that it had filed a Petition for Relief under Chapter 11 of the Bankruptcy Code in United States Bankruptcy Court for the Southern District of New York.  On November 7, 2018, after trading resumed, shares closed at $0.12 per share.  On November 7, 2018, the BVAL pricing of 4.00% Convertible Unsecured Senior Notes due 2018 fell from $62.014 to $17.197 per share (a decline of 72.27% or $44.817).  On November 7, 2018, the BVAL pricing Aegean 4.25% Convertible Unsecured Senior Notes Due 2021 fell from $60.743 on November 6, 2018 to $15.539 per share on November 7, 2018 (a decline of 74.42% or $45.204).   On December 3, 2018, the Company was delisted from the NYSE.

481.    The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other Class members was a direct result of the Defendants' Massive Fraudulent Scheme to artificially inflate the Company's common stock price and the subsequent significant decline in the value of the Company's common stock when the Defendants' prior misrepresentations and other fraudulent conduct was partially revealed.

## XII.    PRESUMPTION OF RELIANCE

482.    Lead Plaintiff is entitled to a presumption of reliance under the fraud-on-the-market doctrine.  At all times, the market for the Company's securities was an efficient market that promptly digested current information related to the Company from all publicly available sources and reflected such information in the prices of the Company's securities.  Throughout the Class Period:

      (a)    Aegean common stock was actively traded on the NYSE.

      (b)    The market price of Aegean common stock reacted promptly to the dissemination of public information regarding the Company;

(c)     The Company's stock was followed by financial analysts, including those cited in this complaint.  Thus, the Company's stock reflected the effect of information disseminated into the market;

(d)     The average weekly trading volume for Aegean common stock during the Class Period was approximately 2.424 million shares;

(e)     As a regulated issuer, Aegean filed with the SEC periodic public reports during the Class Period;

(f)     Aegean regularly communicated with public investors via established market communication mechanisms; and

(g)     During the Class Period the Company's market capitalization was as high as $748 million with over 48.2 million shares outstanding.

483.    Throughout the Class Period, the Company was consistently followed by the market, including securities analysts.  The market relies upon the Company's financial results and management to accurately present the Company's financial results.  During this period, Aegean and the Defendants continued to pump materially false and misleading information into the marketplace regarding the Company.  This information was promptly reviewed and analyzed by analysts and institutional investors and assimilated into the price of the Company's securities.

484.    The 4.00% Convertible Unsecured Senior Notes due 2018 and 4.25% Convertible Unsecured Senior Notes due 2021 were convertible into Aegean common stock.  As a result, their prices were linked to the market price of Aegean common stock.  In the Company's SEC filing concerning the 4.00% Convertible Unsecured Senior Notes due 2018 the Company stated, *inter alia*, that "the trading price of the notes will be significantly affected by the market price of our common stock."

485.    During the Class Period, 4.00% Convertible Unsecured Senior Notes due 2018 and 4.25% Convertible Unsecured Senior Notes due 2021 were traded and such trades were reported through the Financial Industry Regulatory Authority's Trade Reporting and Compliance Engine ("TRACE") system for public dissemination.

486.     As a result of the misconduct alleged herein, the market for Aegean securities was artificially inflated.  Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies.  Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions for which Defendants are each responsible.

487.     Lead Plaintiff and other members of the Class justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of Aegean securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

488.     Lead Plaintiff and the other members of the Class are also entitled to a presumption of reliance under *Affiliated Ute Citizens v.  United States*, 406 U.S. 128 (1972), because the claims asserted in this complaint against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

489.     Had Lead Plaintiff and other members of the Class known of the material adverse information not disclosed by the Defendants or been aware of the truth behind the Defendants' material misstatements and the Massive Fraudulent Scheme, they would not have purchased Aegean securities at artificially inflated prices.

## XIII.   NO SAFE HARBOR

490.     The statutory safe harbor, which applies to forward-looking statements under certain circumstances, does not apply to any of the allegedly false and misleading statements pleaded in this complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying

important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

491.    To the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Aegean who knew that those statements were false or misleading, or omitted necessary information when they were made.

## XIV.  CLASS ALLEGATIONS

492.    Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil procedure on behalf of a class consisting of all persons and entities who acquired Aegean's securities between February 27, 2014 through November 5, 2018, both dates inclusive, (the "Class Period") and were damaged as a result (the "Class").  Excluded from the Class are: (a) Defendants; (b) members of the immediate families of Defendants; (c) the subsidiaries and affiliates of Defendants; (d) any person who was an officer, director or controlling person of Aegean during the Class Period or is a current officer or director; (e) any person, firm, trust, corporation, officer, director, or other individual or entity in which any Defendant or any excluded person has a controlling interest or which is related to or affiliated with any of the Defendants; (f) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (g) the legal representatives, agents, affiliates, heirs, successors or assigns of any such excluded party.

493.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Aegean common stock was actively traded on the NYSE, an efficient market.   According to the Company's SEC filings, the Company had 39,403,822 shares of common stock outstanding as of December 31, 2016.  Similarly, by the end of December 31, 2016, outstanding 4.00% Convertible Unsecured Senior Notes due 2018 had an aggregate principal amount of approximately $87.9 million and outstanding 4.25% Convertible Unsecured Senior Notes due 2021 had an aggregate principal amount of approximately $130.4 million.  In January 2017, $22.5 million of 4.25% Convertible Unsecured Senior Notes due 2021 were sold by the Company.  Both the 4.00% Convertible Unsecured Senior Notes due 2018 and 4.25% Convertible Unsecured Senior Notes Due 2021 were convertible into shares of common stock.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds, if not thousands, of members in the proposed Class, and that they are geographically dispersed.

494.    Record owners and other members of the Class may be identified from records maintained by Aegean or its transfer agent(s).   Notice may be provided to such Class members via first-class mail using techniques and a form of notice similar to those customarily used in securities class actions.

495.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)    whether the federal securities laws were violated by Defendants' respective acts as alleged herein;

(b)     whether the statements made by or chargeable to Defendants during the Class Period were materially false and misleading, or omitted material facts;

(c)     whether Defendants engaged in, or caused others to engage in, a scheme to defraud investors;

(d)     whether Defendants engaged in illegal insider trading;

(e)     whether Defendants acted knowingly or recklessly in engaging in a scheme to defraud investors and issuing materially false and misleading statements;

(f)     whether and to what extent the prices of Aegean securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

(g)     whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, what is the proper measure of damages.

496.    Lead Plaintiff's claims are typical of the claims of the other members of the Class. Lead Plaintiff and all Class members sustained damages caused by the Defendants' wrongful conduct as alleged in this complaint.

497.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.  Lead Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

498.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them.  Lead Plaintiff knows of no difficulty that will be encountered in this litigation that would preclude its maintenance as a class action.

499.    Lead Plaintiff will rely, at least in part, on the presumption of reliance established by the fraud-on-the-market doctrine.  All purchasers of Aegean securities during the Class Period suffered similar injuries, including injury through their purchase of the securities at artificially inflated prices.  A presumption of reliance therefore applies.

## XV.    COUNTS

### COUNT ONE
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)
### (Against the Officer Defendants and the Outside Directors)

500.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

501.    Throughout the Class Period, the Officer Defendants (*i.e.*, Nikolas Tavlarios, Gianniotis, McIlroy and Fokas) and the Outside Directors (*i.e.*, Georgiopoulos, Koutsomitopoulos, Papanicolaou, Konomos and John Tavlarios), directly or indirectly, by the use of means or instrumentalities of interstate commerce, the United States mails, interstate telephone communications and a national securities exchange, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices and a course of business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class in connection with their purchases of Aegean securities during the Class Period, in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5(b) promulgated thereunder, 17 C.F.R. § 240.10b-5(b).

502.    The Officer Defendants and Outside Directors, as Aegean's most senior officers and directors during the Class Period, are liable as direct participants in all of the wrongs complained of herein.

503.    As detailed above, the Officer Defendants and Outside Directors acted with the requisite scienter as they had actual knowledge of the misrepresentations and omissions of material facts, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts even though such facts were available to them.

504.    Lead Plaintiff and other members of the Class relied upon the Officer Defendants' and the Outside Directors' statements and/or on the integrity of the market in purchasing Aegean securities during the Class Period.

505.    As a direct and proximate cause of the wrongful conduct described herein, Lead Plaintiff and the Class suffered damages in connection with their purchases of Aegean securities at artificially inflated prices during the Class Period.  Had Lead Plaintiff and the other members of the Class known of the material adverse information not disclosed by the Officer Defendants and Outside Directors, or been aware of the truth behind their materially false and misleading statements, they would not have purchased Aegean common stock at artificially inflated prices during the Class Period.

506.    In addition to the duties of full disclosure imposed on the Officer Defendants and Outside Directors, as a result of their responsibility for the Company's consolidated financial statements and making affirmative statements and reports to the investing public, the Officer Defendants and Outside Directors had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including accurate and truthful information with respect to the Company's business operations, growth and financial condition, so that the market price of the Company's securities would be based on truthful, complete and accurate information.

507.     By virtue of the foregoing, the Officer Defendants and Outside Directors violated 10(b) of the Exchange Act and SEC Rule 10b-5(b) promulgated thereunder and are liable to Lead Plaintiff and the Class who have been damaged as a result of such violations.

## COUNT TWO
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c)
(Against Melisanidis, the Officer Defendants and the Outside Directors)**

508.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

509.     During the Class Period, Melisanidis, the Officer Defendants and Outside Directors carried out a plan, scheme and course of conduct that (a) was intended to and did deceive the investing public, including Lead Plaintiff and the Class, and (b) caused Lead Plaintiff and the Class to purchase Aegean securities at artificially inflated and distorted prices.  In furtherance of this unlawful scheme, plan and course of conduct, Melisanidis, the Officer Defendants and Outside Directors engaged in unlawful acts, in addition to the making of false statements as alleged herein, in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5(a) and (c)  promulgated thereunder, 17 C.F.R.  § 240.10b-5(a) and (c).

510.     The Defendants named in this count, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to misappropriate monies from Aegean and conceal adverse material information about Aegean's business and operations and its financial results as specified herein.

511.     The Defendants named in this count employed devices, schemes and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices and a course of conduct in an effort to misappropriate Aegean cash and assets and mislead investors as to the Company's business and financial condition.  As set forth more particularly

herein, these acts included the (a) misappropriation of Aegean cash and assets of approximately $300 million through fraudulent activities including funneling monies to OilTank, a company owned or controlled by Melisanidis, through inflated contracts and fraudulent pricing for the construction of the Fujairah Facility and making fraudulent prepayments for future oil deliveries; (b) creation of and use of shell companies to engage in bogus, commercial transactions with the Company to inflate account receivables by approximately $200 million and artificially inflate Aegean's revenue and income; (c) creation of fictitious documentation, including, falsified and forged bank statements, audit confirmations, contracts, invoices and third-party certifications, which were used to conceal fraudulent accounting entries and misappropriate Company assets; (d) Melisanidis' sale of his Aegean shares to the Company at inflated prices, resulting in a liquidity crisis that triggered related-party loans; and (e) participation in and the approval of the bogus HEC Acquisition, which was intended to conceal the $300 million misappropriation of cash and assets and the $200 million in bogus account receivables booked by the Company.  These acts operated as a fraud and deceit upon the purchasers of Aegean securities during the Class Period.

512.    As a result of the fraudulent scheme and failure to disclose material facts, the prices for Aegean securities were artificially inflated during the Class Period.

513.    Lead Plaintiff and the Class were unaware that the prices of Aegean's securities were artificially inflated or distorted, and relied directly or indirectly on the false and misleading statements disseminated by the Defendants, and upon the integrity of the market in which the Company's securities trade and/or on the absence of material adverse information that was known or recklessly disregarded by the Defendants named in this count, but not disclosed in public statements by these Defendants during the Class Period.  Lead Plaintiff and the Class acquired Aegean securities during the Class Period at artificially high prices and were damaged thereby.

514.    At the time these misrepresentations, omissions and fraudulent acts were made as part of the Massive Fraudulent Scheme, Lead Plaintiff and the Class were unaware of the falsity of the misrepresentations and believed them to be true and were unaware of the Massive Fraudulent Scheme.  Had Lead Plaintiff, the Class and the marketplace known the truth regarding Aegean, Lead Plaintiff and the Class would not have purchased or otherwise acquired Aegean securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated or distorted prices at which they did.

515.    As a direct and proximate result of the wrongful conduct of Melisanidis, the Officer Defendants and Outside Directors, Lead Plaintiff and the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

516.    By virtue of the foregoing, the Company Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5(a) & (c) promulgated thereunder and are liable to Lead Plaintiff and the Class who have been damaged as a result of such violations.

### COUNT THREE
### Violations of Section 20(a) of the Exchange Act
### (Against Melisanidis, the Officer Defendants and the Outside Directors)

517.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

518.    During the Class Period, Melisanidis, the Officer Defendants and the Outside Directors acted as control persons of Aegean and each other within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  By virtue of their high-level positions, membership on Aegean's Board, their stock ownership and participation in and/or awareness of Aegean's operations and/or intimate knowledge of the false consolidated financial statements filed by Aegean with the SEC and disseminated to the investing public, the Defendants named in this count had the power to influence and control, and did influence and control, directly or indirectly, the

decision-making of Aegean, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading, and the acts in furtherance of the Massive Fraudulent Scheme.  The Defendants named in this count were provided with or had unlimited access to copies of Aegean's internal documents, reports, press releases, public filings and other statements alleged by Lead Plaintiff to have been misleading and used in furtherance of the plan, scheme and course of conduct set forth herein, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected as well as to prevent the acts in furtherance of the Massive Fraudulent Scheme.

519.    In particular, each of the Defendants named in this count had direct and supervisory involvement in the day-to-day operations of Aegean and therefore is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged and exercised that power.

520.    As set forth above, Melisanidis, the Officer Defendants and the Outside Directors each violated Section 20(a) by their acts and omissions as alleged in this Complaint.

521.    As a direct and proximate result of the wrongful conduct of the Defendants named in this count, Lead Plaintiff and the Class suffered damages in connection with their purchases of Aegean common stock during the Class Period.

522.    By reason of the conduct of the Company alleged in this complaint, and by virtue of their positions as control persons, the Defendants named in this count are liable pursuant to Section 20(a) of the Exchange Act.

//

//

//

**COUNT FOUR**
**Violation of Section 20(a) of the Exchange Act**
**(Against the Audit Committee Defendants)**

523.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

524.     The Audit Committee Defendants (*i.e.*, Koutsomitopoulos, Papanicolaou and Konomos) acted as control persons of Aegean within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).   By virtue of their oversight of the Company's financial reporting processes and internal controls, their controls over the Company's internal auditing structure and participation in and/or awareness of Aegean's operations and/or intimate knowledge of the false consolidated financial statements filed by Aegean with the SEC and disseminated to the investing public, the Audit Committee Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Aegean, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading and the acts in furtherance of the Massive Fraudulent Scheme.   The Defendants named in this count were provided with or had unlimited access to copies of Aegean's internal documents, reports, press releases, public filings and other statements alleged by Lead Plaintiff to have been misleading and used in furtherance of the plan, scheme and course of conduct set forth herein, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected as well as prevent the acts in furtherance of the Massive Fraudulent Scheme.

525.     As set forth above, the Audit Committee Defendants each violated Section 20(a) by their acts and omissions as alleged in this Complaint.

526.     As a direct and proximate result of the wrongful conduct of the Defendants named in this count, Lead Plaintiff and the Class suffered damages in connection with their purchases of Aegean common stock during the Class Period.

527.     By reason of the conduct of the Company alleged in this complaint, and by virtue of their positions as control persons, the Defendants named in this count are liable pursuant to Section 20(a) of the Exchange Act.

## COUNT FIVE
### Violations of Section 20(b) of the Exchange Act
### (Against Melisanidis)

528.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

529.     As set forth above, Melisanidis directly and indirectly acted through and used another person or entity to issue materially false and misleading information in violation of Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

530.     By virtue of each of Melisanidis' acts resulting in the issuance Aegean's materially false and misleading statements to the public and the acts in furtherance of the Massive Fraudulent Scheme, Melisanidis, directly or indirectly, engaged in conduct that was unlawful under section 10(b) of the Exchange Act and the rules and regulations promulgated thereunder through the Officer Defendants, Outside Directors, Audit Committee and Aegean.

531.     As a direct and proximate result of Melisanidis' wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

532.    In light of the foregoing, Melisanidis is liable to Lead Plaintiff and the Class for the damages they suffered as a result of their purchases of Aegean securities during the Class Period.

**COUNT SIX**
**Violation of Section 20A of the Exchange Act**
**(Against Defendants Melisanidis, Fokas & Gianniotis)**

533.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

534.    This claim is brought pursuant to Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, against Defendants Melisanidis, Fokas and Gianniotis on behalf of all members of the Class damaged by the insider trading by these Defendants during the Class Period.

535.    Lead Plaintiff purchased at least one share of Aegean common stock contemporaneously with sales of Aegean common stock by Defendants Melisanidis, Fokas and Gianniotis.

536.    By virtue of their positions at Aegean and the specific facts alleged herein, these Defendants were in possession of material, adverse, non-public information about Aegean contemporaneously with when Defendants sold their Aegean common stock.

537.    As alleged above, each of the Defendants violated Sections 10(b), and 20(a) and 20(b) of the Exchange Act.

538.    These Defendants violated Section 20A of the Exchange Act and applicable rules and regulations thereto by selling Aegean common stock while in possession of material, non-public information about the adverse information detailed herein.

539.    Lead Plaintiff and other members of the Class who traded in Aegean securities contemporaneously with the sales of Aegean stock by Defendants named in this Count have suffered substantial damages in that they paid artificially inflated prices for Aegean stock as a

result of the violations of Sections 10(b), 20(a) and 20(b) herein described.  Moreover, these Class members would not have traded Aegean stock at the prices they paid or received, or at all, if they had been aware that the market prices had been artificially inflated by Defendants' false and misleading statements and scheme to defraud.

540.    The Defendants named in this count are required to account for all such stock sales and to disgorge their profits or ill-gotten gains.

## COUNT SEVEN
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)
### (Against Deloitte Greece and PwC Greece)

541.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

542.    Deloitte Greece and PwC Greece made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading, by use of the means or instrumentalities of interstate commerce in order to maintain artificially inflated prices for Aegean securities in violation of Section 10(b) for the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5.

543.    During the Class Period, Deloitte Greece and PwC Greece made false and misleading statements of material fact, which were intended to and did: (a) deceive the investing public, including Lead Plaintiff, as alleged herein; (b) artificially inflate and maintain the market for and market prices of Aegean's securities; and (c) cause Lead Plaintiff to purchase or otherwise acquire Aegean securities at artificially inflated prices.

544.    Deloitte Greece and PwC Greece acted as independent Auditor Defendants for Aegean.  They knew and understood that the opinions issued by its member firms concerning the consolidated financial statements and reports of Aegean would be released to the investing public, and that investors would rely, and had a right to rely, on those reports and opinions.  Deloitte

Greece and PwC Greece had access to Aegean employees and continuing access to and knowledge of Aegean's confidential corporate, financial, operating and business information. Despite this access and knowledge, Deloitte Greece and PwC Greece knowingly, or with extreme recklessness, perpetrated and/or concealed the accounting manipulations and other schemes undertaken, and certified without qualification and publicly represented that Aegean's financial reports were free from material misstatements, in order to fraudulently boost Aegean's reported assets and earnings.

545.    Deloitte Greece and PwC Greece engaged in the fraudulent activity described above knowingly, or in such a reckless manner, as to constitute willful deceit and fraud upon Lead Plaintiff. They knowingly, or recklessly caused Aegean's and their own reports and statements to contain misrepresentations and omissions of material fact as alleged herein.

546.    At all times relevant hereto, Deloitte Greece and PwC Greece were and acted as the agents of their parents, DTTL and PwC International, respectively. Deloitte Greece and PwC Greece had actual, apparent and/or implied authority to act and speak on behalf of DTTL and PwC International, respectively, and DTTL and PwC International exercised substantial control over the manner in which Deloitte Greece and PwC Greece conducted business, including through their centralized global leadership structure, which sets the strategy, policies and standards globally. As a result, DTTL and Deloitte Greece have a principal-agent relationship and DTTL is chargeable with and responsible and liable for the acts and public statements of its agent, Deloitte Greece, under the doctrine of *respondeat superior*. Likewise, PwC International and PwC Greece have a principal-agent relationship and PwC International is chargeable with and responsible and liable for the acts and public statements of its agent, PwC Greece, under the doctrine of *respondeat superior*

547.     As a result of the fraudulent activities of Deloitte Greece and PwC Greece described above, in conjunction with the activities of the other Defendants, the price of Aegean securities was artificially inflated during the Class Period.

548.     In ignorance of Aegean's true financial condition, Lead Plaintiff, relying upon the integrity of the market price for Aegean's securities, and/or the statements and reports of Aegean containing false and misleading information, purchased or otherwise acquired Aegean's securities at artificially inflated prices during the Class Period.

549.     The prices for Aegean's securities declined materially upon the public disclosure of the true facts which had been misrepresented or concealed as alleged herein.

550.     As a direct and proximate result of the wrongful conduct of Deloitte Greece and PwC Greece, Lead Plaintiff suffered damages in connection with their respective purchases of Aegean's securities for which the Defendants are jointly and severally liable.

**COUNT EIGHT**
**Violations of Section 20(a) of the Exchange Act**
**(Against DTTL, Deloitte U.S., PwC International and PwC U.S.)**

551.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

552.     As set forth above, the Deloitte Greece and PwC Greece committed primary violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78t(a).  DTTL, Deloitte U.S., PwC International and PwC U.S. acted as a controlling person of its member firms and their employees within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of the unified international structure of the auditing firm and the relationships among member firms as alleged above, DTTL, Deloitte U.S., PwC International and PwC U.S. had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of their respective member firms.  DTTL's, Deloitte U.S.', PwC International's and PwC U.S.' actual

218

control of the conduct of Deloitte Greece and PwC Greece, respectively, is demonstrated by, *inter alia,* their centralized global leadership structure, which sets the strategy, policies and standards globally, including for Deloitte Greece and PwC Greece. Through this relationship, DTTL, Deloitte U.S., PwC International and PwC U.S. possessed the power to direct and/or cause the direction of the management of Deloitte Greece and PwC Greece's affairs, including conduct of their audits and the preparation of audit reports.

553.    DTTL, Deloitte U.S., PwC International and PwC U.S. were provided with, or had unlimited access to, copies of its member firms' work papers for audits of Aegean, as well as copies of internal documents, reports, memoranda, communications, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading and had the ability to prevent the issuance of the false and misleading statements or to cause the statements to be corrected.

554.    DTTL, Deloitte U.S., PwC International and PwC U.S. had direct involvement in its members firms' audits of Aegean, and therefore are presumed to have had the power to control or influence the particular conduct giving rise to the securities law violations, and exercised that power, as set forth herein.  By virtue of their position as a controlling person of their respective member firms and their employees, DTTL, Deloitte U.S., PwC International and PwC U.S. are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of their wrongful conduct, Lead Plaintiff suffered damages in connection with their respective purchases of Aegean securities for which they are jointly and severally liable.

**WHEREFORE**, Lead Plaintiff prays for relief and judgment as follows

555.    Determining that this action is a proper class action, certifying Lead Plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure and appointing Lead Counsel as Class Counsel;

556.     Awarding compensatory damages in favor of Lead Plaintiff and the other members of the Class against Defendants for all damages sustained as a result of Defendants' wrongdoing in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

557.     Awarding disgorgement of all insider trading profits in favor of Lead Plaintiff and the other members of the Class who purchased contemporaneously with Defendants;

558.     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

559.     Awarding such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Lead Plaintiff hereby demand trial by jury of all issues that may be so tried.

Dated: January 31, 2019                     Respectfully submitted,

                                            **BERMAN TABACCO**


                                            By: /s/ *Joseph J. Tabacco, Jr.*

                                            Joseph J. Tabacco, Jr. (JT1994)
                                            Nicole Lavallee
                                            Christopher T. Heffelfinger
                                            A. Chowning Poppler
                                            44 Montgomery Street, Suite 650
                                            San Francisco, CA 94104
                                            Telephone: (415) 433-3200
                                            Facsimile: (415) 433-6382
                                            Email: jtabacco@bermantabacco.com
                                                   nlavallee@bermantabacco.com
                                                   cheffelfinger@bermantabacco.com
                                                   cpoppler@bermantabacco.com

Jay W. Eng
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194
Email: jeng@bermantabacco.com

*Counsel for Lead Plaintiff Utah Retirement Systems*