**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE AEGEAN MARINE PETROLEUM NETWORK, INC. SECURITIES LITIGATION | Case No. 18-cv-4993 (NRB)<br><br>Hon. Naomi Reice Buchwald<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>DEFENDANT DIMITRIS MELISSANIDIS'S MOTION TO DISMISS</u>**

BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 446-2300
Facsimile:  (212) 446-2350

*Counsel for Dimitris Melissanidis*

# <u>TABLE OF CONTENTS</u>

PRELIMNARY STATEMENT ................................................................................ 1

RELEVANT ALLEGATIONS ............................................................................... 3

LEGAL STANDARD ........................................................................................... 8

ARGUMENT ......................................................................................................... 9

   **I.**   **The Court Lacks Personal Jurisdiction Over Mr. Melissanidis** ................... 9

      A. There Is No General Jurisdiction Over Mr. Melissanidis. .......................... 10

      B. There Is No Specific Jurisdiction Over Mr. Melissanidis........................... 11

            *i.*   *The Complaint Fails to Allege Mr. Melissanidis's Personal Involvement in Any Fraudulent Conduct In or Aimed at the United States* ..................................... 12

            *ii.*   *The Complaint Fails to Allege Mr. Melissanidis's Personal Involvement in Any Allegedly False or Misleading Statements Aimed at the United States* .......... 14

            *iii.*   *The Complaint's Allegations That Mr. Melissanidis Sold Aegean Stock Back to the Company Fail to Establish Personal Jurisdiction*...................................... 17

      C. Even if Jurisdiction Were Proper, the Court Should Decline to Exercise It............... 20

   **II.**   **The Complaint Fails to State a Claim Against Mr. Melissanidis** ............... 21

      A. Plaintiff Fails to State a Claim Against Mr. Melissanidis Under Section 10(b) and Rule 10b-5(a) and (c). .................................................................................. 22

            *i.*   *Plaintiff Does Not Allege With Particularity That Mr. Melissanidis Was Involved In The Alleged Manipulative Scheme* ................................................. 23

            *ii.*   *Plaintiff's Allegations Do Not Create a "Strong Inference" of Scienter*......... 26

            *iii.*   *Plaintiff Has Not Alleged Use of Interstate Commerce by Mr. Melissanidis*... 29

      B. Plaintiff Fails to Plead that Mr. Melissanidis is a Control Person Under Sections 20(a) and 20(b) ................................................................................................... 30

            *i.*   *Plaintiff Fails to Assert a Primary Violation Under Section 10(b)*................. 31

            *ii.*   *Plaintiff Fails to Plead Mr. Melissanidis's Control of, or Culpable Participation in, the Alleged Fraudulent Scheme* ............................................ 31

      C. Plaintiff Fails to Sufficiently Plead Insider Trading Claims Against Mr. Melissanidis Under Section 20A...................................................................................... 33

CONCLUSION ..................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Arkansas Teacher Ret. Sys. v. Bankrate, Inc.*, 18 F.Supp.3d 482 (S.D.N.Y. 2014) .................... 30

*Asahi Metal Indus. Co., Ltd. v. Superior Ct. of California, Solano Cnty.*, 480 U.S. 102 (1987).  20

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)............................................................................. 8, 22, 29

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007).................................. 22, 23

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................................... 8, 21

*Best Van Lines, Inc. v. Walker*, 490 F.3d 239 (2d Cir. 2007) ....................................................... 10

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985).............................................................. 19

*Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786 (S.D.N.Y. 2018) ......................................................... 9

*DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242 (2d Cir. 1987)............................ 23

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187 (2d

   Cir. 2009) ......................................................................................................................... 26, 27

*Goodyear Dunlop Tires Operations S.A. v. Brown*, 564 U.S. 915 (2011).................................... 10

*Gordon v. Sonar Capital Mgmt.* LLC, 962 F. Supp. 2d 525 (S.D.N.Y. 2013) ............................ 34

*Gruber v. Gilbertson*, No. 16-cv-9727, 2019 WL 4458956 (S.D.N.Y. Sept. 17, 2019).............. 33

*Harris v. Mills*, 572 F.3d 66 (2d Cir. 2009)............................................................................. 9, 34

*In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731 (S.D.N.Y. 2017) ....................... 10, 14, 30, 33

*In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279 (E.D.N.Y. 2002)........................................ 14

*In re Glob. Crossing, Ltd. Sec. Litig.*, No. 02 CIV. 910 (GEL), 2005 WL 1907005 (S.D.N.Y.

   Aug. 8, 2005).................................................................................................................... 31

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-md-2262 (NRB), 2016 WL 7378980

   (S.D.N.Y. Dec. 20, 2016) ..................................................................................................... 11

*In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449 (S.D.N.Y. 2005)........................................... 15, 19

*In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527 (S.D.N.Y. 2007)............................................ 16

*In re Satyam Computer Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450 (S.D.N.Y. 2013).......... 11, 13

*In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659 (2d Cir. 2013)................................... 8, 10

*Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697 (2d Cir. 1994) ......................... 33

*Mazloum v. Int'l Commerce Corp.*, 829 F. Supp. 2d 223 (S.D.N.Y. 2011)................................... 10

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560 (2d Cir. 1996)................. 8, 10, 11, 20

*Pilates, Inc. v. Pilates Inst., Inc.*, 891 F. Supp. 175 (S.D.N.Y. 1995) .......................................... 11

*Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*, 761 F. Supp. 2d 103 (S.D.N.Y. 2011)............................................................................................................................................. 10

*S.E.C. v. Alexander*, 160 F. Supp. 2d 642 (S.D.N.Y. 2001) ......................................................... 17

*S.E.C. v. Euro Security Fund, Coim SA*, No. 98 Civ. 7347, 1999 WL 76801 (S.D.N.Y. Feb.17, 1999)............................................................................................................................................. 18

*S.E.C. v. Sharef*, 924 F. Supp. 2d 539 (S.D.N.Y. 2013) ................................................... 12, 13, 20

*S.E.C. v. Unifund SAL*, 910 F.2d 1028 (2d Cir.1990)............................................................. 17, 18

*SEC v. Straub*, 921 F. Supp. 2d 244 (S.D.N.Y. 2013) ............................................................... 9, 29

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F.Supp.3d 401 (S.D.N.Y. 2014) ....................................................................................................................... 31, 32

*State Universities Ret. Sys. of Illinois v. Astrazeneca PLC*, 334 Fed. Appx. 404 (2d Cir. 2009). 17

*Steginsky v. Xcelera Inc.*, 741 F.3d 365 (2d Cir. 2014) ............................................................... 25

*Tarsavage v. Citic Tr. Co.*, 3 F. Supp. 3d 137 (S.D.N.Y. 2014).................................................... 15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).............................................. 26

*Tung v. Bristol-Myers Squibb Co.*, 412 F. Supp. 3d 453 (S.D.N.Y. 2019)..................................... 8

*United States v. O'Hagan*, 521 U.S. 642 (1997) ............................................................ 25

*Walden v. Fiore*, 571 U.S. 277 (2014) ............................................................................ 12

*Walsh v. Rigas*, No. 17 CIV. 4089 (NRB), 2019 WL 294798 (S.D.N.Y. Jan. 23, 2019) ....... 22, 31

*Wilson v. Merrill Lynch & Co.*, 671 F.3d 120 (2d Cir. 2011) ........................................ 23

*World-Wide Volkswagen Corp v. Woodson*, 444 U.S. 286 (1980) ................................ 12

**Statutes**

15 U.S.C. § 78aa .............................................................................................................. 9

15 U.S.C. § 78j ................................................................................................................. 23

15 U.S.C. § 78t ...................................................................................................... 31, 32, 34

15 U.S.C. § 78t-1 ............................................................................................................. 35

15 U.S.C. § 78u–4 ....................................................................................................... 23, 27

**Rules**

17 CFR § 240.10b-5 ......................................................................................................... 23

Fed. R. Civ. P. 12(b) .......................................................................................................... 8

Fed. R. Civ. P. 9(b) .......................................................................................................... 23

Dimitris Melissanidis respectfully submits this memorandum of law in support of his Motion to Dismiss the Consolidated Class Action Complaint ("Complaint") pursuant to Rules 9(b), 12(b)(2), and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act ("PSLRA").  Further, Mr. Melissanidis respectfully joins and hereby incorporates those arguments made by his co-defendants in their motions to dismiss, to the extent applicable to him.

## PRELIMNARY STATEMENT

Dimitris Melissanidis is Greek citizen, living in Greece, who founded a Greek company, which he ran from its offices in Greece until 2006.  In 2006, that company—Aegean Marine Petroleum Network, Inc. ("Aegean")—was listed publicly on the New York Stock Exchange, and moved its financial operations and decision-making to New York City.  At the same time, Mr. Melissanidis stepped down as President and CEO in favor of an executive in New York, while he remained in Greece in a figurehead capacity.  In 2016, Mr. Melissanidis stepped back even further, becoming a mere consultant and also selling all of his outstanding shares back to the company.

Over a decade after Mr. Melissanidis turned over the reins at Aegean to the next generation of leaders, those leaders ran Aegean into bankruptcy.  Rather than taking responsibility for the company's financial condition, Aegean and its board decided to publicly blame Mr. Melissanidis for an "elaborate fraudulent scheme" to misappropriate assets, overstate revenue, and mislead investors—despite the fact that the every single allegedly fraudulent transaction and statement occurred after Mr. Melissanidis had stepped back from running the company.  Piggy-backing on these baseless allegations, the lead plaintiff in this lawsuit likewise alleges that Mr. Melissanidis and several others committed securities fraud.  To bring a securities fraud suit, however, a plaintiff must do more than parrot a press release; it must allege specific and non-conclusory facts

supporting its accusations of fraud, as well as establish that each named defendant is properly subject to jurisdiction in the United States.  Here, the Complaint does neither.

First, the Complaint fails to allege facts supporting personal jurisdiction over Mr. Melissanidis, a citizen and resident of Greece.  The Complaint is devoid of any allegation that Mr. Melissanidis purposefully availed himself of the privilege of conducting business within the United States, let alone directed any single activity at the United States.   To the extent the Complaint makes any allegations about Mr. Melissanidis's conduct, everything he did was overseas.  When (in the past) Mr. Melissanidis conducted business on behalf of Aegean, he did so in Greece.  And even when Mr. Melissanidis sold his Aegean shares back to the company, he did so in Greece in a private transaction with the company, not on the New York Stock Exchange.  On these facts, the plaintiff simply has no basis to sue Mr. Melissanidis in the United States.

Second, the Complaint fails to state a claim against Mr. Melissanidis.  At base, the plaintiff alleges that $300 million was misappropriated from Aegean through inflated contracts and invoices, and that the company misled investors about the strength of its balance sheet through false and misleading statements.  The Complaint, however, fails to connect Mr. Melissanidis to any part of this alleged fraud.  It does not allege that Mr. Melissanidis negotiated or signed the allegedly inflated contracts.  It does not allege that Mr. Melissanidis had input on Aegean's balance sheets.  And it does not allege that Mr. Melissanidis signed a single financial statement or made one false statement to investors.  Instead, the Complaint relies on conclusory and unsupported alleges that Mr. Melissanidis used "various inappropriate means" to assert "*de facto* control" over the entire company.  Nowhere in the 221-page Complaint, however, does the plaintiff provide even one example of *how* Mr. Melissanidis purportedly exercised control over the company, let alone the allegedly fraudulent conduct.

The Complaint's allegations of scienter are equally lacking.  If anything, the Complaint alleges facts that undercut any reason to believe that Mr. Melissanidis was involved in any fraud. For example, the Complaint alleges that in 2018—after the alleged misappropriation—Mr. Melissanidis offered to sell a different company he allegedly controlled to Aegean, in return for Aegean debt and equity.  If Mr. Melissanidis in fact knew about the misappropriation and fraud at Aegean, this transaction would make absolutely no sense.  The Complaint certainly offers no plausible explanation for why Mr. Melissanidis would swap 100% of the equity in a valuable company for 33% of the equity in one whose share price was artificially inflated by fraud.  Like the rest of the Complaint's allegations about Mr. Melissanidis, the allegations regarding this transaction, which was never even consummated, are conclusory, contradictory, and illogical.

Accordingly, the Complaint should be dismissed in its entirety against Mr. Melissanidis.

## RELEVANT ALLEGATIONS[1]

Dimitris Melissanidis is, and at all relevant times was, a resident and citizen of Greece.  In 1995, Mr. Melissanidis founded Aegean Marine Petroleum Network, Inc. ("Aegean" or the "Company"), a marine fuel logistics company that supplies and markets refined marine fuel and lubricants to ships in port and at sea.  (Compl. ¶¶ 4, 43.)  Aegean is headquartered in Piraeus, Greece and incorporated under the laws of the Marshall Islands.  (*Id.* ¶ 43.)  The Company's primary business is operating a fleet of offshore bunkering vessels, which it uses to supply fuel and lubricants to vessels.  (*Id.* ¶¶ 123-125.)

When Mr. Melissanidis founded the Company in 1995, it was limited to a single bunkering station in the Port of Piraeus, Greece.  (*Id.* ¶ 120).  Over the years, however, the Company steadily

---

[1]     For purposes of this motion, Mr. Melissanidis assumes—but of course does not concede— the truth of the well-pleaded, non-conclusory allegations of the Complaint, as well as the materials incorporated by reference into the Complaint.

grew under Mr. Melissanidis's careful leadership.  In December 2006, Aegean held an initial public offering ("IPO") and listed its stock on the New York Stock Exchange ("NYSE").  (*Id.* ¶ 4.) Following the IPO, the Company opened a New York office, which was tasked with the responsibility of overseeing the company's "ultimate administration, financial reporting, and control functions."  (*Id.* ¶ 128.)  Specifically, the New York office prepared all SEC filings and "all levels of the Company and its subsidiaries" reported up to the New York office.  (*Id.* ¶ 128.)

When the New York office opened, Mr. Melissanidis stepped down from his position as President and CEO. (*Id.* ¶ 49.)  In giving up his oversight and control responsibilities, Mr. Melissanidis made room for a new generation of leadership to take over the Company, both in New York and in Greece.  To ensure a smooth transition, Mr. Melissanidis stayed on in a greatly reduced role, becoming head of corporate development, a mostly figurehead position meant to instill confidence in Aegean's long-time business partners.  (*Id.*)  Mr. Melissanidis served in that role until August 2016, at which time he scaled back his involvement even further, agreeing to a limited consulting role until May 2018.  (*Id.*)  That is, according to the Complaint, Mr. Melissanidis ceased being in charge of the Company in 2006, and has not even been an employee since August 2016.

At about the same time, on August 17, 2016, Aegean publicly announced that an independent audit committee of the Board of Directors had reviewed and unanimously approved a repurchase of Mr. Melissanidis's 11,303,031 million shares (representing approximately 22% of the Company).  (*Id.* ¶¶ 50, 178.)  Under the terms of the authorization, Mr. Melissanidis sold his shares directly back to Aegean at the current market price of $8.81 per share.  (*Id.*)  The shares were never publicly traded on the New York Stock Exchange.  (*Id.*)  According to Aegean's August

17, 2016 press release, the sale benefited Aegean and its shareholders because it provided "meaningful and immediate earnings accretion for all Aegean shareholders." (*Id.* ¶ 179.)

Over ten years after Mr. Melissanidis stepped down as President and CEO and over two years after he sold his shares and gave up all management responsibilities within the Company, Aegean's entire Audit Committee was forced to step down, and a new "Reconstituted Audit Committee" was formed. (*Id.* ¶ 7.) A few weeks later, on June 4, 2018, the Company announced that $200 million in accounts receivable had to be written off because it claimed that the underlying transactions—which all occurred between 2015 and 2017—lacked economic substance. (*Id.* ¶¶ 7, 25, 148.)

Parroting the Reconstituted Audit Committee's subsequent press release, lead plaintiff brought this action against Mr. Melissanidis and 17 other former Aegean officers, directors, and auditors. The plaintiff alleges that Aegean's "senior managers" and Mr. Melissanidis misappropriated approximately $300 million in Aegean assets through the construction of an in-land storage facility in Fujairah, United Arab Emirates (the "Fujairah Facility") and then improperly recorded $200 million in accounts receivable to conceal the scheme. (*Id.* ¶ 149.) The Complaint, however, is silent as to any action Mr. Melissanidis took in furtherance of the so-called scheme. Instead, the Complaint relies entirely on the conclusory (and false) allegation that Mr. Melissanidis retained "*de facto* control" over the Company "through various inappropriate means" even after he stepped down as President and CEO. (*Id.* ¶¶ 12, 34, 320.) The Complaint, however, does not state any specific action that Mr. Melissanidis allegedly took to exert his so-called control.

As to the Fujairah Facility project, which was announced in 2010 (four years after Mr. Melissanidis stepped down as President and CEO), the plaintiff alleges that the project initially was estimated to cost $105 million but ended up costing $205.3 million, plus $16.6 million in

capitalized interest.  (*Id.* ¶ 157, 162.)  According to the plaintiff, the increased costs were not due to legitimate reasons (such as an increase in construction costs), but rather were used to misappropriate Aegean assets.  The Complaint's only mention of Mr. Melissanidis with respect to this alleged fraud is the unsubstantiated and entirely conclusory claim that OilTank – the company that oversaw the construction of the Fujairah Facility is "believed to be controlled by Melisanidis." (*Id.* ¶ 156.)  The Complaint makes no claim that Mr. Melissanidis negotiated the allegedly inflated contracts, personally benefited from them, or even knew about them.

The same is true as to the plaintiff's allegations regarding prepayment for future oil deliveries.  In a single paragraph, the plaintiff alleges that in 2010, Aegean prepaid for future oil deliveries that allegedly were never made.  (*Id.* ¶ 172.)  Mr. Melissanidis's name, however, is not mentioned once.  Nor is there any indication how the prepayments would benefit Aegean, let alone Mr. Melissanidis.

To cover up both alleged frauds, the plaintiff alleges that Aegean created $200 million in accounts receivable that arose from purported commercial transactions occurring between 2016 and 2017—a time when Mr. Melissanidis was a consultant for the Company.  (*Id.* ¶ 149.)  Again, the Complaint does not allege that Mr. Melissanidis was involved in or aware of the alleged scheme.  Rather, the plaintiff generally asserts that "[b]ased on the Company's recent revelations, the Company Defendants knew or were reckless in not knowing that the transactions at issue lacked economic substance."  (*Id.* ¶ 153.)

In addition, the plaintiff alleges that Aegean issued multiple false and misleading statements to its auditors and investors, concealing the alleged misappropriation of the Company's assets and false accounts receivables.  (*Id.* ¶¶ 228-52.)  But Mr. Melissanidis never made, signed, directed, or otherwise influenced any of the statements at issue.  Rather, as the Complaint alleges,

Spyros Gianniotis (Chief Financial Officer), John Tavlarios (director), Nikolas Tavlarios (President and Principal Executive Officer), Jonathan McIlroy (President), Peter Georgiopoulos (Chairman of Board), Spyridon Fokas (General Counsel), George Konomos (director and Chairman of Audit Committee), Konstantinos Koutsomitopoulos (director), and Yiannis Papanicolaou (director) signed the allegedly false and misleading SEC filings. (*Id.* ¶¶ 228-320.) And Nikolas Tavlarios, Spyros Gianniotis, Peter Georgiopoulos, Jonathan McIlroy, and Yiannis Papanicolaou made allegedly false and misleading statements in press releases, conference calls, and letters to Aegean shareholders concerning Aegean's financial results, profitability, balance sheet, and business model. (*Id.* ¶¶ 253-314.) The Complaint does not allege that Mr. Melissanidis was at all connected to any of these statements.

Lastly, the Complaint alleges that, in an alleged attempt to cover up the alleged fraud, Aegean's "senior managers and employees along with the Board" and Mr. Melissanidis entered into a transaction whereby Aegean would acquire HEC, an entity purportedly controlled by Mr. Melissanidis, in exchange for $367 million in total consideration, comprised of debt (including certain receivables), cash, and Aegean stock. (*Id.* ¶ 197.) The HEC transaction was approved by a Special Committee of the Board, which was "advised by [an] 'independent financial advisor.'" (*Id.*) The Complaint does not explain how the HEC transaction—which was never consummated (*id.* ¶ 211)—was involved in any alleged fraud.

In total, the Complaint says very little about Mr. Melissanidis, other than his historical founding and stewardship of Aegean prior to its IPO. The allegations about his involvement in the alleged fraud are entirely conclusory, and the allegations of scienter are non-existent. For example, the Complaint fails to offer any explanation as to why Mr. Melissanidis would accept payment for HEC principally in a combination of Aegean stock, debt, and those allegedly fictitious

receivables if he knew, or was involved in, a fraud that had the effect of massively overvaluing Aegean.[2]  To the contrary, just as Aegean's Reconstituted Audit committee tried to blame Mr. Melissanidis for the Company's flagging financial performance during a time when he no longer had any management responsibilities, Aegean's management tried to fleece Mr. Melissanidis in the HEC transaction by acquiring a valuable asset—HEC—for Company assets that they knew were distressed.

## LEGAL STANDARD

"On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996); *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) ("In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists.").

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although a court must accept as true the "well-pleaded factual allegations of the complaint," *Tung v. Bristol-Myers Squibb Co.*, 412 F. Supp. 3d 453, 458 (S.D.N.Y. 2019), "that 'tenet' 'is inapplicable to legal conclusions,' and 'threadbare recitals of the elements of a cause of action,

---

[2]     The only, purely speculative, explanation offered by the Complaint for the HEC transaction is that it would have given Mr. Melissanidis a controlling equity position in the Company, which he could have used to shut down the Company's internal investigation.  This bit of speculation is flatly contradicted by the Complaint's main (albeit conclusory) thesis regarding Mr. Melissanidis, which is that he retained *de facto* control over Aegean despite having no formal management responsibilities or shareholding.  Moreover, that argument is wrong as a matter of law, insofar as the Company's directors would have fiduciary duties regardless of the identity of the controlling shareholder.

supported by mere conclusory statements, do not suffice.'"  *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S at 678).

## ARGUMENT

### I.    The Court Lacks Personal Jurisdiction Over Mr. Melissanidis

The Complaint does not allege sufficient contacts with the United States to establish personal jurisdiction over Mr. Melissanidis.  Mr. Melissanidis is a Greek citizen, who founded a Greek company that operated entirely oversees during Mr. Melissanidis's tenure as President and CEO.  Nowhere in its 221 pages does the Complaint state a single fact supporting this Court's jurisdiction over Mr. Melissanidis personally.

Instead, the Complaint alleges that "subject matter jurisdiction over this action" exists pursuant to "Section 27 of the Exchange Act" (Compl. ¶ 38), which provides that the "district courts of the United States . . . shall have exclusive jurisdiction of violations of [the Exchange Act] or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by [the Exchange Act] or the rules and regulations thereunder," 15 U.S.C. § 78aa(a).  Section 27, however, does not displace Constitutional limits on personal jurisdiction.  Rather, because Section 27 "permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment," the exercise of personal jurisdiction "must be tested against due process standards," *SEC v. Straub*, 921 F. Supp. 2d 244, 252 (S.D.N.Y. 2013).

Those standards require "minimum contacts" with the United States such that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice." *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 800 (S.D.N.Y. 2018).  The central question is whether the defendant "purposefully availed itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws such that the defendant should

reasonably anticipate being haled into court there." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242–43 (2d Cir. 2007) (citations and internal quotation marks omitted).

A defendant's contacts with the forum can "confer two types of personal jurisdiction – specific and general." *Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*, 761 F. Supp. 2d 103, 106 (S.D.N.Y. 2011).  For both, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant, *see Metro. Life Ins. Co.*, 84 F.3d at 566 (2d Cir. 1996), and the plaintiff cannot rely on conclusory allegations to make the *prima facie* showing necessary to survive a motion to dismiss under Rule 12(b)(2) of the Federal Rules of Civil Procedure, *see Mazloum v. Int'l Commerce Corp.*, 829 F. Supp. 2d 223, 227 (S.D.N.Y. 2011) ("a plaintiff may not rely on conclusory statements without any supporting facts" in pleading personal jurisdiction).

Notably, courts "consider[] the contacts the defendant *himself* creates with the forum, not the plaintiff's connections to the forum." *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 767 (S.D.N.Y. 2017) (citations and internal quotation marks omitted) (emphasis in original).  "[W]hile effects in the United States attributable to conduct abroad may be sufficient to provide for personal jurisdiction, foreseeability *alone* has never been a sufficient benchmark under the Due Process Clause." *Das*, 332 F. Supp. 3d at 800.

Here, the plaintiff's allegations fail to support either general or specific jurisdiction over Mr. Melissanidis.

A.     There Is No General Jurisdiction Over Mr. Melissanidis.

To establish general jurisdiction, the plaintiff must allege that the defendant had "continuous and systematic" contacts with the forum at the time the initial complaint was filed. *See In re Terrorist Attacks*, 714 F.3d at 674.  "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile . . . ." *Goodyear Dunlop Tires Operations S.A. v. Brown*, 564 U.S. 915, 924 (2011).

10

The plaintiff does not—and cannot—plead that Mr. Melissanidis is subject to general jurisdiction in this Court.  Mr. Melissanidis was at all relevant times (and still is) a resident and citizen of Greece.  (Certificate of Service [ECF 115] at 5-11.)  At the time the Complaint was filed, Mr. Melissanidis lived and worked in Greece, which is where he was served.  (*Id.*)  The Complaint does not claim otherwise and does not specify any action that Mr. Melissanidis allegedly took in the United States, much less in this District.  Indeed, while the Complaint refers to Mr. Melissanidis numerous times, it is conspicuously silent as to the location of any of Mr. Melissanidis's alleged actions, and utterly fails to allege facts that could establish general jurisdiction over him.[3]

B.     There Is No Specific Jurisdiction Over Mr. Melissanidis

Plaintiff has similarly failed to meet its burden of making a *prima facie* showing of specific jurisdiction over Mr. Melissanidis.  *See Metro Life Ins. Co.*, 84 F.3d at 567.  To establish specific jurisdiction, the plaintiff must show that "the defendant has purposefully directed his activities to the forum *and* the litigation arises from or relates to those activities."  *In re Satyam Computer Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 483 (S.D.N.Y. 2013); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-md-2262 (NRB), 2016 WL 7378980, at *8-9 (S.D.N.Y. Dec. 20, 2016)  While courts may exercise jurisdiction over a foreign defendant who knowingly and intentionally causes an effect in the forum by an act committed elsewhere, "this is a principle that must be applied with caution, particularly in the international context."  *S.E.C. v. Sharef*, 924

---

[3]     There is no dispute that Aegean itself had operations in New York.  But it is well-settled that personal jurisdiction is defendant-specific.  *See Pilates, Inc. v. Pilates Inst., Inc.*, 891 F. Supp. 175, 180–181 (S.D.N.Y. 1995) ("[I]t is well established that individual officers and employees of a corporation are not automatically subject to personal jurisdiction in New York simply because a court can exercise jurisdiction over the corporation.").  Thus, the fact that Aegean had an office in New York and that some of the other defendants—Nikolas Tavlarios, Peter Georgiopoulos, John Tavlarios, and George Konomos—lived in New York, has no bearing on the Court's ability to assert personal jurisdiction over Mr. Melissanidis.

F. Supp. 2d 539, 545 (S.D.N.Y. 2013).  Thus, the personal jurisdiction requirements "principally protect the liberty of the non-resident defendant—not the convenience of plaintiffs or third parties."  *Walden v. Fiore*, 571 U.S. 277, 284 (2014).

Here, the Complaint fails to allege any conduct by Mr. Melissanidis that was purposefully directed at the United States.  The plaintiff's allegations involving Mr. Melissanidis fall into three categories:  (a) that approximately $300 million was misappropriated from Aegean in cash and assets through inflated contracts and invoices; (b) that Aegean took steps to conceal the misappropriation of Company assets, which caused the Company to make false and misleading statements to its auditors and U.S. investors; and (c) that Mr. Melissanidis engaged in insider trading by selling Aegean corporate stock to the Company while in possession of material, non-public information.  None of these allegations are true.  But putting that aside, as the Court must on a motion to dismiss, none of the alleged conduct is sufficient to confer specific jurisdiction over Mr. Melissanidis in this District.

i.   *The Complaint Fails to Allege Mr. Melissanidis's Personal Involvement in Any Fraudulent Conduct In or Aimed at the United States*

The alleged scheme to misappropriate assets from Aegean took place entirely overseas. The Complaint alleges that approximately $300 million in cash and assets was misappropriated from Aegean, a Marshall Islands entity headquartered in Greece, through OilTank, a Marshall Islands entity headquartered in Fujairah, in connection with the construction of a storage facility located in the United Arab Emirates.  (Compl. ¶¶ 156-71.)  The Complaint further alleges that additional funds were misappropriated from Aegean through inflated contracts for the prepayment of future oil deliveries.  (*Id.* ¶¶ 172-177.)  The Complaint does not allege where the alleged prepayment scheme took place.  In short, the Complaint does not allege any facts connecting the underlying fraudulent schemes—which involved foreign companies on foreign soil—to the United

States.  *See In re Satyam Computer Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 483 (S.D.N.Y. 2013) (To satisfy the constitutional requirements of the Due Process Clause, plaintiff must show that "the defendant has purposefully directed his activities to the forum *and* the litigation arises from or relates to those activities.").

Rather, the plaintiff's apparent basis for asserting jurisdiction over Mr. Melissanidis is that Aegean (but not Mr. Melissanidis) allegedly concealed the misappropriation of funds, including by issuing false and misleading statements to its auditors and investors, and that those subsequent actions by Aegean were specifically directed at the United States.  In such cases, courts in this District have refused to find personal jurisdiction over foreign defendants *unless* they were personally involved in making false or misleading statements directed at U.S. investors.  *See, e.g., Sharef*, 924 F. Supp. 2d at 547 (rejecting the theory that a "participant in an illegal action taken by a foreign company subject to U.S. securities laws would be subject to the jurisdiction of U.S. courts no matter how attenuated their connection with the falsified financial statements"); *see also Das*, 332 F. Supp. 3d at 800 ("[C]ourts have exercised personal jurisdiction over individuals who orchestrated bribery schemes aimed at foreign governments *and* as part of that scheme signed off on misleading management representations to company auditors and signed false SEC filings.").

For example, in *S.E.C. v. Sharef*, a defendant was alleged to have participated in a bribery scheme directed at the government of Argentina, but he was not alleged to have been involved in the subsequent cover up designed to conceal the bribery scheme from investors, including the company's issuance of falsified filings to the SEC.  924 F. Supp. 2d at 546.  The court held that the exercise of jurisdiction over the defendant was not proper absent a showing that the defendant played a role in the subsequent cover up and preparation of falsified financial statements directed at the United States.  *Id.* at 547-48.  Here, there is no allegation that Mr. Melissanidis made any

allegedly misleading statements to the auditors or to U.S. investors.  Thus, even if the plaintiff had sufficiently alleged that Mr. Melissanidis was involved in the underlying fraudulent conduct (which it did not), that, alone, would be insufficient to subject him to personal jurisdiction.

        ii.    *The Complaint Fails to Allege Mr. Melissanidis's Personal Involvement in Any Allegedly False or Misleading Statements Aimed at the United States*

The Complaint's allegations regarding false and misleading statements designed to cover up the alleged fraud are likewise insufficient to establish personal jurisdiction over Mr. Melissanidis.  Apart from the sweeping and conclusory statement that he exercised "*de facto* control" over the Company during the relevant period, the Complaint contains no factual allegations that Mr. Melissanidis played *any role* in the allegedly false or misleading statements directed at U.S. investors.  While courts have found that it is appropriate to assert personal jurisdiction over a foreign defendant who signed or approved the dissemination of particular forms filed with the SEC, that is not the case here.  *See In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 306 (E.D.N.Y. 2002) (exercising jurisdiction over the General Counsel of a Canadian company because she personally signed a registration statement released with a securities offering to American investors); *Das*, 332 F. Supp. 3d at 801 (upholding jurisdiction over the CEO of a foreign corporation because "Plaintiff alleges that [he] signed specific SEC filings that contained allegedly misleading information," but refusing to exercise jurisdiction over a board member who "Plaintiff does not allege . . . actually signed any SEC filings.").  Mr. Melissanidis did not sign any of the SEC filings at issue.  (Compl. ¶¶ 228-320).  Nor does the Complaint allege that Mr. Melissanidis directed, influenced, or had knowledge of any of the false or misleading statements at issue—aside from the conclusory statement that he exercised control over the company.  But this, without more, is simply not enough to establish minimum contacts sufficient to establish specific jurisdiction.  *See In re Braskem*, 246 F.Supp.3d at 770 (finding no minimum contacts

where complaint "does not allege, concretely, that [defendant] played any role in making, proposing, editing, or approving [company's] public filings in the United States").

The section of the Complaint describing the alleged false and misleading statements made by Aegean to its auditors and investors (Compl. ¶¶ 228-320) references Mr. Melissanidis just two times (Compl. ¶¶ 244, 247). In both instances, the Complaint merely alleges that "the Company's Founder had access to and control over the Company's electronic and physical files." *Id.* But having access to files is not the same as being directly—or even indirectly—involved in the making of any false or misleading statement by Aegean.[4]

Nor is it enough, even if it were true, that Mr. Melissanidis exercised "*de facto* control over the Company," and thus allegedly, in some unspecified sense, caused Aegean to make false or misleading statements to its auditors and investors, (Compl. ¶ 529). A defendant's control status alone is not sufficient to confer personal jurisdiction over him or her. *See In re Parmalat Sec. Litig.,* 376 F. Supp. 2d 449, 454 (S.D.N.Y. 2005) (Defendant's "[control] status alone would be insufficient to warrant the conclusion that [the defendant's] contacts with the United States satisfied the requirements of due process"); *Tarsavage v. Citic Tr. Co.*, 3 F. Supp. 3d 137, 147 (S.D.N.Y. 2014) ("Control person status alone [is] insufficient to warrant the conclusion that [defendant's] contacts with the United States satisf[y] the requirements of due process.").

Further, the plaintiff's allegations purporting to show that Mr. Melissanidis exercised control over Aegean likewise fail to establish minimum contacts. For example, the plaintiff alleges that even after Mr. Melissanidis sold his interest in Aegean he continued to exercise control over the Company because (a) he was listed as a consultant on Aegean's organizational chart at the

---

[4]     The allegation that Mr. Melissanidis had "access to and control over the Company's electronic files" is particularly weak because it seems to be based on the allegation that Aegean's offices in Greece are located in a building owned by Mr. Melissanidis. (Compl. ¶¶ 372-73).

same level as then-President and CEO, Nikolas Tavlarios; (b) he retained the authority to terminate employees; (c) Aegean, and a number of companies allegedly affiliated with Mr. Melissanidis, operated out of a building owned by Mr. Melissanidis; (d) Mr. Melissanidis's personal office was located next to Spyridon Fokas (former Aegean General Counsel) and Spyros Gianniotis (former Aegean CFO); (e) certain Aegean employees in Greece also worked for other companies allegedly controlled by Mr. Melissanidis, but their salaries were paid by Aegean; (f) Mr. Melissanidis listed Aegean "under his umbrella of companies" in an Autumn 2017 news magazine published by Mr. Melissanidis; and (g) Mr. Melissanidis had previously appointed—at a time when he was still controlling shareholder—three of Aegean's then-current Board members.  (Compl. ¶ 205.)  None of these actions were directed at this forum.  And none of these actions establish that Mr. Melissanidis controlled the officers and directors who made the statements at issue, or even that he was aware of them.  Thus, regardless of whether these "control" allegations are true, the plaintiff has failed to sufficiently allege that Mr. Melissanidis was involved in any false or misleading statement directed at the United States.  *See In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 542 (S.D.N.Y. 2007) ("Being a corporation's control person of itself does not, as Lead Plaintiffs contend, merit personal jurisdiction.").

At base, the Complaint alleges in conclusory fashion that Mr. Melissanidis controlled Aegean, and thus caused it to make certain false and misleading statements aimed at investors in the United States.  But such allegations are insufficient as a matter of law to establish personal jurisdiction without specific, concrete allegations of Mr. Melissanidis's personal involvement in those statements.  *See, e.g., In re Braskem*, 246 F. Supp. 3d at 770 ("Such conclusory labels and allegations will not do.").  "As various courts have held, a conclusory statement that a foreign defendant caused an issuer to making false and misleading filings is not enough to support personal

jurisdiction."  *Id.*; *see also In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 467 (S.D.N.Y. 2008), *aff'd sub nom. State Universities Ret. Sys. of Illinois v. Astrazeneca PLC*, 334 Fed. Appx. 404 (2d Cir. 2009) (complaint's allegations that defendants "caused the distribution of false and misleading reports and statements to AstraZeneca investors in the U.S." or "had actual knowledge that each of the representations alleged herein were materially false or misleading" were "merely conclusory statements" incapable of supporting the exercise of personal jurisdiction).   The plaintiff's unsubstantiated assertion that Mr. Melissanidis "directly and indirectly acted through and used another person or entity to issue materially false and misleading information" (Compl. ¶ 529), is thus insufficient to confer jurisdiction on this Court.

      iii.    *The Complaint's Allegations That Mr. Melissanidis Sold Aegean Stock Back to the Company Fail to Establish Personal Jurisdiction*

Finally*,* the plaintiff's allegation that Mr. Melissanidis engaged in insider trading when Aegean directly purchased all of his outstanding shares in 2016, in a transaction approved by a Special Committee of the Board, cannot support a finding of personal jurisdiction because the Complaint is devoid of detail as to where or how that sale took place.

Although the Complaint obviously alleges that Aegean's stock traded on the NYSE, (Compl. ¶ 4), that alone is hardly sufficient to confer jurisdiction over Mr. Melissanidis.   In determining whether jurisdiction is proper in an insider trading claim, courts look to "the facts and circumstances of the insider trading in order to determine whether the defendant should reasonably have anticipated being hauled into court where the acts occurred."  *S.E.C. v. Alexander*, 160 F. Supp. 2d 642, 656 (S.D.N.Y. 2001).   While courts have exercised jurisdiction over foreign defendants who engaged in insider trading by selling stock in a company listed on a U.S. exchange, they have done so only where there are sufficient facts to establish that U.S. investors were affected.  *See S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir.1990).

In *S.E.C. v. Unifund SAL*, the defendant purchased approximately $2 million in shares, and approximately $300,000 in call options, in a company listed on the NYSE through a foreign affiliate of a United States brokerage firm days before a merger involving the company was announced publicly.  910 F.2d at 1030.  The court held that the transactions had a direct and foreseeable effect within the United States because the activity created a near certainty that United States shareholders—who could reasonably have been expected to be the holders of the securities being purchased through the brokerage firm—would be adversely affected.  *Id.* at 1033.  In reaching its holding, however, the court noted that "not every securities law violation involving shares of a United States corporation will have the requisite effect within the United States."  *Id.*

Likewise, in *S.E.C. v. Euro Security Fund, Coim SA*, the defendant traded in excess of $6 million over a one-month period in shares in a company listed on the NYSE.  No. 98 Civ. 7347, 1999 WL 76801, at *3 (S.D.N.Y. Feb.17, 1999).  The court found that because the trades constituted a significant portion of the daily trading volume in the company's stock on the NYSE, the defendant should have reasonably anticipated being haled into an American court.  *Id.*

Here, the Complaint describes a private securities transaction, in which Aegean repurchased shares directly from its founder at an agreed-upon price.  (Compl. ¶ 178.)  Further, Aegean announced that it would retain those shares and reduce the outstanding number of Company shares in circulation, rather than allow them to trade on the market.  (*See id.* (citing August 17, 2016 Press Release, attached as Ex. 99.1 to August 18, 2016 Form 6-K); (*see id.* ¶ 181 (citing September 20, 2016 Press Release, attached as Ex. 99.1 to September 20, 2016 Form 6-K).  Thus, as set out in the Complaint, there was no investor on the other side of Mr. Melissanidis's share sale, and no conduct aimed at the United States.  The plaintiff has therefore not alleged that

Mr. Melissanidis's actions were "purposefully directed" at shareholders in this forum.  S*ee Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985).

*     *     *

In sum, the plaintiff has failed to establish that Mr. Melissanidis—a Greek citizen and resident who undertook all alleged activity in Greece and who is not alleged to have been involved in or knowledgeable about any conduct or statements aimed at the United States—is subject to personal jurisdiction in the United States.  Even assuming that the plaintiff's allegations regarding the alleged misappropriation of Aegean assets are true—which they are not—this conduct took place entirely overseas.  Further, the Complaint does not allege (except with conclusory and legally insufficient allegations of control) that Mr. Melissanidis played a role in the making of any false or misleading statements to the Aegean's auditors or investors.  *In re Braskem*, 246 F. Supp. 3d at 770 ("Critical, however, is what the SAC does not allege. It does not allege, concretely, that Odebrecht played any role in making, proposing, editing or approving Braskem's public filings in the United States, including the two categories of filings which the court has found to be the potential bases for defendants' liability to the plaintiffs.").  Rather, the Complaint generally alleges that Mr. Melissanidis exercised *de facto* control over Aegean (*see, e.g.*, Compl. ¶ 34), which alone is not sufficient to confer jurisdiction on the court.  *See In re Parmalat Sec. Litig.,* 376 F. Supp. at 454 ("[A] different conclusion would be inconsistent with the principle that a motion to dismiss assumes the truth of the well-pleaded factual allegations, but not the legal conclusions asserted in the complaint.").  In the end, the Complaint fails to identify any specific action that connects Mr. Melissanidis to the United States, and it should therefore be dismissed as against him.

C.     <u>Even if Jurisdiction Were Proper, the Court Should Decline to Exercise It</u>

Even if the Court were to conclude that the plaintiff has alleged sufficient minimum contacts between Mr. Melissanidis and the United States, the exercise of jurisdiction over a defendant "may be defeated where the defendant presents a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Metro. Life Ins.*, 84 F.3d at 568 (internal quotation marks omitted). When, as here, a defendant is located outside the United States, "'great care and reserve should be exercised when extending our notions of personal jurisdiction into the international context.'" *Sharef*, 924 F. Supp. 2d at 548 (quoting *Asahi Metal Indus. Co., Ltd. v. Superior Ct. of California, Solano Cnty.*, 480 U.S. 102, 115 (1987)).

In assessing whether the exercise of jurisdiction over a foreign defendant is reasonable, courts apply the five-factor test set forth in *Asahi Metal Industry Co. See Metro. Life Ins.*, 84 F.3d at 573. Those factors include: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum . . . in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interests of the states in further substantive social policies." *Id.* at 568. When analyzed together, this inquiry demonstrates that exercising jurisdiction over Mr. Melissanidis on the facts of this case does not "comport[] with traditional notions of fair play and substantial justice." *Id.* at 573.

As discussed above, the plaintiff has failed to allege any relevant contacts between Mr. Melissanidis and the United States. It would be a significant burden to require Mr. Melissanidis, a resident and citizen of Greece with no ties to the United States, to defend the action in this Court. Further, this forum does not have the greatest interest in adjudicating the action. Aegean is headquartered in Greece and incorporated under the laws of the Marshall Islands. The alleged

fraudulent conduct allegedly occurred in Greece and involves only foreign companies.  Indeed, the trustee appointed by the Bankruptcy Court to bring claims on behalf of Aegean's creditors has brought claims against Mr. Melissanidis in various European jurisdictions (Luxembourg and Cyprus), but has not pursued litigation against him in the United States despite suing others here, such as the Company's U.S.-based former officers and directors.  Although the United States has a generalized interest in this action because Aegean's stock is listed on the New York Stock Exchange, other jurisdictions have a more direct interest.  In addition, it would be more efficient to hold the proceeding in a jurisdiction—like Greece—where the majority of the potential witnesses and discovery material are located.  Taken as a whole, it would be constitutionally unreasonable to subject Mr. Melissanidis to the jurisdiction of this Court.

Because this Court lacks jurisdiction over Mr. Melissanidis, the Complaint against him should be dismissed.[5]

## II.   The Complaint Fails to State a Claim Against Mr. Melissanidis

The Complaint against Mr. Melissanidis should separately be dismissed because the plaintiff fails to plead any allegations—outside of sweeping, conclusory statements—plausibly connecting Mr. Melissanidis to the alleged misconduct.  While a court should accept well-pled factual allegations as true, it need not assume the truth of conclusory allegations.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A complaint will not suffice if it contains "'naked

---

[5]     For the same reasons, the doctrine of *forum non conveniens* warrants dismissal of the action.  The doctrine permits a court to dismiss an action "even if the court is a permissible venue with proper jurisdiction over the claim."  *LaSala v. UBS, AG*, 510 F. Supp. 2d 213, 221–22 (S.D.N.Y. 2007).  Courts routinely dismiss complaints "where, on balance, the resolution of the matter in an adequate alternative forum would be more convenient for the parties and courts and more just."  *Id*.  This is especially true where there is a "similarity of parties and issues involved in [a] foreign litigation" and where a different jurisdiction would be more convenient to parties and witnesses.  *See Evergreen Marine Corp. v. Welgrow Int'l Inc*., 954 F. Supp. 101, 103 (S.D.N.Y. 1997).

assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

Where, as here, a complaint alleges claims of securities fraud, it must also satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *Walsh v. Rigas*, No. 17 CIV. 4089 (NRB), 2019 WL 294798, at *5 (S.D.N.Y. Jan. 23, 2019) (quoting Fed. R. Civ. P. 9(b)). In addition, where scienter is an element of a plaintiff's claim, the PSLRA requires the plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 129 (2d Cir. 2011) (quoting 15 U.S.C. § 78u–4(b)(2)(A)). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI*, 493 F.3d at 99.

Here, the plaintiff asserts four claims under the securities laws against Mr. Melissanidis. For the reasons that follow, none of the claims meet Rule 9(b) or the PLSRA's heightened pleading standard.

A.  <u>Plaintiff Fails to State a Claim Against Mr. Melissanidis Under Section 10(b) and Rule 10b-5(a) and (c).</u>

To state a market manipulation claim under Section 10(b) and Rule 10b-5(a) and (c) a plaintiff must allege—with particularity—"(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *ATSI*, 493 F.3d at 101. In order for market

activity to be manipulative, however, "that conduct must involve misrepresentation or nondisclosure." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011).

  i. *Plaintiff Does Not Allege With Particularity That Mr. Melissanidis Was Involved In The Alleged Manipulative Scheme*

  Aside from the conclusory (and false) assertion that Mr. Melissanidis exercised *de facto* control over the Company, the Complaint fails to plead sufficient facts connecting Mr. Melissanidis to the alleged fraudulent conduct.  A claim under Rule 10b-5(a) and (c) "must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." *ATSI*, 493 F.3d at 102.  "General allegations not tied to the defendants or resting upon speculation are insufficient." *Id.*; *see also DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987) ("Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud.").

  To begin, the plaintiff has failed to sufficiently plead a claim for the underlying fraud— *i.e.*, that approximately $300 million was misappropriated from Aegean in a scheme to defraud investors—and it certainly has not alleged any facts showing Mr. Melissanidis's involvement in this conduct.  To support its allegation, the plaintiff relies on a single statement in a press release from the Company on November 2, 2018 ("November 2, 2018 Press Release"): "The Audit Committee believes up to US$300 million of Company cash and other assets were misappropriated through fraudulent activities.  The Audit Committee believes that the principal beneficiary of the misappropriation is Oil Tank."  (Compl. ¶ 147.)  The Complaint, however, contains no other factual support for this conclusion.

  But even if the Court were to find that these allegations sufficiently plead the underlying fraud, the plaintiff has failed to allege that Mr. Melissanidis was personally involved in the alleged

misappropriation of Aegean assets.   Again, the plaintiff relies on a single statement in the November 2, 2018 Press Release to support its assertion: "The Audit Committee has reason to believe that OilTank is controlled by a former affiliate of the Company." (Compl. ¶ 166.)  Such a conclusory statement, however, cannot survive the heightened pleading requirements under FRCP 9(b) and the PLSRA.  *ATSI*, 493 F.3d at 99.  The Complaint contains no other facts alleging that Mr. Melissanidis controlled OilTank or that he participated in or was aware of the purported misappropriation of Aegean assets.

Likewise, the plaintiff does not sufficiently plead that Mr. Melissanidis was involved in the acts allegedly taken by Aegean to conceal the misappropriation.  *First*, the Complaint contains no factual allegations connecting Mr. Melissanidis to the purported creation of approximately $200 million in false accounts receivables by Aegean to allegedly manipulate revenue and income to conceal the misappropriation of Aegean assets.  (*Id.* ¶¶ 156-171.)  This section of the Complaint does not mention Mr. Melissanidis at all.  *Second*, as explained above, the Complaint similarly contains no factual allegations that Mr. Melissanidis signed, directed, influenced, or had knowledge of any of the alleged false or misleading statements issued by Aegean to its auditors and investors.  (*Id.* ¶¶ 228-320.)  And, *third*, despite the fact that HEC was alleged to be "owned by [Mr. Melissanidis] and his family," (*Id.* ¶ 197), the Complaint contains no other facts alleging that Mr. Melissanidis was involved in Aegean's decision to approve the acquisition of HEC, (*see id.* ¶¶ 191-213.)  Rather, the plaintiff alleges that the HEC acquisition was approved by a Special Committee of the Board, which included George Konomos, Yiannis Papanicolaou, and Konstantinos Koutsomitopoulos, and an independent financial advisor Clarksons Platou Securities, Inc.  (*Id.* ¶ 197.)  Although the plaintiff alleges that Mr. Melissanidis would have acquired approximately 33% of the outstanding shares of Aegean under the terms of the agreement,

the Complaint notably does not allege that Mr. Melissanidis influenced in any way the Special Committee's decision to approve the acquisition.  (*Id*.)  To the contrary, the Complaint speculates that Mr. Melissanidis's motivation to engage in the HEC transaction was to obtain control over Aegean, meaning that (contrary to the Complaint's other conclusory allegations), he must have *lacked* control at the time of the proposed HEC transaction.  (*Id*. ¶ 21.)  In any event, the HEC acquisition was ultimately terminated by Aegean following a lawsuit that was brought by a group of activist investors, (*Id*. ¶ 197)—without harming or deceiving shareholders—so this cannot serve as an actionable manipulative act under Section 10(b).

Finally, the Complaint fails to sufficiently allege an insider trading claim by Mr. Melissanidis.  Specifically, the plaintiff alleges that before the market opened on August 17, 2016, Aegean announced that an independent committee of the Board authorized the repurchase of the 11,303,031 million shares of Aegean corporate stock that was owned at the time by Mr. Melissanidis.  (Compl. ¶ 178.)  Where, as here, a plaintiff alleges that a defendant exercised *de facto* control of the Company, Rule 10b-5 is "violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information."  *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 370 (2d Cir. 2014).  The plaintiff, however, has failed to allege with particularity facts demonstrating that Mr. Melissanidis knowingly possessed material, nonpublic information.  Throughout the relevant period, the plaintiff does not contend that Mr. Melissanidis was involved in the day-to-day operations of Aegean.  Mr. Melissanidis did not sit on the Board, nor was he an executive officer of the Company.  In fact, following Aegean's IPO in 2006, the Company's "principle executive offices responsible for financial reporting and control functions, including preparation of reports to the SEC" were located in New York, rather than Greece, where Mr. Melissanidis was located.  (Compl. ¶ 136.)  While the plaintiff specifically alleges that

25

Aegean's executive officers, including Spyros Gianniotis, John Tavlarios, and Jonathan McIlroy, signed the Company's annual and quarterly filings with the SEC, the Complaint is silent as to a single act taken by Mr. Melissanidis.   (Compl. ¶¶ 228-44.)   Further, the repurchase of Mr. Melissanidis's shares by Aegean after approval by an independent committee of the Board further undermines the allegation that he was in possession of material, nonpublic information at the time of the transaction.   To the contrary, assuming the truth of plaintiff's underlying allegations of misappropriation from Aegean, the more plausible conclusion to be drawn from the facts as alleged is that the Company's New York-based officers and directors wishes to acquire Mr. Melissanidis's shares so that they could continue to loot the Company without any oversight whatsoever. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007) ("A complaint will survive only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged.").   Under the pleading requirements of Rule 9(b) and the PSLRA, the plaintiff must do more than merely assert that Mr. Melissanidis was in *de facto* control of Aegean to establish that he knowingly possessed material, nonpublic information. *ATSI*, 493 F.3d at 99.

For the reasons just provided, the plaintiff has failed to plead with particularity facts connecting Mr. Melissanidis to the alleged manipulative acts.

ii.      *Plaintiff's Allegations Do Not Create a "Strong Inference" of Scienter*

The plaintiff has also not alleged—as required by the PSLRA—facts giving rising to a "strong inference" that Mr. Melissanidis acted with the required state of mind.   The requisite state of mind for a claim brought under Section 10(b) is "an intent to deceive, manipulate, or defraud." *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co*., 553 F.3d 187, 198 (2d Cir. 2009).   A plaintiff may satisfy the scienter requirement by alleging with particularity either

26

"(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA, Local 134 IBEW Jt. Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).

The plaintiff's allegations of scienter do not satisfy either standard. For instance, in attempting to establish scienter, the plaintiff points to a subpoena that was allegedly issued to Aegean by the U.S. Attorney's Office for the Southern District of New York ("SDNY") in connection with suspected felonies at Aegean. (Compl. ¶ 328.) The allegation that Aegean received a subpoena from the SDNY in connection with undisclosed "suspected felonies at Aegean" fails to demonstrate that Mr. Melissanidis (or any of the other Company defendants) personally acted with the requisite scienter. The mere existence of a grand jury subpoena to Aegean does not plead any factual allegations with respect to the alleged fraudulent scheme nor does it speak to Mr. Melissanidis's state of mind.

Likewise, the allegation that Mr. Melissanidis secured a provisional order before the Hellenic Data Privacy Authority cannot serve as evidence of an intent to "deceive, manipulate, or defraud" the plaintiff. (*Id.* ¶ 329.) To the contrary, an order from a neutral arbiter in Greece in favor of Mr. Melissanidis creates an inference of legitimacy, not an inference of wrongdoing.

Further, the removal of the Audit Committee Defendants from Aegean's Audit Committee after new Board members were installed is not unusual. (*Id.* ¶ 325.) In fact, transition often occurs when a change of leadership takes place at a company. And, moreover, an event that occurred after the alleged fraud took place does little to establish Mr. Melissanidis's state of mind during the relevant time period. In any event, this allegations is irrelevant to Mr. Melissanidis.

Finally, the plaintiff alleges that the HEC transaction—which according to the plaintiff "overvalued HEC by at least 300%"—supports a strong inference of scienter. (*Id.* ¶ 334.) Yet in

the same breath, plaintiff also alleges that the value of Aegean's stock (which was substantially all of the consideration to be paid under the terms of the proposed merger) was inflated due to fraudulent contracts and false accounts receivables.  The plaintiff fails to explain how both companies could simultaneously be overvalued where the consideration for the merger was Aegean stock.  The plaintiff also fails to address why HEC, a company purportedly controlled by Mr. Melissanidis, would want to own 33% of Aegean if Mr. Melissanidis had knowledge that Aegean was inflating its books and records.  If anything, the HEC transaction illustrates that Mr. Melissanidis *lacked* scienter, because (according to the Complaint) he stood to trade a valuable asset for worthless receivables and overvalued securities.

Many of the plaintiff's additional allegations of scienter do not concern Mr. Melissanidis. According to the plaintiff, Aegean announced that "members of senior management" who participated in the alleged fraudulent scheme were terminated by the Company.  (*Id.* ¶ 327.)  The Complaint recognizes that each of the Officer Defendants (Nikolas Tavlarios, Spyros Gianniotis, Jonathan McIlroy, and Spyridon Fokas) were no longer at Aegean by the end of 2018, but, notably, this allegation is silent with respect to Mr. Melissanidis.  (*Id.*)  The Complaint claims that Aegean conducted a private placement and public offering of convertible notes to "bolster the Company's liquidity because the Company's balance sheets were grossly misstated."  (*Id.* ¶ 333.)  Again, however, the Complaint does not suggest that Mr. Melissanidis was involved in or even knew about this conduct.  And the Complaint alleges that Aegean's President Nikolas Tavlarios shared office space in New York with Peter Georgiopoulos and John Tavlarios.  (*Id.* ¶ 337.)  None of these allegations relate to Mr. Melissanidis's state of mind.

For the reasons just stated, and for the reasons discussed previously, *see supra* Section II.A.1, the plaintiff's allegations of scienter do not create a strong inference that Mr. Melissanidis acted with an intent to deceive, manipulate, or defraud the plaintiff.

### iii.    *Plaintiff Has Not Alleged Use of Interstate Commerce by Mr. Melissanidis*

Finally, the plaintiff's claim against Mr. Melissanidis should be dismissed because it does not allege with particularity that Mr. Melissanidis made use of interstate commerce in furtherance of a potential violation of Section 10(b).  Although the jurisdictional requirement of Rule 10b–5 is broadly construed, *see S.E.C. v. Straub*, 921 F. Supp. 2d at 263, the plaintiff fails to allege a single act showing that Mr. Melissanidis made use of interstate commerce in furtherance of the alleged fraudulent scheme.  The Complaint fails to allege a single phone call or e-mail in furtherance of the alleged scheme that involved Mr. Melissanidis.  And even the repurchase of his shares in 2016 did not involve the use of the wires, mails, or a U.S. stock exchange.  Unlike in a traditional insider trading case, Mr. Melissanidis (a Greek defendant) sold his shares directly to Aegean (a Greek company) rather than on a public U.S. exchange.  (Compl. ¶ 178.)  Thus, even the sale of Mr. Melissanidis's stock in Aegean did not make use of interstate commerce.  Instead, the plaintiff includes the following conclusory statement at the end of the Complaint in an attempt to satisfy this standard:

> The Defendants named in this count, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to misappropriate monies from Aegean and conceal adverse material information about Aegean's business and operations and its financial results as specified herein.

(Compl. ¶ 510.)  However, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  This is particularly true where, as here, the defendant is a foreign individual that is not alleged to have engaged in any acts

within or directed at the United States.   As a result, the plaintiff has failed to satisfy the jurisdictional requirement of Section 10(b) and his claim should therefore be dismissed.

      B.     <u>Plaintiff Fails to Plead that Mr. Melissanidis is a Control Person Under Sections 20(a) and 20(b)</u>

The Complaint fails to plead any factual allegations establishing that Mr. Melissanidis is a control person under Sections 20(a) and (b).   To establish a prima face case of control person liability under Section 20(a), "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."   *ATSI*, 493 F.3d at 108.   With respect to the second element, "control over a primary violator may be established by showing that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."   *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472–73 (2d Cir. 1996). With respect to the third element, "culpable participation, it means actual involvement in the making of the fraudulent statements by the putatively controlled entity."   *In re Braskem*, 246 F. Supp. 3d at 771.

In addition, "to satisfy a Section 20(b) claim, the defendant must not only have actual control over the primary violator, but have actual control over the transaction in question."   *In re Braskem*, 246 F. Supp. 3d at 771 (S.D.N.Y. 2017) (quoting *Arkansas Teacher Ret. Sys. v. Bankrate, Inc.*, 18 F.Supp.3d 482, 486 (S.D.N.Y. 2014) (finding no control person liability where complaint "alleged no particularized facts suggesting that the [defendant] had control over the alleged misrepresentations at issue.")).

   i.  *Plaintiff Fails to Assert a Primary Violation Under Section 10(b)*

  As a threshold matter, the plaintiff fails to allege a primary violation of a Section 10(b) claim, *see supra* Section II.A., and therefore the Sections 20(a) and 20(b) claims against Mr. Melissanidis should be dismissed.  *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F.Supp.3d 401, 437 (S.D.N.Y. 2014) ("It is axiomatic that liability for a Section 20(a) violation is derivative of liability for a Section 10(b) violation."); *Walsh v. Rigas*, No. 17 CIV. 4089 (NRB), 2019 WL 294798, at *12 (S.D.N.Y. Jan. 23, 2019) (holding the same with respect to a Section 20(b) claim).

   ii.  *Plaintiff Fails to Plead Mr. Melissanidis's Control of, or Culpable Participation in, the Alleged Fraudulent Scheme*

  The plaintiff also fails to meet its burden by showing that Mr. Melissanidis "knew or should have known that the primary violator, over whom [he] had control, was engaging in fraudulent conduct."  *Special Situations Fund III*, 33 F. Supp. 3d at 439.  "Conclusory allegations of control are insufficient as a matter of law."  *In re Glob. Crossing, Ltd. Sec. Litig.*, No. 02 CIV. 910 (GEL), 2005 WL 1907005, at *12 (S.D.N.Y. Aug. 8, 2005)

  The plaintiff asserts that Mr. Melissanidis exerted *de facto* control over Aegean and its officers and directors during the Class Period.  (*See* Compl. ¶ 12).  But the plaintiff fails to plead with particularity any specific decision over which Mr. Melissanidis exerted control.  For example, in *Special Situations Fund III*, the plaintiff alleged that Deloitte U.S. culpably participated in false statements issued by its Chinese affiliate in connection with SEC filings that were made on behalf of a Chinese client.  33 F. Supp. 3d at 439.  The plaintiff alleged control on the basis that Deloitte U.S. had "final authority" over the audits done by its Chinese affiliate in connection with any SEC filings made on behalf of the client, and, in the past, Deloitte U.S. had participated directly in the client's communications with the SEC.  *Id.* at 416, 439.  The court, however, found that the

plaintiffs had not sufficiently alleged control, because they had not provided specific facts showing that Deloitte U.S. culpably participated in the fraudulent statements at issue. *Id.* at 439. Here, as discussed above, the plaintiff only generally alleges that Mr. Melissanidis "had the power to influence and control, directly or indirectly, the decision-making of Aegean, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading, and the acts in furtherance of the Massive Fraudulent Scheme." (Compl. ¶ 518.)

The plaintiff admits that Mr. Melissanidis stepped down from his position as President and CEO of Aegean in December 2006. (*Id.* ¶ 49.) In August 2016, the plaintiff acknowledges that Mr. Melissanidis sold his shares in Aegean and resigned from his position as head of corporate development, and was only a consultant from that point on. (*Id.* ¶ 178.) The plaintiff does not allege that Mr. Melissanidis served on Aegean's Board or was an executive officer of the Company, at any point during the Class Period. Although the Complaint broadly asserts that Mr. Melissanidis exerted "*de facto* control" over the Company, (*Id.* ¶ 34), the plaintiff fails to provide any specific instances to support that claim. For example, Section VII of the Complaint walks through each false and misleading statements that the plaintiff alleges were issued by Aegean during the Class Period. (*Id.* ¶¶ 228-320.) Although the plaintiff discusses in detail the other defendants who played a role in making each statement, the Complaint is silent as to Mr. Melissanidis's supposed involvement. (*Id.*) There is thus no suggestion that Mr. Melissanidis supervised or was responsible for Aegean's financial reporting or the statements it issued to investors. As such, the plaintiff has not satisfied its burden by alleging facts that indicate Mr. Melissanidis "knew or should have known" that Aegean was purportedly issuing false statements to investors and auditors. For the reasons given above, the plaintiff has failed to state a claim against Mr. Melissanidis for control person liability under Section 20(a).

32

For the same reasons, the plaintiff does not allege that Mr. Melissanidis had actual control over any of the alleged misstatements in question – as is required for a claim under Section 20(b). *See In re Braskem*, 246 F. Supp. 3d at 771 ("[T]o satisfy a Section 20(b) claim, the defendant must not only have actual control over the primary violator, but have actual control over the *transaction* in question."). In *In re Braskem,* like here, the plaintiff attempted to support a theory of control person liability with only "conclusory and general allegations to the effect that the company's executive board members were all responsible for all necessary corporate functions, including public filings." *Id.* Again, like here, the plaintiff was silent with respect to the defendant's "actual control of, or any role he played" with respect to the particular SEC filings at issue. *Id.* Ultimately, the court held that because the complaint did not contain any "concrete allegations as to [the defendant's] activities in connection with, or responsibility for, such filings," the plaintiff did not meet its burden of establishing that the defendant had "control over this distinct function." *Id.* Similarly, the plaintiff here has failed to plead concrete allegations sufficient to show that Mr. Melissanidis is a control person under Sections 20(a) and (b).

C.   Plaintiff Fails to Sufficiently Plead Insider Trading Claims Against Mr.
     Melissanidis Under Section 20A

To establish an insider trading claim under Section 20A, a plaintiff must "(1) plead a predicate insider trading violation of the Exchange Act, and (2) allege sufficient facts showing that the defendant traded the security at issue contemporaneously with the plaintiff." *Gruber v. Gilbertson*, No. 16-cv-9727, 2019 WL 4458956, at *2 (S.D.N.Y. Sept. 17, 2019). As discussed above, *see supra* Section II.A, the plaintiff has failed to sufficiently allege a predicate insider trading claim under Section 10(b), and therefore this claim cannot survive. *Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 703 (2d Cir. 1994).

However, even if the Court finds that the plaintiff did sufficiently plead a predicate insider trading claim, the plaintiff failed to allege with particularity facts showing that the plaintiff traded contemporaneously with Mr. Melissanidis.  To satisfy this requirement, a plaintiff must allege the specific dates of the parties' trades in order to establish that the plaintiff traded contemporaneously with the defendant.  *See Gruber*, 2019 WL 4458956, at *2  ("[A] plaintiff must allege the dates on which a defendant sold his stock to establish that the parties' trades occurred contemporaneously.").  For example, in *Gordon v. Sonar Capital Mgmt. LLC*, the plaintiff asserted that it traded contemporaneously with the defendant in order to satisfy the second element of Section 20A.  962 F. Supp. 2d 525, 532 (S.D.N.Y. 2013).  Rather than providing the specific dates of the defendant's trades that coincided with the plaintiff's trades, the complaint alleged that the defendant purchased shares at "unspecified times" during a period that overlapped with two of the plaintiff trades.  *Id.*  The court dismissed the plaintiff's claim under the first element of Section 20A, but noted that given the "sparseness of the Complaint's allegations" with respect to the dates of the parties' trades, it could not determine whether the plaintiff traded contemporaneously with the defendant.  *Id.*  "Typically, plaintiffs must allege that shares were bought and sold by plaintiffs and defendants 'within a reasonable time period, usually limited to a few days, of each other.'"  *Gruber*, 2019 WL 4458956, at *2.

Here, the Complaint merely states, in a conclusory fashion, that "Lead Plaintiff purchased at least one share of Aegean common stock contemporaneously with sales of Aegean common stock by Defendants Melisanidis, Fokas and Gianniotis."  (Compl. ¶ 535.)  A conclusory statement tracking the elements of a cause of action "does not suffice."  *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009).  Because the plaintiff fails to allege the relevant date on which it purchased Aegean

34

corporate stock, the Court cannot assess whether the plaintiff did, in fact, trade contemporaneously with Mr. Melissanidis and must dismiss the plaintiff's claim under Section 20A.

Finally, plaintiff's section 20A claim should be dismissed because, as alleged, Mr. Melissanidis did not sell his shares on an exchange, but rather in a direct transaction with the Company, resulting in the overall float of Aegean's stock being reduced by the amount of Mr. Melissanidis's former shareholding.  The reason why a section 20A plaintiff must allege that he or she traded contemporaneously with the alleged insider trader is that the harm caused by insider trading befalls investors on the other side of the transaction.  William K.S. Wang & Marc I. Steinberg, *Insider Trading* § 3.3 (1996).  Because listed securities trade on an efficient market, and because they are almost always traded through brokers, the law requires only that a plaintiff have traded contemporaneously.  But where an alleged insider trade has an identifiable counter-party, it is that counter-party—and only that counter-party—who is harmed.  *Id.*  Because Mr. Melissanidis allegedly sold his shares back to Aegean, which removed them from circulation, no investor could conceivably have been on the other side of Mr. Melissanidis's sale, and therefore no investor is a proper plaintiff in a section 20A claim against him.

## **CONCLUSION**

For the foregoing reasons, the Complaint against Mr. Melissanidis should be dismissed in its entirety.

BOIES SCHILLER FLEXNER LLP

/s/ Jonathan D. Schiller
Jonathan D. Schiller
Matthew L. Schwartz
Sara K. Winik
55 Hudson Yards
New York, New York 10001
Telephone:      (212) 446-2300
Fax:                  (212) 446-2350
E-mail:            jschiller@bsfllp.com
                       mlschwartz@bsfllp.com
                       swinik@bsfllp.com

*Counsel for Dimitris Melissanidis*