

March 5, 2021

VIA ECF

Hon. Naomi Reice Buchwald
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007-1312

Re:   *In re Aegean Marine Petroleum Network, Inc. Securities Litigation*,
       No. 18 Civ. 4993 (NRB)

Dear Judge Buchwald:

Lead Plaintiff, the Utah Retirement System ("Plaintiff"), submits this response to the Court's March 2, 2021 letter (ECF No. 281) directing the parties to respond to issues concerning the Court's decision in *Kravitz v. Tavlarios*, No. 19 Civ. 8438 ("*Kravitz*"), 2020 WL 3871340 (S.D.N.Y. July 8, 2020) (the "*Kravitz* Order").

I.   **BACKGROUND**

On March 6, 2020, Defendants Nikolas Tavlarios, Konomos, John Tavlarios and Georgiopoulos (collectively, the "U.S. Defendants" or "*Kravitz* Defendants") jointly filed a Motion to Dismiss the January 31, 2019 Consolidated Class Action Complaint alleging securities fraud[1] (ECF No. 196). On June 30, 2020, Plaintiff filed its Opposition to the Motion to Dismiss (ECF No. 250) (the "Opposition" or "Opp."). On July 8, 2020 (after Plaintiff filed its Opposition), this Court entered the *Kravitz* Order dismissing the later-filed September 11, 2019 Original Complaint filed by the Trustee against the U.S. Defendants (the "*Kravitz* Complaint").

On August 20, 2020, the U.S. Defendants filed a Reply Memorandum (ECF No. 268) (the "Reply"). Nowhere in their Reply do the U.S. Defendants assert that the *Kravitz* Order has any preclusive effect on the case at bar, making only conclusory references to it. This is not surprising since the *Kravitz* Complaint involves, among other things, vastly different claims and different allegations regarding defendants' wrongdoing and intent, and relies on different factual support.

---

[1] The "Complaint" (ECF No. 81) is cited herein as "¶__." All capitalized terms not otherwise defined herein have the same meaning as set forth in the Complaint. Unless otherwise noted, all emphasis has been added.

II.     **SECURITIES FRAUD AND CAREMARK CLAIMS INVOLVE FUNDAMENTALLY SEPARATE INQUIRIES**

   A.     **Derivative Breach of Fiduciary Duty *Caremark* Cases And Securities Fraud Cases Address Substantively Distinct Factual And Legal Questions**

A derivative suit asserts claims by a Company against its officers and directors for breaches of fiduciary duty, including duties of loyalty and good faith **owed to the Company**. *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006). Such breaches, which implicate matters of the company's internal controls and business judgment, typically stem from directors' failures to act in good faith vis-à-vis the company (*i.e.*, entering into a transaction on which a director stands on both sides, or a sustained or systematic failure to exercise oversight). A case about a systemic failure to exercise oversight is referred to as a "*Caremark* case."[2]

At its core, a *Caremark* claim requires establishing that officers and directors exercised **their oversight duties** in bad faith. To plead a claim under *Caremark*, a Plaintiff must allege specific facts establishing that the directors "utterly failed to provide a corporate reporting system to permit board-level review of compliance with law," or that the "directors were provided sufficient notice of corporate noncompliance with law such that their failure to remediate amounts to bad faith." *Teamsters Local 443 Health Servs. & Ins. Plan v. Chou*, No. CV 2019-0816-SG, 2020 WL 5028065, at *1 (Del. Ch. Aug. 24, 2020).

By contrast, the Securities Exchange Act of 1934 ("Exchange Act"), which seeks to protect investors and to maintain confidence in the securities markets, is focused on whether defendants misled **investors** by issuing material misleading statements to them or by engaging in deceptive acts against them. *See, e.g.*, 15 U.S.C. §78j(b); H.R. Conf. Rep. 104-369, at 31 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 730, 731. Specifically, Section 10(b) of the Exchange Act prohibits those acts or omissions that result in fraud or deceit involving the purchase or sale of a security. 15 U.S.C.A. § 78j(b). Thus, a Rule 10b-5 claim addresses misconduct by an officer/director defendant that directly injures investors in connection with their purchases or sales of a security. This misconduct can come in multiple forms, such as, making misleading statements of a material fact or engaging in a scheme or practice to defraud. 17 C.F.R. § 240.10b-5(a), (b) & (c).

Pleading and proving a claim under Rule 10b-5 is different from than under a *Caremark* claim. The elements of a Rule 10b-5(b) claim include: a material misrepresentation or omission by the defendant; scienter; a

---

[2] The *Caremark* standard has developed as a framework to evaluate whether a company's directors have complied with their oversight duties to the company and whether the directors failed in those duties such that they are incapable of considering a litigation demand in good faith. *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996). To do this, the *Caremark* standard incorporates several concepts under Delaware law, including: (1) whether to wrest control of the decision to pursue litigation against the individuals involved in a corporate trauma away from the directors; (2) the fact that most of the decisions a corporation makes through its human agents are not the subject of directorial attention; and (3) the Delaware director exculpatory statute, 8 Del. C. § 102(b)(7), which exculpates all director misconduct unless the director acted in bad faith or breached her duty of loyalty. *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 367-68 (Del. 2006).

connection between the misrepresentation or omission and the purchase or sale of a security; reliance upon the misrepresentation or omission; economic loss; and loss causation. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011). A claim under Rule 10b-5(a) or (c) requires that a plaintiff show that the defendant committed a deceptive or manipulative act, with scienter, that the act affected the market for securities or was otherwise in connection with their purchase or sale, and that defendants' actions caused the plaintiffs' injuries. *In re ForceField Energy Inc. Sec. Litig.*, No. 15 Civ. 3020 (NRB), 2017 WL 1319802, at *7 (S.D.N.Y. Mar. 2017) (Buchwald, J.).

Thus, a *Caremark* claim focuses on the directors' inactions *vis-à-vis* the company, whereas a securities fraud claim focuses on the individual defendants' actions directed to shareholders. Each claim seeks to vindicate distinct misconduct and different injury from a unique perspective.

    **B.    Because the Claims Are So Different, The Focus and Scope of the Allegations of The Complaint here and the *Kravitz* Complaint Are Entirely Different**

Even more importantly, the complaints allege entirely different facts regarding both defendants' conduct and their respective knowledge or intent regarding said conduct.

The *Kravitz* Complaint alleges **solely** that the *Kravitz* Defendants breached their fiduciary duties to the Company by failing to monitor and failing to exercise oversight and investigate such that they failed to prevent Melisanidis from looting Aegean through a sham consulting contract with OilTank and covering up the illicit payments through fake accounts receivables. *See, e.g.,* RJN Ex. 1 (ECF No. 249-1), at ¶¶1-9. It does not allege that the *Kravitz* Defendants took any affirmative actions (against the Company or against investors) or had any knowledge or reckless disregard of Melisanidis' conduct – focusing instead on assertions of knowingly abdicating their duties to the Company by failing to implement systems or monitor them. *Id.* at ¶¶1-9, 29, 32, 37, 39, 43, 45, 50, 58, 59, 62, 67, 68, 79, 81-83, 85-87, 91-94, 96-98; *see also Kravitz* Order, 2020 WL 3871340, at *5. At best, the Company alleges, in cursory form, that the *Kravitz* Defendants' knowledge related to **abdicating their duties to the Company**. RJN Ex. 1, at ¶1.

Based on these very limited allegations in the *Kravitz* Complaint, this Court concluded that the Trustee could not satisfy the *Caremark* standard because the *Kravitz* Defendants **did** implement controls by establishing an Audit Committee that retained an auditor to audit the Company's financial statements and because the effectiveness of its internal controls was sufficient to establish that a system of Board-level compliance monitoring and reporting existed. *Kravitz* Order, 2020 WL 3871340, at *9. Similarly, the Court found that, when presented with information about red-flags, members of the Board "remediated the weaknesses" and, based on express allegations (RJN Ex. 1, at ¶53), that the Audit Committee actually commenced an investigation once alerted to the potential fraud, thus "rebuff[ing] any contention that the Audit Committee 'chose to do nothing' in response to those irregularities." *Kravitz* Order, 2020 WL 3871340, at *9*. As discussed below, Plaintiff alleges that the Audit Committee did not conduct a real investigation, which allegations are supported by more recently filed statements on behalf of the Company. Thus, the fact that the Trustee may have alleged that Board took certain steps to resolve problems with the Company's internal controls simply does not dispose of the securities claims, particularly given that the allegations here are far more detailed and – in fact – altogether different.

The Complaint here details how the Officer and Director Defendants (i) **issued false statements directly to the investors** regarding, among other things, **the Company's financial results** (which the Company later admitted were misleading), its **internal controls regarding financial reporting** (which the Company

Hon. Naomi Reice Buchwald
March 5, 2021
Page 4 of 10

later admitted were utterly deficient)[3] and **the purpose of various transactions they approved to conceal their fraud** [*e.g.*, Sections VI, VII]; and (ii) **took deceptive acts** in furtherance of the scheme that were directed at concealing the massive fraudulent scheme from investors [*e.g.*, Section V]. Furthermore, the Complaint alleges a host of facts, which collectively demonstrate that the Officer and Director Defendants acted **knowingly or recklessly** in issuing materially misleading statements and in engaging in deceptive acts in furtherance of the fraudulent scheme.

The contrasting allegations as between both complaints may be best illustrated by the following chronology set forth in our Complaint and Opp. This chronology evidences how each of the Company Defendants – including the *Kravitz* Defendants – took affirmative actions to mislead investors and, contrary to the inferences that have been drawn from the *Kravitz* Complaint, refused to investigate or stop their ongoing fraud in the 13-month period after being alerted to the fraud by third parties outside the Company:[4]

- Sometime in May 2017, **PwC Greece alerted the Audit Committee Defendants** (which included Konomos) about irregularities in Aegean's outstanding receivables. RJN Ex. 1, at ¶53. That same month, on May 16, 2017, Aegean filed its 2016 Form 20-F, which the Company later admitted were false, in part based on sham accounts receivables.[5] *See, e.g.*, ¶¶7-9, 26-27, 149-51, 189, 231, 236, 479.

- **After being alerted by PwC Greece**, the Company continued to file quarterly reports **with the approval of the Audit Committee**, which reports the Company later admitted were false and misleading, including for Q1 2017 (issued May 24, 2017) through Q4 2017 (issued March 7, 2018). ¶¶230, 234, 303. Nikolas Tavlarios as well as Gianniotis continued to sign off on these financials and issued statements about the strength of these financials and the Company's business until their terminations in June 2017 and April 2018, respectively. ¶¶234-35, 303-06, 308.[6]

- On June 1, 2017, Nikolas Tavlarios, suddenly resigned "by mutual agreement." ¶194.

- Because Melisanidis, John Tavlarios and Georgiopoulos lost shareholder voting control, John Tavlarios and Georgiopoulos were voted off the Board at the June 8, 2017 shareholder meeting. ¶195.

- Starting sometime in 2017, the Activist Investors Committee tried to engage with the Audit

---

[3] The Complaint alleges how the contention that the internal controls in 2014 were remedied were misleading and nevertheless the ultimate investigations revealed that Company's internal controls were utterly deficient. ¶¶27, 437, 479.

[4] While Plaintiff offers this example, the Complaint is replete with additional examples of scienter. *E.g.*, (i) the fact that the Reconstituted Audit Committee ("RAC") discovered the fraud in a mere two weeks (Opp. at 26-27); (ii) the insiders ignored significant red flags (*id*. at 28-31); (iii) Nikolas Tavlarios, Gianniotis and the Audit Committee Defendants were responsible for oversight of internal controls, which the Company ultimately admitted were utterly ineffective, despite having claimed to have remedied internal control issues regarding related-party transactions in 2014 (*id*. at 31-32).

[5] This was filed late after a May 1, 2017 filing of a Notification of Late Filing (Form 12b-25) with the SEC, disclosing that the Company needed an extension to complete its assessment to file its 2016 Form 20-F.

[6] On December 13, 2016, the Company filed a prospectus for a $150 million convertible Notes offering which included the most recent financials and was **expressly** incorporated into the Registration Statement filed by each of the Company Defendants. ¶¶187-90, 474; RJN Ex. 9, at 31.

- Committee in the coming months – but to no avail.

- On November 27, 2017, Konomos admitted to a member of the Activist Investors Committee that he suspected that Melisanidis might engineer a purchase of another Melisanidis company "to regain voting control and ensure that no independent directors would be appointed." ¶208.

- On December 20, 2017, the Activist Investors Committee sent Audit Committee Defendant Papanicolaou a letter objecting, among other things, to indications that the Company would reduce its Board to four members and continuing related-party transactions with Melisanidis, and advising that it would nominate four independent members at next annual shareholder meeting, usually held in June. ¶¶20, 196.

- On February 26, 2018, Konomos further acknowledged to a member of the Activist Investors Committee that, *if Melisandis did engineer a purchase to regain control, it would be a "problem for current shareholders, stating frankly that, if the transaction closes, 'You'll be F\*\*k\*d.'"* ¶208.

- **Despite this admission and the PWC Greece warning**, the Company structured the "HEC Acquisition" with Melisanidis. On February 20, 2018, the Company announced the transaction and advised that it was recommended by a Special Committee of the Board (**which included Konomos, Papanicolaou and Koutsomitopoulos**) and approved by the full Board (which also included Fokas). Pursuant to this deal, Aegean would pay $367 million (in cash and assumption of certain debt) to acquire H.E.C. Europe Limited ("HEC"), give 33% shares to Melisanidis or his family, which allowed him to have full voting shareholder control, and provided that HEC would designate three board members (one of which was Melisanidis' son). ¶¶21, 197, 315. There could be no more blatantly deceptive act in furtherance of the fraudulent scheme in violation of Rule 10b-5(a) & (c). *See*, *e.g.*, *Forcefield Energy*, 2017 WL 1319802, at *8.

- Moreover, McIlroy and Papanicolaou issued statements touting a false narrative about the purpose of the transaction and how the Board and management viewed this as part of a strategic plan. ¶¶316-20. These statements were misleading because they provided a false pretense for the acquisition, which was, in fact, designed to give full shareholder voting control to Melisanidis and exclude independent directors – precisely as Konomos admitted he would. *Id.*

- On March 8, 2018, the Activist Investor Committee filed a suit to enjoin the HEC Acquisition, against Aegean and its four Board members (which included Konomos), arguing that the transaction was designed to (i) thwart their attempts to appoint independent directors; (ii) stack the Board with friendly directors; and (iii) dilute the interests of shareholders. ¶¶22, 203-04.

- Based on the alleged facts which are referenced in the Complaint, on March 12, 2018, the Honorable Loretta A. Preska of the Southern District of New York granted a preliminary injunction halting the transaction. ¶209.

- On March 27, 2018, the transaction was terminated and, on May 2, 2018, the Company announced that an agreement was reached with the Activist Investor Committee and further that the Company had agreed to appoint three independent members to the Board. ¶¶23, 211.

- On April 17, 2018, Gianniotis, Aegean's CFO since 2008, "resigned." ¶211.

- On June 4, 2018, the Company announced that the existing members of the Audit Committee (including Konomos) had been forced to step down by May 22, 2018 and there was a newly appointed and reconstituted Audit Committee ("RAC") comprised of entirely new people. ¶¶7, 213; *see also* May 22, 2018 Press Release (attached to May 22, 2018 Form 6-K).

- The June 4, 2018 press release also announced that **the newly appointed RAC** had discovered that: (a) approximately $200 million of accounts receivable owed to the Company as of December 31, 2017 would need to be written off and that the transactions giving rise to the receivables were "without economic substance and improperly accounted for in contravention of the Company's normal policies and procedures"; (b) the Audit Committee would recommend that Aegean pursue claims against individuals and entities involved in these transactions; (c) the Company would identify weaknesses in the Company's internal controls and remedy such weaknesses; (d) "a number of individuals employed by the Company across multiple functions who are believed to have been involved in the transactions have been terminated or placed on administrative leave pending the outcome of the investigation"; and (e) the RAC's preliminary finding had been reported to the SEC and DOJ. ¶¶24, 213, 477.

In *Kravitz*, the Trustee alleged that the Audit Committee Defendants actually started investigating the potential improprieties once they were advised by PWC which led to the revelations here. RJN Ex. 1, at ¶53. However, Plaintiff here clearly alleges the Company Defendants were part of the cover up and that the RAC conducted the only meaningful investigation. *See, e.g.*, ¶¶7, 26, 373, 403, 477.

Indeed, the Complaint and the Company's filings in the second half of 2018 and 2019 (issued after the Complaint was filed) explain that (i) the RAC forced the Audit Committee members to leave shortly after they joined; (ii) as of at least May 22, 2018, it was **only** the RAC and the newly appoint CFO were working through its annual reporting process; and (iii) per the June 4, 2018 press release, the review was now being conducted by the RAC, which is now "solely comprised of the three recently elected independent members" of the Board.[7] As disclosed in bankruptcy filings, the (i) RAC began working closely with Arnold & Porter Kaye Scholer LLP to lead the internal independent internal investigation **following the June 4, 2018 announcement**;[8] and (ii) **"no legacy member of the Board of Directors has any role on the Audit Committee or oversight of the Investigation"**;[9] (iii) the RAC also retained Kobre & Kim LLP in July 2018 for asset recovery and claim monetization strategies;[10] (iv) Ernst & Young apparently did the forensic accounting work;[11] and (v) "Arnold & Porter is uniquely positioned to continue representing the Debtors because it has been the sole special counsel advising the Debtors regarding the Investigation since it commenced";[12] and (vi) "The Audit Committee determined to commence the Investigation after the Debtors became aware of certain accounts receivable reflected in the Debtors' financial statements that lacked

---

[7] ¶213; May 2, 2018 Press Release (attached to May 2, 2018 Form 6-K); May 22, 2018 Press Release (attached to May 22, 2018 Form 6-K); June 4, 2018 Press Release (attached to June 4, 2018 Form 6-K).

[8] Decl. of Tyler Baron, Director of Aegean, In Supp. of Ch. 11 Petitions & First Day Motions, *In re Aegean Marine Petroleum Network, Inc.*, No. 18-13374 ("*Aegean Bankruptcy Action*") (Bankr. N.D. Cal. Nov. 6, 2018), ECF No. 2, at ¶¶72-74.

[9] *Id.* at ¶75.

[10] Application to Employ Kobre & Kim LLP as Special Counsel, *Aegean Bankruptcy Action* (Bankr. N.D. Cal. Nov. 16, 2018), ECF No. 96, at ¶6 & Ex. C (July 20, 2018 Kobre & Kim LLP letter to RAC).

[11] Decl. of Tyler Baron in Supp. of Confirmation of the Joint Plan of Reorg. of Aegean, *Aegean Bankruptcy Action* (Bankr. N.D. Cal. May 22, 2019), ECF No. 479, at ¶16.

[12] Application to Employ Arnold & Porter Kaye Scholer LLP as Special Counsel, *Aegean Bankruptcy Action* (Bankr. N.D. Cal. Nov. 16, 2018), ECF No. 91, at ¶7.

economic substance and were improperly recorded in contravention of the Debtors' accounting principles," which was in June 2018.[13]

There is no clearer statement that the Defendants did nothing to investigate than the declaration by the Chair of the RAC made on March 22, 2019 (after the filing of the Complaint):

> Prior to the May 2018 board restructuring, a law firm had been retained in 2017 by the prior audit committee to initiate an investigation into the $200 million of receivables which had been intended to be used as a form of consideration in the attempted HEC acquisition. The law firm had begun its work in late 2017. But little to nothing had happened in the six months prior to the May 2018 board restructuring. In the first week of May, the law firm briefed the new board members on these matters indicating that the counterparties and underlying transactions related to these receivables were suspicious.[14]

The declaration further states that the purported investigation conducted prior to the RAC "was essentially nowhere."[15]

Thus, in this example alone, unlike the Trustee who simply alleges that the *Kravitz* Defendants took no action, the Complaint affirmatively alleges that – after learning from PWC Greece about concerns with the Company's receivables and knowing that Melisanidis would try to orchestrate an acquisition with one of his company's to regain control and avoid new independent directors joining the team – the *Kravitz* Defendants (and others) (i) continued to allow the Company to issue of false quarterly reports; (ii) misled investors regarding the purpose of the HEC Acquisition; and/or (iii) voted in favor of or approved the HEC Acquisition.

To be clear, this example of blatant knowing or recklessness in affirmatively issuing false statements to investors and actively taking deceptive acts to further the fraudulent scheme speaks to Defendants' scienter **throughout the Class Period** as it demonstrates that – even when told by independent third parties to look into the matter – they continued to mislead investors about the Company's financials and value and give free-reign to Melisanidis to continue to loot the Company at the expense of shareholders. Any steps regarding the stepping down of Nikolas Tavlarios and the CFO were apparently efforts to appease the Activist Investors Committee. Had they not known or recklessly disregarded the fraud, their reaction would have been very different to this news.[16] Accordingly, for this and all the additional allegations regarding the *Kravitz* Defendants' conduct and scienter throughout the Class Period, Plaintiff's Complaint should be upheld.

---

[13] *Id.* While the Audit Committee Defendants presumably remained on the Board, this appears to simply be a function of the fact that Board members serve at the will of shareholders pursuant to a shareholder vote. Since the Company never issued its FY 2017 financials or 2017 Form 20-F and then went bankrupt in late 2018, the last shareholder vote was in June 2017.

[14] Decl. of Tyler Baron in Supp. of Confirmation of the Joint Plan of Reorg., *supra*, ECF No. 479, at ¶14.

[15] *Id.* at ¶19.

[16] Plaintiff here does not speak to the issue of whether the facts might support a *Caremark* claim. However, the point is that, regardless, the facts do support claims for violations of the federal securities laws where defendants took affirmative act against shareholders.

It is important to note also that this case involves a multitude of defendants not named in *Kravitz* Complaint including the founder, former chief financial officer, second president, former general counsel, foreign-based directors who were members of the Audit Committee and other auditors.

      **C.      The *Kravitz* Decision Has No Preclusive Effect On The Pending Case**

As noted by the Court, *Kravitz* is on appeal to the Second Circuit. Whether the *Kravitz* Order is affirmed, in whole or in part, is of no moment to the pending proceeding and cannot bind Plaintiff and the proposed Class, particularly given the dramatically different factual allegations of wrongdoing.

Collateral estoppel and res judicata are both affirmative defenses. Accordingly, the U.S. Defendants have the burden of proving that either doctrine applies. *Goldberg Cohen, LLP v. Luv N' Care, Ltd*., No. 16 Civ. 6576 (NRB), 2018 WL 4538927, at *6 (S.D.N.Y. Sept. 20, 2018). The U.S. Defendants have ***not*** asserted either the doctrine of collateral estoppel or res judicata in their papers. Nor have the U.S. Defendants sought leave to amend their motion to dismiss to raise these arguments. In any event, even if they had raised these defenses, the circumstances here do not permit the application of collateral estoppel and res judicata.

      **1.      Collateral Estoppel Is Inapplicable Because Plaintiff and the Class Were Not Parties And Did Not Have Representation In The *Kravitz* Action And Because The Issues In The *Kravitz* Action Were Different**

Issue preclusion, or collateral estoppel, "bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." *Kaplan v. S.A.C. Capital Advisors, L.P.*, No. 12 CIV. 9350 (NRB), 2017 WL 6403087, at *9 (S.D.N.Y. Nov. 16, 2017), *aff'd*, 919 F.3d 154 (2d Cir. 2019). In determining whether issue preclusion applies, the Court considers four requirements:

> (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the part[ies] had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.

*Id.* at *9 (citations omitted).

**First**, neither Plaintiff nor the Class were parties in the *Kravitz* action and were not represented in those proceedings. It would be unfair to bind Lead Plaintiff and the putative Class to findings in another proceeding where it and its counsel was vetted and appointed by this Court to litigate the issues on behalf of the putative class. *E.g., In re First Cent. Fin. Corp.*, 238 B.R. 9, 20 (Bankr. E.D.N.Y. 1999) (rejecting assertion that non-party trustee asserting derivative claims in a separate action could be bound by findings reached in a separate shareholders' direct action involving same defendants).

Court-appointed Class Counsel should not be constrained by the work or focus of the Trustee's counsel in a different case. Indeed, it would be unjust to bind Plaintiff and the Class to the limited fact allegations and assertion in the Trustee's 30-page complaint and ignore the substantial investigation and additional factual allegations culminating in Plaintiff's 200-page Complaint which has claims against numerous additional defendants (not named in *Kravitz*, including the founder, former chief financial officer, president, general

counsel, foreign-based directors, and auditors). Findings in the *Kravitz* Order have no bearing on securities fraud claims against these additional named defendants for actual acts taken against the Class.

**Second**, as detailed above, the *Caremark* claim and the 10b-5 claims are separate and distinct claims, which allege different misconduct – breaches of fiduciary duty duties for failing to act versus actual actions directed at the Class through acts in furtherance of the fraudulent scheme and misrepresentations – and require a presentation of different evidence. *See In re First Cent. Fin. Corp.*, 238 B.R. at 20 (rejecting collateral estoppel argument and stating "[w]e fail to understand how the Trustee, in his mismanagement lawsuit, can be bound by findings in the [class action], when that suit forwards different claims, alleges different duties, and requires a presentation of different evidence") (citation omitted).

Thus, collateral estoppel is inapplicable here.

> **2. Res Judicata Cannot Be Applied Here Because Plaintiff Was Neither A Party Nor In Privity To The Trustee Which Asserted A Claim On Behalf Of The Company And Because Plaintiffs' Securities Claims Were Not Asserted And Could Not Have Been Asserted By The Trustee**

"Under the doctrine of res judicata, or claim preclusion, 'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'" *Flaherty v. Lang*, 199 F.3d 607, 612 (2d Cir. 1999) (quoting *Rivet v. Regions Bank of La.*, 522 U.S. 470, 476 (1998)). A defendant asserting res judicata must show that "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the same adverse parties or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Marcel Fashions Grp., Inc. v. Lucky Brand Dungarees, Inc.*, 779 F.3d 102, 108 (2d Cir. 2015) (alterations omitted).

The second and third requirements are plainly not satisfied here. Plaintiff (and the Class) was not a party in *Kravitz* and is not in privity with the Trustee. Further, the Trustee did not and could not have asserted the securities class action claims in the present case as he had no standing to do so. *See, e.g., In re Semtech Corp. Sec. Litig.*, No. CV 07-7114 CAS (FMOx), 2008 WL 11333471, at *8 (C.D. Cal. Dec. 15, 2008) ("Plaintiff's claim is for a distinct injury suffered by the shareholders—overpaying for artificially inflated Semtech stock. Therefore, any resulting damages from this claim belong to the shareholders who purchased stock during the class period and not Semtech."). Accordingly, res judicata cannot apply.

> **D. Courts Have Sustained Rule 10b-5 Claims in Direct Actions Where *Caremark* Claims Have Been Dismissed in Derivative Proceedings**

Because the claims and underlying wrongdoing are so different between breach of fiduciary duty and securities fraud cases, it is not surprising that a survey of matters where facts have given rise to securities fraud claims on behalf of shareholders and breach of fiduciary duty claims on behalf of a company under *Caremark* reveals that courts will sustain Rule 10b-5 claims despite the dismissal of *Caremark* claims in parallel derivative actions:

- *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 161, 168-72 (S.D.N.Y. 2008) (Judge Crotty upheld plaintiffs' §§ 10(b) and 20(a) Exchange Act claims relating to false statements to investors which were misleading because they failed to disclose secret side agreements with Apotex, Inc., limiting the company's ability to recover damages and enforce its patent

- rights). *Sampson v. Robinson*, No. 07 CIV. 6890 (PAC), 2008 WL 3884386, at *7 (S.D.N.Y. Aug. 20, 2008) (in the derivative action arising under the same events, Judge Crotty dismissed the Caremark claims and found no oversight failure where plaintiffs alleged only a "generalized failure to scrutinize management's conduct").

- *In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 99 (S.D.N.Y. 2006) (Judge McMahon sustaining claims under Rule 10b-5 against CEO/director, CFO and chairman). *Ferre v. McGrath*, No. 06 Civ.1684 CM, 2007 WL 1180650, at *1, *8 (S.D.N.Y. Feb. 16, 2007) (Judge McMahan dismissing shareholder derivative complaint which "relie[d] on many of the same allegations as a related class action complaint that this court recently declined to dismiss" against the same CEO/director and chairman named in the class action).

- *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 239 (S.D.N.Y. 2010) (Judge Stein upholding in part plaintiffs' § 10(b) allegations that defendants materially misstated its risks to collateralized debt holdings and finding that plaintiff had adequately plead facts giving rise to a strong inference of scienter with respect to the risks associated with Citigroup's CDO exposure). *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 128 (Del. Ch. 2009) (dismissing Caremark claims relating to Company's exposure to the subprime lending market including its CDO exposure, finding, plaintiffs' allegations, at most, evidenced that the directors made bad business decisions).

- *N.Y. State Teachers' Ret. Sys. v. Gen. Motors Co.*, 315 F.R.D. 226, 231, 233 (E.D. Mich. 2016) (securities fraud class action alleging violations of § 10(b) of the Exchange Act and Rule 10b-5 arising from defendants' false and misleading statements about GM's product warranty and recall liabilities, settled for $300,000,000 after the defendants' motions to dismiss were fully briefed), *aff'd sub nom. Marro v. N.Y. State Teachers' Ret. Sys.*, No. 16-1821, 2017 WL 6398014 (6th Cir. Nov. 27, 2017). *In re Gen. Motors Co. Deriv. Litig.*, No. CV 9627-VCG, 2015 WL 3958724, at *17 (Del. Ch. June 26, 2015) (dismissing *Caremark* claim arising out of same event that formed basis for securities fraud claims and finding that the allegations demonstrate that directors "did a poor job of overseeing risk in a poorly-managed corporation" but did not "imply director bad faith"), *aff'd*, 133 A.3d 971 (Del. 2016).

### III.     CONCLUSION

For the reasons stated herein, Plaintiff submits that the *Kravitz* Order which is on appeal to the Second Circuit has no impact on the pending proceedings.

Respectfully,

Nicole Lavallee