UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

IN RE AEGEAN MARINE PETROLEUM NETWORK,     **MEMORANDUM AND ORDER**
INC. SECURITIES LITIGATION
------------------------------------X      18 Civ. 4993 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


Court-appointed lead plaintiff Utah Retirement Systems ("lead plaintiff") brings this securities class action individually and on behalf of other investors who purchased or otherwise acquired Aegean Marine Petroleum Network, Inc. ("Aegean") securities on the New York Stock Exchange ("NYSE") between February 27, 2014 and November 5, 2018 inclusive (the "Class Period") and were damaged as a result.  Specifically, lead plaintiff brings claims against sixteen defendants, alleging violations of Sections 10(b), 20(a), 20(b), and 20A of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), 78t(b), and 78t-1, and the rules and regulations promulgated thereunder, including Rule 10b-5, 17 C.F.R. §§ 240.10b-5(b), 240.10b-5(a) and (c).  Before the Court are nine motions to dismiss the consolidated class action complaint.

This case was filed the day after Aegean issued a press release on June 4, 2018, which disclosed the existence of a

fraudulent scheme that transpired over a number of years.[1] According to the press release, certain accounts receivable at Aegean, amounting to approximately $200 million, would need to be written off because the transactions that gave rise to the accounts receivable "may have been, in full or in part, without economic substance and improperly accounted for in contravention of the Company's normal policies and procedures."  Complaint ("Compl."), ECF No. 81 ¶ 148.

Aegean issued a second press release on November 2, 2018, announcing that an internal investigation determined that Aegean had been the victim of a fraud perpetrated by a "former affiliate of the Company," whereby "up to US$300 million of Company cash and other assets were misappropriated through fraudulent activities." Id. ¶¶ 26, 166.  The Reconstituted Audit Committee "further confirmed that the approximately US$200 million of receivables are uncollectible and will be written off."  Id. ¶ 149.

As alleged in the complaint, Dimitris Melissanidis,[2] the founder and former chief executive officer of Aegean, was the driving force behind the scheme.  Further, lead plaintiff alleges

---

[1] The first complaint was filed by Nick Simco, who was not ultimately appointed lead plaintiff.  ECF No. 1.  The complaint named defendants Aegean, E. Nikolas Tavlarios, and Spyros Gianniotis.

[2] Melissanidis' counsel points out that lead plaintiff has incorrectly spelled his name in the caption in the complaint and in its briefing.  For purposes of this opinion, we will use the correct spelling.  ECF No. 200.

that Melissanidis was aided by various officers and directors. Aegean's auditors, moreover, are alleged to have failed to identify the scheme notwithstanding the existence of numerous red flags. As a consequence of the scheme, Aegean is alleged to have issued public filings, financial statements, and audit opinions containing false information throughout the Class Period.

Unsurprisingly, when the reconstituted Audit Committee disclosed the scheme in 2018, Aegean's stock price fell. Days later, on November 6, 2018, Aegean declared Chapter 11 bankruptcy and was delisted from the NYSE on December 3, 2018. Id. ¶ 480.

Defendants in this action include Aegean's founder and former Chief Executive Officer ("CEO"), Dimitris Melissanidis ("Melissanidis"); Aegean officers E. Nikolas Tavlarios ("Nikolas Tavlarios"), Spyros Gianniotis ("Gianniotis"), Jonathan McIlroy ("McIlroy"), and Spyridon Fokas ("Fokas"); Aegean outside directors Peter C. Georgiopoulos ("Georgiopoulos"), Yiannis N. Papanicolaou ("Papanicolaou"), John P. Tavlarios ("John Tavlarios"), Konstantinos D. Koutsomitopoulos ("Koutsomitopoulos"), and George Konomos ("Konomos"); and auditors Deloitte Touche Tohamatsu Limited ("Deloitte Touche"), Deloitte & Touche LLP ("Deloitte US"), Deloitte Certified Public Accountants, S.A. ("Deloitte Greece"), PricewaterhouseCoopers International

Limited ("PwC International"), PricewaterhouseCoopers LLP ("PwC US"), and PricewaterhouseCoopers S.A ("PwC Greece").[3]

For the reasons set forth below, the Court grants Papanicolaou and Koutsomitopoulos' motion to dismiss for lack of personal jurisdiction; grants Fokas' motion to dismiss for lack of personal jurisdiction; grants in part and denies in part Melissanidis' motion to dismiss for lack of personal jurisdiction and failure to state a claim upon which relief can be granted; grants McIlroy's motion to dismiss for insufficient service of process; grants PwC International and Deloitte Touche's motion to dismiss for failure to state a claim upon which relief can be granted; grants PwC US and Deloitte US's motion to dismiss for failure to state a claim upon which relief can be granted; grants Nikolas Tavlarios, Georgiopoulos, Konomos, and John Tavlarios' motion to dismiss for failure to state a claim upon which relief can be granted; denies

---

[3] Defendants filed separate submissions as below: Deloitte US and PwC US (ECF Nos. 180, 182, 184, 267); Deloitte Greece and PwC Greece (ECF Nos. 187, 188, 272); Deloitte Touche and PwC International (ECF Nos. 191, 192, 273); Nikolas Tavlarios, Georgiopoulos, John Tavlarios, and Konomos (ECF Nos. 196, 197, 268); Melissanidis (ECF Nos. 199, 200, 271); Fokas (ECF Nos. 210, 211, 264); McIlroy (ECF Nos. 225, 226, 261); Gianniotis (ECF Nos. 229, 230, 263); and Koutsomitopoulos and Papanicolaou (ECF Nos. 232, 233, 269). Lead plaintiff opposed defendants' motions in five separate submissions, one of which opposed various defendants' motions to dismiss for lack of personal jurisdiction and improper service (ECF No. 242). Lead plaintiff also submitted the following submissions challenging the merits of the defendants' motions, as below: Melissanidis (ECF No. 239); Deloitte Greece and PwC Greece (ECF No. 240); Deloitte US, PwC US, Deloitte Touche, and PwC International (ECF No. 241); and Nikolas Tavlarios, Georgiopoulos, Konomos, John Tavlarios, McIlroy, Fokas, Gianniotis, Papanicolaou, and Koutsomitopoulos (ECF No. 250).

Gianniotis' motion to dismiss; and denies PwC Greece and Deloitte Greece's motion to dismiss.

## I. Background[4]

Melissanidis founded Aegean in 1995 as a single bunkering station in Piraeus, Greece. Compl. ¶ 120. Aegean grew into a marine fuel logistics company that supplied and marketed refined marine fuel and lubricants to ships in port and at sea. Id. ¶ 43. Aegean also owned and operated a fleet of bunkering tankers, which supplied fuel for use by ships. Id. On June 6, 2005, Aegean was incorporated under the laws of the Marshall Islands, but it

---

[4] The following facts, which are drawn from the operative consolidated complaint, are accepted as true for purposes of the Court's ruling on defendants' motion to dismiss. See ECF No. 81. The Court draws all reasonable inferences in lead plaintiff's favor. See Koch v. Christie's Int'l PLC, 699 F.3d 141, 145 (2d Cir. 2012). In addition, the Court takes judicial notice of various court transcripts, filings, and rulings in other lawsuits; publicly available SEC filings; publicly available websites; and publicly available accounting and financial/auditing standards, which the parties appended to their submissions. See Declaration of A. Chowning Poppler, ECF No. 247 ("Poppler Decl.") and Declaration of Nicole Lavallee, ECF No. 249 ("Lavallee Decl."). In a separate submission, ECF No. 248, lead plaintiff requested that the Court take judicial notice of the documents appended to the Lavallee Decl., and defendants did not object. See, e.g., In re ForceField Energy Inc. Sec. Litig., No. 15 Civ. 3020, 2017 WL 1319802, at *1 (S.D.N.Y. Mar. 29, 2017) (taking judicial notice of defendant's public SEC filings for fact that contents were disclosed); RA Glob. Servs. Inc. v. Avicenna Overseas Corp., 817 F. Supp. 2d 274, 281 (S.D.N.Y. 2011) (finding that the Court may take judicial notice of documents filed in other courts to establish the fact of such litigation and associated filings); Jenkins v. Eaton, No. 08 Civ. 0713, 2009 WL 811592, at *1 (E.D.N.Y. Mar. 27, 2009) (finding that the Court may take judicial notice of public documents, including records of administrative agencies).

maintained its headquarters in Piraeus, Greece and had an office in New York, New York.  <u>Id.</u> ¶¶ 43, 46.

Aegean is not named as a defendant since, as noted earlier, Aegean filed for bankruptcy on November 6, 2018 in the United States Bankruptcy Court for the Southern District of New York following the disclosure of Melissanidis' fraud.

### A. Parties

#### 1. Lead Plaintiff

Lead plaintiff Utah Retirement Systems is a public pension fund that provides retirement and insurance benefits for Utah public employees.  <u>Id.</u> ¶ 42.  Lead plaintiff purchased shares of Aegean securities during the Class Period.  <u>Id.</u>

#### 2. Defendant Melissanidis

After founding Aegean in 1995, Melissanidis served as President and CEO of Aegean from June 2005 until December 2006 and served as director and Chairman of the Board until July 2006.  <u>Id.</u> ¶ 49.  Following Aegean's Initial Public Offering ("IPO") in 2006 and until September 2016, Melissanidis served as the Head of Corporate Development.  <u>Id.</u>  From September 2016 until May 2018, Melissanidis worked as a consultant to Aegean.  <u>Id.</u>  As will be explored in greater detail below, Melissanidis and his family are also alleged to have owned and/or controlled other businesses that

engaged in related-party transactions with Aegean, including Aegean Oil, S.A. and Aegean Shipping Management S.A.   <u>Id.</u> ¶ 51.

Lead plaintiff brings claims against Melissanidis pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder alleging scheme liability; Section 20(a) of the Exchange Act alleging control liability; Section 20(b) of the Exchange Act alleging action "through or by means of another person"; and Section 20A of the Exchange Act alleging insider trading.   At the threshold, Melissanidis challenges the Court's exercise of personal jurisdiction.

### 3. Officer Defendants

Lead plaintiff brings claims against four officer defendants ("Officer Defendants").   Nikolas Tavlarios was President and Principal Executive Officer ("President") of Aegean from December 2006 until June 1, 2017.   <u>Id.</u> ¶ 52.   Thereafter he worked as a consultant to Aegean from an office in New York City.   <u>Id.</u> Gianniotis was the Chief Financial Officer ("CFO") of Aegean from 2008 until April 17, 2018.   <u>Id.</u> ¶ 55.   Fokas was General Counsel and Secretary for Aegean as well as a Board member beginning in June 2005.   <u>Id.</u> ¶ 57.   McIlroy was the manager of global trading from January 2016 until July 2017, and then served as the President of Aegean until November 2018.   <u>Id.</u> ¶ 56.

Lead plaintiff brings claims against each of the Officer Defendants pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder alleging fraudulent misstatements or omissions; Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder alleging scheme liability; and Section 20(a) of the Exchange Act alleging control liability.  Lead plaintiff also brings claims against Giannotis and Fokas under Section 20A of the Exchange Act alleging insider trading.  At the threshold, Fokas challenges this Court's exercise of personal jurisdiction and McIlroy argues that he was not properly served.

### 4. Director Defendants

Lead plaintiff also brings claims against five director defendants ("Director Defendants") who sat on the Board of Directors of Aegean (the "Board").  Georgiopoulos served as Chairman of the Board of Aegean from December 2006 until his resignation on June 16, 2017.  Id. ¶¶ 60, 195.  Likewise, John Tavlarios served as a Board member from December 2006 until his resignation on June 16, 2017.  Id. ¶ 66, 195.  Papanicolaou became a Board member in December 2006, and also served as a member of Aegean's Audit Committee.  Id. ¶ 65.  Koutsomitopoulos and Konomos also served as a Board members, beginning in May 2008 and November 2008 respectively, and they also served on the Audit Committee until they were removed on June 4, 2018.  Id. ¶¶ 69, 70.  Together,

Koutsomitopoulos, Konomos, and Papanicolaou are referred to as the "Audit Committee Defendants."

Lead plaintiff brings claims against each of the Director Defendants pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder alleging fraudulent misstatements or omissions; Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder alleging scheme liability; and Section 20(a) of the Exchange Act alleging control liability. Additionally, lead plaintiff brings claims under Section 20(a) of the Exchange Act against the Audit Committee Defendants with respect to their alleged supervision of the auditors. At the threshold, Papanicolaou and Koutsomitopoulos challenge this Court's exercise of personal jurisdiction.

### 5. Auditor Defendants

Lead plaintiff sued six auditor defendants ("Auditor Defendants"), three of which are affiliated with the Deloitte network and three of which are affiliated with the PriceWaterhouseCoopers network.

Deloitte Touche is a membership-based company with member and network accounting and advisory firms operating in countries throughout the world. Id. ¶ 74. Deloitte Touche has headquarters in the United Kingdom and an office in New York City, and maintains global policies that address relationships between foreign

associated firms and audit clients.  Id. ¶¶ 74-76.  Deloitte US is
a member of Deloitte Touche, and is a Delaware corporation
headquartered in New York City.  Id. ¶ 82.  Deloitte US is alleged
to have assisted Deloitte Greece in reviewing various filings with
the Securities and Exchange Commission ("SEC").  Id. ¶ 84.
Deloitte Greece also is a member of Deloitte Touche.  Id. ¶ 77.
Deloitte Greece served as Aegean's principal accountant and
independent auditor from 2006 — when Aegean had its IPO — until
June 20, 2016.  Id.

PwC International is a membership-based company with member
and network accounting and advisory firms operating locally in
countries throughout the world.  Id. ¶ 87.  PwC US is a member of
PwC International, and is a Delaware corporation with its principal
office in New York City.  Id. ¶ 92.  PwC Greece is a member of the
PwC network and is located in Halandri, Greece.  Id. ¶ 88.  PwC
Greece served as Aegean's principal accountant and independent
auditor from June 20, 2016 through the end of the Class Period.
Id. ¶ 89.

Lead plaintiff brings claims pursuant to Section 10(b) of the
Exchange Act and Rule 10b-5(b) promulgated thereunder against
Deloitte Greece and PwC Greece (together, the "Greek Auditors")
alleging fraudulent misstatements and omissions.  Lead plaintiff
also brings claims against Deloitte Touche and PwC International

(together, the "Global Auditors") and Deloitte US and PwC US (together, the "US Auditors") pursuant to Section 20(a) of the Exchange Act alleging control liability.

### B. Factual Allegations

As the predicate for its case, lead plaintiff relies on two 2018 press releases, in which Aegean announced that a former affiliate (now identified as Melissanidis) had fraudulently misappropriated $300 million from Aegean and that $200 million in accounts receivable had to be written off because the receivables were based on fake transactions ("Fraudulent Scheme").

First, on June 4, 2018, Aegean issued a press release (the "June 2018 Press Release") announcing that a recently reconstituted Audit Committee (the "Reconstituted Audit Committee") at Aegean retained independent legal counsel to examine "approximately $200 million of accounts receivable owed to the Company . . . from four counterparties that were reflected in the Company's financial statements as of December 31, 2017." Id. ¶ 148.  The press release explained that the transactions that gave rise to the accounts receivable "may have been, in full or in part, without economic substance and improperly accounted for in contravention of the Company's normal policies and procedures." Id.  The press release further stated that a "number of individuals employed by the Company across multiple functions who are believed

to have been involved in the Transactions have been terminated or
placed on administrative leave pending the outcome of the
investigation." Id. The June 2018 Press Release does not identify
the individuals who were terminated or placed on administrative
leave.

On November 2, 2018, Aegean issued another press release (the
"November 2018 Press Release," and together with the June 2018
Press Release, the "2018 Press Releases"), announcing that an
internal investigation determined that Aegean had been the victim
of a fraud perpetrated by a "former affiliate of the Company,"
whereby "up to US$300 million of Company cash and other assets
were misappropriated through fraudulent activities." Id. ¶¶ 26,
166. The press release further provided that the Reconstituted
Audit Committee believed that the "receivables were improperly
recorded as part of a scheme to facilitate and conceal an extensive
misappropriation of Company assets channeled to OilTank, but
accounted for as transactions with these shell companies." Id.
¶ 149. The Reconstituted Audit Committee "further confirmed that
the approximately US$200 million of receivables are uncollectible
and will be written off." Id. The press release stated that the
scheme "involved the creation of falsified and forged documents,
including bank statements, audit confirmations, contracts,
invoices and third party certifications." Id. The Reconstituted

Audit Committee also explained that Aegean's internal controls over financial reporting had been materially ineffective.   Id. ¶ 8.  Aegean conceded that as a result of the scheme, revenues and earnings were "substantially overstated" in 2015, 2016, and 2017. Id. ¶¶ 150, 155.

The operative complaint, ECF No. 81, endeavors to build upon the 2018 Press Releases.  While lead plaintiff proffers various theories to hold the Officer Defendants, Director Defendants, and Auditor Defendants responsible for the Fraudulent Scheme, of which Melissanidis was the architect, lead plaintiff concedes that there is no allegation that any of the Officer or Director Defendants were directly sharing in Melissanidis' self-dealing and theft, or that they were the active participants in the creation of false documents.  Tr. of Oral Arg., Mar. 9, 2021 at 55:19-56:1. Nevertheless, lead plaintiff, again relying on the 2018 Press Releases, alleges a series of events beginning in 2010, including "additional actions to defraud" Aegean, which "allowed the . . . Fraudulent Scheme to continue for years."  Id. ¶¶ 12, 172.  These actions are detailed in sequence below.

### 1. Initial Public Offering

Eleven years after Melissanidis founded Aegean, Aegean completed an IPO in December 2006.  Id. ¶ 4.  The IPO Prospectus,

-13-

dated November 24, 2006, revealed a record of Melissanidis' past, which included, <u>inter alia</u>:

- Charges in 1999 and 2000 against Melissanidis arising from an investigation of sham bunkering transactions, which included instances of false certifications, forgery, and trafficking in contraband.  Ultimately Melissanidis was acquitted.  <u>Id.</u> ¶ 130.

- A criminal complaint filed by a dock workers union, which ultimately was withdrawn.  <u>Id.</u> ¶ 131.

- Criminal charges in 2002 regarding embezzlement arising from a 1992 transaction.  Melissanidis was acquitted.  <u>Id.</u> ¶ 132.

- Accusations of threatening the chief executive of a Greek gaming company.  <u>Id.</u> ¶ 134.

The IPO Prospectus also disclosed that Aegean was engaged in substantial related-party transactions with entities controlled by Melissanidis and/or his family, including Aegean Oil, S.A., and Aegean Shipping Management S.A.  <u>Id.</u> ¶ 133.

As a result of his background, Melissanidis was forced to take extraordinary steps so that Aegean could complete its IPO. <u>Id.</u> ¶ 135.  Prior to the IPO, Aegean structured its management team so that Melissanidis did not remain an executive after the IPO.  <u>Id.</u> ¶ 370.  Further, Aegean entered into the so-called Framework Agreement, filed with the SEC on November 3, 2006, which provided that Melissanidis would step down from the Aegean Board and was precluded from joining the Board or naming directors who would serve as either Board Chairman or Chair of the Audit and

Nominating Committees.  Id. ¶ 135.  After the IPO, Aegean traded on the NYSE under the ticker symbol "ANW."  Id. ¶ 44.

Notwithstanding the Framework Agreement, Melissanidis remained active in Aegean: he served as head of corporate development and owned the Aegean Warehouse where the Aegean corporate offices were located.  Id. ¶¶ 45, 49.  Further, Melissanidis continued to control a majority of Aegean shares following the IPO, as Leveret — a company controlled by Melissanidis - was expected to own 55.3% of Aegean's outstanding shares.  Id. ¶ 50.

Additionally, Melissanidis had long-standing relationships with a number of the officers and directors at Aegean.  For example, Director Defendants Georgiopoulos and John Tavlarios were major shareholders of Aegean since before Aegean's IPO, and they maintained their significant stakes throughout the Class Period. Id. ¶ 33.  Also, both Georgiopoulos and John Tavlarios agreed to serve on the Aegean Board.  Id. ¶ 136.

Further, companies run by Georgiopoulos and John Tavlarios are alleged to have engaged in related-party transactions with Aegean.  For example, Georgiopoulos was formerly the Chairman of Genco Shipping & Trading Limited, which purchased lubricating oils from Aegean.  Id. ¶ 433.  Also, Gener8 (also known as "General Maritime Corporation" or "GMC"), where Georgiopoulos, John

-15-

Tavlarios, and Konomos were also directors and/or executives, purchased sizeable amounts of marine fuel from Aegean. Id. ¶ 433. Moreover, Aegean also leased office space from Gener8. Id. ¶ 46.

Aegean's officers, too, are alleged to have connections with other Melissanidis ventures. Fokas, Aegean's General Counsel, was appointed to serve as Vice Chairman of the Board of OPAP, a company owned in part by Melissanidis, and his law practice was engaged by other entities controlled by Melissanidis. Id. ¶ 332. Gianniotis, Aegean's CFO, meanwhile, is alleged to have engaged in the financing of some of Melissanidis' companies. Id.

### 2. The Fraudulent Scheme: Fujairah Facility & False Accounts Receivable

The construction of the Fujairah Oil Terminal Facility ("Facility") was central to the Fraudulent Scheme. Lead plaintiff alleges that a company called OilTank was the principal beneficiary of Aegean's cash and asset misappropriation, which was facilitated in connection with construction of the Facility. Id. ¶ 156. In order to conceal the misappropriation, Aegean accumulated approximately $200 million in accounts receivable between 2015, 2016, and 2017, through transactions that lacked economic substance and were made with shell companies "owned or controlled by former employees or affiliates of [Aegean]." Id. ¶ 26. The details of this scheme, as alleged, are set forth below.

On April 27, 2010, Aegean announced its plan to build the Facility, an inland storage facility located in the United Arab Emirates ("UAE").  In order to construct the Facility, Aegean acquired as a subsidiary Aegean Oil Terminal Corporation ("AOTC") — which is owned and controlled by the Melissanidis family — for no consideration.  Id. ¶¶ 157, 381.  AOTC's only asset was a 25-year lease on a property in Fujairah.  Id. ¶ 381.  Aegean separately contracted with OilTank to oversee the construction and building of the Facility on that property.  Id. ¶ 382.  The complaint alleges on information and belief that OilTank is owned or controlled by Melissanidis.  Id.  It is also alleged that on March 31, 2010, OilTank had signed a contract with AOTC for OilTank's oversight of the construction of the Facility.  Id.  The estimated cost of the facility was $105 million, and construction was expected to be complete by the end of 2012.  Id. ¶¶ 157, 159.

However, construction was not complete in 2012 or 2013 and the cost of the Facility continued to rise, exceeding budget.  In Aegean's 2013 Form 20-F[5] for the fiscal year ending December 31, 2013, Aegean stated that it had paid an additional $62.7 million that year for construction of the Facility, bringing total costs

---

[5] A Form 20-F is a form issued by the SEC that must be submitted by all foreign private issuers with equity shares listed on exchanges in the United States.  Form 20-F requires foreign private issuers to submit annual reports within six months of the end of a company's fiscal year.

to $151.8 million.  Id. ¶ 160.  Aegean stated that it had remaining contractual obligations of approximately $13 million for 2014, and that it expected construction to be complete by the second quarter of 2014.  Id.

Once again, the completion date was not met and construction was not completed until the fourth quarter of 2014.  Id. ¶ 162. In its 2014 Form 20-F, Aegean disclosed that it paid $61.4 million toward the Facility in that year.  Id.  Ultimately, Aegean stated that it paid $205.3 million for construction and other related costs of the Facility, as well as capitalized interest of $16.6 million.  Id.

Relatedly, beginning in December 2014, Aegean is alleged to have misrepresented the cost of the Facility on its balance sheets, id. ¶¶ 163-67, which resulted in violations of US GAAP requirements, id. ¶ 168.  Moreover, the complaint alleges on information and belief that Aegean transferred an additional $185.3 million to OilTank between July 2015 and January 2018.  Id. ¶ 385.

In connection with the alleged misappropriation, the complaint alleges that between 2015 and 2017, Aegean's accounts receivable escalated, and that some of the "receivables" were connected to transactions with related parties.  Id. ¶¶ 401-02. In fact, the Reconstituted Audit Committee found that

approximately $200 million of accounts receivable balances were uncollectible and overstated.  Id. ¶ 403.  The Reconstituted Audit Committee also found that the transactions underlying the reported receivables "lacked economic substance as the [four] counterparties were shell companies with no material assets or operations and were owned or controlled by former employees or affiliates of [Aegean]."  Id.  Receivables from these four counterparties are alleged to have accounted for approximately 6% and 11% of Aegean's total assets reported on December 31, 2015 and 2016 respectively.  Id. ¶ 404.  Moreover, for 2015 and 2016, it is alleged that sales were declining while accounts receivable were increasing.  Id. ¶ 406.  The complaint does not allege the names of the four counterparties.

### 3. 2013 and 2015 Note Offerings

During this period, Aegean filed a series of documents with the SEC in advance of note offerings.  On July 3, 2013, Aegean filed a shelf Registration Statement on Form F-3 ("Form F-3") for the sale of up to $200 million in Aegean securities.  Id. ¶ 138. The Form F-3 was signed by the Officer and Director Defendants including Gianniotis, Nikolas Tavlarios, Fokas, Georgiopoulos, Konomos, John Tavlarios, Papanicolaou, and Koutsomitopoulos, with the exception of McIlroy.  Id.  On August 20, 2013, Aegean filed an amendment to the Form F-3 ("Prospectus") (together with the

Form F-3, the "Shelf Registration Statement"). Id. ¶ 139. The same defendants who signed the original Form F-3 — Gianniotis, Nikolas Tavlarios, Fokas, Georgiopoulos, Konomos, John Tavlarios, Papanicolaou, and Koutsomitopoulos — each signed the Prospectus. Id. On October 18, 2013, Aegean filed with the SEC a Prospectus Supplement for the sale of $75 million of notes due in 2018, and on October 23, 2013, Aegean issued and sold $86.3 million of notes. Id.

About fourteen months later, on January 12, 2015, Aegean announced that it would sell $40 million aggregate principal amount of notes in a public offering, and on January 13, 2015, Aegean announced that it was increasing the size of the offering to $42 million. Id. ¶ 140. On January 14, 2015, Aegean filed with the SEC a prospectus supplement (together with the Shelf Registration Statement and preceding filings disclosing note offerings, the "Offering Documents"). Id. ¶¶ 139-40. The Offering Documents incorporated by reference Aegean's November 24, 2015 Form 6-K[6] with financial results for the nine months that ended September 30, 2014 as well as the 2013 Form 20-F, which contained audited financial statements for the most recent fiscal period. Id. ¶ 250. Lead plaintiff alleges that the 2013 Form 20-F contained false and

---

[6] Form 6-K is required as a cover page for foreign issuers filing reports with the SEC.

misleading statements.  Id. ¶ 252.  Aegean sold $48.3 million worth of notes two days later.  Id.  ¶ 251.

### 4. Bylaws Amendment

About four months later, on May 27, 2015, the Board of Aegean revised Aegean's Amended and Restated Bylaws to reduce the quorum requirement for stockholders' meetings from a majority of the outstanding shares to one-third of outstanding shares.  Id. ¶ 375. In effect, this provided Melissanidis, Georgiopoulos, and John Tavlarios with shareholder control.  Id. ¶ 338.

### 5. Share Repurchase

About fifteen months later, on August 17, 2016, Aegean issued a press release ("August 2016 Press Release") announcing that an independent committee of the Board authorized the purchase of 11,303,031 shares that belonged to Melissanidis ("Repurchase"). Id. ¶ 178.  Under the terms of the authorization, Aegean agreed to repurchase the shares at a price of $8.81 per share, based on the value of the shares at the close of trading on August 16, 2016. Id.  In total, the purchase price was approximately $100 million, representing approximately 22% of Aegean's outstanding shares. Id.  In connection with this announcement, Melissanidis agreed to step down from his role as Head of Corporate Development at Aegean, effective immediately.  Id.  He would, however, continue to serve as a consultant to Aegean.  Id.  Meanwhile, Fokas and Gianniotis

are alleged between the two of them to have sold $1 million in
Aegean stock contemporaneously with the Repurchase.  Id. ¶ 332.
Speaking of the Repurchase, Melissanidis is quoted in the August
2016 Press Release, having stated that he was "honored to have
played a role in Aegean's evolution" and that he "look[ed] forward
to . . . watching Aegean continue on its trajectory of growth and
success."  Id. ¶ 180.

Also in the August 2016 Press Release, President Nikolas
Tavlarios commented on the Repurchase, stating:

> We believe this sizeable repurchase of the
> Company's shares underscores the Board's
> confidence in Aegean's prospects, and will
> provide meaningful and immediate earnings
> accretion for all Aegean shareholders . . . We
> are fortunate to have a solid balance sheet
> and strong free cash flow, which provide us
> the opportunity to repurchase shares while
> continuing to invest in our business to drive
> continued growth and shareholder value.

Id. ¶ 179.  Nikolas Tavlarios echoed this sentiment in an August
25, 2016 article on Tradewinds.com, a maritime publication,
stating, "The company had good strength on its balance sheet . . .
It worked out well for [Melissanidis], for us and for the
investors. Everyone wins."  Id. ¶ 182.

On September 19, 2016, Aegean issued a press release
announcing that the Repurchase closed on September 15, 2016.  Id.
¶ 181.

### 6. 2016 Loans and Offerings

According to lead plaintiff, notwithstanding Nikolas Tavlarios' statements, the Repurchase created a "severe liquidity problem behind the scenes because the repurchase caused [Aegean] to violate the terms of its line of credit." Id. ¶ 190. As a result, following the Repurchase, Aegean renewed and obtained a number of loans and offered a series of notes, which "dilut[ed]" Aegean's current shareholder value. Id.

Specifically, on September 20, 2016, Aegean issued a press release announcing the successful renewal of a $1 billion secured global borrowing base multicurrency revolving credit facility as well as a $250 million secured United States borrowing base revolving credit facility. Id. In the press release, Nikolas Tavlarios touted that the loans would provide "ample financial flexibility" as Aegean continued to execute its strategy. Id. ¶ 183. CFO Gianniotis is also quoted in the press release, having stated, "We believe that the decision by our bank lenders to renew and contribute to the credit facilities underscores their confidence in the strength of our global platform and ability to generate significant value." Id. On October 24, 2016, Aegean entered into a loan agreement with Grady Properties Corporation SA, which is owned by relatives of Melissanidis, for up to $25

-23-

million at a 6% interest rate.  Id. ¶ 189.  The balance was $20 million as of December 31, 2016.  Id.

In Aegean's November 16, 2016 Q3 press release, Gianniotis stated, "During the quarter we strengthened our financial flexibility with the renewal of our $1 billion credit facility on improved terms."  Id. ¶ 185.  During Aegean's Q3 conference call the next day, however, Gianniotis explained that total debt was $756 million, having increased by $64.5 million as Aegean "used cash to buy back shares from our founder."  Id. ¶ 186.

Further, on December 13, 2016, Aegean revealed in a Form 6-K that Aegean was not in compliance with the covenants in its debt agreements.  Id. ¶ 187.  Therefore, on November 4, 2016, Aegean had obtained a waiver from its lenders under its 2013 Secured Multicurrency Revolving Credit Facility, which resulted in a temporary increase in the interest rate.  Id.  Moreover, Aegean announced that it intended to offer $100 million in 4.25% convertible senior unsecured notes in a private offering, which would be used in part to repay a portion of "the outstanding short-term indebtedness under [Aegean's] [2013 Credit Facility]."  Id. ¶¶ 142, 188.  On December 14, 2016, Aegean announced that it was upsizing the notes offering to $150 million.  Id. ¶ 188.  On December 19, 2016 and January 11, 2017, Aegean issued and sold $150 million and $22.5 million, respectively, in aggregate

principal amount of its 4.25% convertible unsecured senior notes.
Id. ¶ 144.

### 7. 2017 Activist Investor Committee Letters and Interim Resignations

Against the background of the delays in constructing the Facility, escalating receivables, the Repurchase, and a series of loan adjustments and debt offerings, investors began to voice concerns and objections.

First, on April 25, 2017, a group of shareholders representing more than 12% of Aegean's outstanding shares (the "Activist Investors Committee") sent a letter to Georgiopoulos, the Chairman of the Board, highlighting deficiencies in Aegean's financing structure and corporate governance and suggesting changes to the composition of the Board. Id. ¶¶ 20, 192. The letter was not public. Id.

On June 1, 2017, following a poor Q1 earnings report released on May 23, 2017, Nikolas Tavlarios resigned as Aegean's President. Id. ¶¶ 17-18. On June 16, 2017, Georgiopoulos and John Tavlarios left the Board after failing to receive a majority vote for their reelection. Id. ¶¶ 18, 195.

On December 20, 2017, the Activist Investors Committee sent another private letter to Papanicolaou, who was interim Chairman of the Board, objecting to (a) a recent suggestion that the Company would consider reducing the size of the Board to four members; (b)

continuing related-party transactions with the companies controlled by Melissanidis; (c) the Repurchase, which took place prior to a 48% decline in Aegean's stock price; and (d) the move of Aegean's executive functions, including financial and control, to the same offices in Piraeus as Melissanidis' other entities. Id. ¶ 196.   The Activist Investors Committee also complained that capital expenditure projects had "destroyed an immense amount of shareholder value," and, in particular, argued that Aegean's share price would be more than double its present level if Aegean had not constructed the Facility.   Id.   The letter also stated that the Activist Investors Committee would nominate four independent director candidates at the 2018 Annual Meeting.   Id.

### 8. HEC Acquisition

According to lead plaintiff, in reaction to pressure from outside shareholders urging the election of new independent directors, senior managers and employees along with the Board took action to conceal the Fraudulent Scheme by orchestrating an acquisition that would solidify Melissanidis' control of Aegean. Id. ¶ 197.

On February 20, 2018, Aegean announced in a press release that it had entered into a transaction to acquire H.E.C. Europe Limited ("HEC") (the "HEC Acquisition"), a closely-related company owned by Melissanidis and his family.   Id.   Consideration for the

deal was $367 million, including the assumption of certain indebtedness, which was payable in the form of a combination of debt, the assignment of certain accounts receivable, cash, and shares of Aegean common stock, which would represent approximately 33% of the issued and outstanding common stock of Aegean after giving effect to the issuance. Id. This 33% stake in Aegean would provide Melissanidis with the sole ability to form a quorum for shareholder votes pursuant to the Second Amended and Restated Bylaws. Id. Moreover, as a term of the HEC Acquisition, Melissanidis and his family would designate three nominees (including Melissanidis' son) for appointment to the Board and would recommend an independent nominee to the Board. Id. A Special Committee of the Board, comprised of Konomos, Papanicolaou, and Koutsomitopoulos, approved the HEC Acquisition. Id. The press release indicated that the Special Committee was advised by an independent financial advisor. Id.

On March 8, 2018, certain shareholders from the Activist Investors Committee initiated a lawsuit against Aegean and its four directors at the time — Konomos, Papanicolaou, Fokas and Koutsomitopoulos — seeking to enjoin the HEC Acquisition in the United States District Court for the Southern District of New York. Id. ¶ 203. On March 12, 2018, Judge Loretta A. Preska entered a temporary restraining order ("TRO") enjoining the HEC Transaction.

Id. ¶ 209.   She referred to the HEC Acquisition as "highly suspect."   Id.   Referencing the allegations, she observed that Melissanidis, the founder, "stands on both sides of the transaction" insofar as he "exercises de facto control over Aegean Marine, the proposed acquirer, and exercises control over the proposed acquiree" and that there are "interconnections between the three members of the independent committee and [the Founder] and his other companies."   Id.; see also Decision, RMB Holdings LLC v. Aegean Marine Petroleum Network, Inc., No. 18 Civ. 2085, Mar. 12, 2018, ECF No. 21 at 3:20-4:4.   Judge Preska extended the TRO for 14 days on March 16, 2018, and on March 20, 2018, stayed the proceedings.   Compl. ¶¶ 210-211.

On March 27, 2018, Aegean announced the termination of the HEC Acquisition.   Id. ¶ 211.   Just over a month later, on May 2, 2018, Aegean announced that it settled the HEC Acquisition lawsuit and agreed to appoint three additional members to the Board (none of whom are named in this lawsuit): Tyler Baron, Donald Moore, and Raymond Bartoszek.   Id. ¶¶ 23, 211.   Moreover, the members of the Audit Committee — Papanicolaou, Koutsomitopoulos, and Konomos — were replaced by the three new directors, who together comprised the Reconstituted Audit Committee.   Id. ¶¶ 24, 213.   On May 22, 2018, Aegean announced that the Reconstituted Audit Committee was reviewing Aegean's annual reporting process and that Aegean's

principal offices, located in a building owned by Melissanidis, would be relocated.  Id. ¶ 212.

### 9. The Fall Out

On June 4, 2018, Aegean issued the June 2018 Press Release, detailed above, which revealed the Fraudulent Scheme to the public. Id. ¶ 25.  On November 2, 2018, Aegean issued the follow-up November 2018 Press Release, also described above, which detailed findings from the Reconstituted Audit Committee's investigation. Id. ¶ 26.

On November 6, 2018, Aegean announced that it filed a petition for relief under Chapter 11 of the Bankruptcy Code.  Id. ¶ 29. Aegean's shares were delisted from the NYSE on December 3, 2018. Id. ¶ 44.

## II.  Personal Jurisdiction

At the outset, defendants Melissanidis, Fokas, Koutsomitopoulos, and Papanicolaou move to dismiss for lack of personal jurisdiction.  "The Court considers the jurisdictional issues first, because a dismissal for lack of jurisdiction renders all other claims moot."  Darden v. DaimlerChrysler N. Am. Holding Corp., 191 F. Supp. 2d 382, 386 (S.D.N.Y. 2002) (citing Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 583 (1999)).  For the reasons below, the Court grants Fokas' and Koutsomitopoulos and

-29-

Papanicolaou's motions in their entirety and grants in part Melissanidis' motion.

**A. Legal Standard**

"Jurisdiction to resolve cases on the merits requires . . . authority . . . over the parties (personal jurisdiction), so that the court's decision will bind them." <u>Ruhrgas</u>, 526 U.S. at 577. In determining whether it has personal jurisdiction over a defendant, the Court employs a two-step inquiry. First, the Court must determine whether there is a "statutory basis for exercising personal jurisdiction." <u>Marvel Characters, Inc. v. Kirby</u>, 726 F.3d 119, 128 (2d Cir. 2013) (citation omitted). Second, the Court must consider whether exercise of personal jurisdiction over the defendant is consistent with due process under the Constitution, which requires the Court to determine whether the defendant has minimum contacts with the forum and whether it is reasonable to exercise jurisdiction. <u>Licci ex rel. Licci v. Lebanese Canadian Bank, SAL</u>, 732 F.3d 161, 168-73 (2d Cir. 2013).

As to the first step, section 27 of the Exchange Act, 15 U.S.C. § 78aa, provides a statutory basis for federal jurisdiction. Section 78aa states, in relevant part:

> The district courts of the United States . . . shall have exclusive jurisdiction of violations of [the Exchange Act] or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by [the

>           Exchange Act] or the rules and regulations
>           thereunder.

15 U.S.C. § 78aa.  Section 27 also provides for worldwide service

of process.  SEC v. Straub, 921 F. Supp. 2d 244, 252 (S.D.N.Y.

2013) (citing 15 U.S.C. § 77v).  Pursuant to case law, there are

three recognized bases for exercising jurisdiction over a foreign

defendant.  "Jurisdiction is proper if a foreign defendant . . .

(1) does business in the forum (Restatement § 35); (2) does an act

in the forum (Restatement § 36); or (3) causes an effect in the

forum by an act done elsewhere (Restatement § 37)."  In re CINAR

Corp. Sec. Litig., 186 F. Supp. 2d 279, 304-05 (E.D.N.Y. 2002)

(citation omitted).

    As to the second step, to determine whether personal

jurisdiction is consistent with due process, the Court first

inquires whether the defendant has sufficient minimum contacts

with the forum.  Int'l Shoe Co. v. Washington, 326 U.S. 310, 316

(1945).  Second, if the defendant has sufficient minimum contacts

with the forum, the Court assesses whether the exercise of personal

jurisdiction comports with "traditional notions of fair play and

substantial justice."  Id.

    A Court has general personal jurisdiction over a defendant

where the individual is domiciled.  Sonera Holding B.V. v. Cukurova

Holding A.S., 750 F.3d 221, 225 (2d Cir. 2014).  With respect to

specific personal jurisdiction, on the other hand, "[t]he inquiry

-31-

... focuses on 'the relationship among the defendant, the forum, and the litigation.'" Walden v. Fiore, 134 S.Ct. 1115, 1121 (2014) (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 775 (1984)).  For this Court "to exercise [specific] jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." Id. "The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." Id. at 1125; see also 7 W. 57th St. Realty Co., LLC v. Citigroup, Inc., No. 13 Civ. 981, 2015 WL 1514539, at *10 (S.D.N.Y. Mar. 31, 2015), aff'd, 771 F. App'x 498 (2d Cir. 2019) ("Plaintiff must demonstrate that the [defendant's] suit-related conduct creates minimum contacts with New York, however, not simply that the [defendant has] a presence here or conduct[s] business activities here in general") (alterations in original).

To allege personal jurisdiction over a defendant, group pleading is not permitted.  Instead, the plaintiff is required to establish personal jurisdiction separately over each defendant. Famular v. Whirlpool Corp., 16 Civ. 944, 2017 WL 2470844, at *2 (S.D.N.Y. June 7, 2017).  Moreover, the "plaintiff must establish the court's jurisdiction with respect to each claim asserted."

-32-

Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 24 (2d Cir. 2004) (emphasis in original).

Where, as here, a number of the defendants reside in Greece, this Circuit relies on the "effects test" to determine whether it can exercise specific jurisdiction over a defendant whose "conduct that forms the basis of the controversy occurs entirely out-of-forum," and whose "only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff." Tarsavage v. Citic Tr. Co., Ltd., 3 F. Supp. 3d 137, 145 (S.D.N.Y. 2014). Pursuant to the effects test, "the exercise of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its conduct at the forum." Id. (citing Licci, 732 F.3d at 173). "[T]he fact that harm in the forum is foreseeable . . . is insufficient for the purpose of establishing specific personal jurisdiction over a defendant." In re Terrorist Attacks on Sept. 11, 2001, 714 F.3d 659, 674 (2d Cir. 2013).

If a Court finds that the plaintiff has alleged that defendant has minimum contacts with the forum sufficient to establish personal jurisdiction, the Court then must determine whether it is "reasonable" to assert jurisdiction. To do so, the Court considers "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and

effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies."  Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 568 (2d Cir. 1996).

### B. Analysis

#### 1. Melissanidis

Melissanidis moves to dismiss this case for lack of personal jurisdiction.  As an initial matter, lead plaintiff does not dispute that there is no general jurisdiction over Melissanidis, who is a resident of Greece.  Lead plaintiff does, however, argue that Melissanidis is subject to specific jurisdiction.

Lead plaintiff's argument in support of the exercise of specific jurisdiction is grounded in a series of cases, including Straub, 921 F. Supp. 2d 244; In re Banco Bradesco S.A. Sec. Litig., 277 F. Supp 3d 600 (S.D.N.Y. 2017); In re CINAR Corp. Sec. Litig., 186 F. Supp. 2d 279 (E.D.N.Y. 2002); and Das v. Rio Tinto PLC, 332 F. Supp 3d 786 (S.D.N.Y. 2018), in which the Court exercised personal jurisdiction over defendants who, like Melissanidis, were alleged to have perpetrated fraud abroad.  However, none of these cases present factual scenarios that are analogous to Melissanidis', as the defendants in those cases were involved in the preparation and/or execution of statements filed with the SEC.

-34-

For completeness, we recite the facts of the cases upon which lead plaintiff relies.

In <u>Straub</u>, 921 F. Supp. 2d at 255-258, the Court exercised specific jurisdiction over individual defendants allegedly engaged in schemes involving bribery of public officials in Macedonia and Montenegro. <u>Id.</u> at 248. There, the company's securities traded through American depositary receipts listed on the NYSE, and were registered with the SEC. <u>Id.</u> at 255. To conceal the schemes, the individual defendants made false statements in SEC filings and signed false management representation letters to auditors. <u>Id.</u> Likewise, in <u>Bradesco</u>, 277 F. Supp. 3d at 643-44, the Court exercised personal jurisdiction over an Executive Vice President and Board member involved in a bribery scheme in Brazil where he signed off on and was involved in the preparation and review of false and misleading statements filed with the SEC. <u>See also</u> <u>CINAR</u>, 186 F. Supp. 2d at 305-06 (exercising specific jurisdiction over the general counsel of a Canadian company who signed registration statements that were filed with the SEC); <u>Das</u>, 332 F. Supp 3d at 801 (exercising personal jurisdiction over CEO of NYSE-listed company who signed Form 20-Fs, despite his residence in Australia, work for a UK-headquartered company, and allegedly problematic payment in Guinea).

However, unlike the defendants in the cases just described, Melissanidis was not involved in the preparation of SEC filings. In fact, because of the issues concerning his past conduct, Aegean's IPO only proceeded after Melissanidis left his executive position and after the Framework Agreement was signed, which precluded Melissanidis from being a member of the Board of Directors.[7]

Contrary to lead plaintiff's citations, we find this case analogous to In re Braskem S.A. Sec. Litig., 246 F. Supp. 3d 731 (S.D.N.Y. 2017). There, like here, plaintiff argued that defendant exercised control over the company because he had a majority of voting share capital, veto power over corporate actions, the ability to appoint officers and Board members, and power to approve the business plan. Id. at 769. The complaint also alleged that defendant participated in the bribery scheme aimed at influencing prices. Id. Nevertheless, the Court found that it could not exercise personal jurisdiction over the defendant because the complaint did not allege that defendant had "any role in making, proposing, editing or approving" the company's public filings in the United States. Id. at 770. Instead, the complaint only made sweeping allegations, i.e., that defendant had the "power to

---

[7] This discussion may provide an explanation for why lead plaintiff does not assert a Rule 10b-5(b) claim against Melissanidis.

-36-

influence and control and did influence and control . . ."  The Court found that these allegations were a "far cry from the concrete factual pleadings in Straub . . . and In re CINAR Corp., each of which pled specific facts making the foreign defendant accountable for an issuer's allegedly actionable corporate statements."  Id.

The Court in SEC v. Sharef, 924 F. Supp. 2d 539, 547 (S.D.N.Y. 2013), set out a rationale for the outcome in Braskem, 246 F. Supp. 3d 731.  There, the Court declined to exercise jurisdiction over a foreign defendant involved in a bribery scheme, explaining that "the exercise of jurisdiction over foreign defendants based on the effect of their conduct on SEC filings is in need of a limiting principle."  Id.  Otherwise, the Court explained, subjecting to United States securities laws "every participant in illegal action taken by a foreign company subject to U.S. securities laws" would be "akin to a tort-like foreseeability requirement, which has long been held to be insufficient."  Id.

To avoid a similar outcome to Braskem, 246 F. Supp. 3d 731, lead plaintiff relies on several arguments in an effort to establish that the Court has jurisdiction over Melissanidis in connection with its claims arising from the Fraudulent Scheme.  We address each in turn.

First, lead plaintiff relies on Aegean's listing on the NYSE. Lead plaintiff correctly recognized that Melissanidis' ability to control Aegean does not provide for specific jurisdiction, as this would be contrary to law.  See ECF No. 242 at 10 ("Plaintiff does not contend that Melissanidis' ability to control Aegean constitutes minimum contacts"); see also In re Parmalat Sec. Litig., 376 F. Supp. 2d 449, 454 (S.D.N.Y. 2005) (finding that "the Due Process Clause is made of sterner stuff than a mere allegation of control") (internal quotation marks omitted); Braskem, 246 F. Supp. 3d at 770 (finding that allegations regarding defendant's "power to influence and control" were insufficient to confer jurisdiction).  Thus the statements of representatives of Aegean to United States investors do not amount to a jurisdictional predicate for Melissanidis.

Moreover, Melissanidis himself had very few contacts with the United States.  Lead plaintiff asserts that Melissanidis travelled to New York for the IPO in 2006 and to the United States to form various strategic alliances and open facilities.[8]  However, as Melissanidis maintains, these events have no relevance to the Court's jurisdiction because the IPO preceded the conduct at issue,

_____

[8] Additionally, these facts are not even alleged in the operative complaint, ECF No. 81, but instead are only raised in the Poppler Declaration submitted with lead plaintiff's opposition to the motions to dismiss for lack of personal jurisdiction.  See ECF No. 242 at 9; ECF No. 247.

and the alliances that Melissanidis formed and the facilities
Melissanidis visited have no discernable relation to the case. As
plaintiff "do[es] not allege that these [events] relate in any way
to the conduct underlying the instant case," the Court cannot
exercise jurisdiction over the foreign defendant on this basis.
Wilder v. News Corp., 2015 WL 5853763, at *11 (S.D.N.Y. Oct. 7,
2015); see also Walden v. Fiore, 571 U.S. 277, 284 (2014)
("defendant's suit-related conduct must create a substantial
connection with the forum State").

Next, there is no support for the proposition that
Melissanidis directed his conduct toward the United States.  To
the extent that the complaint establishes that Melissanidis
embezzled funds, those actions were entirely outside of the United
States.  Aegean is a Marshall Islands entity headquartered in
Greece, OilTank is a Marshall Islands entity headquartered in
Fujairah, and the Fraudulent Scheme arose in connection with the
Facility, which is located in the UAE.[9]  Melissanidis' conduct in
connection with the Fraudulent Scheme is therefore insufficient to

---

[9] Lead plaintiff attempts to connect Melissanidis to the United States by
reference to Miami Export Group, LLC ("MEG"), a company identified by the
trustee in Aegean's bankruptcy as a shell company used in Melissanidis'
embezzlement scheme, but nowhere mentioned in the complaint.  ECF No. 242 at
11-12.  Even adopting the trustee's allegation, this does not amount to conduct
directed toward the United States.  Rather, the direction would appear to be
toward Greece, Melissanidis' home country.

confer jurisdiction.  7 W. 57th St., 2015 WL 1514539, at *11 (internal quotation marks and citation omitted).

Lead plaintiff next argues that Melissanidis' orchestration of the HEC Acquisition and Aegean's issuance of press releases out of New York about the transaction, Compl. ¶ 21, create minimum contacts with the United States.  However, there is no allegation that the effects of the HEC Acquisition — involving the acquisition of one foreign company by another which did not ultimately succeed — were directed toward the United States.  Even if Melissanidis were responsible for the proposed HEC Acquisition, as alleged by lead plaintiff, his alleged intention was to maintain control of the Aegean Board — which is not conduct "expressly aimed" at the United States.  Calder v. Jones, 465 U.S. 783, 789 (1984); Compl. ¶ 197.[10]

Finally, lead plaintiff argues that the Court has personal jurisdiction over Melissanidis on the basis of the Repurchase.  In support of its argument, lead plaintiff points to Melissanidis' statement in the August 2016 Press Release, which was filed with the SEC, wherein he is quoted as saying that he was "honored to have played a role in Aegean's evolution."  Compl. ¶ 180.  Lead

---

[10] The Court notes and rejects lead plaintiff's suggestion that Melissanidis' hindrance of new management's access to electronic data on Aegean's servers and deletion of documents, Compl. ¶¶ 10, 330, could suffice to establish personal jurisdiction over Melissanidis in the United States, particularly where there is no allegation that the server was located in the United States.

plaintiff also relies on Nikolas Tavlarios' statement, published
on Tradewinds.com, that the buyback was "something [Melissanidis]
wanted to do . . .   The company had good strength on its balance
sheet."   Id. ¶ 182.   Further, lead plaintiff argues that the
Repurchase had an impact in the United States on the ground that
Aegean lost millions of dollars by overpaying for Melissanidis'
shares, and was then forced to dilute its shares by issuing
additional notes.   Id. ¶¶ 178, 187-90.

Melissanidis, meanwhile, denies that his statement is a
jurisdictional hook in the absence of any contention that he
actually prepared the August 2016 Press Release.   Moreover, relying
on Calder, 465 U.S. at 789, Melissanidis argues that the effects
of his actions on Aegean's stock price — where the stock traded on
the NYSE — is not material as the law requires more than just
"effects" in the United States; the act at issue must be "expressly
aimed" at the United States.   Further, Melissanidis argues that
notwithstanding lead plaintiff's attempt to link the Repurchase
with the "liquidity crisis" that followed, it is not alleged in
the complaint that the notes issuance, loan, or credit issues were
actually a result of the Repurchase.   Finally, Melissanidis argues
that the Repurchase did not affect United States shareholders
because it was a private buyback, rather than a trade on the open

market such that shareholders could have traded with him simultaneously.

With the exception of the Repurchase, we have to this point addressed each of lead plaintiff's arguments in support of a finding of jurisdiction over Melissanidis in connection with the Fraudulent Scheme, and we have found each of them deficient. Similarly, we hold that the Repurchase does not provide a basis for the Court's exercise of specific jurisdiction over Melissanidis in connection with the Fraudulent Scheme for the following reasons.

First, lead plaintiff has not established that Melissanidis made a misstatement in furtherance of the Fraudulent Scheme in connection with the Repurchase that provides for minimum contacts. Lead plaintiff relies on the August 2016 Press Release wherein Melissanidis is quoted as saying that he was "honored to have played a role in Aegean's evolution." Compl. ¶ 180. However, consistent with the case law outlined supra, the Court's exercise of personal jurisdiction over Melissanidis does not arise from the reference to Melissanidis' supposed statement about the Repurchase in the August 2016 Press Release because the presence of the statement does not establish Melissanidis' involvement in the creation of the filing. Wilder, 2015 WL 5853763, at *12 (finding allegation that defendant was "regularly quoted in press releases"

insufficient to support plaintiff's contention that defendant "drafted, reviewed, authorized and/or disseminated the [company's] press releases"). It follows that Nikolas Tavlarios' statement about Melissanidis in a Tradewinds.com article is an even less meaningful ground for the exercise of specific jurisdiction.

Second, despite its efforts, lead plaintiff has not established a sufficient link between the Repurchase and the Fraudulent Scheme lead plaintiff pled. Here, the essence of the fraud alleged is that the Officer Defendants, Director Defendants, and Auditor Defendants actively assisted or failed to adequately respond to red flags as Melissanidis embezzled $300 million dollars. Given the limited allegations of trading by other insiders,[11] any suggestion that the goal of the conspiracy was to prop up the stock price would be inconsistent with and contrary to the essence of the scheme as pled. Finally, we note that cases regarding scheme liability in the securities fraud context generally consider unusual trading by corporate insiders as part of the scienter analysis, rather than as proof of the underlying fraud. See In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 74–75 (2d Cir. 2001).

---

[11] Lead plaintiff alleges that it is "unclear what other insider trading may have occurred during the Class Period." Compl. ¶ 15. This plainly falls short of the specificity required for a claim of securities fraud, discussed infra.

For each of the above reasons, lead plaintiff has not alleged a basis for specific jurisdiction over Melissanidis in connection with the Fraudulent Scheme on the basis of the Repurchase alone or considered in combination with any of the other bases which we have previously found wholly insufficient.

Nevertheless, the Court finds that the Repurchase, when viewed in isolation, does support a finding of personal jurisdiction over Melissanidis with respect to the Section 20A insider trading claim alleged.  The reason for this conclusion is that the Repurchase, in the context of the Section 20A claim, was aimed at the United States.  Aegean stock traded only on the NYSE and Aegean's transfer agent is located in Colorado.  Tr. of Oral Arg., Feb. 9, 2021, at 15:12-16:17.  Unlike the business transactions that could readily occur entirely overseas, this one could not be effected anywhere other than in the United States. Facilitating a $100 million stock buyback of shares that trade on the NYSE, constituting over 20% of shares outstanding, created a "near certainty that United States shareholders. . . would be adversely affected" by Melissanidis' actions.  Donoghue v. Dicut, Inc., No. 01 Civ. 10194, 2002 WL 1728539, at *2 (S.D.N.Y. July 24, 2002) (citing SEC v. Unifund SAL, 910 F.2d 1028, 1033 (2d Cir. 1990)).

Indeed, acknowledging the anticipated effects of the Repurchase upon United States investors, Nikolas Tavlarios stated in the August 17, 2016 Press Release that the Repurchase would "provide meaningful and immediate earnings accretion for all Aegean shareholders." Compl. ¶ 179. As alleged, however, following the Repurchase, the stock price for Aegean declined substantially and Aegean violated terms of its line of credit, obtained a loan, and offered notes, which "dilut[ed]" Aegean's current shareholders. Id. ¶¶ 16, 190, 196. For this reason, we reject Melissanidis' suggestion that the Repurchase had no impact on United States shareholders simply because it was a buyback, i.e., a private transaction. Even though there was no direct United States shareholder on the other side of the transaction, the Repurchase inevitably affected United States shareholders. Id. ¶ 16. In such circumstances, Melissanidis should have "reasonably anticipate[d] being haled into an American court." SEC v. Euro Sec. Fund, No. 98 Civ. 7347, 1999 WL 76801, at *3 (S.D.N.Y. Feb. 17, 1999) (exercising jurisdiction over foreign investors in Dutch corporation that traded exclusively on the NYSE).

Having found that Melissanidis has minimum contacts with the forum on the basis of the Repurchase, the Court must also assess whether it is reasonable to exercise specific jurisdiction over

Melissanidis.  We find that it is reasonable to do so.  Though it may be inconvenient for Melissanidis to litigate this action in the United States, his inconvenience is far outweighed by this forum's interest in adjudicating this claim and deterring such conduct in the future.  <u>Metro. Life</u>, 84 F.3d at 568.  Further, "it is not clear that any other country would have a substantial regulatory interest in insider trading occurring on a United States exchange in stock registered under the Exchange Act, since the parties injured by the insider trading are other investors trading on a United States exchange."  <u>Euro Sec. Fund</u>, 1999 WL 76801, at *4.  Accordingly, the Court may exercise specific jurisdiction over Melissanidis in connection with the Repurchase and lead plaintiff's Section 20A claim.

### 2. Papanicolaou and Koutsomitopoulos

Papanicolaou, an outside director to Aegean from December 2006 through the Class Period, and Koutsomitopoulos, an outside director from May 2008 through June 4, 2018, move to dismiss for lack of personal jurisdiction.  Papanicolaou served as interim Chairman of the Board and Chairman of the Compensation Committee, as well as on the Audit and Nominating and Corporate Governance Committees.  Koutsomitopoulos served as Chairman of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee and Audit Committee.  Both Papanicolaou and

Koutsomitopoulos were members of the Special Committee that approved the HEC Acquisition.

As an initial matter, lead plaintiff does not attempt to assert that there is general jurisdiction over either Papanicolaou or Koutsomitopoulos, both of whom live in and are citizens of Greece, where Aegean is headquartered. However, lead plaintiff does argue that the Court has specific jurisdiction over Papanicolaou and Koutsomitopoulos on the basis of their Board membership, Audit Committee membership, approval of the Repurchase, and approval of the HEC Acquisition. We will consider each relied-upon basis seriatim to determine whether any were "expressly aimed" at the United States such that the effects test is met.

First, lead plaintiff argues that Papanicolaou's and Koutsomitopoulos' Board memberships and the decisions they made on the Board suffice to establish jurisdiction. However, "[a] person's status as a board member is not alone sufficient to establish jurisdiction, and such conclusory allegations of participation in the fraud are insufficient." In re AstraZeneca Sec. Litig., 559 F. Supp. 2d 453, 467 (S.D.N.Y. 2008), aff'd sub nom. State Universities Ret. Sys. of Illinois v. Astrazeneca PLC, 334 F. App'x 404 (2d Cir. 2009) (internal citations omitted). In the absence of an allegation that as members of the Board either

-47-

of these defendants expressly aimed their conduct at the United States, their status as Board members does not satisfy the effects test. <u>Dennis v. JPMorgan Chase & Co.</u>, 343 F. Supp. 3d 122, 207-08 (S.D.N.Y. 2018).

Lead plaintiff also focuses a significant amount of its argument on Papanicolaou's and Koutsomitopoulos' signatures on Aegean's Shelf Registration Statement, which was filed with the SEC. Compl. ¶¶ 138-39. In so doing, lead plaintiff relies on the statutory scheme applicable to shelf registration statements, which provides that information disclosed in a supplemental prospectus is "deemed to be part of and included in the registration statement." ECF No. 250 at 12 (citing <u>N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC</u>, 709 F.3d 109, 114 (2d Cir. 2013) (quoting 17 C.F.R. § 230.430B(f)(1)). Though it is not alleged that the Shelf Registration Statement itself contained false statements, lead plaintiff argues that the Shelf Registration Statement was integrated into the Offering Documents - which contained an allegedly false and misleading 2013 Form 20-F. <u>Id.</u> ¶ 252. For several reasons, the Court rejects this argument.

As an initial matter, the statutory scheme on which lead plaintiff relies is applicable to Section 11 claims, and not to Section 10(b) claims. <u>See, e.g.</u>, <u>In re Am. Realty Capital</u>

-48-

Properties, Inc. Litig., No. 15 MC 40, 2016 WL 11110435, at *1
(S.D.N.Y. Aug. 5, 2016); Federal Housing Finance Agency v. HSBC N.
Am. Holdings Inc., 987 F. Supp. 2d 369, 375-76 (S.D.N.Y. 2013).
This distinction is important, because Section 11 of the Securities
Act of 1933 applies a strict liability standard for registration
statements that incorporate later-filed false prospectus
supplements, whereas Section 10(b) permits a finding of liability
only where plaintiff alleges scienter.   The incorporation of a
legal standard from one statute into a claim advanced under another
is impermissible.[12]

     In any event, the record here is distinguishable from the
cases on which lead plaintiff relies because, unlike in lead
plaintiff's citations, defendants did not sign any statement that
is alleged to contain false information, and specifically did not
sign the allegedly false 2013 Form 20-F.   For example, in CINAR,
186 F. Supp. 2d at 305-06, the Court exercised specific
jurisdiction over the Canadian general counsel based "solely on
her signing the 1999 Registration Statement," which was itself
alleged to contain false statements.   Id. at 287.   In re Alstom

_____

     [12] Even if the statutory scheme were applicable to Section 10(b) claims,
whether Koutsomitopoulos and Papanicolaou can be held liable for the statements
made in the Offering Documents is an entirely different question from whether
the Court can exercise jurisdiction over these Director Defendants on the basis
of minimum contacts arising from the Offering Documents.   Indeed, in support of
its argument, lead plaintiff refers the Court to a separate brief that seeks to
establish the liability of defendants.   See ECF No. 242 at 21 (citing to ECF
No. 250 at 7, 11-15).

SA, 406 F. Supp. 2d 346, 399, 401 (S.D.N.Y. 2005); Rex & Roberta Ling Living Tr. u/a Dec. 6, 1990 v. B Commc'ns Ltd., No. 17 Civ. 4937, 2019 WL 1407453, at *6 (S.D.N.Y. Mar. 28, 2019); and In re Veon Ltd. Sec. Litig., No. 15 Civ. 08672, 2018 WL 4168958, at *6 (S.D.N.Y. Aug. 30, 2018), are all similar.  In each of those cases, the Court found minimum contacts where a foreign defendant signed statements of a company that traded on a United States exchange that actually were alleged to contain the false information.

Nor is the Court convinced by lead plaintiff's argument, based on Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. 135, 142 (2011), that Papanicolaou and Koutsomitopoulos "made" the Registration Statement because they "signed" it.  Again, neither defendant signed the fraudulent documents later integrated into the Offering Documents, so these documents cannot provide a basis for a finding of minimum contacts.

As Papanicolaou and Koutsomitopoulos correctly note, this case is similar to AstraZeneca, 559 F. Supp. 2d at 467.  There, plaintiffs sought leave to amend the complaint to add an allegation that defendants "signed AstraZeneca's F-3 [which presumably contained no material misstatement], an SEC filing that incorporated AstraZeneca's 2003 20-F (which the complaint alleges contains material misstatements)."  Id.  The court explained that the "signing, undoubtedly in a foreign country, is insufficient

for personal jurisdiction[.]" Id.[13] Here, too, Papanicolaou and Koutsomitopoulos signed a Form F-3 and amendment thereto in July and August 2013, neither of which themselves are alleged to contain fraudulent statements. Compl. ¶¶ 249-52. In AstraZeneca, where the allegedly fraudulent Form 20-F was combined with the Form F-3 simultaneously with its signing, the court observed that it would not exercise jurisdiction. Similarly, here, where the allegedly fraudulent Form 20-F was not combined with the Form F-3 until sixteen months later, this Court will not exercise jurisdiction.

The Court also does not find minimum contacts in connection with Papanicolaou or Koutsomitopoulos arising from their approval of either the Repurchase or the HEC Acquisition. Crucially, there is no allegation that the Special Committee of the Board, which approved the HEC Acquisition, "expressly aimed" their conduct at the United States. Calder, 465 U.S. at 789. Similarly, there is no indication from the complaint that the independent committee of the Board's approval of the Repurchase was anything more than "mere untargeted negligence." Id. Nor, for that matter, is it alleged that either Papanicolaou or Koutsomitopoulos were among the special committee members who approved the Repurchase. Compl. ¶ 421 (referencing a "specific committee of Aegean's board

---

[13] The Court acknowledges that the AstraZeneca court's analysis in this case was dicta, but nevertheless agrees with its rationale. Lead plaintiff does not cite any case law to the contrary.

(presumably the outside directors)"); see also id. ¶¶ 178-190. Further, contrary to lead plaintiff's argument, Papanicolaou's statement in a February 20, 2018 press release also is not sufficient to establish personal jurisdiction. There, Papanicolaou stated that the HEC Acquisition was the "first decisive step in the direction of combining higher profitability for our shareholders with environmental sustainability and social accountability." Id. ¶ 316. But there is no allegation that Papanicolaou signed the SEC filing attaching this press release. See, e.g., Das, 332 F. Supp. 3d at 801 (declining to exercise jurisdiction where defendant made a statement in a Form 6-K that the signing of Investment Framework was "culmination of . . . tremendous work").

Finally, lead plaintiff argues that the Court can exercise personal jurisdiction over Papanicolaou and Koutsomitopoulos because they were members of the Audit Committee who oversaw Deloitte Greece's and PwC Greece's audits of Aegean. But again, personal jurisdiction does not follow from an oversight role absent an allegation that Papanicolaou and Koutsomitopoulos "expressly aimed" their behavior on the Audit Committee toward the United States. Calder, 465 U.S. at 789.

As Papanicolaou's and Koutsomitopoulos' alleged statements and actions are insufficient for a finding of minimum contacts

under the effects test, the Court grants Papanicolaou and Koutsomitopoulos' motion to dismiss.[14]

### 3. Fokas

Fokas, a Board member and General Counsel and Secretary of Aegean since June 2005, as well as a member of a firm that provided counsel to Aegean, moves to dismiss for lack of personal jurisdiction.[15] Lead plaintiff alleges that the Court has specific jurisdiction over Fokas because he voted to approve the HEC Acquisition, participated in insider trading, and visited the United States for expansion efforts. Lead plaintiff also alleges that there is specific personal jurisdiction over Fokas on the basis of three alleged statements that he made: his signature on the Form F-3, his signature on the Prospectus (the amendment to the Form F-3), and a statement made on a quarterly conference call. None of these allegations are sufficient to support the Court's exercise of personal jurisdiction over Fokas.

As an initial matter, many of lead plaintiff's jurisdictional allegations with respect to Fokas are nothing more than group pleading regarding the "Company Defendants," "Officer Defendants," "management," and the "Board." See, e.g., Compl. ¶¶ 12, 21, 145,

---

[14] As the Court does not find that Papanicolaou or Koutsomitopoulos have minimum contacts with the United States sufficient to establish specific personal jurisdiction, the Court does not engage in a reasonableness analysis.

[15] As Fokas does not live or work in the United States, there is no general jurisdiction over him.

147, 219.  "Such conclusory labels and allegations will not do."
Braskem, 246 F. Supp. 3d at 770 (internal quotation marks and
citation omitted).  Further, Fokas' status as an officer, without
more, does not give rise to jurisdiction.  In re Rhodia S.A. Sec.
Litig., 531 F. Supp. 2d 527, 542 (S.D.N.Y. 2007) (finding no
jurisdiction over executives who were French citizens and
residents because being an executive "does not, without more,
amount to sufficient minimum contacts with the forum").  Next, for
the same reasons that the Court declined to exercise jurisdiction
over Papanicolaou and Koutsomitopoulos based on their Board
membership, signatures on the Shelf Registration Statement, and
approval of the HEC Acquisition,[16] the Court declines to exercise
jurisdiction over Fokas.

Moreover, lead plaintiff's additional jurisdictional
allegations regarding Fokas fail because they lack specificity.
For the Court to exercise jurisdiction, "[p]laintiff must
demonstrate that the [defendants'] suit-related conduct creates
minimum contacts . . . not simply that the [defendants have] a
presence here or conduct business activities here in general."  7
W. 57th St., 2015 WL 1514539, at *10 (alterations in original).
Lead plaintiff alleges that Fokas made a statement on a quarterly

---

[16] In any event, the complaint does not allege that Fokas, specifically,
voted in favor of the HEC Acquisition.  See, e.g., Compl. ¶¶ 21, 197, 315.

conference call on November 17, 2016.  Compl. ¶ 57.  In the absence of any indication of what Fokas said, there is no basis to evaluate the allegation.  Likewise, there is no basis to find jurisdiction from alleged but undescribed visits by Fokas to the United States as part Aegean's "expansion" efforts.

Next, having woefully failed to identify any statement or meaningful contact, lead plaintiff turns its attention to Fokas' unspecified stock sale contemporaneous to the Repurchase.  Compl. ¶ 332; see also id. ¶¶ 533-540.  Crucially, as distinct from Melissanidis, there is no specific allegation that Fokas was aware of the Fraudulent Scheme.  In the absence of allegations sufficient to support Fokas' knowledge of the Fraudulent Scheme such that he would be aware that the stock price was inflated, the sale of stock by a director or officer of a foreign corporation traded in the United States is an insufficient predicate for the assertion of jurisdiction.[17]  For that reason, lead plaintiff's reliance on SEC v. Euro Sec. Fund, No. 98 Civ. 7347, 1999 WL 76801, at *3 (S.D.N.Y. Feb. 17, 1999), is inapposite.  There, the Court exercised personal jurisdiction over defendants alleged to possess insider information about a tender offer, but there is no similar non-conclusory factual allegation here.

---

[17] The absence of such allegations also eliminates a predicate for a Section 20A claim.

As lead plaintiff's scattered allegations about Fokas' role, statements, and actions do not support a finding of minimum contacts with the United States, the Court grants Fokas' motion to dismiss.[18]

\*\*\*

In sum, because lead plaintiff failed to plead that Papanicolaou, Koutsomitopoulos, or Fokas have minimum contacts with the forum sufficient for the Court to exercise personal jurisdiction over them, lead plaintiff's claims against each of these individual defendants are dismissed.   Likewise, lead plaintiff's Section 10(b), 20(a), and 20(b) claims against Melissanidis are dismissed.[19]

## III.  Service[20]

McIlroy, the President of Aegean from July 2017 until November 15, 2018, argues that the Court should dismiss the claims against

---

[18] As the Court does not find that Fokas has minimum contacts with the United States sufficient to establish specific personal jurisdiction, the Court does not engage in a reasonableness analysis.

[19] In the event that the Court granted any of the Rule 12(b)(2) motions, lead plaintiff requested an opportunity to conduct limited discovery of the defendants who asserted personal jurisdiction defenses, including with respect to their attendance of annual shareholder meetings, locations of Board and Audit Committee meetings, travels to the United States, contacts with Deloitte US and PwC US, contacts with Aegean Bunkering (USA) LLC, and contacts with MEG.   ECF No. 242 at 40.   Lead plaintiff fails to explain how evidence arising from this discovery would cure the deficiencies in its current jurisdictional allegations, and therefore "its passing request for jurisdictional discovery is denied." Hitachi Data Sys. Credit Corp. v. Precision Discovery, Inc., 331 F. Supp. 3d 130, 147 n.3 (S.D.N.Y. 2018).

[20] As distinct from the rest of the Memorandum and Order, facts in this section are derived from the Declaration of Jonathan McIlroy, ECF No. 227, and

him on the basis of insufficient service of process pursuant to Federal Rule of Civil Procedure 12(b)(5), as lead plaintiff only served him at his former residence and made no attempt to serve him at his actual home.  "Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., 484 U.S. 97, 104 (1987).

McIlroy is a British citizen who owns an apartment in London. However, since 2014, he has continuously lived in the UAE and neither votes nor pays taxes in in England.  According to lead plaintiff, counsel searched for McIlroy's addresses in both London and Dubai and was unable to find a record of his residence in Dubai.  Lead plaintiff's counsel thus decided to use McIlroy's London address and proceeded to deliver the summons and complaint to that address.  McIlroy learned about this lawsuit when a former neighbor emailed him to tell him that a large parcel was at his former doorstep in the United Kingdom.  A friend then sent the package to McIlroy in Dubai, and upon receipt, he understood that he was a named defendant in this case.

Lead plaintiff claims that service at McIlroy's apartment in London is sufficient under the Hague Convention, a treaty to which the United Kingdom is a signatory.  McIlroy does not challenge

---

the Poppler Declaration of June 30, 2020, ECF No. 247.

that service would have been proper if he lived in London; instead, he argues that service was improper because he was not served at his home in Dubai.

**A. Legal Standard**

When serving a person in a foreign country, Federal Rule of Civil Procedure 4(f) provides three acceptable means of service:

> (1) by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the . . . Hague Convention; (2) if there is no internationally agreed means, or if an international agreement allows but does not specify other means . . . as prescribed by the foreign country's law for service in that country . . . ; or (3) by other means not prohibited by international agreement, as the court orders.

Fed. R. Civ. P. 4(f).

**B. Analysis**

The Court finds that McIlroy was not properly served, and consequently that the claims against him must be dismissed.

As an initial matter, service pursuant to Rule 4(f)(1) via the Hague Convention to McIlroy's apartment in the United Kingdom was improper because McIlroy does not live in the United Kingdom. The Hague Convention requires that the defendant be served at his address — the actual, current place where he lives. See Hague Convention, Art. 1 ("This Convention shall not apply where the

address of the person to be served with the document is not known").

Lead plaintiff's reliance on <u>Devi v. Rajapaska</u>, No. 11 Civ. 6634, 2012 WL 309605, at *2 (S.D.N.Y. Jan. 31, 2012), is completely distorted.  There, the Court ordered that plaintiff attempt to use the Hague Convention to serve the defendant who actually resided in the country in question, which was a signatory to the Hague Convention.  <u>Id.</u>  Here, by contrast, McIlroy does not reside in the United Kingdom and the country in which he does reside is not a Hague Convention signatory.  Accordingly, lead plaintiff was not permitted to rely on Rule 4(f)(1) to effectuate service on McIlroy.[21]

Lead plaintiff next attempts to rely on Rule 4(f)(2) to establish that service was proper by arguing that service was compliant with the United Kingdom's service laws.  However, United Kingdom law itself requires that a defendant be served through a letterbox at defendant's "[u]sual or last known residence."  UK CPR 6.3(1)(c) and 6.9; <u>see also</u> UK CPR 6.9(3) ("[w]here a claimant has reason to believe that the address of the defendant . . . is

---

[21] That McIlroy ultimately received notice of the lawsuit because of the fortuity that his friend mailed him the complaint is insufficient to confer proper service. <u>Zen Music, Inc. v. CVS Corp.</u>, No. 98 Civ. 4246, 1998 WL 912102, at *2 (S.D.N.Y. Dec. 30, 1998) ("Actual receipt of notice alone, however, cannot cure an otherwise defective service.").

an address at which the defendant no longer resides . . . the claimant must take reasonable steps to ascertain the address of defendant's current residence"). While in other circumstances it may have been appropriate to rely on a receipt from the United Kingdom attesting to service, such reliance here is not well-placed because lead plaintiff knew when it served that McIlroy did not live in the United Kingdom. Thus, to actually effect service, lead plaintiff should have sought to serve McIlroy in the UAE by internationally agreed means, or, if no such means exist, in compliance with UAE law.

Moreover, having experienced challenges in determining McIlroy's address in the UAE, plaintiff could have moved for alternative service pursuant to Rule 4(f)(3). This Court has granted such motions where countries are not signatories to an internationally agreed means of service and where plaintiff cannot determine defendant's address. See, e.g., Ehrenfeld v. Salim a Bin Mahfouz, No. 04 Civ. 9641, 2005 WL 696769, at *2 (S.D.N.Y. Mar. 23, 2005) (finding alternative service appropriate where defendant's home, Saudi Arabia, is not a Hague Convention member, personal service would be challenging, and plaintiff's counsel could not discern defendant's address address); In re GLG Life Tech Corp. Sec. Litig., 287 F.R.D. 262, 264, 268 (S.D.N.Y. 2012) (granting alternative service where plaintiff could not find a

Canadian defendant's residential address in China).  However, lead plaintiff failed to make such a motion and it is now too late to do so since the statute of limitations has long since run.  Tr. of Oral Arg., Mar. 9, 2021, at 25:13-25.  Thus, the Court grants McIlroy's motion to dismiss.

*** 

Having concluded that the Court cannot exercise personal jurisdiction over Papanicolaou, Koutsomitopoulos, and Fokas, and that McIlroy is dismissed from the case as a result of improper service, the Court will proceed as follows.  First, the Court will determine whether the lead plaintiff has alleged actionable claims against the Greek Auditors; second, the Court will determine whether the lead plaintiff has alleged actionable claims for control liability against the Global and US Auditors; third, the Court will determine whether the lead plaintiff has alleged actionable claims against the remaining Officer and Director Defendants pursuant to Sections 10(b) and 20(a); and fourth, the Court will determine whether the lead plaintiff has alleged an actionable claim against Gianniotis and Melissanidis pursuant to Section 20A.

## IV.  Exchange Act Claims

Before addressing the sufficiency of lead plaintiff's causes of action, we describe the applicable legal standards.

-61-

**A. Legal Standard**

Lead plaintiff's first and seventh claims are brought under Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, and lead plaintiff's second claim is brought under Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c).

Section 10(b) of the Exchange Act prohibits the use or employment of "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of a security in contravention of rules and regulations prescribed by 15 U.S.C. § 78j(b). SEC Rule 10b-5(b), promulgated thereunder, makes it "unlawful for any person. . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). SEC Rule 10b-5(a) and (c) make it "unlawful for any person . . . (a) [t]o employ any device, scheme, or artifice to defraud . . . or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." Id. §§ 240.10b-5(a), (c).

**1. Pleading Standard**

At the outset, to state a claim under Section 10(b) of the Exchange Act, plaintiffs must satisfy the heightened pleading

requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Fed. R. Civ. P. 9(b); Pub. L. No. 104-67, 109 Stat. 737.   "The PSLRA mandated a uniform national pleading standard for securities fraud actions that mimics the standard the Second Circuit had derived from Rule 9(b), except insofar as the PSLRA requires particularity in the pleading of the requisite mental state."   In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 615-16 (S.D.N.Y. 2005).

Importantly, "[w]hen fraud is alleged against multiple defendants, a plaintiff must set forth separately the acts complained of by each defendant.   A complaint may not simply clump defendants together in vague allegations to meet the pleading requirements of Rule 9(b)."   In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 641 (S.D.N.Y. 2007).   The "failure to isolate the key allegations against each defendant supports dismissal under the standards set forth in Twombly and Iqbal."   Ochre LLC v. Rockwell Architecture Planning & Design, P.C., No. 12 Civ. 2837, 2012 WL 6082387, at *6 (S.D.N.Y. Dec. 3, 2012), aff'd, 530 F. App'x 19 (2d Cir. 2013).

As applicable to auditors, this District has "declined to treat different firms as a single entity, holding them liable for one another's acts, simply because they shared an associational

name and/or collaborated on certain aspects of a transaction." Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP, No. 03 Civ. 0613, 2004 WL 112948, at *3 (S.D.N.Y. Jan. 22, 2004); see also In re Asia Pulp & Paper Sec. Litig., 293 F. Supp. 2d 391, 396 (S.D.N.Y. 2003) (rejecting "the 'one-firm,' unified-company theory").

### 2. Misstatements or Omissions

To sustain a private cause of action under section 10(b) and Rule 10b-5(b), "a plaintiff must [adequately plead] (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 267 (2014) (internal quotation marks omitted).

In the context of Rule 9(b)'s requirements, plaintiffs making allegations of misrepresentations or omissions under Rule 10b-5(b) must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004).

### 3. Scheme Liability

"Scheme liability under subsections (a) and (c) of Rule 10b-5 hinges on the performance of an inherently deceptive act that is

distinct from an alleged misstatement." <u>In re Smith Barney
Transfer Agent Litig.</u>, 884 F. Supp. 2d 152, 161 (S.D.N.Y. 2012).
"To state a claim under Rule 10b-5(a) or (c), the plaintiff must
allege that the defendant (1) committed a deceptive or manipulative
act, (2) with <u>scienter</u>, that (3) the act affected the market for
securities or was otherwise in connection with their purchase or
sale, and that (4) defendants' actions caused the plaintiffs'
injuries." <u>In re ForceField Energy Inc. Sec. Litig.</u>, No. 15 Civ.
3020, 2017 WL 1319802, at *7 (S.D.N.Y. Mar. 29, 2017) (citing <u>In
re Parmalat Sec. Litig.</u>, 376 F. Supp. 2d 472, 491-92 (S.D.N.Y.
2005)) (internal quotation marks omitted).

With respect to pleading requirements, "[b]ecause scheme
liability does not require an allegation that the defendant made
a statement, claims brought under Rule 10b-5(a) and (c) need not
comport with Subsection (b)(1) of the PSLRA, which requires that
a plaintiff set forth each statement alleged to have been
misleading, and facts giving rise to this belief." <u>Menaldi v.
Och-Ziff Capital Mgmt. Grp. LLC</u>, 164 F. Supp. 3d 568, 577 (S.D.N.Y.
2016) (citing <u>Alstom</u>, 406 F. Supp. 2d at 474) (internal quotation
marks omitted).  However, Federal Rule of Civil Procedure 9(b)
requires plaintiff to "state with particularity what deceptive or
manipulative acts were performed, which defendants performed them,
when the acts were performed, and the effect the scheme had on

investors in the securities at issue." Id. (citing In re Parmalat Sec. Litig., 383 F. Supp. 2d 616, 622 (S.D.N.Y.2005)).

### 4. Scienter

The PSLRA requires that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "The requisite state of mind in a Section 10(b) and Rule 10b-5 action is an intent 'to deceive, manipulate, or defraud.'" ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007)). The inference must be more than merely reasonable or permissible; it must be "cogent and compelling," i.e., "strong in light of other explanations." Tellabs, 551 U.S. at 324. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id.

With respect to claims of misstatement or omission pursuant to Rule 10b-5(b), "[t]he PSLRA expanded on the Rule 9(b) standard, requiring that securities fraud complaints specify each misleading statement; that they set forth the facts on which a belief that a statement is misleading was formed; and that they state with particularity facts giving rise to a strong inference that the

defendant acted with the required state of mind." <u>Anschutz Corp.</u>
<u>v. Merrill Lynch & Co.</u>, 690 F.3d 98, 108 (2d Cir. 2012) (citing
<u>Dura Pharms., Inc. v. Broudo</u>, 544 U.S. 336, 345 (2005)) (internal
quotation marks and alterations omitted).

Scheme liability claims also are subject to the PSLRA pleading
standard with respect to scienter. <u>Menaldi</u>, 164 F. Supp. 3d at
577. To state a scheme liability claim, therefore, a plaintiff
must plead facts demonstrating "a strong inference that the
defendant acted with the required state of mind." <u>Tellabs</u>, 551
U.S. at 321.

A strong inference of fraud may be established by alleging
facts demonstrating: "(1) that defendants had the motive and
opportunity to commit fraud, or (2) strong circumstantial evidence
of conscious misbehavior or recklessness." <u>ECA</u>, 553 F.3d at 198.
"In order to raise a strong inference of scienter through 'motive
and opportunity' to defraud, [p]laintiff[] must allege that
[defendants] 'benefitted in some concrete and personal way from
the purported fraud.'" <u>Id.</u> (citing <u>Novak</u>, 216 F.3d at 307–08).
Where a plaintiff does not make a showing of motive, "the strength
of the circumstantial allegations [of conscious misbehavior or
recklessness] must be correspondingly greater." <u>Id.</u> at 198–99
(citing <u>Kalnit v. Eichler</u>, 264 F.3d 131, 142 (2d Cir. 2001)); <u>see</u>
<u>also</u> <u>S. Cherry St., LLC v. Hennessee Grp. LLC</u>, 573 F.3d 98, 109

-67-

(2d Cir. 2009) (defining recklessness as conduct that is "highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it") (internal quotation marks and alteration omitted).

### a. Auditor Scienter

Lead plaintiff brings Exchange Act claims against six auditors. In order to successfully plead auditor scienter, plaintiff "must prove that the accounting practices were so deficient that 'the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.'" Refco, 503 F. Supp. 2d at 658 (citing SEC v. Price Waterhouse, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992)). "Bare allegations of disregarded auditing standards are insufficient to plead scienter against an outside auditor for the purposes of Section 10(b)." In re Longtop Fin. Techs. Ltd. Sec. Litig., 910 F. Supp. 2d 561, 576 (S.D.N.Y. 2012). It follows that "[m]ere allegations of GAAP violations or accounting irregularities, or even a lack of due diligence, will not state a securities fraud claim absent evidence of corresponding

fraudulent intent." <u>In re Advanced Battery Techs., Inc.</u>, 781 F.3d 638, 644 (2d Cir. 2015) (internal citations and quotation marks omitted).

"Only where such allegations are coupled with evidence of corresponding fraudulent intent, might they be sufficient. A complaint may show this corresponding fraudulent intent through allegations that the auditor disregarded red flags." <u>Longtop</u>, 910 F. Supp 2d. at 576; <u>see also</u> <u>In re Complete Mgmt. Inc. Sec. Litig.</u>, 153 F. Supp. 2d 314, 334 (S.D.N.Y. 2001) ("It is unambiguously the law that allegations of a violation of GAAP and GAAS are, without more, insufficient to survive a motion to dismiss. However . . . such allegations may be one of several 'red flags' that support an inference of scienter").

"[A]uditor scienter can be established by allegations that the auditor was aware of 'red flags' of fraud and yet recklessly disregarded them." <u>Athale v. SinoTech Energy Ltd.</u>, No. 11 Civ. 0531, 2014 WL 687218, at *7 (S.D.N.Y. Feb. 21, 2014), <u>on reconsideration in part</u>, No. 11 Civ. 05831, 2014 WL 12674464 (S.D.N.Y. Apr. 17, 2014). However, "the red flags must be so obvious that knowledge of them by the auditor can be presumed." <u>Longtop</u>, 910 F. Supp. 2d at 576-77 (internal quotation marks omitted). That said, "[b]ecause it is elementary that, on a motion to dismiss, the Complaint must be read as a whole, the red flags

-69-

must be viewed in the aggregate; defendants cannot secure dismissal by cherry-picking only those allegations susceptible to rebuttal and disregarding the remainder." Refco, 503 F. Supp. 2d at 658 (internal quotation marks and citations omitted).

### 5. Control Liability

"To state a claim of control person liability under § 20(a), a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 236 (2d Cir. 2014) (internal quotation marks omitted). With respect to the second factor, "[t]he Section 20(a) defendant must not only have actual control over the primary violator, but have actual control over the transaction in question." Floyd v. Liechtung, 10 Civ. 4254, 2013 WL 1195114, at *6 (S.D.N.Y. March 25, 2013) (citation omitted; emphasis in original). Courts in this District differ with respect to whether plaintiff must allege facts supporting the third factor in order to state an actionable control liability claim. However, "this Court has consistently sided with most judges in the District and found that a plaintiff must plead culpable participation with scienter." ForceField, 2017 WL 1319802, at *16. To plead the culpable participation element of

a Section 20(a) claim, a plaintiff "must allege facts indicating that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct." Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd., 33 F. Supp. 3d 401, 439 (S.D.N.Y. 2014) (internal quotation marks omitted).

**B. Greek Auditors**

Claim 7, brought under Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, is directed to the Greek Auditors. The parties do not dispute that the Aegean audit opinions signed by the Greek Auditors included actionable misstatements or omissions. Accordingly, only scienter is at issue.

Lead plaintiff argues that the Greek Auditors are responsible for losses to investors because when they issued their respective clean, unqualified audit opinions in 2013 through 2016, they knew about or were reckless in ignoring a series of red flags that should have put them on notice of the Fraudulent Scheme. Lead plaintiff therefore argues that the Greek Auditors violated auditing standards.[22] The Greek Auditors move to dismiss these

---

[22] Specifically, lead plaintiff alleges that the Greek Auditors were required to conduct their audits of Aegean's financials and internal controls in compliance with the standards of the Public Company Accounting Oversight Board ("PCAOB"), which establishes professional audit standards applicable to audits of certain issuers who trade publicly on United States markets.

claims on the ground that lead plaintiff has failed to adequately allege any facts giving rise to an inference of scienter.

Deloitte Greece issued unqualified audit opinions on Aegean's consolidated financial statements for 2013 through 2015. Compl. ¶ 78. These audit opinions were included in Aegean's Form 20-F filings with the SEC. Id. In 2013 and 2015, Deloitte Greece also issued unqualified audit opinions in connection with its review of Aegean's internal controls over financial reporting. Id. Only Deloitte Greece — and not Deloitte Touche or Deloitte US — signed Deloitte Greece's audit opinions. Id. ¶¶ 452, 454, 458, 460, 462, 464, 469. After dismissing Deloitte Greece on June 20, 2016, Aegean hired PwC Greece to conduct its audit for 2016, and PwC issued an unqualified audit opinion for 2016. Id. ¶ 86. The opinion was disseminated to investors in the United States and elsewhere. Id.

Central to lead plaintiff's scienter claim are thirteen red flags, which plaintiff alleges the Greek Auditors ignored. They include:

(1) Melissanidis' criminal background and history of legal issues, id., ¶¶ 364-370;

(2) Melissanidis' large holdings in Aegean and ability to exercise control over the company, id. ¶¶ 371-78;

(3) the facilitation of the Facility, including the 2010 transaction wherein Aegean acquired AOTC and its obligations under a 25-year lease on a property in Fujairah for no consideration and subsequent payments for

the construction of an oil storage facility there, including through OilTank, id. ¶¶ 381-87;

(4) a 2005 marine fuel supply service agreement between Aegean and a related-party, Aegean Oil S.A., id. ¶¶ 389-93;

(5) freight service agreements between Aegean and a related-party, Aegean V, id. ¶ 395;

(6) a 2006 Registration Rights agreement between Aegean and related-party, Leveret International Inc., whereby Aegean agreed to pay some of Leveret's administrative expenses, id. ¶¶ 397-99;

(7) an increase in Aegean's accounts receivable between the fiscal years of 2015 and 2017, id. ¶¶ 401-02;

(8) related-party Aegean Shipping Management S.A.'s failure to make payments due to Aegean on sales of marine petroleum in 2015 and 2016, id. ¶¶ 408-10;

(9) the failure of various UAE companies to make payments due under contracts with AOTC, id. ¶ 412;

(10) unpaid bills and financial losses at related party General Maritime Corporation, an entity with which Aegean transacted and for which Deloitte US performed audits, id. ¶ 415;

(11) the Repurchase, i.e., Melissanidis' sale of his shares to the Company at allegedly inflated prices in August 2016, id. ¶ 421;

(12) the so-called liquidity crisis Aegean faced after it repurchased Melissanidis' shares in Aegean, id. ¶¶ 424-25; and

(13) material weaknesses in Aegean's internal controls that Aegean management identified and disclosed in its 2014 Form 20-F, which were not addressed in Deloitte Greece's FY 2015 clean audit or PwC Greece's FY 2016 clean audit, id. ¶¶ 426-429.[23]

To a lesser extent, in support of its argument that the Greek Auditors knew about the Fraudulent Scheme or acted recklessly in failing to know about it, lead plaintiff also relies on the

---

[23] Red flags 7 (in part), 11, and 12 occurred after Aegean dismissed Deloitte Greece, and thus Deloitte Greece could not have been aware of them.

magnitude of the fraud, certain PCAOB-issued Inspection Reports, and the alleged rapidity with which the Reconstituted Audit Committee uncovered the fraud.

### 1. Analysis

#### a. Red Flags

Our analysis of lead plaintiff's position that the existence of numerous, serious red flags is sufficient to establish scienter begins with the recognition that the proper analytical framework is to consider the red flags as a collective whole. Refco, 503 F. Supp. 2d at 658 ("the red flags must be viewed in the aggregate; defendants cannot secure dismissal by cherry-picking only those allegations susceptible to rebuttal") (internal quotation marks omitted).   As we are able to reach a conclusion based on a collective view of the red flags, we need not delve into each of the Greek Auditors' specific arguments, which seek to negate each red flag either because it was disclosed by Aegean or because lead plaintiff does not allege that the Greek Auditors were aware of it.   Nonetheless, we will address some of their arguments as to why individual red flags should be ignored to illustrate that the Greek Auditors' efforts to avoid responsibility are wholly unpersuasive.

Were the Greek Auditors encountering these red flags in isolation, the Court recognizes that they would not necessarily be

sufficient to give rise to an inference of scienter.  For example, with respect to the multiple related-party transactions, the Greek Auditors are correct that "indicators of related-entity status are not, under traditional theories of auditor scienter, tantamount to red flags of fraud."  Iowa Pub. Employees' Ret. Sys. v. Deloitte & Touche LLP, 973 F. Supp. 2d 459, 466 (S.D.N.Y. 2013), aff'd, 558 F. App'x 138 (2d Cir. 2014).  And on the question of the Repurchase, in isolation, the Greek Auditors' "failure to uncover and appreciate the significance of the inflated price . . . does not represent an extreme departure from the standards of ordinary care."  In re Advanced Battery Techs., Inc., 781 F.3d 638, 646 (2d Cir. 2015) (internal quotation marks omitted).  Likewise, on the issue of the internal control remediation, "it is unlikely that an auditor would investigate, discover, and disclose internal control deficiencies when it had no obligation to do so, only to turn a blind eye to them after being engaged to ferret them out."  In re Longtop Fin. Techs. Ltd. Sec. Litig., 939 F. Supp. 2d 360, 387 (S.D.N.Y. 2013).

However, the essential analytical factor here is that the Greek Auditors are not alleged to have encountered the red flags in isolation.  Indeed, the Greek Auditors themselves acknowledge that the proper framework requires the Court to assess the thirteen red flags together.  Tr. of Oral Arg., Mar. 9, 2021, at 26:22-23.

As alleged, the Greek Auditors were presented with, <u>inter alia</u>, a significant number of related-party transactions, unpaid accounts, escalating receivables, and a founder and former CEO who still maintained significant control over the company and who benefitted from an expensive share buyback, which was followed by liquidity issues at the company.  Indeed, we need not hold and do not hold that all of the red flags were necessary to put the Greek Auditors on notice.  However, the laundry list of red flags alleged should have "prompted further investigation" on the part of the Greek Auditors.  <u>In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.</u>, No. 13 Civ. 214, 2014 WL 285103, at *6 (S.D.N.Y. Jan. 27, 2014).  Their failure to undertake such an investigation supports a strong inference that the Greek Auditors intentionally or recklessly ignored red flags.[24]

Notwithstanding their position to the contrary expressed at oral argument, Tr. of Oral Arg., Mar. 9, 2021 at 26:22-23, in their submissions, the Greek Auditors attempt to dismiss the red flags

---

[24] This conclusion is not at odds with <u>Kravitz as Tr. of Aegean Litig. Tr. v. Tavlarios</u>, No. 19 Civ. 8438, 2020 WL 3871340, at *9 (S.D.N.Y. July 8, 2020), discussed <u>infra</u>.  There, the trustee alleged that Nikolas Tavlarios, Georgiopoulos, John Tavlarios, and Konomos (directors and an officer resident in the United States) failed to recognize red flags in the context of Aegean's monitoring and internal controls system.  Here, lead plaintiff alleges that the Greek Auditors, who were hired to review internal controls and to act as Aegean's monitoring system, failed to recognize these and additional red flags.  <u>In re Philip Servs. Corp. Sec. Litig.</u>, 383 F. Supp. 2d 463, 475 (S.D.N.Y. 2004) (finding that auditor must have noticed and chosen to ignore red flag where red flags would be "clearly evident to any auditor performing its duties").

by relying on essentially two arguments.  First, they argue that many of the alleged red flags were publicly disclosed. Specifically, the Greek Auditors argue that Melissanidis' criminal history, numerous related-party transactions, the details of the Repurchase, and deficiencies in internal controls in 2014 were all disclosed by Aegean in its SEC filings.  Second, the Greek Auditors argue that the complaint does not allege that the Greek Auditors knew about certain of the red flags, including that Melissanidis owned OilTank and that the Repurchase would trigger a liquidity crisis.  Viewed holistically, the Greek Auditors' arguments amount to a virtual abandonment of their professional obligations.  On the one hand, they need not investigate what was disclosed by Aegean, and on the other, they could not investigate what was not openly disclosed.

First, that many of the red flags alleged were disclosed in SEC filings in no way absolves the Greek Auditors of their responsibility to review them critically.  The Greek Auditors rely on the proposition that "an inference of scienter based on publicly available red flags is simply not as cogent and compelling as the opposing inference of nonfraudulent intent."  <u>Saltz v. First Frontier, LP</u>, 782 F. Supp. 2d 61, 72 (S.D.N.Y. 2010), <u>aff'd sub nom. Saltz v. First Frontier, L.P.</u>, 485 F. App'x 461 (2d Cir. 2012).  However, the disclosure of red flags does not foreclose an

inference of scienter.  <u>Gould v. Winstar Commc'ns, Inc.</u>, 692 F.3d 148, 159 n.10 (2d Cir. 2012) ("'[p]rofessional skepticism should be exercised throughout the audit process,' and requires the employment of 'a questioning mind' in the 'gathering and objective evaluation of evidence,' including with regard to representations by management" (quoting GAAS, AU §§ 230.07-08)).  Here, the combination of Melissanidis' reputation and history, the cost overruns at the Facility, related-party transactions, and escalating receivables called for heightened scrutiny by the Greek Auditors.  Based on the allegations in the complaint, we are thus persuaded that had either Greek Auditor conducted "any kind of audit at all, [it] would have seen the potential problems . . . and the need to investigate further."  <u>Complete Mgmt.</u>, 153 F. Supp. 2d at 334.[25]

Relatedly, attempting to offload their own recklessness, the Greek Auditors suggest that investors could have reviewed the public information, just as the Greek Auditors did, to uncover potential fraud.  This argument is exceptionally unattractive for

---

[25] The Greek Auditors attempt to differentiate <u>Complete Mgmt.</u>, 153 F. Supp. 3d 314, on the basis that there: a single counterparty owed the growing receivables at issue; a significant overlap existed between the audited company and the counterparty (which created potential self-dealing); and the audited company was dependent on the counterparty.  <u>See</u> ECF No. 272 at 9.  The Court is puzzled by this attempted distinction because here, too, lead plaintiff alleges that the growing receivables were connected, at least in part, to transactions with related entities.  Compl. ¶ 401 ("As auditors, the Auditor Defendants would have had access to the Company's accounts receivables aging reports, which would have revealed the scope and the source of the mounting accounts receivables, some of which relate to receivables with related parties").

the obvious reasons that the Greek Auditors were hired to perform an auditing function on behalf of Aegean and its investors, and the investors did not have the same level of access to Aegean's records.   The investors, moreover, were appropriately assured by the Greek Auditors' clean audit opinions.   It should go without saying that "it is unreasonable to expect investors to independently verify an international corporation['s] financial figures after an accounting firm has independently completed an audit . . . ."   Ho v. Duoyuan Glob. Water, Inc., 887 F. Supp. 2d 547, 565 (S.D.N.Y. 2012).

With respect to their second argument that they were ignorant of certain facts, the Greek Auditors argue that "pleading the existence of red flags does not establish that a defendant was aware of those warning signals."   Stephenson v. PricewaterhouseCoopers, LLP, 482 F. App'x 618, 623 (2d Cir. 2012), as amended (June 13, 2012).   However, the Greek Auditors take an exceedingly limited view of what the Greek Auditors knew and when, and altogether ignore the part of the law that permits an inference of scienter where auditors exhibit "an egregious refusal to see the obvious, or to investigate the doubtful."   Refco, 503 F. Supp. 2d at 658.   For example, while the Greek Auditors acknowledged that they knew that Aegean purchased AOTC from the Melissanidis family and that the Facility was experiencing major delays and

cost overruns, they argue that they did not know that Melissanidis controlled OilTank.   But as lead plaintiff argues, it would have been reasonable, given the high costs, lengthy delays, and known related-party transactions, for the Greek Auditors to examine the Facility and the related transactions in depth.   See Longwei, 2014 WL 285103, at *6 (citing In re Philip Serv. Corp. Sec. Litig., 383 F.Supp.2d 463, 475 (S.D.N.Y. 2004)) ("[W]here the red flags would be clearly evident to any auditor performing its duties it is reasonable to infer that the auditor must have noticed the red flags, but deliberately chose to disregard them") (internal quotation marks omitted).   Their failure to do so amounts to a failure to "investigate the doubtful." Refco, 503 F. Supp. 2d at 658.

### b. Additional Allegations Supporting an Inference of Scienter

In addition to the red flags, lead plaintiff suggests that (1) the magnitude of the fraud, (2) the findings in the PCAOB Inspection Reports, and (3) the Reconstituted Audit Committee's quick discovery of the fraud further support an inference of scienter.   While we are of the opinion that the red flags, viewed in combination, are sufficient to find scienter, for the sake of completeness we address each of the additional arguments.

First, lead plaintiff asserts that the magnitude of the Fraudulent Scheme presents circumstantial evidence of the Greek

Auditors' scienter.  We agree.  While a "fraud's large size, standing alone, is insufficient to show recklessness," we find that the magnitude of the fraud supports an inference of scienter, "just as failing to detect a large boulder in front of your face qualifies as circumstantial evidence of blindness." Athale, 2014 WL 687218, at *11 (internal quotation marks and citations omitted).

On the other hand, we do not find that the PCAOB Reports or the quick discovery of the fraud by the Reconstituted Audit Committee support an inference of scienter.  There are significant issues with lead plaintiff's reliance on the PCAOB Inspection Reports.  First, the Inspection Reports do not refer to issuers by name.  Compl. ¶ 444; ECF No. 240 at 18.  Given the anonymity of the Inspection Reports, it is not clear that the Inspection Reports actually refer to the Aegean audits conducted by the Greek Auditors.  Second, with respect to the Inspection Reports allegedly about PwC Greece, the Reports' dates of coverage do not overlap with PwC's FY 2016 Aegean audit opinion: one of the reports concerns a period that predates PwC's engagement by Aegean, and the other covers a period after Aegean declared bankruptcy.  Compl. ¶ 446; ECF No. 240 at 18-19.  The allegations regarding the PCAOB Inspection Reports thus fall short of Rule 9(b) and PSLRA standards.

Meanwhile, lead plaintiff's contention that "new management quickly unearthed the fraud, and thus it was easily discoverable . . . suffers from hindsight bias." Special Situations, 33 F. Supp. 3d at 434; see also Iowa Pub. Employee's Ret. Sys. V. Deloitte & Touche LLP, 919 F. Supp. 2d 321, 334 (S.D.N.Y. 2013).[26] Therefore, this allegation does not support an inference of scienter.

### c. Auditors' Conduct & Reliability

The Greek Auditors also argue that lead plaintiff failed to allege facts regarding the conduct of the audits or how the audit standards were violated, which is a requirement when pleading scienter. The Greek Auditors contend that lead plaintiff merely provided a "broad citation to 73 consecutive paragraphs in the Complaint." ECF No. 272 at 11 (referencing Compl. ¶¶ 360-433). The Court has reviewed these paragraphs, which detail each of the alleged red flags. The Greek Auditors are correct that the references to the Greek Auditors' precise conduct are scarce, however the complaint systematically describes each of the alleged

---

[26] In any event, the parties dispute the proper timeline for discovery of the fraud. ECF No. 268 at 14-15.

red flags and the PCAOB standards that the Greek Auditors violated when they failed to dig deeper.  See, e.g., Compl. ¶¶ 420, 432.

In any event, where, as here, lead plaintiff's claim against the auditors is that they were reckless, the central theme is what the auditors did not do, rather than their affirmative conduct. In re IMAX Sec. Litig., 587 F. Supp. 2d 471, 483 (S.D.N.Y. 2008) ("A complaint might reach this no audit at all threshold by alleging that the auditor disregarded specific red flags that would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors") (internal quotation marks omitted).  The Court is satisfied that lead plaintiff adequately alleged that the Greek Auditors "disregarded specific red flags" throughout the course of the audits, such that lead plaintiff has adequately alleged the Greek Auditors' conduct. Id.[27]

---

[27] The Greek Auditors go to great lengths to distinguish on In re Philip Servs. Corp. Sec. Litig., 383 F. Supp. 2d 463, 476 (S.D.N.Y. 2004), which held that because details about the audit process were "peculiarly within Deloitte's knowledge," they were "not required at the pleading stage."  The Greek Auditors explain that in Philip, the complaint alleged that the auditors received notice of obvious and suspicious red flags during the audit and chose to ignore them — which is not explicitly alleged here.  ECF No. 272 at 12 n.13.  Regardless, in Philip, plaintiff also alleged, inter alia, an increase in inventories, an inadequate financial reporting system, unrecorded liabilities, and the "obvious simplicity" of the defendant's fraudulent practices.  Id. at 475.  There, the court found that the "multiple allegations of 'red flags,' considered in the aggregate," supported an inference of fraudulent intent.  Id.  We do not think it is too great a leap to draw parallels with the instant complaint, where lead plaintiff has alleged, inter alia, increasing receivables, an inadequate internal controls system, unpaid bills, and numerous related party transactions. Here, like in Philip, the Court does not find lead plaintiff's failure to allege details about the conduct of the audits fatal.  See also Liberty Ridge LLC v. RealTech Sys. Corp., 173 F. Supp. 2d 129, 137 (S.D.N.Y. 2001) ("courts should

### d. <u>Tellabs</u>

Based on the foregoing, the Court is entirely unpersuaded by the Greek Auditors' position: essentially, that the reasonable inference is that the Greek Auditors were fooled by the forgeries and fake accounting documentation allegedly created by individuals at Aegean.  Compl. ¶ 8.  As auditors, it was their job to review Aegean's records and to delve deep into financial documents, including those financial documents purportedly substantiating the escalating receivables and the cost of the Facility.  The appropriate inference to be drawn at this stage from both Greek Auditors' failures to detect the fraud is that both Greek Auditors lapsed in their responsibilities.

The Court does not make such an assessment in a vacuum.  We are aware of cases in this Circuit where the court found that the auditor was plausibly fooled.  <u>See, e.g.</u>, <u>Meridian Horizon Fund, LP v. Tremont Grp. Holdings, Inc.</u>, 747 F. Supp. 2d 406, 413 (S.D.N.Y. 2010), <u>aff'd sub nom.</u> <u>Meridian Horizon Fund, LP v. KPMG (Cayman)</u>, 487 F. App'x 636 (2d Cir. 2012) ("the more compelling inference as to why Madoff's fraud went undetected for two decades was his proficiency in covering up his scheme and deceiving the SEC and other financial professionals").  Here, however, given the

---

not demand a level of specificity in fraud pleadings that can only be achieved through discovery").

plethora of red flags alleged in this case, the plausible inference is that the Greek Auditors exhibited willful blindness in the face of numerous indications that something may have been awry.

### e. Omnicare

In one final and equally futile effort to dismiss the claims against them, the Greek Auditors assert that the Aegean audit opinions were statements of opinions, rather than fact, that must be dismissed pursuant to Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund, 135 S.Ct. 1318 (2015), which addresses how courts should treat allegedly false or misleading statements of opinion under the securities laws.[28] According to the Greek Auditors, to state an actionable claim, lead plaintiff must allege that the Greek Auditors "did not subjectively believe the content of their audit opinions" or "omitted material facts about their inquiry into those statements of opinion." ECF No. 272 at 20. The Court rejects this argument,

---

[28] According to Omnicare, a "plaintiff who asserts that a statement of opinion or belief is false or misleading must plead facts that, if true, would be sufficient to show one of two things: (1) if asserting that the statement of opinion or belief 'constitutes a factual misstatement' in itself, that the speaker did not 'actually hold[ ] the stated belief," or (2) "if asserting that the statement of opinion or belief is misleading due to the omission of 'discrete factual representations,' that the statement did 'not rest on some meaningful ... inquiry,' rendering it 'misleading to a reasonable person reading the statement fairly and in context.'" In re Lehman Bros. Sec. & Erisa Litig., 131 F. Supp. 3d 241, 255 (S.D.N.Y. 2015) (citing Omnicare, 135 S.Ct. 1325-28, 1332).

Relying in part on Lehman, 131 F. Supp. 3d at 251 n.48, the Greek Auditors insist that Omnicare applies to Section 10(b) claims, even though Omnicare was a case based on Section 11 of the Securities Act of 1933.

which would undermine the traditional meaning of an auditor's opinion letter.

In an event, in order to sustain its claim, lead plaintiff need not allege the Greek Auditors' contemporaneous disbelief in the content of the Aegean audit opinions.  Lead plaintiff only needs to allege that the Greek Auditors ignored a sufficient number of red flags, which would permit the inference that the Greek Auditors did not believe that they conducted a compliant audit. See, e.g., Lehman, 131 F. Supp. 3d at 259 (finding that "a sufficient accumulation of 'red flags' perhaps could permit the inference that the auditor did not actually believe that it had conducted a GAAS-compliant audit (i.e., that it intentionally or recklessly cut corners or otherwise skirted auditing standards) when it rendered its opinions").  Lead plaintiff has done this, and thus the Greek Auditors' argument fails.[29]  "Auditors may not shield themselves from liability . . . merely by using the word 'opinion' as a disclaimer."  In re OSG Sec. Litig., 971 F. Supp. 2d 387, 399 (S.D.N.Y. 2013).

\*\*\*

---

[29] Querub v. Hong Kong, 649 F. App'x 55, 58 (2d Cir. 2016), relied on by the Greek Auditors, does not compel a different result.  There, the Second Circuit affirmed the district court's summary judgment decision, noting that "uncontested expert testimony" opined that the auditor "fully complied with PCAOB standards," and that there was no evidence that the auditor did not believe its opinions.  Here, by contrast, we are at the motion to dismiss stage and the complaint is replete with sufficient allegations of auditing failures.

Based on the foregoing, the Greek Auditors' motion to dismiss is denied.  Indeed, the litany of excuses relied upon by the Greek Auditors brings to mind the Japanese proverb of the three monkeys: hear no evil, see no evil, speak no evil.

**C. Global and US Auditors**

Lead plaintiff asserts control liability claims pursuant to Section 20(a) against the Global Auditors (Deloitte Touche and PwC International) and the US Auditors (Deloitte US and PwC US) (claim 8).  Lead plaintiff's claims are based on the Global and US Auditors' relationships with Deloitte Greece and PwC Greece, who conducted the Aegean audits.

Deloitte Touche is a private company headquartered in the United Kingdom.  Compl. ¶¶ 74, 101.  It provides policies and protocols regarding professional standards, methodologies, and systems for quality control and risk management for the global network of Deloitte firms.  Id. ¶ 102.  Deloitte Touche also exhibits control over the acceptance and rejection of engagements by member firms.  Id. ¶ 110.  Deloitte Greece and Deloitte US are both member firms within the Deloitte Touche network.  Id. ¶¶ 77, 82.  The complaint does not allege that Deloitte Touche audited Aegean.

Deloitte US is a Delaware limited liability company with headquarters in New York.  Id. ¶ 82.  According to the complaint,

Deloitte US never issued an opinion on Aegean's financial statements or made any public statement regarding Aegean. Id. ¶¶ 77-78, 82-83. However, Deloitte's United States office assists in resolving issues surrounding SEC regulations, and also reviews documents to be used in connection with the sale or exchange of securities. Id. ¶ 83. Thus, for certain SEC filings, Deloitte US conducts a pre-issuance review. Id. ¶¶ 84, 107. In a declaration, lead plaintiff appended a letter stating that Deloitte US or UK would be paid $63,000 for work on the Aegean audit for the 2015 fiscal year. ECF No. 249-5 at 8. Lead plaintiff also alleged that Deloitte US audited a company, GMC, that shared two Board members with Aegean's Board. Compl. ¶¶ 415-16.

Like Deloitte Touche, PwC International is headquartered in the United Kingdom, and is a membership-based company with member and network accounting and advisory firms operating locally, including PwC US and PwC Greece. Id. ¶¶ 87, 92. Like Deloitte US, PwC US is a Delaware limited liability company with its headquarters in New York. Id. ¶ 92. According to the complaint, PwC US never issued an opinion on Aegean's financial statements or made any public statement regarding Aegean. Id. ¶¶ 89, 92. PwC US is alleged to provide assistance to individual firms and engagement teams whose clients are foreign issuers. Id. ¶ 116.

### 1. Analysis

Lead plaintiff brings claims against the Global Auditors and the US Auditors, alleging that they controlled the Aegean audits conducted by the Greek Auditors.  The paucity of particular allegations that pertain to the Global and US Auditors would alone be sufficient to grant the motions to dismiss.  Nevertheless, for the sake of completeness, the Court will first address the claims against the Global Auditors and then the claims against the US Auditors.

Having concluded that lead plaintiff alleged actionable claims against the Greek Auditors arising from the Aegean audit opinions, lead plaintiff has alleged a primary violation.  However, because lead plaintiff fails to allege that the Global Auditors or the US Auditors exercised control over or were culpable participants in the making of the Aegean audit opinions, the Section 20(a) claims are not actionable.

### a. Global Auditors

Lead plaintiff fails to allege that either Deloitte Touche or PwC International exhibited any control over the Greek Auditors. As an initial matter, the majority of lead plaintiff's allegations regarding the Global Auditors' control relate to the Auditor Defendants' shared set of professional standards and an associated name.  Yet it is well-established that "allegations of generalized

-89-

control are insufficient to state a plausible claim of coordinating-entity control over its member firms in the auditing context." <u>Anwar v. Fairfield Greenwich Ltd.</u>, 728 F. Supp. 2d 372, 461 (S.D.N.Y. 2010).

Lead plaintiff's most specific argument is that the Global Auditors exhibited control because they were involved in the Appendix K reviews.[30] Lead plaintiff argues that Deloitte Touche was involved in the Aegean audits because Deloitte Touche maintains overarching policies for pre-issuance reviews of documents to be filed with the SEC. Compl. ¶ 107. Likewise, with respect to PwC International, lead plaintiff alleges that the "Global Capital Markets Group" is involved with the review of filings for foreign issuers. <u>Id.</u> ¶ 116. These assertions are lacking is substance. Lead plaintiff's allegations do not remotely suggest that the Global Auditors actually exerted control over the Aegean audits, or even, at the very least, reviewed any of the Aegean audit opinions at all. As "control under Section 20(a) is not satisfied where [] coordinating entit[ies] like PwC International and

---

[30] Appendix K of the PCAOB provides that financial statement filings of audits performed by a foreign associated firm should be reviewed by a United States affiliate firm. Lead plaintiff does not explicitly mention Appendix K reviews by name in its complaint. Though "[c]ourts in this Circuit have made clear that a plaintiff may not shore up a deficient complaint through extrinsic documents submitted in opposition to a defendant's motion to dismiss," <u>Endeavor Capital Holdings Grp., LLC v. Umami Sustainable Seafood, Inc.</u>, No. 13 Civ. 4143, 2014 WL 3897577, at *3 (S.D.N.Y. Aug. 7, 2014), the complaint does refer to "pre-issuance reviews," Compl. ¶¶ 84, 107. Accordingly, the Court will briefly address these arguments.

[Deloitte Touche] merely set[] 'professional standards and principles' under which individual offices operate," In re NQ Mobile, Inc. Sec. Litig., No. 13 Civ. 7608, 2015 WL 1501461, at *2 (S.D.N.Y. Mar. 27, 2015), lead plaintiff has failed to plead actionable claims against the Global Auditors.

Further, even if, arguendo, plaintiff had pled control, the Section 20(a) claims against the Global Auditors would be dismissed because lead plaintiff failed to allege culpability.  Beyond conclusory allegations that the Global Auditors should have known about red flags because they had access to the Aegean audits, there are no specific allegations that either Deloitte Touche or PwC International knew or should have known about any of the statements in the Aegean audit opinions because they were not actually involved in the audits.  In re LIBOR-Based Fin. Instruments Antitrust Litig., No. 11 MDL 2262, 2019 WL 1331830, at *28 (S.D.N.Y. Mar. 25, 2019) (finding that allegations that the parent company defendants were "culpable participant[s] in the fraud" are "general and conclusory allegation[s] of culpable participation" that "cannot withstand defendants' motion").  Accordingly, the claims against the Global Auditors are dismissed.

### b. US Auditors

Lead plaintiff advances similar arguments with respect to the US Auditors.  First, lead plaintiff argues that the US Auditors

had control over the Aegean audits because they had access to the Aegean audits and participated in the Appendix K review.  Second, lead plaintiff argues that the US Auditors are culpable because they engaged in willful blindness by ignoring serious red flags during the Appendix K review of the Aegean filings.

Lead plaintiff's allegations regarding the Appendix K reviews do not suffice to establish control because the Aegean audit opinions were controlled by the Greek Auditors themselves, who issued the final publications.  This is so notwithstanding the US Auditors' alleged role in the review of relevant filings and Deloitte US's potential fee for that review.  See Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd., 96 F. Supp. 3d 335, 345 n.16 (S.D.N.Y. 2015) (finding that "generalized allegations" that Deloitte US "provided input [and] technical expertise" and that it "actively consulted and gave directions" to a Chinese member firm did not establish control of any specific transaction).[31]

_____

[31] Lead plaintiff's references to Dietrich v. Bauer, 126 F. Supp. 2d 759, 765 (S.D.N.Y. 2001), reconsideration denied, No. 95 Civ. 7051, 2001 WL 536971 (S.D.N.Y. May 21, 2001), are inapposite.  There, the defendant owned 100% of the controlled entity at issue.  Id.  Here, there is no allegation that the Deloitte US owned any part of Deloitte Greece or that PwC US owned any part of PwC Greece.

Though referenced in the context of its argument regarding disclaimers, lead plaintiff's reference to the summary judgment decision in In re Parmalat Sec. Litig., 594 F. Supp. 2d 444, 459 (S.D.N.Y. 2009), is similarly inappropriate.  While the Court in Parmalat denied Deloitte US's motion for summary judgment with respect to plaintiff's Section 20 claims, the underlying facts there bear no resemblance to this record.  Specifically, several Deloitte US partners held "key leadership positions" at the lead auditor, provided "a

Moreover, lead plaintiff has not alleged the US Auditors' culpability.  "The willful blindness standard is satisfied where a control person knew or should have known that the primary violator was engaged in fraudulent conduct, but did not take steps to prevent the primary violation." Parmalat, 594 F. Supp. 2d at 458 (internal quotation marks and alterations omitted).  Here, lead plaintiff does not allege with particularity any facts indicating that either of the US Auditors knew that the Greek Auditors were acting recklessly.

As with the Global Auditors, the US Auditors' theoretical "access to the information by which it could have discovered the fraud is not sufficient to establish recklessness." Iowa, 919 F. Supp. 2d at 332 (internal quotation marks omitted); see also Longtop, 939 F. Supp. 2d at 378 ("merely alleging that the auditor had access to the information by which it could have discovered the fraud is not sufficient").  The US Auditors are not alleged, for example, to have redone the Aegean audits such that they would have familiarized themselves with Aegean's primary financial documentation.

Relatedly, lead plaintiff argues that the Appendix K reviews required Deloitte US to read Aegean's key SEC filings, which should

---

large portion" of the auditor's funding, and there also was evidence that Deloitte US may have "influenced [the auditor's] decision making." Id.  No comparable facts are alleged here.

have revealed certain red flags, including Melissanidis' history
and numerous related-party transactions.  As alleged, however, as
the Greek Auditors themselves were not reactive to those red flags,
it is again not clear that Deloitte US would have had access to
raw information or documents to alert it to the issues that the
Greek Auditors, on the ground, failed to uncover.  Ultimately,
lead plaintiff's arguments rely on speculation, which is
insufficient to allege culpability.  Glaser v. The9, Ltd., 772 F.
Supp. 2d 573, 591 (S.D.N.Y. 2011) (citing Campo v. Sears Holdings
Corp., 371 Fed. App'x 212, 217 (2d Cir. 2010)) ("conclusory
statements that defendants 'were aware' of certain information,
and mere allegations that defendants 'would have' or 'should have'
had such knowledge is insufficient").

Lead plaintiff also asks the Court to make unsubstantiated
comparisons and assumptions.  First, lead plaintiff points to
Appendix K reviews of completely unrelated companies by completely
unrelated auditors — for example, Ernst & Young — that uncovered
fraud.  ECF No. 241 at 24-25.  Obviously these examples are
entirely irrelevant and fall woefully short of the Rule 9(b)
pleading standard.  Additionally, lead plaintiff argues that
because one of the shell companies allegedly used by Aegean to
generate fake receivables — MEG — was located in the United States,
it is "reasonable to infer that Deloitte US likely was involved in

confirming those transactions as part of the Aegean audit."  ECF No. 241 at 25.[32]  Such bald assumptions do not suffice to establish culpability.  <u>Glaser</u>, 772 F. Supp. 2d at 591.

With respect to PwC US, lead plaintiff similarly argues that PwC US should have identified red flags during the course of its Appendix K review and that PwC US may have been involved in confirming Aegean's transactions with MEG.  For the same reasons that lead plaintiff's arguments regarding Deloitte US fail, its arguments regarding PwC US fail.[33]

Because lead plaintiff failed to allege that the US Auditors exercised control over the Greek Auditors or had any culpability with respect to the Greek Auditors' violations, the claims against the US Auditors are dismissed.[34]

---

[32] MEG is nowhere mentioned in the complaint, having been raised for the first time in lead plaintiff's opposition submissions.  This provides another reason to reject lead plaintiff's argument.

[33] The Global and US Auditors also argue that they cannot be liable for the Aegean audit opinions because their websites state that they are separate legal entities that cannot obligate or act as agents of one another.  While disclaimers "are not dispositive of the question of whether an agency relationship existed," <u>In re Parmalat Sec. Litig.</u>, 375 F. Supp. 2d 278, 294 (S.D.N.Y. 2008), the Court need not rely on the disclaimers to dismiss the Section 20(a) claims.  Accordingly, the Court does not engage in the parties' disclaimer-related arguments.

[34] Lead plaintiff requests leave to amend if the Court grants any of the Auditor Defendants' motions in whole or in part.  ECF No. 241 at 39.  However, the operative complaint is an amended complaint, and lead plaintiff supplemented its opposition submissions with dozens of additional documents not referenced in its complaint.  ECF Nos. 247 (attaching 28 exhibits); 249 (attaching 41 exhibits).  Lead plaintiff, moreover, does not provide any information about the nature of its intended amendments.  Accordingly, we deny lead plaintiff's request for leave to amend.

### D. Officer and Director Defendants

We now turn to the claims against the Officer and Director Defendants brought under Section 10(b) of the Exchange Act. Claim 1 relies on Rule 10b-5(b) (misstatements or omissions) and Claim 2 relies on Rule 10b-5(a) and (c) (scheme liability). Having found that this Court lacks personal jurisdiction over Papanicolaou, Koutsomitopoulos, and Fokas as to all claims and Melissanidis as to the Section 10(b), 20(a), and 20(b) claims, this section of analysis pertains only to Gianniotis (CFO) and the so-called "US Defendants," who include Nikolas Tavlarios (President), Georgiopoulos (outside director and Chairman of the Board), John Tavlarios (outside director), and Konomos (outside director and Audit Committee member).

The US Defendants move to dismiss the Section 10(b) claims against them on the basis that the complaint relies on impermissible group pleading and does not plead an inference of scienter. Gianniotis likewise moves to dismiss the Section 10(b) claims against him, arguing that his statements amount to nonactionable puffery and the complaint fails to allege facts giving rise to an inference of scienter. We first address the US Defendants' arguments, and then address Gianniotis' arguments.

### 1. US Defendants

Lead plaintiff argues that the same allegations support an inference of scienter as to each individual defendant under both claims 1 and 2.  ECF No. 250 at 47; <u>Alstom</u>, 406 F. Supp. 2d at 475 (liability can arise under Rule 10b-5(b) and 10b-5(a) and (c) "out of the same set of facts").  Though the US Defendants challenge to some extent whether certain of their statements are actionable,[35] the core of the US Defendants' argument is that lead plaintiff failed to adequately allege scienter.  For this reason, the Court will likewise limit its analysis to an assessment of lead plaintiff's allegations of scienter against the US Defendants.

### a. Group Pleading

Lead plaintiff relies heavily on group pleading.  <u>See, e.g.</u>, Compl. ¶¶ 145, 147, 321, 421.  However, "[s]cienter must be separately pled and individually supportable as to each defendant; scienter is not amenable to group pleading."  <u>C.D.T.S. v. UBS AG</u>,

---

[35] While the US Defendants argue broadly that the 2018 Press Releases and the complaint do not allege that any US Defendant had involvement in the Fraudulent Scheme, the US Defendants' arguments challenging the viability of allegations regarding their misstatements, omissions, and actions in furtherance of a fraudulent scheme are relatively sparse.  For example, in their Memorandum in Support of the US Defendants' Motion to Dismiss, the US Defendants present in a footnote an after-thought of an argument that several of the alleged material misrepresentations made by Nikolas Tavlarios and Peter Georgiopoulos constitute non-actionable puffery.  ECF No. 197 at 24 n.9.  In this footnote, defendants cite - without any engagement in their content — five examples of Georgiopoulos' statements and none of Nikolas Tavlarios' statements.  The Court's decision does not turn on these statements, and thus it need not engage in this analysis.

No. 12 Civ. 4924, 2013 WL 6576031, at *6 (S.D.N.Y. Dec. 13, 2013),

aff'd sub nom. Westchester Teamsters Pension Fund v. UBS AG, 604

F. App'x 5 (2d Cir. 2015); see also In re BISYS Sec. Litig., 397

F. Supp. 2d 430, 440 (S.D.N.Y. 2005) ("[T]he group pleading

doctrine has no effect on the PSLRA's scienter requirement.  It

merely gives plaintiffs the benefit of a presumption that certain

kinds of statements were made by certain kinds of defendants.  It

does not permit plaintiffs to presume the state of mind of those

defendants at the time the alleged misstatements were made").

Allegations regarding a defendant's title, Board membership,

and/or signatures on documents — such as the Offering Documents —

are plainly insufficient to allege scienter as to each defendant.

### b. Motive & Opportunity

To obtain clarification of lead plaintiff's position on the

motive and opportunity prong of a Rule 10b-5 claim, the Court asked

the following question at oral argument:

> Am I correct that there is no allegation that
> any of the individual defendants were directly
> sharing in Melissanidis' self-dealing and
> theft, or that they were active participants
> in the creation of false documents?

Lead plaintiff responded, "The answer is no."[36]  Tr. of Oral Arg.,
Mar. 9, 2021, at 55:19-56:4.[37]  As the Court in <u>Novak</u>, 216 F.3d at
307-08, stated, plaintiff alleges "motive and opportunity to
commit fraud" where the complaint pleads facts showing that the
defendant "benefitted in some concrete and personal way from the
purported fraud."   Given the acknowledgment that none of the
individual US Defendants benefitted in a concrete and personal
way, lead plaintiff has simply failed to plead motive and
opportunity arising from the Fraudulent Scheme itself as to the US
Defendants.[38]

### c. Recklessness

Having failed to plead motive and opportunity, to state an
actionable claim lead plaintiff must allege that the US Defendants
acted recklessly.   Where a plaintiff does not make a showing of
motive, "the strength of the circumstantial allegations [of
conscious misbehavior or recklessness] must be correspondingly

---

[36] We do not construe this concession as necessarily precluding an
inference of motive that arises from insider trading.

[37] In its opposition brief, lead plaintiff stated, "it is impossible for
Plaintiff to pinpoint at this stage of the litigation all those who, in addition
to Defendant Melissanidis, may have profited from the fraudulent transactions
underlying the project." <u>See</u> ECF No. 250 at 37.   This statement is, of course,
no substitute for a well-pled allegation.

[38] The Court is not remotely persuaded by lead plaintiff's argument that
the individual defendants were motivated by a fear of Melissanidis' violence
and physical threats.   This argument is extremely implausible, especially where,
as here, the US Defendants all reside in New York — far away, geographically at
least, from the command and influence of Melissanidis.   Lead plaintiff does not
allege a single instance of Melissanidis exerting pressure or acting violently
in the United States.

greater." ECA, 553 F.3d at 198–99 (citing Kalnit, 264 F.3d at 142). "Recklessness may be pled based on strong circumstantial evidence, and a plaintiff may rely on allegations that defendants knew facts or had access to information suggesting that their public statements were not accurate or failed to check information they had a duty to monitor." Braskem, 246 F. Supp. 3d at 764 (internal quotation marks and citations omitted).

In support of its argument that the US Defendants acted recklessly, lead plaintiff proffers an assortment of theories, apparently hoping that the Court will be persuaded by at least one. Specifically, lead plaintiff argues that an inference of scienter is supported by the US Defendants' failure to implement and monitor adequate internal controls to detect fraud; awareness of red flags; approval of the Repurchase; reactions to the Reconstituted Audit Committee's letters and PwC's concerns; and approval of the HEC Acquisition. Lead plaintiff also alleges that the following lead to an inference of scienter: resignations; the quick discovery of the fraud by the Reconstituted Audit Committee; the existence of a subpoena; office locations; relationships with Melissanidis; voting control; the core operations theory; Aegean's restated financials; and the size of the fraud.

Despite the numerous offerings, lead plaintiff does not make any effort to prioritize among these theories of scienter.

Nevertheless, as this case is predicated on a fraudulent embezzlement scheme, disguised by false documents, and the inaccurate financial statements that resulted therefrom, the alleged failure to implement and monitor adequate internal controls to detect fraud and generate accurate financial reports is clearly central.

In this regard, we begin our discussion by observing that the issue of the liability of the US Defendants presents in an unusual, if not unique, posture. This is because this Court previously dismissed for failure to state a claim a related suit brought by the trustee of the Aegean Litigation Trust against these same individuals. There, on substantially the same facts and pursuant to the lower Rule 8 pleading standard, this Court found that the trustee failed to sufficiently allege a duty of loyalty claim pursuant to Caremark, i.e., that the US Defendants consciously failed to monitor Aegean's internal controls and operations. See Kravitz as Tr. of Aegean Litig. Tr. v. Tavlarios, No. 19 Civ. 8438, 2020 WL 3871340, at *9 (S.D.N.Y. July 8, 2020) ("Kravitz"). The relevance of that decision to this case derives both from the overlapping factual record and the similarity (although not identicality) of the legal standards applicable to each.

-101-

Thus, we begin our assessment of lead plaintiff's theories of scienter with its allegations about inadequate internal controls and a description of our previous holdings in <u>Kravitz</u>.

### i. <u>Kravitz</u> and Internal Controls

Aegean filed for bankruptcy on November 6, 2018.  The plan for reorganization established the Aegean Litigation Trust, the trustee of which was Peter Kravitz ("Kravitz"), and certain of Aegean's claims were assigned to it.  Thus in 2019, Kravitz brought suit against the US Defendants — Nikolas Tavlarios, Georgiopoulos, John Tavlarios, and Konomos — for breach of fiduciary duty based on their alleged failure to monitor Aegean during the period that Melissanidis defrauded the Company.  The US Defendants moved to dismiss the complaint.

The facts set forth in <u>Kravitz</u> will be familiar, as they are a more compact version of the considerably wordier allegations filed here.  As described in <u>Kravitz</u>, Aegean's Board maintained an Audit Committee charged with oversight of Aegean's independent auditors and Aegean's "accounting and financial reporting principles, policies, controls, procedures, and practices." <u>Kravitz</u>, 2020 WL 3871340, at *2.  From its IPO until June 20, 2016, the Audit Committee retained Deloitte Greece as Aegean's independent auditor, which conducted annual audits of consolidated financial statements in accordance with PCAOB standards.  <u>Id.</u>

Deloitte Greece also audited the effectiveness of Aegean's internal controls over financial reporting. Id. For each year except 2014, Deloitte Greece issued unqualified audit opinions, which stated that Aegean had "maintained, in all material respects, effective internal control over financial reporting." Id.

In 2014, however, Deloitte Greece determined that Aegean's internal controls had two material weaknesses. First, Aegean's controls failed to identify an overstatement of cash and cash equivalents and short-term borrowings caused by a transfer payment, and second, Aegean did not have an effectively designed control to identify and disclose transactions with new related parties. Id. As alleged, under the leadership of the US Defendants, Aegean remediated both material weaknesses, and the following year Deloitte Greece issued an unqualified opinion so reflecting. Id. Aegean appointed PwC Greece as its independent auditor on June 20, 2016, which likewise issued unqualified opinions for 2016 with respect to Aegean's financial statements and internal controls. Id.

During the same time period, Melissanidis used various schemes to defraud Aegean of approximately $300 million. Id. at *3. The Kravitz complaint describes the construction of the Facility that was fraught by cost overruns and enabled payments to OilTank, over which Melissanidis exercised control; the fake trade

-103-

receivables scheme, through which Melissanidis caused Aegean to overstate its accounts receivable by $200 million between 2015 and 2017 by entering into contracts with four shell entities; the Repurchase, whereby Melissanidis arranged for Aegean to purchase his 22% stake in Aegean for about $100 million in August 2016 (it is not alleged how the Repurchase concealed the fake trade receivables scheme); and the HEC Acquisition, through which Melissanidis attempted to regain voting control of Aegean and which was ultimately enjoined when a group of shareholders filed for a temporary restraining order in March 2018.  Id. at *3-4.

Following the settlement of the lawsuit that arose from the HEC Acquisition, three independent directors joined the Board of Aegean and were appointed to the Audit Committee.  Id. at *4.  They initiated an investigation with the assistance of outside legal counsel, forensic accountants, and investigators into Aegean's finances, which culminated in announcements, by press releases issued on June 4, 2018 and November 2, 2018, that Aegean believed that it had been subject to a scheme involving misappropriation and sham transactions.  Id.  The precise contents of the 2018 Press Releases should by now be well-known.

This Court determined that the allegations in Kravitz's complaint implicated the duty of loyalty, and accordingly constituted a Caremark claim.  Id. at *7.  For a Caremark claim to

be successful, a plaintiff must show "that the directors allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in so doing they violated [their] duty to be active monitors of corporate performance." In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959, 967 (Del. Ch. 1996). Caremark liability requires a plaintiff to clear a particularly high hurdle, the reason being that "Caremark liability is rooted in bad-faith conduct, not merely negligence." Corp. Risk Holdings LLC v. Rowlands, No. 17 Civ. 5225, 2018 WL 9517195, at *3 (S.D.N.Y. Sept. 28, 2018) (citing Stone v. Ritter, 911 A.2d 362, 369 (Del. 2006)); see also City of Birmingham Ret. & Relief Sys. v. Good, 177 A.3d 47, 55 (Del. 2017) (Under Caremark and its progeny, "a showing of bad faith is a necessary condition to director oversight liability"). Imposition of Caremark liability "requires a showing that the directors knew that they were not discharging their fiduciary obligations." Stone, 911 A.2d at 370 (emphasis added).

For the reasons below, however, the Court concluded that Kravitz failed to state a Caremark claim. First, a Caremark claim is not stated where plaintiff alleges the existence of a reporting system, and Kravitz alleged the existence of that and more: Aegean's Board maintained an Audit Committee, which retained Deloitte Greece and PwC Greece to audit Aegean's financial

statements and the effectiveness of its internal controls over financial reporting. <u>Kravitz</u>, 2020 WL 3871340, at *9.

Next, we concluded that Kravitz failed to plead that the US Defendants "consciously failed" to monitor and oversee operations. <u>Id.</u> Rather than "conscious inaction," the facts of <u>Kravitz</u> demonstrate that the US Defendants were reactive to operational issues at Aegean. <u>Id.</u> After Deloitte Greece determined that there were material weaknesses in Aegean's internal controls in 2014, Aegean remediated the weaknesses, and when PwC Greece identified irregularities in connection with accounts receivable, the Audit Committee engaged outside counsel to investigate. <u>Id.</u>

Kravitz also argued that the US Defendants failed to acknowledge red flags, including Melissanidis' criminal history and resignation prior to the IPO; payments to OilTank, which was not performing the services for which it was paid; contracts with shell entities; and the accumulation of $200 million in accounts receivable. <u>Id.</u> at *10. However, we concluded that Melissanidis' pre-IPO history had nothing to do with the schemes at issue, and that Kravitz failed to allege that the US Defendants knew that issues involving OilTank and the Facility were related to Melissanidis' scheme. <u>Id.</u> Kravitz alleged that the US Defendants were aware of escalating accounts receivable accumulated from four shell entities, however Kravitz also alleged the US Defendants,

again, reacted to this information.  Id. at *11.  As explained
above, after PwC Greece informed the Audit Committee about these
irregularities, the Audit Committee engaged outside counsel to
review Aegean's account receivables.  Id.

In a last-ditch effort, despite allegations regarding the
appointment of outside auditors and demonstrating a pattern of
reactivity, Kravitz asked the Court to infer that the US Defendants
consciously disregarded deficiencies in internal controls because
Melissanidis succeeded in defrauding Aegean.  On the basis that
the Court could not "use the benefit of hindsight . . . to equate
a bad outcome with bad faith," we rejected that argument as well.
Id.

Thus, on substantially the same facts as here, we concluded
that Kravitz failed to allege that the US Defendants "violated
[their] duty to be active monitors of corporate performance."  Id.;
Caremark, 698 A.2d at 967.  In other words, Kravitz did not
plausibly allege that the US Defendants exhibited "bad faith" or
"knew that they were not discharging their fiduciary obligations."
Kravitz, 2020 WL 3871340, at *11; see also Birmingham Ret., 177
A.3d at 55; Stone, 911 A.2d at 370.

Notwithstanding the overlap between the facts in Kravitz and
those alleged in the instant case, lead plaintiff has not offered
a viable argument as to how a complaint, which alleged a failure

to maintain and monitor internal controls, that did not survive a
Rule 8 analysis can state a securities claim under the more
exacting standards of Rule 9(b) and the PSLRA.  In fact, in
preparing for oral argument, we were surprised when we realized
that lead plaintiff had not sought permission to submit a surreply
on this motion, even though the Court issued the Kravitz decision
on July 8, 2020, after lead plaintiff submitted its opposition
papers but before the US Defendants submitted their reply.
Recognizing the importance of the interplay between Kravitz and
the instant case, in advance of oral argument, on March 2, 2021,
the Court sent the parties the following letter:

> Dear Counsel,
>
> In the course of preparing for oral argument,
> I was perplexed to realize that there had been
> no serious briefing on the issue of the
> relationship between a Caremark claim and a
> securities fraud claim under Rule 10b-5.
> Specifically, can a Rule 10b-5 claim be pled
> successfully against an individual defendant
> if a Caremark claim against the same defendant
> has been found deficient?  To state the issue
> otherwise, are the pleading standards /
> elements of Caremark and Rule 10b-5 claims the
> same? If not, how do they differ? Looking at
> the issue from a somewhat different
> perspective, if a Caremark claim has been
> adequately pled, does it follow as a matter
> legal logic that a Rule 10b-5 claim has been
> pled?  This latter issue is clearly relevant
> here given the pending appeal from this
> Court's decision in Kravitz v. Tavlarios, No.
> 19 Civ. 8438, 2020 WL 3871340 (S.D.N.Y. July
> 8, 2020), which was argued in front of the
> Second Circuit on February 25, 2021.  We would

> appreciate an analysis from both the plaintiff
> and the defendants in _Kravitz_ on the impact of
> an affirmance or any reversal, in whole or in
> part, by the Second Circuit.
>
> To enable the Court to fully consider your
> submissions in advance of oral argument, the
> submissions shall be filed no later than
> Friday, March 5, 2021 at 4 PM EST. Consistent
> with the briefing in this case, the Court
> expects a joint submission from the _Kravitz_
> defendants.  Neither submission shall exceed
> ten pages.

ECF No. 281.  Our intent in sending this letter was to give lead

plaintiff's counsel a final opportunity to do what, in our view,

they should have done on their own: namely, to explain why a

dismissal of a parallel claim, which only needed to comply with a

Rule 8 pleading standard, should not logically result (not in a

technical way by application of collateral estoppel or res judicata

doctrines) in the dismissal of a claim that needed to meet both

Rule 9(b) and PSLRA standards.

   Lead plaintiff's response was, to say the least, frustrating.

The first section spent a page a half explaining that a breach of

fiduciary duty _Caremark_ claim and a securities fraud claim "seek[]

to vindicate distinct misconduct and different injury from a unique

perspective," a proposition which either needed no explanation or

was analytically flawed, as both claims are designed to protect

shareholders.  ECF No. 284 at 3.  Another section of lead

plaintiff's letter asserted that neither the doctrines of res

judicata nor collateral estoppel were controlling — a proposition that had never been suggested. Finally, a lengthy section proffered a readily refutable suggestion that "the complaints allege entirely different facts regarding . . . defendants' conduct. . . ." Compare ECF No. 284 at 3-6 with Kravitz *1 to *4. Indeed, such a comparison easily establishes that the essential transactions and fundamental facts were known to this Court when it decided Kravitz. Relatedly, and most significantly, the letter did not address the obvious challenge to lead plaintiff, which is presented by the more robust pleading standard applicable to a securities claim.

It is not surprising that lead plaintiff attempts to differentiate the facts alleged in Kravitz from those alleged here. ECF No. 284 at 3-6. Lead plaintiff also argues that the instant complaint is significantly more detailed, and alleges that the US Defendants took affirmative steps in furtherance of the Fraudulent Scheme, including allowing Aegean to issue false reports, misleading investors regarding the HEC Acquisition, and voting in favor of the HEC Acquisition. Id. By contrast, lead plaintiff argues that the Kravitz complaint merely alleged that the US Defendants abdicated their duties to implement internal control systems and to monitor. Id. at 3.

As an initial matter, we are not convinced by lead plaintiff's characterization of the two complaints.  Aside from the obvious parallels between the facts alleged in both complaints, both complaints are fundamentally about internal controls, the failure of which allowed the Fraudulent Scheme to persist undetected and led to the issuance of false financial statements and misstatements about Aegean's financial strength.  See, e.g., Compl. ¶¶ 33, 241, 321.  In this regard, in Kravitz, 2020 WL 3871340, at *8, we held that the trustee did not adequately allege that the US Defendants, "having implemented such a system of controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."

Moreover, to the extent that lead plaintiff alleges additional detail in the instant complaint regarding the US Defendants' oversight of Aegean's internal controls, certification of the accuracy of financial statements, and misstatements about Aegean's financial strength, these allegations are unavailing.

First, lead plaintiff alleges that certain of the US Defendants oversaw the remediation of material weaknesses in Aegean's internal controls, which leads to an inference of scienter because the internal controls, in hindsight, were obviously deficient.  See Compl. ¶ 430 (Nikolas Tavlarios); ¶¶ 321, 427-28

-111-

(Konomos).  As alleged, however, following a review of the internal controls by management, the 2015 Form 20-F confirmed their remediation.  Id. ¶ 430.  Although these facts could give rise to an inference of fraudulent intent, it is more compelling that Nikolas Tavlarios and Konomos actually believed that the weaknesses were remediated.  Tellabs, 551 U.S. at 324.

Second, lead plaintiff alleges that certain of the US Defendants made statements certifying or touting the strength of Aegean's financials.  For example:

- Nikolas Tavlarios signed Sarbanes-Oxley certifications, Form 20-Fs, and Form 6-Ks, which included affirmations that Aegean's financial statements were fairly presented.  Compl. ¶¶ 229, 234, 241-48.

- Nikolas Tavlarios stated in the Q1 2017 press release that Aegean had a strong overall business and a "strong track record of delivering consistent growth and stable financial results."  Id. ¶ 303.

- In a letter appended to the 2013 Annual Report, Georgiopoulos wrote that "Aegean achieved another strong year of profitable growth."  Id. ¶ 256.

- In a letter appended to the 2014 Annual Report, Georgiopoulos wrote that Aegean had a "landmark year."  Id. ¶ 279.

- On the Q3 2014 conference call on November 25, 2014, Georgiopoulos spoke of the value of the Facility, stating, "[t]here is a $200 million asset that we've been carrying on our books. . . ."  Id. ¶ 270.

- During the Q4 2014 conference call on March 17, 2015, Georgiopoulos stated, with respect to the Facility, that Aegean "had an asset where [it] had couple of hundred million bucks sunk in and zero earnings from it and most of that money, and there was equity money from the company and now [Aegean is] starting to see the benefits of that."  Id. ¶ 274.

Importantly, each of these statements was predicated upon the indisputably inaccurate financial statements.  If the US Defendants did not know that the financial statements were untrue, it follows that they could not have known that their statements were untrue.

Mindful of the burden on lead plaintiff to prove that an inference of fraud is as compelling as a benign inference, we find that lead plaintiff does not allege with specificity that the US Defendants knew or were reckless in not knowing that the financial statements were inaccurate when they made these statements.  Here, the more "cogent and compelling" inference is that the US Defendants relied on the Greek Auditors' clean audit opinions regarding Aegean's financial statements and internal controls and did not know about the Fraudulent Scheme, which rendered the financials inaccurate.  <u>Tellabs</u>, 551 U.S. at 324.  Indeed, reliance on auditors "has been recognized as a viable defense to scienter in securities fraud cases."[39]  <u>In re Reserve Fund Sec. & Derivative</u>

---

[39] Lead plaintiff cites <u>In re Winstar Commc'ns</u>, No. 01 Civ. 11522, 2006 WL 473885, at *8 (S.D.N.Y. Feb. 27, 2006), for the proposition that officers and directors of a corporation have "a well-defined obligation to ensure the accuracy of the information filed with the SEC," while leaving out the Court's statement that "[t]he good faith reliance on an accountant is a viable defense to scienter in securities fraud cases."  Lead plaintiff's reliance on <u>SEC v. Softpoint, Inc.</u>, 958 F. Supp. 846, 865 (S.D.N.Y. 1997), <u>aff'd</u>, 159 F.3d 1348 (2d Cir. 1998), is misplaced.  That case stands for the unremarkable proposition that an active participant in the fraud cannot rely in good faith on the auditor's opinion.

Litig., No. 09 Civ. 4346, 2012 WL 4774834, at *2 (S.D.N.Y. Sept. 12, 2012).[40]

For the avoidance of doubt, the Court does not believe that the Kravitz decision has a preclusive effect on the pending case. Rather, we believe that there would be a tension in finding that the trustee insufficiently alleged under Rule 8 that the US Defendants consciously failed, in bad faith, to monitor operations in Kravitz, but that here, lead plaintiff plausibly alleged under Rule 9(b) that the US Defendants intended to "deceive, manipulate, or defraud," Fort Worth Employers' Ret. Fund v. Biovail Corp., 615 F. Supp. 2d 218, 225 (S.D.N.Y. 2009), during the discharge of their duties.  In any event, we need not grapple with this tension, as lead plaintiff's scienter allegations regarding the US Defendants' oversight of internal controls are in any event deficient.

* * *

As we explained above, lead plaintiff advances numerous additional theories in in support of its argument that the US Defendants acted recklessly.  We find that none of these theories

---

[40] The filings related to the instant motions amount to well-over a foot in height when stacked together.  Nevertheless, lead plaintiff suggests that the Court should not yet reach the issue of whether the US Defendants can rely on the auditors' opinions.  In this regard, lead plaintiff's reliance on In re Glob. Crossing, Ltd. Sec. Litig., 313 F. Supp. 2d 189, 211 (S.D.N.Y. 2003), a Section 11 case with an explicit statutory defense, does not advance its position here.  Similarly, In re New Century, 588 F. Supp. 2d 1206, 1231 (C.D. Cal. 2008), is distinguishable on its facts.  There, plaintiff alleged that the auditors themselves were complicit in misrepresenting the company's financial condition.  Thus, lead plaintiff has offered no persuasive reason to delay the central scienter issue in this case.

-114-

overcome the more "cogent and compelling" inference that the US Defendants did not know about the Fraudulent Scheme, which was obscured by the consolidated financial statements that were approved by the Greek Auditors.   <u>Tellabs</u>, 551 U.S. at 324. Nevertheless, for the sake of completeness, we address each theory below.

### ii.  Red Flags

Lead plaintiff argues that there were numerous red flags that the US Defendants either knew about or were reckless in not knowing, including Melissanidis' past; multiple related-party transactions; escalating receivables; the existence of sham transactions; and the $100 million overrun in cost in connection with the Facility.   The US Defendants, however, argue that these red flags were alleged in connection with <u>auditor</u> scienter, not in connection with the individual defendants' scienter.   <u>See, e.g.</u>, Compl. ¶¶ 360, 434.   Moreover, the US Defendants argue that none of the red flags alleged lead to an inference of scienter.

"[S]cienter may be found where there are specific allegations of various reasonably available facts, or red flags, that should have put the [defendants] on notice that the public statements were false."   <u>Longwei</u>, 2014 WL 285103, at *5 (internal quotation marks and citation omitted).   Here, the US Defendants could have known about related transactions, escalating receivables, and cost

overruns at the Facility without knowing that the Facility was being used as a vehicle for fraud or that the escalating receivables reflected sham transactions.   In any event, the US Defendants were entitled to rely on the findings of the Greek Auditors.  Reserve Fund, 2012 WL 4774834, at *2.

### iii.   Repurchase

Lead plaintiff also argues that the approval of the Repurchase supports an inference of scienter.  Specifically, lead plaintiff alleges that an "independent committee" of the Board approved the Repurchase.  Compl. ¶ 178.  Also, lead plaintiff alleges that contemporaneous with and after the Repurchase, Nikolas Tavlarios made statements reporting on the strength of Aegean's financials, even though in the months that followed, Aegean announced its noncompliance with covenants in its debt agreements, conducted a notes offering, and secured a loan — all of which suggest that Aegean had liquidity issues.  Id. ¶¶ 179, 182, 187-89.  See id. ¶ 179 (on the date of the Repurchase, Nikolas Tavlarios stated that Aegean had a "solid balance sheet and strong free cash flow"); ¶ 182 (describing Nikolas Tavlarios' statement in Tradewinds.com article that Aegean had "good strength on its balance sheet").

Broadly, the Court finds that the allegation that an unspecified "independent committee" of the Board approved the Repurchase does not support an inference of scienter, particularly

where there is no allegation that any specific member of this independent committee knew that the Repurchase would create a "liquidity problem." Id. ¶ 190.   In that regard, though Nikolas Tavlarios' statements did not accurately reflect Aegean's financial reality, there is no allegation that he knew his statements to be untrue at the time that he made them.   A belief in Aegean's financial strength would not, in any event, be unreasonable in light of the Greek Auditors' opinions.

### iv.   Reactions to Activist Investors Committee and PwC

Lead plaintiff also argues that, notwithstanding concerns expressed by outsiders, the US Defendants recklessly failed to identify the Fraudulent Scheme.   First, on April 25, 2017, the Activist Investors Committee sent a letter to Georgiopoulos, Chairman of the Board, which highlighted deficiencies in Aegean's financing structure and corporate governance and proposed changes to the composition of the Board (the "Letter").   Compl. ¶ 192. Then, in May 2017, PwC Greece approached the Audit Committee to express concerns about escalating receivables.   Lavallee Decl., Ex. 1 ¶ 53 (Kravitz Complaint).   Nevertheless, Aegean continued to file financial documents with the SEC.   Compl. ¶¶ 234-36.

"[A]n egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness." Novak, 216 F.3d at 308 (internal quotation

marks and citation omitted).  Here, however, lead plaintiff does not allege with particularity that the US Defendants failed to address the issues flagged by the Letter or PwC Greece.  Without more detail about the precise issues set forth in the Letter and by PwC, and the US Defendants' reactions thereto, it cannot be inferred that the warnings fell on deaf ears.

### v.  HEC Acquisition

Lead plaintiff also argues that the circumstances surrounding the HEC Acquisition lead to an inference of scienter.  On November 27, 2017, Konomos allegedly expressed that Melissanidis may attempt to engineer a purchase of another Melissanidis-owned company by Aegean in order to regain Aegean voting stock and ensure that no independent directors would be appointed.  Compl. ¶ 208.

On February 20, 2018, Aegean announced that a special committee of the Board, including Konomos, approved the HEC Acquisition.  Id. ¶ 197.  Various members of the Board touted the HEC Acquisition as a positive opportunity.  Id. ¶¶ 316-20.  On February 26, 2018, however, Konomos is alleged to have stated to a member of RBM Holdings LLC, a shareholder from the Activist Investors Committee, that the HEC Acquisition would be a problem for current shareholders, and that if the transaction closed, they would "be f**cked."  Id. ¶ 208.

-118-

The approval of the HEC Acquisition does not support an inference of scienter.  As an initial matter, Nikolas Tavlarios, John Tavlarios, and Georgiopoulos all had already left Aegean by the time of the HEC Acquisition.  Id. ¶¶ 194-95.  And while Konomos' statement that investors would be "f**cked," id. ¶ 208, makes clear that Konomos did not think that the HEC Acquisition would benefit stockholders, his overt disclosures about the HEC Acquisition's purpose and potential effect hardly suggest that he was using the HEC Acquisition to conceal fraud.  While a claim for breach of fiduciary duty may be appropriate here, a claim for securities fraud is not.

### vi.  Resignations

Lead plaintiff also argues that the timing of the US Defendants' resignations leads to an inference of scienter. Nikolas Tavlarios resigned on June 1, 2017, and Georgiopoulos and John Tavlarios followed on June 16, 2017 after they did not receive a majority of votes for their reelection to the Board.  Compl. ¶¶ 18, 194-95.  On March 12, 2018, after Judge Preska enjoined the HEC Acquisition, Konomos was ousted from the Audit Committee.  Id. ¶¶ 23-24.

"[H]ighly unusual or suspicious" resignations can contribute to an inference of fraud, particularly "when independent facts indicate that the resignation was somehow tied to the fraud

alleged." In re Salix Pharm., Ltd., No. 14 Civ. 8925, 2016 WL 1629341, at *15 (S.D.N.Y. Apr. 22, 2016) (citing Glaser, 772 F. Supp. 2d at 598). Here, however, it is not clear that any of the resignations arose from the fraud alleged. Nikolas Tavlarios resigned by "mutual agreement" a year before the Fraudulent Scheme was revealed. Compl. ¶ 194. Georgiopoulos and John Tavlarios left the Board after they did not receive sufficient votes for reelection, and Konomos likewise was ousted from the Board. Id. ¶ 195. The US Defendants' resignations therefore do not support an inference of scienter.

### vii. Reconstituted Audit Committee

Lead Plaintiff also argues that the Reconstituted Audit Committee's quick discovery of the fraud could support an inference of scienter. Compl. ¶¶ 23-25. Lead plaintiff's argument fails because it suffers from hindsight bias. See Special Situations, 33 F. Supp. 3d at 434 ("To the extent that Plaintiffs argue that new management quickly unearthed the fraud, and thus it was easily discoverable, this argument suffers from hindsight bias"). Even if the Reconstituted Audit Committee did quickly uncover the Fraudulent Scheme with the assistance of outside counsel, Compl. ¶ 7, this does not establish what the US Defendants knew prior to June 2018.

### viii.   Subpoena

Lead plaintiff argues that the Southern District of New York's issuance of a grand jury subpoena in connection with Aegean is suggestive of scienter. See id. ¶ 328. However, lead plaintiff does not allege details of the investigation, including when the subpoena was sent (though the US Defendants clarify that the subpoena was issued in fall 2018). Therefore, the fact of the subpoena does not enable lead plaintiff or the Court to draw any inference about the state of the US Defendants' knowledge. Ultimately, "as currently plead, the government investigations are just that, investigations." Lipow v. Net1 UEPS Techs., Inc., 131 F. Supp. 3d 144, 167 (S.D.N.Y. 2015).

### ix.   Office Space

Lead plaintiff next alleges that the US Defendants shared office space in New York. Compl. ¶ 337. This unremarkable allegation is a weak read for an inference of wrongdoing or recklessness. See Sedona Corp. v. Ladenburg Thalmann & Co., No. 03 Civ. 3120, 2009 WL 1492196, at *8 (S.D.N.Y. May 27, 2009).

### x.   Relationship with Melissanidis

Lead plaintiff also argues that the US Defendants' relationships with Melissanidis support an inference of scienter. This theory also fails, as "allegations of a close relationship fail to establish the kind of circumstantial evidence necessary to

support a claim of fraudulent or reckless intent." <u>Vogel v. Sands Bros. & Co.</u>, 126 F. Supp. 2d 730, 743 (S.D.N.Y. 2001).  To the extent that lead plaintiff was implying that close relationships resulted in participation in Melissanidis' self-dealing and theft, lead plaintiff already conceded that there is no such allegation. Tr. of Oral Arg., Mar. 9, 2021 at 55:19–56:4.

### xi.  Voting Control

Lead plaintiff also alleges that Melissanidis, Georgiopoulos, and John Tavlarios owned sufficient shares to influence control over Aegean at various points in time.  Compl. ¶ 338.  Relatedly, the complaint alleges that John Tavlarios, Georgiopoulos, and Konomos voted to revise Aegean's Amended and Restated Bylaws to provide Melissanidis, Georgiopoulos, and John Tavlarios with shareholder power.  <u>Id.</u> ¶¶ 338, 375.  However, since Melissanidis, Georgiopoulos, and John Tavlarios had "control" of Aegean in 2006, Compl. ¶ 338, it is speculative to suggest that they amassed voting control in order to conceal the Fraudulent Scheme, which is not alleged to have begun until years later.

### xii.  Core Operations Theory, Size, Restated Financials

Allegations regarding core operations, the size of the fraud, and restated financials are not, on their own, sufficient to allege scienter.  <u>In re Ferrellgas Partners, L.P., Sec. Litig.</u>, No. 16 Civ. 7840, 2018 WL 2081859, at *19 (S.D.N.Y. Mar. 30, 2018), <u>aff'd</u>,

764 F. App'x 127 (2d Cir. 2019) ("[W]hile allegations regarding core operations may factor into a court's holistic assessment of scienter allegations, they are not independently sufficient to raise a strong inference of scienter") (citation and internal quotation marks omitted); Longtop, 910 F. Supp. 2d at 578 ("a fraud's large size, standing alone, is insufficient to show recklessness"); Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce, 694 F. Supp. 2d 287, 302 (S.D.N.Y. 2010) ("Plaintiff's repeated allegation concerning the magnitude of the write-downs is insufficient to plead scienter"). As lead plaintiff has failed to allege scienter as to the US Defendants on any other ground, none of these allegations suffice either.

* * *

Having concluded that lead plaintiff failed allege facts, either singularly or in combination, to support an inference of scienter as to any of the US Defendants, the claims against the US Defendants are dismissed in their entirety.[41]

---

[41] In its letters outlining its arguments (which are not formal briefs), lead plaintiff in footnotes requests leave to amend if the Court grants any of the individual defendants' motions.  ECF Nos. 251 at 3 n.5; 243 at 3 n.5. "[T]he Second Circuit has consistently stated that district courts may deny leave to amend when plaintiffs request such leave in a cursory sentence on the last page of an opposition to a motion to dismiss, without any justification or an accompanying suggested amended pleading." Ferrellgas, 2018 WL 2081859, at *20.  Accordingly, we deny lead plaintiff's requests for leave to amend.

### 2. Gianniotis

Unlike many of the other individual defendants, Gianniotis is not asserting that the claims against him should be dismissed for lack of personal jurisdiction even though he lives and works in Greece.

In pleading its Section 10(b) claims against Gianniotis, lead plaintiff alleges that, in his capacity as CFO, Gianniotis signed Registration Statements, Sarbanes-Oxley certifications, Form 20-Fs, and Form 6-Ks, each of which contained inaccurate financial statements.  Compl. ¶¶ 228-38, 245-47, 249-52.  Lead plaintiff also alleges that Gianniotis made misstatements regarding the strength of Aegean's financials.  In support of its claim for scheme liability, lead plaintiff alleges that Gianniotis, inter alia, oversaw internal controls; traded Aegean stock; and maintained a close relationship with Melissanidis.  While Gianniotis does not deny his involvement in these actions, he does argue that various statements attributable to him amount to non-actionable puffery and that lead plaintiff has failed to adequately allege scienter.  We address each of his arguments below.

### i.  Puffery

We first describe examples of the statements in dispute.  In the fourth quarter press release for 2013, Gianniotis is alleged to have said, "During the quarter we built our track record of

solid financial performance and believe we are very well positioned for the year ahead . . . . [O]ur strong financial position and dynamic business model distinguish Aegean from the competitive landscape . . . ." Id. ¶ 254. In the fourth quarter press release for 2015, Gianniotis allegedly said, "With a strong balance sheet and with significant financial flexibility, Aegean is competitively positioned to deliver returns to shareholders in a variety of market conditions." Id. ¶ 286. Similarly, in the fourth quarter press release for 2016, Gianniotis allegedly said that Aegean "continued [its] focus on driving higher margins and profitable volume and improved [its] financial strength." Id. ¶ 300.

Gianniotis argues that the statements attributable to him constitute nonactionable puffery. "[S]tatements that are too general to cause a reasonable investor to rely upon them and therefore could not amount to a guarantee are considered 'puffery' and are not actionable." ForceField, 2017 WL 1319802, at *15 (internal quotation marks and citation omitted); see also Novak, 216 F.3d at 315 ("While statements containing simple economic projections, expressions of optimism, and other puffery are insufficient, defendants may be liable for misrepresentations of existing facts") (internal citations omitted). Relying on Gissin v. Endres, 739 F. Supp. 2d 488, 512 (S.D.N.Y. 2010), Gianniotis

contends that in the statements alleged, he is "express[ing] his belief that the figures presented on the balance sheet indicate a favorable showing for the concluding quarter" without offering "any of the 'long-term guarantees' or specifics which would convert an opinion or projection into a factual misrepresentation."

The Court disagrees. Gianniotis' statements, which reference Aegean's "strong financial position," "strong balance sheet," and "improved financial strength," Compl. ¶¶ 254, 286, 300, are not merely optimistic, forward-looking statements. Gianniotis' statements are retrospective, and focus on how the events of the previous quarter affected Aegean's financial health. Where, as here, statements are "grounded in historical facts (false revenue numbers)" and "plausibly designed to mislead investors into believing" that Aegean's "present (as well as its future) was rosier than reality," they are properly considered "more than mere puffery." Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc., 268 F. Supp. 3d 526, 548 (S.D.N.Y. 2017).

### ii.  Scienter

Lead plaintiff asks the Court to infer scienter as to Gianniotis based on a series of allegations: Gianniotis was a member of senior management and in that capacity, made statements about Aegean's financial health and company updates, i.e., the HEC Acquisition, see, e.g., Compl. ¶¶ 202, 327; Gianniotis financed

Melissanidis' companies and maintained a long-term relationship with Melissanidis, id. ¶¶ 206, 332; Gianniotis' office was adjacent to Melissanidis' office, id. ¶¶ 128, 205; Gianniotis oversaw, reviewed, and implemented internal controls, and in 2015 confirmed the remediation of those controls, id. ¶ 430; Gianniotis left Aegean after Judge Preska enjoined the HEC Acquisition, id. ¶ 23, 211, 336; and Gianniotis, together with Fokas, sold $1 million in Aegean stock contemporaneously with the Repurchase, id. ¶¶ 35, 332.

As is clear from the above list, many of lead plaintiff's allegations regarding Gianniotis' scienter are similar to those made in connection with the US Defendants. However, there are significant distinctions between Gianniotis and the US Defendants, which lead to a different result. First, Gianniotis is the CFO of Aegean, who had duties to review and oversee Aegean's financials. Also, Gianniotis is a resident in Greece, with an office next door to Melissanidis' office. Additionally, it is alleged that Gianniotis sold stock at the same time as the Repurchase. These factors, addressed below, support an inference of scienter as to Gianniotis.

We begin with lead plaintiff's allegation that Gianniotis sold shares on the same day as the Repurchase. Compl. ¶¶ 15, 332. "Unusual insider sales at the time of the alleged withholding of

negative corporate news may permit an inference of bad faith and scienter." Scholastic, 252 F.3d at 74 (internal quotation marks and citation omitted).   To determine whether insider trading activity is unusual, the Court may consider "the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." Id. at 74-75.   While none of these factors have been pled, lead plaintiff did allege the fact of Gianniotis' stock trade.[42] Gianniotis' decision to trade Aegean stock on the same day that Melissanidis sold over 20% of Aegean's stock qualifies the trade as "unusual."   Id.   A reasonable inference is that as CFO, Gianniotis was privy to insider information — i.e., that Aegean was on the verge of a liquidity crisis — and traded on that information.   Lead plaintiff has thus pled scienter as to Gianniotis.

The conclusion that Gianniotis was aware of insider information is supported by the core operations theory, which provides supplemental support for an inference of scienter.   "Under the core operations theory, a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a

---

[42] Lead plaintiff alleges that Fokas and Gianniotis, together, sold $1 million of stock at the same time as the Repurchase.   Compl. ¶ 332.

significant source of revenue." Oklahoma Firefighters Pension &
Ret. Sys. v. Lexmark Int'l, Inc., 367 F. Supp. 3d 16, 37-38
(S.D.N.Y. 2019) (citing In re Supercom Inc. Sec. Litig., 2018 WL
4926442, at *31 (S.D.N.Y. Oct. 10, 2018)); see also Ferrellgas,
2018 WL 2081859, at *19.  As CFO, Gianniotis "had a duty to
familiarize himself with the facts relevant to the core operations
of the company and the financial reporting of those operations."
In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp.
2d 474, 491 (S.D.N.Y. 2004).  It is reasonable to infer that in
the course of such duties, which should have included the review
of credit facilities, impending notes issuances, and loan
documents, Gianniotis recognized that Aegean was not in the strong
financial position that it represented publicly.  Id. (finding
that an individual defendant is "not entitled to make statements
concerning the company's financial statements and ignore
reasonably available data that would have indicated that those
statements were materially false or misleading").

Having found that Gianniotis' statements are actionable and
that lead plaintiff adequately alleged scienter arising from his
stock trade and role as CFO, the Court sustains lead plaintiff's
Section 10 claims against Gianniotis.

**E. Control Liability**

Lead plaintiff also asserts claims of control liability pursuant to Section 20(a) against Melissanidis, the Officer Defendants, and the Director Defendants (Claim 3) and the Audit Committee Defendants (Claim 4). "To state a claim of control person liability under § 20(a), a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." Carpenters, 750 F.3d at 236 (internal quotation marks and citation omitted).

Since the Court cannot exercise personal jurisdiction over Melissanidis, Papanicolaou, Koutsomitopoulos, and Fokas with respect to the Section 10 or 20 claims, and since lead plaintiff did not serve McIlroy, the Court assesses lead plaintiff's Section 20(a) claims only against Gianniotis and the US Defendants. As lead plaintiff has failed to plead scienter against the US Defendants, lead plaintiff's Section 20(a) claims against them fail on the third prong.

On the other hand, lead plaintiff has alleged a viable control liability claim against Gianniotis. As to the first factor, the Fraudulent Scheme constitutes a primary violation. As explained in the previous section, the third factor has been adequately pled

-130-

as well.  Section 20(a) liability as to Gianniotis therefore turns on the second factor — whether Gianniotis exercised control over the primary violator.

Here, the parties dispute who or what committed the primary violations alleged.  In connection with its Section 20(a) claims, lead plaintiff argues that Aegean committed the primary violations, and that as CFO, Gianniotis had control over Aegean's actions.  Compl. ¶ 527.  Defendants, meanwhile, argue that lead plaintiff's position is a late-stage pivot, as lead plaintiff's narrative throughout the complaint was that Melissanidis controlled everything, and certainly, Melissanidis was not controlled by Gianniotis.  Compl. ¶¶ 371-79.

The Court is not convinced that the distinction matters.  Even if Melissanidis was a primary violator, he used Aegean as a vehicle to facilitate the Fraudulent Scheme, thereby making Aegean a controlled person that committed the primary violation.  And regardless of whether Melissanidis controlled Gianniotis, Gianniotis exerted significant control over Aegean: he was the CFO, reviewed the company's financials, and made statements on behalf of Aegean in public filings.  Katz v. Image Innovations Holdings, Inc., 542 F. Supp. 2d 269, 276 (S.D.N.Y. 2008).  As such, Gianniotis directed activity in furtherance of the primary violation.  We agree with the finding in Refco, 503 F. Supp. 2d at

638 (internal citation and quotation marks omitted): "[a]s a matter of logic . . . it makes little sense to say that controlling entities should escape liability on the grounds that other entities in turn controlled them.  The issue is whether the entity has the power to direct or cause the direction of the management and policies of a person, not whether that power is exercised at the direction of another."

The parties do not explicitly engage in the issue of Aegean's liability, because as a bankrupt corporation, Aegean is not a named defendant.  But the fact that a corporate defendant is bankrupt does not preclude the assertion of actionable claims under Section 20(a).  See, e.g., In re Pronetlink Sec. Litig., 403 F. Supp. 2d 330, 337 (S.D.N.Y. 2005); In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 285 (3d Cir. 2006) ("Essentially, plaintiffs argue that Suprema's controlling persons should not escape liability under Section 15 and Section 20(a) merely because Suprema's underlying liability cannot be formally adjudicated due to its insolvency.  We agree.").

Against this background, the Court finds that lead plaintiff has alleged an actionable Section 20(a) claim against Gianniotis.

## V. <u>Insider Trading</u>

Lead plaintiff brings claims for insider trading against Melissanidis, Fokas, and Gianniotis (Count 6) pursuant to Section 20A of the Exchange Act, 15 U.S.C. § 78t-1.  Section 20A provides:

> Any person who violates any provision of [the Exchange Act] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . securities of the same class.

<u>Id.</u> § 78t-1(a).  As the Court declines to exercise personal jurisdiction over Fokas, this discussion pertains only to Melissanidis and Gianniotis.

"As a threshold matter, claims brought under § 20A must comply with the heightened pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act."  <u>Gruber v. Gilbertson</u>, No. 16 Civ. 9727, 2019 WL 4458956, at *2 (S.D.N.Y. Sept. 17, 2019) (internal quotation marks and alterations omitted).  "To establish such a claim, [plaintiff] must (1) plead a predicate insider trading violation of the Exchange Act, and (2) allege sufficient facts showing that the defendant traded the security at issue contemporaneously with the plaintiff."  <u>Id.</u>; <u>see also</u> <u>Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co.</u>, 32 F.3d 697, 703 (2d Cir.

1994) ("to state a claim under § 20A, a plaintiff must plead a predicate violation of the '34 Act or its rules and regulations").

The first factor requires plaintiff to allege "unlawful trading in securities based on material non-public information." Gruber, 2019 WL 445956, at *2.  "Under the traditional or classical theory of insider trading, a corporate insider is prohibited from trading shares of that corporation based on material non-public information in violation of the duty of trust and confidence insiders owe to shareholders."  Id. (internal quotation marks and alteration omitted).

To comply with the statutory requirement, plaintiff has alleged the second factor where the defendants' sales and the plaintiffs' purchases fall "within a reasonable period of time, usually limited to a few days, of each other." In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig., 763 F. Supp. 2d 423, 508 (S.D.N.Y. 2011), on reconsideration, No. 07 Civ. 10453, 2011 WL 4072027 (S.D.N.Y. Sept. 13, 2011).  "In order to permit a broader class of potential victims to sue, while at the same time protecting defendants from limitless liability, Section 20A defines those who may sue as anyone who traded contemporaneously with, and opposite to, the defendant, even if they traded on an impersonal market and therefore cannot prove that they actually bought shares from the defendant or sold shares to the defendant."

Gordon v. Sonar Cap. Mgmt. LLC, 92 F. Supp. 3d 193, 203 (S.D.N.Y. 2015).

We first assess the 20A claim as it pertains to Melissanidis. As to the first element of a 20A claim, the complaint alleges that Melissanidis engaged in insider trading when he facilitated the Repurchase while he was in possession of material non-public information.  Specifically, as alleged, Melissanidis knew that Aegean's balance sheet and actual cash on hand could not support the Repurchase as Aegean's financials were inflated as a result of the Fraudulent Scheme.  Compl. ¶¶ 145, 425, 509.  Melissanidis, however, argues that dismissal of the 20A claim is warranted because lead plaintiff has not alleged a predicate violation of the Exchange Act against him.

In their submissions, neither party addresses outright whether an underlying violation of Section 10(b) must be alleged against the defendant against whom the Section 20A claim is alleged.  This Court has found, however, that "there is no case law expressly requiring the pleading of a § 10(b) claim to assert a § 20A claim.  Rather, § 20A merely requires that an underlying violation of § 10(b) occurred." Gruber, 2019 WL 4458956, at *3. "Therefore, a plaintiff may state a § 20A claim without pleading a § 10(b) claim, so long as there are factual allegations supporting a reasonable inference of a § 10(b) violation." Id.

In this case, since the Court found that it lacked jurisdiction over Melissanidis, it did not evaluate the sufficiency of the Section 10 or Section 20 claims against Melissanidis. However, the Court has sustained Section 10(b) claims against the Greek Auditors and Gianniotis. Lead plaintiff alleges that Melissanidis knew about the same insider information which forms the basis of these Section 10(b) claims, and that he traded on this information during the Repurchase. We therefore conclude that lead plaintiff has adequately alleged the first element of a Section 20A claim against Melissanidis.

Meanwhile, the complaint alleges that Gianniotis engaged in insider trading in violation of Section 20A when he traded up to $1 million in Aegean stock at artificially inflated prices. Compl. ¶¶ 15, 35, 332. Gianniotis argues that lead plaintiff failed to plead with particularity what material non-public information Gianniotis possessed when he traded Aegean stock. According to lead plaintiff, however, Gianniotis was in possession of non-public information about, inter alia, Aegean's true financial condition, and traded on that information. Based on our analysis supra, which concluded that Gianniotis had knowledge of the impending liquidity crisis, we agree.

Second, in compliance with the statutory requirement that there be a contemporaneous buyer, lead plaintiff represents that

he purchased shares at the same time that Melissanidis and Gianniotis sold their shares.   Lead plaintiff purchased 3,717 shares of Aegean stock on September 16, 2016.   Compl. ¶ 42; ECF No. 81-1 at 4.   Melissanidis' Repurchase closed on September 15, 2016, and Gianniotis sold up to $1 million in Aegean shares on September 15, 2016.   Compl. ¶¶ 15, 50, 332.

Finally, Melissanidis argues that even if lead plaintiff did trade contemporaneously with the Repurchase, a Section 20A claim is inappropriate here.   Given that the Repurchase was a buyback, Melissanidis argues that lead plaintiff did not "actually trade[] with the alleged insider" such that he would have been harmed by the insider.   ECF No. 271 at 22.   It is beyond cavil that a buyback affects shareholders.   Indeed, in the words of Aegean's President Nikolas Tavlarios, the $100 million buyback purportedly would "provide meaningful and immediate earnings accretion for all Aegean shareholders."   Compl. ¶ 179 (emphasis added).   Perhaps the effects from the Repurchase differ from those of an open trade, but we are nonetheless persuaded that lead plaintiff was "immediate[ly]" harmed.   Id.; see also Gordon, 92 F. Supp. 3d at 203; Fujisawa Pharm. Co. v. Kapoor, 115 F.3d 1332, 1337 (7th Cir. 1997) ("[T]he purpose of section 20A was to extend the protections of the existing insider-trading prohibition to persons not in

privity with the insider").[43]  In this regard, we note that Aegean's stock price is alleged to have dropped 48% following the Repurchase.  Id. ¶ 196.

Accordingly, lead plaintiff's Section 20A claim against Melissanidis and Gianniotis survives the motion to dismiss.

## VI.  **Conclusion**

For the foregoing reasons, the Court:

GRANTS the motions to dismiss as to Papanicolaou, Koutsomitopoulos, and Fokas for lack of personal jurisdiction;

GRANTS the motion to dismiss as to McIlroy for improper service;

GRANTS the motions to dismiss as to PwC International, PwC US, Deloitte Touche, and Deloitte US for failure to state a claim upon which relief can be granted;

GRANTS the motion to dismiss as to Nikolas Tavlarios, Georgiopoulos, Konomos, and John Tavlarios for failure to state a claim upon which relief can be granted;

GRANTS in part and DENIES in part the motion to dismiss as to Melissanidis; and

---

[43] Though not directly analogous, we note that Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 179 (2d Cir. 2001), holds "that just as knowledgeable corporate insiders have a fiduciary duty to disclose material facts when entering stock deals with outsiders, so do closed corporations buying their own stock."

DENIES the motions to dismiss as to PwC Greece, Deloitte Greece, and Gianniotis.

The Clerk of Court is directed to terminate the motions pending at ECF Nos. 180, 182, 187, 191, 196, 199, 210, 225, 229, and 232.

**SO ORDERED.**

Dated:    New York, New York
          March 29, 2021

_____
NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE