UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE AEGEAN MARINE PETROLEUM NETWORK, INC. SECURITIES LITIGATION | ) ) ) ) ) ) ) ) | Case No. 1:18-cv-04993 (NRB)<br><br>Hon. Naomi Reice Buchwald |

**DECLARATION OF NICOLE LAVALLEE IN SUPPORT OF (A) LEAD PLAINTIFF'S MOTION FOR: (I) FINAL APPROVAL OF THE PROPOSED INDIVIDUAL DEFENDANTS SETTLEMENTS; (II) FINAL CERTIFICATION OF THE SETTLEMENT CLASS; AND (III) FINAL APPROVAL OF THE PROPOSED INDIVIDUAL DEFENDANTS PLAN OF ALLOCATION; AND (B) LEAD COUNSEL'S MOTION FOR <u>ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES</u>**

**TABLE OF CONTENTS**

I.      Preliminary Statement ...................................................................................................1

II.     Factual Summary of Lead Plaintiff's Claims Against The Individual Defendants .................6

III.    Relevant Procedural History...........................................................................................8

        A.      Initial Complaint ...............................................................................................8

        B.      Appointment of Lead Plaintiff .............................................................................8

        C.      The Consolidated Complaint, Investigation and Motions To Dismiss ........................8

        D.      The Aegean Bankruptcy...................................................................................10

        E.      Responsive Pleadings, Initial Disclosures and Discovery Protocols ........................11

        F.      Formal Discovery............................................................................................12

                1.      Discovery Propounded by Lead Plaintiff to the Individual Defendants ........12

                2.      Lead Plaintiff's Responses to Defendants' Discovery Requests ..................12

                3.      Non-Party Discovery.............................................................................13

                4.      Review of Documents Produced in Discovery and Further Work with
                        Consulting Experts ...............................................................................13

                5.      Depositions .........................................................................................13

        E.      The Auditor Settlements...................................................................................14

        F.      Motions for Class Certification..........................................................................15

        G.      Negotiations and Settlements with the Individual Defendants..................................16

IV.     Risks Faced by Lead Plaintiff in the Action......................................................................18

V.      The Proposed Individual Defendants Settlements and Individual Defendants Plan of
        Allocation ....................................................................................................................23

VI.     Lead Plaintiff's Compliance with the Court's Preliminary Approval Orders Requiring
        Issuance of the Notices of the Individual Defendants Settlements to Settlement Class
        Members......................................................................................................................25

VII.    Application for Attorneys' Fees, Reimbursement of Lead Counsel's Expenses and
        Award to Lead Plaintiff..................................................................................................30

A.      Lead Counsel's Request for Attorneys' Fees ..........................................................30

B.      Lead Counsel's Request for Reimbursement of Litigation Expenses......................33

C.      Reimbursement to Lead Plaintiff is Fair and Reasonable ........................................35

D.      The Reaction of the Settlement Class to the Requested Fee, Reimbursement of
        Expenses and Award to Lead Plaintiff....................................................................36

VIII.   Conclusion ......................................................................................................................37

I, Nicole Lavallee, declare:

1.      I am a partner in the San Francisco office of Berman Tabacco, the Court-appointed Lead Counsel for Lead Plaintiff Utah Retirement Systems ("Lead Plaintiff" or "URS") and the proposed class counsel in the above-captioned matter.[1] As a result of my own substantial involvement in this litigation, I have personal knowledge of the facts set forth in this declaration.

2.      I respectfully submit this declaration in support of Lead Plaintiff's Motion For (I) Final Approval of the Proposed Individual Defendants Settlements; (ii) Final Certification of the Settlement Class; and (iii) Final Approval of the Proposed Individual Defendants Plan of Allocation (the "Final Approval Motion").

3.      I also respectfully submit this declaration in support of Lead Counsel's Motion for Attorneys' Fees and Reimbursement of Litigation Expenses (the "Fee and Expense Application").

4.      The purpose of this declaration is to summarize the factual and procedural history of this Action, including the investigation and filing of this litigation, motion to dismiss proceedings, discovery proceedings, motions for class certification, settlement negotiations, the previously approved settlements with PricewaterhouseCoopers Auditing Company S.A. ("PwC Greece") and Deloitte Certified Public Accountants, S.A. ("Deloitte Greece") (the "Auditor Settlements") and the proposed Individual Defendants Settlements.

I.      **Preliminary Statement**

5.      After extensive investigation and discovery for over four years of litigation as well as numerous arm's-length negotiations between highly experienced counsel, including multiple alternative dispute resolution sessions, Lead Plaintiff and the Individual Defendants have agreed to settle all claims against Spyros Gianniotis ("Gianniotis") and Dimitris Melissanidis ("Melissanidis") (collectively, the "Individual Defendants") in this Action in exchange (a) for a total payment of

---

[1] All capitalized terms not otherwise defined herein have the same meaning as in the Notice of (I) Pendency of Class Action and Proposed Individual Defendants Settlements; and (II) Final Approval Hearing For The Individual Defendants Settlements, the Individual Defendants Plan of Allocation and Motion For Approval of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Detailed Notice") (ECF No. 438-6), and the Individual Defendants Stipulations and Individual Defendants Plan of Allocation (ECF Nos. 438-1 & 438-2), cited therein.

$11,949,999 ($11 million from Gianniotis and $949,999 from Melissanidis), which has been deposited in an interest-bearing escrow account (the "Individual Defendants Settlement Funds").

6.      As set forth in the Gianniotis Stipulation and the Melissanidis Stipulation, in exchange for said consideration, the proposed Individual Defendants Settlements resolve all claims asserted by Lead Plaintiff and the Settlement Class against the Individual Defendants in the Action.

7.      Although Lead Counsel believes the claims alleged against the Individual Defendants are meritorious, we recognize the uncertainty and the risk attendant to any litigation—especially a complex class action such as this—and the difficulties, substantial expense and length of time necessary to prosecute the litigation through fact and expert discovery, summary judgment motions, trial, post-trial motions and appeals.  We also recognize the time and potential challenges to enforcing and collecting upon any judgment from the Individual Defendants, who are Greek residents.

8.      Lead Counsel had a clear understanding of the strengths and weaknesses of the case when we negotiated the Individual Defendants Settlements.  As described herein, Lead Counsel has undertaken a thorough investigation and exhausted considerable resources vigorously prosecuting this Action.  In particular, Lead Counsel's efforts have included, *inter alia*, (a) research and investigation of the claims; (b) detailed reviews of Aegean's public U.S. Securities and Exchange Commission ("SEC") filings, annual reports, press releases, earnings calls and other publicly available information spanning over a decade; (c) review of analyst reports and articles relating to Aegean; (d) work with investigative staff to uncover relevant facts and witnesses; (e) research of legal issues and analysis of documents filed in connection with several court cases involving Aegean and/or some of the defendants, including a significant volume of pleadings and discovery filed in the Aegean Bankruptcy and pleadings filed in cases brought in the United States and overseas by the Litigation Trustee in the Aegean Bankruptcy;[2] (f) consultation with forensic accounting/auditing consultants; (g) preparation of a comprehensive Consolidated Class Action Complaint ("Complaint" or "Compl.") (ECF No. 81) and service of said Complaint on defendants, including through international service of process; (h)

---

[2] The Chapter 11 plan established a Litigation Trust to pursue claims belonging to Aegean's bankruptcy estate against various potential wrongdoers on behalf of the estate.

2

retention and work with Lowenstein Sandler LLP ("Lowenstein" or "Bankruptcy Counsel") to protect the Settlement Class's claims by, among other things, successfully opposing Aegean's efforts to release all investors' claims under the federal securities laws through the Aegean Bankruptcy proceedings, including those against the Individual Defendants; (i) research and evaluation of potential issues arising from the fact that Aegean and many of the witnesses, including the Individual Defendants, and documents were located in Greece, the United Kingdom and other foreign countries; (j) consultation and analysis with international privacy law consultants; (k) consultation with foreign counsel on various matters; (l) extensive briefing to oppose defendants' motions to dismiss; (m) settlement negotiations with PwC Greece and Deloitte Greece (the "Auditor Defendants"), drafting settlement papers and obtaining final approval of the Auditor Settlements; (n) issuance of discovery requests to the Individual Defendants and review of their responses and objections; (o) extensive meet and confer sessions with counsel for the Individual Defendants regarding their responses and objections to Lead Plaintiff's discovery; (p) responding to Gianniotis's request for production of documents and meeting and conferring with his counsel about the same; (q) review and production of 17,263 pages of documents in response to Gianniotis's document requests; (r) issuance of 15 subpoenas to non-parties and engaging in dozens of meet and confers regarding their objections and the scope of their productions; (s) meeting and conferring to receive the auditor workpapers related to Aegean (t) review and analysis of over 187.052 gigabytes of documents received in discovery (including substantial productions from Aegean's successor and its Litigation Trustee), some of which are in Greek; (u) deposing a key non-party; (v) preparing Lead Plaintiff's motion for class certification and revised motion for class certification and defending its expert's deposition; (w) attendance at two mediations and a settlement conference; (x) negotiating and preparing the Settlement Agreements with the Individual Defendants and the papers in support of approval of same; and (y) work with the Court-appointed Claims Administrator to provide notice of the Individual Defendants Settlements to Settlement Class Members.

9.     As discussed below, Lead Plaintiff obtained this recovery for the Settlement Class despite heightened challenges and risks related to the claims against Gianniotis and Melissanidis, both

residents of Greece, who were Aegean's former CFO and founder, respectively. In reaching the Individual Defendants Settlements, Lead Plaintiff and Lead Counsel weighed, among other matters, the substantial and certain cash benefit to Settlement Class Members against: (a) the difficulties involved in proving the required elements of each claim, including materiality, falsity, scienter, loss causation and damages; (b) the difficulties in overcoming challenges to class certification and the potential delays involved in appeals of a decision on class certification; (c) the fact that, even if Lead Plaintiff were to prevail at summary judgment and trial, any monetary recovery could have been less than the Individual Defendants Settlement Amount; (d) the delays that would follow even a favorable judgment including appeals; and (e) the risks associated with and potential delay, expense and uncertainty related to potential post-judgment collection efforts against foreign individuals and issues related to the directors & officers ("D&O") coverage. These risks and challenges are outlined below.

10. Moreover, Lead Plaintiff and Lead Counsel engaged in lengthy, arm's length negotiations with the Individual Defendants that included two mediations with a nationally recognized mediator, Michelle Yoshida, and a settlement conference before Magistrate Judge Stewart D. Aaron.

11. For the reasons set forth herein, I believe that the Individual Defendants Settlements represent a very favorable outcome for the Settlement Class and that their approval is in the best interest of the Settlement Class.

12. As discussed in further detail below, the Individual Defendants Plan of Allocation was developed with the assistance of Lead Plaintiff's damages consultant and provides for the distribution of the Individual Defendants Settlement Funds to Settlement Class Members who submit timely Claim Forms that are approved for payment on a *pro rata* basis based on Authorized Claimants' losses that are attributable to the fraud alleged against each of the Individual Defendants. The Individual Defendants Plan of Allocation for the Individual Defendants Settlements is the same as the one approved by the Court in connection with the Deloitte Greece Settlement, which covered claims for the entire Class Period.[3]

---

[3] "Deloitte Greece Settlement" is defined in the Notice of (I) Pendency of Class Action and Proposed Partial Settlements;

13.     Lead Counsel's and Lead Plaintiff's efforts have resulted in the creation of a global common fund of $41,749,999, including the $11,949,999 from the current Individual Defendants Settlements, for the benefit of the Settlement Class.  This Court has previously awarded Lead Counsel's fee request of 25% of the Auditor Settlements for the period of inception to June 30, 2022 (ECF No. 402), and, as detailed below, similarly paying Lead Counsel's reasonable 25% fee request from the Individual Defendants Settlement Funds would result in an award of 25% of the global settlements reached in the Action and would properly compensate counsel for its efforts prosecuting and resolving the claims against the Individual Defendants.  Additionally, the fee requested represents a negative multiplier of 0.52 on the collective lodestar of Lead Counsel incurred after June 30, 2022.  Moreover, Lead Counsel's request for reimbursement of Litigation Expenses, including Lead Plaintiff's expenses pursuant to 15 U.S.C. § 78u-4(a)(4), are reasonable and of the type typically reimbursed in securities fraud class actions and awarded throughout the Second Circuit.

14.     On June 1, 2023, this Court preliminarily approved the Individual Defendants Settlements, preliminarily certified the Settlement Class for settlement purposes and approved the program for providing Notice to the Settlement Class (the "Preliminary Approval Orders").  ECF Nos. 446-47.  While the deadline to submit objections and requests for exclusion has not passed, I am informed by the Claims Administrator A.B. Data, Ltd. ("A.B. Data") that, to date, no Settlement Class Member has objected to the Individual Defendants Settlements, the Individual Defendants Plan of Allocation or the Fee and Expense Application.   A.B. Data has informed me that one request for exclusion has been received from an individual investor who stated that he spent $1,234.95 to acquire his shares.

15.     For all the reasons set forth herein and in the accompanying memoranda, including with respect to the exceptional result obtained and the numerous significant litigation risks and challenges to the continued pursuit of the claims against the Individual Defendants, Lead Counsel

---

and (II) Final Approval Hearing For The Partial Settlements, Plans of Allocation, Motion For Approval of Attorneys' Fees and Reimbursement of Litigation Expenses and Application For The Establishment of a Litigation Expense Fund (the "Auditor Settlement Notice") (ECF No. 375-6).

respectfully submits that the Individual Defendants Settlements and Individual Defendants Plan of Allocation are fair, reasonable and adequate and should be approved, and that their Fee and Expense Application likewise should be approved.

16.     I have been informed by both Gianniotis's Counsel and Melissanidis's Counsel that neither Gianniotis nor Melissanidis oppose this motion.  Both Gianniotis and Melissanidis take no position on any of the calculations contained in this declaration or Detailed Notice to Settlement Class Members, including Lead Counsel's calculations of likely recoverable damages under the Individual Defendants Plan of Allocation, average distribution per share and attorneys' fees per share.

## II.     Factual Summary of Lead Plaintiff's Claims Against The Individual Defendants

17.     This Action stems from an alleged long-running, multi-faceted fraudulent scheme to steal $300 million from Aegean and to artificially inflate the Company's earnings and revenues by reporting $200 million in worthless accounts receivable (the "Sham Receivables") with four shell companies (the "Shell Companies"), which concealed the theft from the public.  As a result, the Complaint alleges that Aegean, certain Company insiders and the Individual Defendants (a) significantly overstated the Company's income and revenue in its public filings and reports; (b) overstated the Company's assets and the strength of its balance sheet; (c) misled investors concerning the adequacy of the Company's internal controls over financial reporting ("ICFR"); and (d) misappropriated Company assets.  *See, e.g.*, Compl. ¶¶148-49.  Lead Plaintiff further alleges that several insiders, including Melissanidis, also engaged in insider trading. *Id.* ¶¶178, 182.

18.     The Complaint further alleges that the fraud at Aegean remained concealed to the investing market for years.  However, as alleged, because of actions undertaken by certain shareholders, the Company's entire Audit Committee stepped down in May 2018 and a reconstituted Audit Committee (the "Reconstituted Audit Committee") was formed with new, independent directors. *See, e.g.*, ¶7.  Only weeks later, on June 4, 2018, the Company announced that $200 million in accounts receivable had to be written off because the receivables were based on allegedly fraudulent transactions.  *Id.*  On November 2, 2018, following an internal investigation by outside counsel and retained forensic accountants, the Company announced that the Reconstituted Audit Committee had

determined that: (a) the Company's financial results were manipulated by improperly booking approximately $200 million in accounts receivables from bogus transactions with four Shell Companies controlled by former employees or affiliates of the Company; (b) approximately $300 million in cash and assets had been misappropriated by former affiliates, including through a 2010 contract with OilTank Engineering & Consulting Ltd.; (c) the revenues and earnings of the Company were substantially overstated in the years 2015, 2016 and 2017 and that both year-end and interim financials for these periods should no longer be relied upon and would need to be restated; (d) there were material weaknesses in the Company's ICFR as of December 31, 2015, 2016 and 2017 and, as such, management's annual report on ICFR as of December 31, 2015, and 2016 included in the Company's Annual Reports on Form 20-F and also for the 2017 interim results should no longer be relied upon and would need to be restated; (e) insiders had engaged in additional actions to defraud the Company, including engaging in prepayments for future oil deliveries which were never made; (f) an individual with administrator rights attempted to delete and permanently erase internal Aegean documents from the Company's server; and (f) the U.S. Department of Justice ("DOJ") had issued a grand jury subpoena in connection with suspected felonies. *See, e.g.*, ¶¶7, 148-51. Then, on November 6, 2018, Aegean filed bankruptcy proceedings under Chapter 11 of the U.S. Bankruptcy Code in the Southern District of New York, Case No. 18-13374 (MEW). *Id.* ¶11.

19. As to Gianniotis, Aegean's former CFO, Lead Plaintiff alleges that he participated in this fraudulent scheme and misled investors by, among other things, certifying the Company's false financial statements, falsely attesting to the effectiveness of the Company's ICFR and consistently portraying the Company as having a strong and dynamic business model producing a sustainable track record of profitability and growth while maintaining a solid balance sheet and ample liquidity. *See, e.g.*, Compl. ¶¶5, 32, 55, 120-23, 145-46, 183, 185-86, 202, 228-52, 254, 259, 264, 268, 277, 281, 283, 286-87, 290, 293-94, 300-01, 304, 306, 308.

20. As to Melissanidis, Aegean's founder, Lead Plaintiff alleges that he played a primary role in carrying out and concealing the fraud by, among other things, exerting control over and working with the Company's senior management to steal from Aegean through the sham transactions and

mislead investors through the falsification of financial statements.  *See* Compl. ¶¶7-11, 25-27, 148-51, 213, 166-67, 172, 376, 382, 385, 403, 406, 477, 479.  Lead Plaintiff further alleges that Aegean's 2016 repurchase of Melissanidis's shares amounted to insider trading in violation of the federal securities laws.  *Id.* ¶¶178, 182.

21.     Gianniotis and Melissanidis both deny all of Lead Plaintiff's allegations against them.

## III.    Relevant Procedural History

### A.     Initial Complaint

22.     On June 5, 2018, an initial complaint asserting violations of the federal securities laws was filed against Aegean and certain officers and directors of Aegean in the United States District Court for the Southern District of New York: *Simco v. Aegean Marine Petroleum Network, Inc., et al.*, No. 1:18-cv-04993-NRB.  ECF No. 1.

### B.     Appointment of Lead Plaintiff

23.     On August 6, 2018, URS moved for appointment as lead plaintiff and requested that its counsel, Berman Tabacco, be appointed lead counsel.  ECF No. 28.

24.     Ten competing motions seeking appointment as lead plaintiff were filed.  ECF Nos. 4, 8, 11, 16, 19-20, 28, 34, 37 and 41.  By the time Lead Plaintiff filed its opposition to the competing motions, seven of the movants had withdrawn their motions or filed non-oppositions.  ECF Nos. 48, 50-52 and 54-56.  By Order dated October 30, 2018, the Court appointed URS as Lead Plaintiff and approved its selection of Berman Tabacco as Lead Counsel.  ECF No. 69.

### C.     The Consolidated Complaint, Investigation and Motions To Dismiss

25.     On February 1, 2019, after extensive investigation and work with various consulting experts by Lead Counsel, Lead Plaintiff filed its Consolidated Complaint alleging violations of Sections 10(b), 20(a), 20(b) and 20A of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), 78t(b) and 78t-1, and the rules and regulations promulgated thereunder, including Rule 10b-5, 17 C.F.R. §§ 240.10b-5(b) (misrepresentations and omissions) and 240.10b-5(a) and (c) (scheme liability).  The named defendants were Melissanidis, Gianniotis and certain other

Aegean's officers and directors,[4] Deloitte Greece, PwC Greece, Deloitte Touche Tohmatsu Limited, Deloitte & Touche LLP, PricewaterhouseCoopers International Limited and PricewaterhouseCooopers LLP. ECF No. 81.

26.     Lead Plaintiff then proceeded to effectuate service on the named defendants, including through means of international service of process in several countries after translating the Complaint into Greece and working with foreign investigators.

27.     On March 6, 2020 and April 3, 2020, Melissanidis and Gianniotis filed their respective motions to dismiss the Complaint. ECF Nos. 199-200, 229-30. Seven additional motions to dismiss on various grounds under Fed. R. Civ. P. 12 were filed by former officers and directors at Aegean as well as the PwC and Deloitte entities named as defendants in Spring 2019: (a) Nikolas Tavlarios, Georgiopoulos, John Tavlarios and Konomos (ECF No. 196-97); (b) Fokas (ECF No. 210-11); (c) Koutsomitopoulos and Papanicolaou (ECF No. 232-33); (d) McIlroy (ECF No. 225-26); (e) PwC Greece and Deloitte Greece (ECF Nos. 187-88); (g) Deloitte US and PwC US (who filed separate motions to dismiss the Complaint with a joint memorandum of law in support) (ECF Nos. 180, 182, 184); and (h) DTTL and PwCIL (who filed a joint motion to dismiss) (ECF Nos. 191-92).

28.     On June 30, 2020, Lead Plaintiff opposed each of the motions to dismiss (ECF Nos. 239-51). All defendants filed their replies on August 20, 2020 (ECF Nos. 261-74) and a hearing was held on March 9, 2021.

29.     On March 29, 2021, after full briefing and a hearing, the Court issued its decision on all defendants' motions to dismiss. ECF No. 293. While the Court granted motions to dismiss for several named defendants, it denied in whole or in part the motions to dismiss filed by the Individual Defendants and the Auditor Defendants. *Id.* In particular, while the Court dismissed the Rule 10b-

---

[4] The other former officers and directors at Aegean against whom the Complaint alleged claims were: (i) E. Nikolas Tavlarios ("Nikolas Tavlarios"); (ii) Peter C. Georgiopoulos ("Georgiopoulos"); (iii) John P. Tavlarios ("John Tavlarios"); (iv) George Konomos ("Konomos"); (v) Spyridon Fokas ("Fokas"); (vi) Konstantinos D. Koutsomitopoulos ("Koutsomitopoulos"); (vii) Yiannis N. Papanicolaou ("Papanicolaou"); and (viii) Jonathan McIlroy ("McIlroy"). While Aegean was initially named as a defendant in the first-filed case, it was not named as a defendant in the Complaint because its filing of a Petition for relief under Chapter 11 of the Bankruptcy Code in November 2018 operated as a stay against the continuation of litigation against it.

5(a) & (c) and Section 20(a) and 20(b) claims against Melissanidis for lack of personal jurisdiction, it upheld the Section 20A insider trading claim. *Id.* Further, the Court upheld all claims alleged against Gianniotis. *See* ECF No. 293 at 135-38.

### D. The Aegean Bankruptcy

30.     In light of potential complexities that might arise due to the Aegean Bankruptcy, Lead Plaintiff proactively retained Lowenstein, counsel specializing in bankruptcy litigation and, in particular, the intersection of Chapter 11 bankruptcy and complex securities litigation, to monitor the Aegean Bankruptcy and to assist Lead Plaintiff in protecting the interests of class members if necessary.

31.     This proved wise as the Debtors attempted to impact the proposed class members' rights in several way. As described more fully in the August 9, 2022 Declaration of Michael S. Etkin in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses filed in connection with the Auditor Settlements (the "Etkin Declaration" or "Etkin Decl.") (ECF No. 375-4), Lead Counsel and Bankruptcy Counsel took a number of steps to protect the interests of Settlement Class in the Aegean Bankruptcy.

32.     First, among other matters, Aegean included a third-party release (the "Third-Party Release") as part of its initially proposed plan of reorganization (the "Chapter 11 Plan"). This Third-Party Release would have stripped Lead Plaintiff and the proposed class of their likely main or only source of compensation—the instant Action. Among other terms harmful to the Settlement Class, the Third-Party Release purported to release the direct claims of investors against numerous, solvent non-debtor defendants, which would have included third parties and Aegean's former employees, affiliates, members, officers, directors, accountants and consultants—*i.e.*, categories of persons that would include the Individual Defendants and the Auditor Defendants. Etkin Decl. ¶¶5-10.

33.     Second, the Chapter 11 Plan did not disclose whether, or to what extent, the claims of Lead Plaintiff and the proposed class would be preserved to the extent of available insurance coverage from the D&O policies, or whether the insurance policies would cover the securities claims at all. The Chapter 11 Plan also purported to permit the Litigation Trustee to "right to pursue any D&O Liability

Insurance Policies for the satisfaction of a claim for which the proceeds of any such D&O Liability Insurance Policies  may be available," but failed to provide Lead Plaintiff and the proposed class with equivalent rights.  Etkin Decl. ¶15.

34. To protect the interests of the Settlement Class, Lead Plaintiff, through Lead Counsel and Bankruptcy Counsel, filed a lengthy objection to the approval of the disclosure statement and vote solicitation procedures for Aegean's proposed plan on numerous grounds, which included objecting to the legal permissibility of the Third-Party Release, and explicitly preserving any available rights to insurance proceeds for the class.  Etkin Decl. ¶¶10, 15.

35. Ultimately, at Lead Counsel's direction and oversight, Bankruptcy Counsel successfully: (a) opposed Aegean's efforts through the Aegean Bankruptcy to release all investors' claims under the federal securities laws, which would have included those against other third parties such as the Individual Defendants, Deloitte Greece and PwC Greece; (b) negotiated and ultimately obtained Bankruptcy Court approval of a complete carve-out of Settlement Class Members' claims from the proposed sweeping release language; (c) obtained modifications to the plan of reorganization, preserving Lead Plaintiff's right to assert its claims to the proceeds from the D&O policies, which insurance would be applicable to claims against certain of Aegean's officers and directors, such as Gianniotis;[5] and (d) preserved the rights of Lead Plaintiff, on behalf of the Settlement Class, to pursue and obtain discovery after confirmation of the Chapter 11 Plan.  *See generally* Etkin Decl.

### E. Responsive Pleadings, Initial Disclosures and Discovery Protocols

36. On July 12, 2021, the Individual Defendants filed their answers.  ECF Nos. 303-04.

37. Counsel for the parties engaged in protracted negotiations regarding the proposed protective orders and discovery protocols.  On October 8, 2021, following a dispute over protocols related to non-party discovery, Lead Plaintiff submitted a pre-motion letter to the Court regarding an anticipated motion for entry of Lead Plaintiff's proposed protective order.  ECF No. 315.   After a

---

[5] Aegean's insurers have insisted throughout the litigation that the Company's D&O policies did not cover claims against Melissanidis.

hearing, the Court approved Lead Plaintiff's form of order.  ECF No. 336.  On May 4, 2022, the Court issued the Joint Discovery Protocol.  ECF No. 358.

38.     Initial disclosures were exchanged on September 2, 2021 and September 3, 2021.

39.     The parties submitted a Joint Report of Rule 26(f) Conference and Proposed Discovery Plan on September 14, 2021.  ECF No. 310.  In response to the Court's October 7, 2021 letter, the Parties submitted a further Joint Report on November 5, 2021.  ECF No. 326.

### F.     Formal Discovery

#### 1.     Discovery Propounded by Lead Plaintiff to the Individual Defendants

40.     On October 8, 2021 and October 21, 2021, Lead Plaintiff served its first set of document requests on Melissanidis and Gianniotis, respectively.  Melissandis served his objections and responses on November 8, 2021, and Gianniotis served his objections and responses on November 22, 2021.

41.     Lead Plaintiff's document requests prompted extensive "meet and confer" sessions with Gianniotis and Melissanidis over the scope and manner of production.

42.     On March 31, 2022, Lead Plaintiff served its first set of Interrogatories on Gianniotis.  Gianniotis served his objections and responses on May 2, 2022.

43.     On October 28, 2022, Lead Plaintiff served its first set of Interrogatories on Melissanidis.  Melissanidis served his objections and responses on November 28, 2022.

44.     Gianniotis and Melissanidis made limited, staggered productions in response to Lead Plaintiff's document requests.

#### 2.     Lead Plaintiff's Responses to Defendants' Discovery Requests

45.     On April 12, 2022, Gianniotis served his first set of document requests on Lead Plaintiff.  Lead Plaintiff filed its timely responses and objections on May 12, 2022.  Gianniotis's requests spawned a series of conferences to negotiate the scope of Lead Plaintiff's production throughout the summer and fall of 2022.

46.     Lead Plaintiff conducted an extensive search in response to Gianniotis's request for production of documents, which involved multiple staff members and led to the review and production

of over 17,263 pages of responsive documents, including two productions on July 28, 2022 and August 16, 2022.

### 3. Non-Party Discovery

47. Lead Plaintiff served 15 subpoenas to various non-parties throughout the litigation, which resulted in multiple meet and confers between Lead Counsel and counsel for the non-parties, including many in the time period from July 2022 to February 2023. During that same period, Lead Counsel reviewed and analyzed thousands of documents, including documents from Aegean's successor, the Litigation Trustee, Deloitte Greece, PwC Greece, various financial firms and some of the Dismissed Defendants.

### 4. Review of Documents Produced in Discovery and Further Work with Consulting Experts

48. To date, Lead Plaintiff has reviewed over 187.052 gigabytes (reflecting 133,842 documents) received in discovery, including substantial documents produced by Aegean's successor company and its Litigation Trustee, some of which were in Greek. A substantial bulk of this review occurred after June 30, 2022, including in preparation for the second mediation, the settlement conference and class certification briefing.

49. Throughout the litigation, from inception through formal discovery, Lead Plaintiff also consulted with forensic accounting/auditing consultants, international privacy law consultants and foreign counsel on various matters including regarding the underlying facts, the prosecution of claims against foreign defendants and the impact of the General Data Protection Regulation ("GDPR") (the recently enacted privacy laws in Greece).

### 5. Depositions

50. On October 6, 2022, Lead Plaintiff took the deposition of Georgios Vogiatzis, the Rule 30(b)(6) designated witness and former sole-owner of third-party Miami Exports LLC—one of four entities with whom Aegean is alleged to have engaged in sham transactions. *See, e.g.*, Compl. ¶¶148-49.

51.     On November 4, 2022, Melissanidis took, and Lead Counsel defended, the deposition of Lead Plaintiff's damages expert in connection with Lead Plaintiff's motion for class certification.

**E.     The Auditor Settlements**

52.     In Summer 2021, following the Court's hearing on the motions to dismiss and the Court's denial of PwC Greece's and Deloitte Greece's joint motion to dismiss, counsel for Lead Plaintiff and PwC Greece's Counsel began good-faith negotiations with an eye toward reaching a potential settlement which would release claims against PwC Greece and the PwC Greece Released Parties.[6]

53.     On August 26, 2021, following numerous rounds of negotiation, an agreement in principle was reached to settle all claims asserted by Lead Plaintiff in this this Action against PwC Greece for the exchange of mutual releases, $14.9 million in cash and an agreement by PwC Greece to produce relevant documents, including audit workpapers, in a form and manner that renders them authentic business records.  *See* Stipulation and Agreement of Partial Settlement with PwC Greece ¶4.6 (ECF No. 351-2).

54.     On November 9, 2021, Lead Plaintiff filed a motion for preliminary approval of the PwC Greece Settlement.[7]  ECF Nos. 327-30.

55.     In Fall 2021, counsel for Lead Plaintiff and Deloitte Greece's Counsel likewise began good-faith negotiations with an eye toward reaching a potential settlement which would release claims against Deloitte Greece and the Deloitte Greece Released Parties.[8]

56.     On December 22, 2021, following numerous rounds of negotiation, an agreement in principle was reached to settle all claims asserted by Lead Plaintiff in this Action against Deloitte Greece for the exchange of mutual releases, $14.9 million in cash and an agreement by Deloitte Greece to produce relevant documents, including audit workpapers, in a form and manner that renders them

---

[6] "PwC Greece Released Parties" is defined in the Auditor Settlements Notice.  ECF No. 375-6.

[7] "PwC Greece Settlement" is defined in the Auditor Settlements Notice. *Id.*

[8] "Deloitte Greece Released Parties" is defined in the Auditor Settlements Notice. *Id.*

authentic business records.  *See* Stipulation and Agreement of Partial Settlement with Deloitte Greece ¶4.6 (ECF No. 351-3).

57.    Lead Plaintiff thereafter filed a motion for preliminary approval of both the Deloitte Settlement and the Deloitte Defendants in order to provide notice of both settlements jointly to the Settlement Class.  This motion was granted on June 3, 2022.  ECF Nos. 361-62.  Motions for final approval of the Auditor Settlements and for attorneys' fees, litigation expenses and the establishment of a litigation fund were filed on August 9, 2022 and granted on September 14, 2022 after a final approval hearing.  ECF Nos. 402-405.

### F.    Motions for Class Certification

58.    On September 12, 2022, Lead Plaintiff filed its motion for class certification.  ECF Nos. 394-97.

59.    On October 26, 2022, following the parties' second mediation, Lead Plaintiff and Gianniotis, through their counsel, filed a joint letter motion requesting the Court stay the Action as to Gianniotis and stay all proceedings and deadlines pertaining to Gianniotis, including the deadline to file an opposition to Lead Plaintiff's motion for class certification.  ECF No. 407.  The Court granted the letter motion on October 27, 2022.  ECF No. 408.

60.    On November 14, 2022, following the tentative agreement to settle the Action with Gianniotis and after several meet and confers with counsel for Melissanidis, Lead Plaintiff, through Lead Counsel, filed a letter motion requesting a pre-conference motion so that Lead Plaintiff could request leave to file a revised motion for class certification to focus solely on the remaining claims against Melissanidis.  ECF No. 409.  Melissanidis opposed Lead Plaintiff's letter motion by instructing Lead Plaintiff to convey Melissanidis's position in Lead Plaintiff's letter to the Court.

61.     The Court granted Lead Plaintiff's request and, on October 19, 2022, the Court held a pre-motion conference attended by Lead Counsel and counsel for Melissanidis.  The Court granted Lead Plaintiff's request to file a revised motion for class certification the same day.  ECF No. 410.

62.     On December 7, 2022, Lead Plaintiff filed its revised motion for class certification as to the remaining claims against Melissanidis.   ECF Nos. 411-14.

63.     Melissanidis filed his opposition to Lead Plaintiff's revised motion for class certification on January 20, 2023.  ECF Nos. 420-22.

### G.     Negotiations and Settlements with the Individual Defendants

64.     Lead Counsel devoted significant effort to negotiate the Individual Defendants Settlements, which included analysis of the risks of establishing the Individual Defendants' liability, the specific defenses raised by the Individual Defendants and issues of recoverable damages from the Individual Defendants.

65.     In or around the latter half of 2021, Lead Counsel and Gianniotis's Counsel began discussing the possibility of mediation.  After agreeing to mediate the case, the parties selected a nationally recognized mediator, Michelle Yoshida, to mediate a possible settlement of the claims against Gianniotis in the Action.  Michelle Yoshida is a mediator with Phillips ADR with extensive experience in mediating complex disputes, including securities class actions, and has been involved in the mediation of over five hundred disputes.  *See* http://www.phillipsadr.com/bios/michelle-yoshida/. Lead Plaintiff and Gianniotis scheduled a mediation with Ms. Yoshida via Zoom videoconference on February 14, 2022.

66.     Melissanidis later accepted an invitation to join this mediation.

67.     Lead Plaintiff and Lead Counsel attended the mediation.  The parties were unsuccessful in reaching a resolution at the February 14, 2022 mediation.

68.     In June 2022, Lead Counsel reached out to Gianniotis's Counsel and Melissanidis's Counsel in an attempt to jump start settlement discussions before the parties engaged in further protracted and expensive litigation.  As a result of that outreach and Gianniotis's request that the parties engage in mediation rather than direct lawyer-to-lawyer negotiations, the parties agreed to a second mediation with Ms. Yoshida via Zoom videoconference on October 25, 2022.  Both Lead Plaintiff and Lead Counsel also attended this mediation.  The mediation lasted a full day, concluding in the evening. At the conclusion of the mediation session, Lead Plaintiff and Gianniotis agreed in principle to settle

the case for $11 million.  Lead Plaintiff and Defendant Melissandis, however, did not reach an agreement at the conclusion of this second, formal mediation session.

69.     On December 22, 2022, Lead Counsel, on behalf of Lead Plaintiff, submitted to the Court a letter requesting the Action be referred to a magistrate judge for a mandatory, in-person settlement conference with Melissanidis at which the parties and their counsel be present.  ECF No. 415.  On January 4, 2023, the Court held a status conference and, on January 5, 2023, the Court issued an order referring the case to Magistrate Judge Stewart D. Aaron for a settlement conference. ECF No. 416.  On January 13, 2023, a settlement conference was scheduled with Magistrate Judge Aaron for February 22, 2023, which was later continued to March 21, 2023 following Melissanidis's letter requesting an adjournment.  ECF Nos. 417, 423, 425.  After several telephonic efforts to resolve the claims followed by a Zoom settlement conference attended by Lead Plaintiff, Lead Counsel, Melissanidis and his counsel with Magistrate Judge Aaron on March 21, 2023, Lead Plaintiff and Melissanidis accepted Magistrate Judge Aaron's mediator proposal to settle the case for $949,999 on March 22, 2023.

70.     On April 21, 2023, after several months of negotiation of the terms, Lead Plaintiff and Gianniotis executed the Gianniotis Stipulation to settle all claims asserted against him for $11 million in exchange of for mutual releases.  Likewise, after a month of negotiation, on April 21, 2023, Lead Plaintiff and Melissanidis executed the Melissanidis Stipulation to settle all claims asserted against him for $949,999 in exchange for mutual releases.

71.     As noted, all counsel involved in the negotiation and settlement process had the requisite skill, knowledge and experience to evaluate the merits of the Individual Defendants Settlements.  Indeed, the Individual Defendants were represented by very skilled attorneys at Morvillo Abramowitz Grand Iason & Anello PC on behalf of Gianniotis, and Boies Schiller Flexner LLP on behalf of Melissanidis.   In addition, staff counsel for URS was intimately involved and in frequent consultation with Lead Counsel at every material step of the settlement negotiations and with respect to the instant motion before the Court.

17

72.     After the agreements in principle were reached, the Settling Parties diligently negotiated and prepared comprehensive settlement papers to notice both Individual Defendants Settlements together and Lead Counsel worked with a damages expert on the plan for allocating the Individual Defendants Net Settlement Funds (defined below).

73.     The Court granted preliminary approval of the Individual Defendants Settlements on June 1, 2023 and the Individual Defendants Settlement Funds have since been deposited into an escrow account on June 27, 2023, July 6, 2023 and July 7, 2023.

## IV.     Risks Faced by Lead Plaintiff in the Action

74.     Given the risks of litigation and the fact that, even where a plaintiff's case appears strong, there is no guarantee against a defense verdict, Lead Counsel believes that the proposed Individual Defendants Settlements are fair, reasonable, adequate and in the best interest of the Settlement Class.

75.     Indeed, while Lead Counsel believes that the claims asserted against the Individual Defendants have merit, they recognize the risks and challenges to establishing liability against the Individual Defendants (including knowledge and participation in the fraudulent scheme, falsity, materiality, scienter and loss causation) or collecting upon a judgment even if obtained, particularly since the Individual Defendants are foreign nationals and the former CFO and founder of a now-bankrupt entity which was located in Greece.

76.     Gianniotis has contended in his motion to dismiss and answer, *inter alia*, that Lead Plaintiff cannot establish its liability for a variety of reasons, including that: (a) he had no knowledge of the fraudulent conduct at issue or the red flags pertaining to the fraud (ECF No. 304 ¶ 248; ECF No. 263 at 6-7); (b) that the Settlement Class's damages resulted from acts or omissions of persons or entities over which Gianniotis had no control; and (c) that he acted in good faith and did not act with the requisite intent (*see*, *e.g.*, ECF No. 263 at 6-7; ECF No. 304 at ¶248 & 9th, 10th, and 12th Affirm. Defenses).  Gianniotis has claimed and/or would also likely claim that Lead Plaintiff cannot prove that he was in any way involved in or knew of the Sham Receivables or the Shell Companies.  Indeed, Lead Plaintiff assumes Gianniotis would claim that the evidence shows that his responsibilities at

Aegean focused on liaising with banks and providing support for capital raises such that the responsibility for Aegean's financial reporting fell almost exclusively to others, such as Aegean's former Comptroller.  Further, similar to arguments raised by certain other dismissed officer and director defendants early in the litigation, Lead Plaintiff also assumes Gianniotis would argue that he was entitled to rely on the professional work of Aegean's outside auditors who cleared Aegean's financials during the Class Period.  Gianniotis would also likely argue that the evidence would show that, in his role as the Company's point person with Aegean's creditors, he honestly portrayed Aegean's financial strength and viability and candidly assured them that the accounts receivables at issue in this litigation—the Sham Receivables—were not part of the Company's borrowing base—*i.e.*, they were not pledged as collateral against the Company's borrowing.  Indeed, Gianniotis has advanced arguments that he too was misled and that his reliance on others was reasonable under the circumstances.  Gianniotis would also likely argue that much of Lead Plaintiff's evidence is inadmissible or otherwise relies on documents and witnesses that lack credibility.  In addition, contested issues related to loss causation and damages would come to a battle of experts with all the risks inherent to that.  Moreover, settlement negotiations revealed that there were several unique issues regarding D&O insurance coverage and unusual potential defenses to certain coverage that significantly complicated the negotiations with Gianniotis, and there was no indication that he has the assets to satisfy a judgment here.  Moreover, Lead Counsel also considered that the Litigation Trustee was pursuing claims on behalf of Aegean, and the DOJ and SEC's investigation and Aegean's bankruptcy and costs of further litigation could significantly dissipate the available insurance.

77.     Melissanidis has claimed, *inter alia*, that he did not use material, non-public information about Aegean in transacting in Aegean stock; and that putative class members did not trade contemporaneously with, and in the same securities, as Melissanidis.  *See*, *e.g.*, ECF No. 303 at 4th, 5th, and 7th Affirm. Defenses).  Melissanidis would also likely argue that the most damning of Lead Plaintiff's evidence cited in Aegean's outside counsel's presentation to the government is inadmissible hearsay, and that Lead Plaintiff cannot show that he owned, controlled or otherwise had any influence over Aegean or the various counterparts that allegedly benefitted from the misappropriation.

Melissanidis has argued that he relinquished control and stepped away from any management role at Aegean in 2006 and that the Company's public statements implicating him in the fraud represent nothing more than blame shifting for years of internal mismanagement. *See*, *e.g.*, ECF No. 200 at 4-5.   Melissanidis also opposed Lead Plaintiff's motion for class certification, arguing that Lead Plaintiff's proposed class definition is far too broad to be certified, that much of the proposed Class would not have standing under the recent Supreme Court case *TransUnion LLC v. Ramirez,* 141 S. Ct. 2190 (2021) and that determining each claimant's standing and damages would require a claimant-by-claimant inquiry.   *See*, *e.g.*, ECF No. 420 at 6-16.   As to Lead Plaintiff's allegations that he committed a primary act in violation of the Exchange Act, Melissanidis would likely argue that Lead Plaintiff would be unable to show that he was responsible for any of the misstatements made in Aegean's SEC filings, that Lead Plaintiff has no evidence showing the market relied on his alleged wrongdoing and that Lead Plaintiff cannot point to any evidence showing that he controlled or had any influence over Aegean and/or the individuals and entities who allegedly made off with misappropriated Company cash and assets.   Under the well-accepted "loss avoided" and "artificial inflation per share" methods for determining Section 20A damages, Lead Plaintiff's damages consultant calculated that Melissanidis's insider trading profits could be as high as between $72 million and $98.2 million. However, Melissanidis has proffered that measuring 20A damages must be assessed based on the class members' losses and would require a claimant-by-claimant inquiry which would limit recovery to those class members who held through a partial disclosure as well as traded contemporaneously with Melissanidis, that Lead Plaintiff's proposed model must consider whether class members suffered actual economic damages and that each claimant's damages must be offset by any prior recovery or countervailing gains.   ECF No. 420 at 16.   Melissanidis has also argued that investors who sold Aegean Securities after the stock price declined but before purported corrective disclosures were made whole and did not suffer losses that are "fairly traceable" to Mr. Melissanidis's alleged wrongdoing and thus, would not be entitled to any recovery under Section 20A.   *Id*. at 7-11.   If Melissanidis's theory of Section 20A damages prevailed, the Section 20A damages would be a fraction of what Lead Plaintiff calculated and Settlement Class Members could be "subject to the potentially meritorious defense that

[they] suffered [little to] no economic loss attributable to [Melissanidis's] alleged wrongdoing." *See Gordon v. Sonar Cap. Mgmt. LLC*, 92 F. Supp. 3d 193, 205 (S.D.N.Y. 2015).  Finally, Melissanidis has consistently maintained that he had no insurance coverage and, as a resident of Greece, there were unique challenges to collectability of any potential judgment against him.

78.     Lead Plaintiff and Lead Counsel also considered the difficulties in establishing liability against foreign nationals and the substantial risks, burdens and expenses involved in further litigation of this Action through trial and appeals against the Individual Defendants, including challenges (a) stemming from the fact that the Aegean Bankruptcy created hurdles to gathering and establishing documents as business records and to introducing such documents into evidence; (b) continuing to gather documentary evidence, much of which would have been written in Greek and located in Greece, or otherwise in Luxembourg, Cyprus or the Marshall Islands, countries where the Litigation Trustee has instituted proceedings and/or where Aegean-related witnesses and entities are believed to be domiciled; (c) rendering admissible the documentary evidence Lead Plaintiff has received thus far in the litigation, including critical documents used by Aegean's outside counsel in its presentation to the DOJ and the SEC; (d) the fact that the Individual Defendants and others are likely to refuse to produce certain documents by asserting privileges under Europe's recently enacted privacy and security law, the GDPR; (e) regarding the costly and time-consuming work of translating relevant documents obtained in discovery and locating, subpoenaing, interviewing and/or deposing former Aegean employees and other key witnesses abroad, including through the Hague Convention; (f) the inability to collect from Aegean; and (g) the difficulty of collecting and/or enforcing any judgment obtained against foreign defendants and the fact that the insurance was limited.  Thus, the foreign nature of these proceedings and Aegean's bankruptcy raise an additional level of risk not usually confronted in securities litigation with U.S.-based companies and defendants and constitutes an additional "weight on the scale" in favor of approval.

79.     Moreover, resolution of many issues would involve various "battles of the experts," with the concomitant risk that the jury could credit the Individual Defendants' experts over Lead

Plaintiff's experts.   These include issues related to whether Aegean's financial statements were materially misleading, loss causation and damages.

80.     I believe that the Individual Defendants would also argue that any judgment against them must be further reduced pursuant to the proportional liability provisions of the federal securities laws.  Specifically, the Individual Defendants may try to assign all or most of the fault to others, such as Aegean, its outside auditors and certain former officers, directors and/or employees, and may therefore argue that they are entitled to a judgment credit of at least the proportionate fault of others. *See* 15 U.S.C. § 78u-4(f)(2)(B).  If successful, these defenses could substantially reduce or eliminate any recovery against the Individual Defendants.

81.     In addition, Lead Plaintiff and Lead Counsel considered the other attendant risks of litigating a complex securities class action, including (a) the possibility that a class may not be certified; (b) a possible adverse judgment; (c) discovery disputes; (d) disputes between experts on complex financial accounting and as well as loss causation and damages; (e) a lengthy trial; and (f) appeals.

82.     Lead Plaintiff and Lead Counsel have considered the uncertain outcome of trial and appellate risk in complex lawsuits like this one.  While Lead Plaintiff and Lead Counsel believe that the case against the Individual Defendants is very meritorious, the fact remains that the Court, at class certification, summary judgment or trial could find the Individual Defendants' defenses persuasive, which could significantly reduce or eliminate recoverable damages.

83.     Given the foregoing, Lead Plaintiff and Lead Counsel believe that the Individual Defendants Settlements provide a substantial benefit now, namely the payment of $11,949,999 ($11 million from Gianniotis and $949,999 from Melissanidis) (less the various deductions described in the Detailed Notice), as compared to the risk that the claims asserted in the Complaint would produce a similar, smaller or no recovery from these Individual Defendants after summary judgment, trial and appeals, possibly years in the future.

84.     In light of the risks of prevailing at trial and collecting any sums after a trial as compared to the amount certain provided to the Settlement Class by way of the Individual Defendants

22

Settlements, Lead Counsel (and Lead Plaintiff as set forth in the Lead Plaintiff Decl. ¶7)[9] believe that the proposed Individual Defendants Settlements are fair, reasonable and adequate, in the best interests of the Settlement Class, and therefore warrant Court approval.

## V.    The Proposed Individual Defendants Settlements and Individual Defendants Plan of Allocation

85.    Lead Plaintiff's damages consultant estimates that total alleged Section 10(b) damages for purchases of Aegean common stock and notes were approximately $349.6 million for the entire Settlement Class Period. Thus, the $11,949,999, together with the previously approved Auditor Settlements (*see* ECF Nos. 402 and 404), brings the damages recovered for the Settlement Class to approximately $41.7 million or, 11.9%, of total Section 10(b) damages.   This is well within—and indeed above—the reported average values for securities fraud class actions.   For example, Cornerstone Research's data shows that the median settlement as a percentage of damages in cases involving accounting issues (including GAAP violations, restatements and accounting irregularities) between 2013 and 2022 was between 5.1% and 7.6%.  *See* **Exhibit 7**, at 9.[10]  Cornerstone Research also estimates that median settlements as a percentage of "simplified tiered damages" in Rule 10b-5 cases since 2013 have ranged between 4.1% and 4.3% for cases with estimated damages of between $250 million to $499 million (*id*. at 6) and that the median settlement dollars for all securities fraud cases from 2018 to 2022 following rulings on motions to dismiss and the filing of a class certification motion, but before a ruling on class certification, is $17 million (*id*. at 14).   Moreover, the Second Circuit's median recovery over the period of 2013 to 2022 is 5.0% of damages according to the same report. *Id*. at 19.  Given the likelihood that not all Settlement Class Members will file claims, it is likely that Authorized Claimants' actual percentage of recovery will be even higher.  Thus, when compared

---

[9] Attached hereto as **Exhibit 5** is a true and correct copy of the Declaration of Kevin Catlett on Behalf of Utah Retirement Systems in Support of (A) Lead Plaintiff's Motion For: (I) Final Approval of The Proposed Individual Defendants Settlements; (II) Final Certification of The Settlement Class; and (III) Final Approval of The Proposed Individual Defendants Plan of Allocation; and (B) Lead Counsel's Motion For Attorneys' Fees and Reimbursement of Litigation Expenses ("Lead Plaintiff Declaration" or "Lead Plaintiff Decl.").

[10] Attached hereto as **Exhibit 7** is a true and correct copy of an excerpt from *Securities Class Action Settlements-2022 Review and Analysis*, Cornerstone Research (2023) ("Cornerstone Research Report").

to the risk that the claims asserted in the Complaint would produce a similar, smaller or no recovery after summary judgment, trial and appeals, possibly years in the future, the Individual Defendants Settlements are adequate.

86.     Lead Counsel also worked closely with its damage consultant to prepare the Individual Defendants Settlements Plan of Allocation which is referenced in the Detailed Notice and set forth at www.AegeanSecuritiesLitigation.com.

87.     Under the Individual Defendants Plan of Allocation, the Gianniotis Net Settlement Fund and Melissanidis Net Settlement Fund (the "Individual Defendants Net Settlement Funds") will be distributed to Authorized Claimants on a *pro rata* basis, based on the relative size of their Recognized Claims, taking into account when they purchased, acquired and/or sold Aegean Securities. Specifically, a "Distribution Amount" will be calculated for each Authorized Claimant, which will be the Authorized Claimant's Recognized Claim divided by the total Recognized Claims of all Authorized Claimants, multiplied by the total amounts in the Individual Defendants Net Settlement Funds.  If any Authorized Claimant's Distribution Amount calculates to less than $10, it will not be included in the calculation and no distribution will be made to that Authorized Claimant.  The computations under the Individual Defendants Plan of Allocation are a method to weigh, in a fair and equitable manner, the claims of Authorized Claimants against one another for the purpose of making *pro rata* allocations of the Individual Defendants Net Settlement Funds.  Thus, I am informed and believe, based on conversations with Lead Plaintiff's damages consultant, that the Individual Defendants Plan of Allocation provides an equitable and reasonable method for calculating an Authorized Claimant's Recognized Loss Amount and distributing the Individual Defendants Net Settlement Funds among Authorized Claimants who suffered economic losses as a result of Gianniotis's and/or Melissanidis's alleged misconduct.

88.     In developing the Individual Defendants Plan of Allocation, Lead Plaintiff's damages consultant calculated the estimated amount of alleged artificial inflation in each of the Aegean Securities purchased or acquired within the Settlement Class Period that were allegedly proximately

caused by Gianniotis's and/or Melissanidis's alleged misconduct.   They apportion Individual Defendants Net Settlement Funds equitably among Settlement Class Members.

89.     In this Action, Lead Plaintiff alleges that the corrective information (referred to as a "corrective disclosure") related to the claims asserted against the Individual Defendants and was released to the market on December 14, 2016; February 20, 2018; June 4, 2018; November 2, 2018; and November 6, 2018; thereby impacting the prices of Aegean Securities on December 14, 2016; February 21, 2018; February 22, 2018; June 5, 2018; November 5, 2018; November 6, 2018; and November 7, 2018.  ¶¶188-89, 97-98, 477-80.  Thus, in order to have a "Recognized Loss Amount" under Individual Defendants Plan of Allocation, Aegean Securities must have been purchased or otherwise acquired at any point during the Settlement Class Period (during the period between February 27, 2014 and November 5, 2018, inclusive) and held through the issuance of at least one corrective disclosure.

90.     The Individual Defendants Plan of Allocation is the same as the one approved by the Court in connection with the Deloitte Greece Settlement.  Additionally, since this plan is identical to the Deloitte Plan of Allocation, it also has the additional benefit of simplifying and reducing costs of the claims process.

## VI.     Lead Plaintiff's Compliance with the Court's Preliminary Approval Orders Requiring Issuance of the Notices of the Individual Defendants Settlements to Settlement Class Members

91.     I am informed and believe that, pursuant to this Court's June 1, 2023 Preliminary Approval Orders, which certified the Settlement Class for purposes of the Individual Defendants Settlements, approved notice to the Settlement Class and appointed A.B. Data as Claims Administrator in the Action (ECF Nos. 446-47), the Claims Administrator has widely disseminated notice of these Individual Defendants Settlements to potential Settlement Class Members.

92.     Lead Counsel worked closely with the Claims Administrator to ensure that notice of the Individual Defendants Settlements was properly given to the Settlement Class Members.  Attached hereto as **Exhibit 6** is a true and correct copy of the Declaration of Jack Ewashko Regarding Mailing

of Notice and Publication of Summary Notice, dated September 14, 2023 ("A.B. Data Declaration" or "A.B. Data Decl."). The following is a summary of A.B. Data's actions to date.

93.     As detailed in the A.B. Data Declaration filed in connection with the previously approved Auditor Settlements notice program (the "Original Notice Program"), A.B. Data mailed a total of 41,879 Auditor Settlement Notice Packets[11] to potential Settlement Class Members of the Auditor Settlements via first class mail. A.B. Data Decl. ¶3. The breakdown of these 41,879 mailings included: (a) 4,099 Auditor Settlements Notice Packets sent to mailing records listed in A.B. Data's proprietary database of names and addresses of the largest and most common banks, brokers and other nominees (the "Nominee List");[12] (b) mailing 11,690 Auditor Settlements Notice Packets to the names and addresses of potential class members provided to A.B. Data by Nominees; (c) sending the Auditor Settlements Notice Packet to 257 additional potential Settlement Class members who appeared on Aegean's transfer agent file; and (d) 25,786 mailings to potential Settlement Class members identified by and sent in bulk by Nominees. *Id.* In addition, A.B. Data caused the securities clearing agency, the Depository Trust Company ("DTC"), to post the Auditor Settlements Notice Packet on its Electronic Legal Notice System ("LENS"),[13] released via *PR Newswire* and publishing in *Investor's Business Daily* a Summary Notice on June 27, 2022, established a case-specific, toll-free telephone helpline and established a settlement website. *See id.*

---

[11] The "Notice Packet" contained copies of the Notice of (I) Pendency of Class Action and Proposed Partial Settlements; and (II) Final Approval Hearing For The Partial Settlements, Plans of Allocation, Motion For Approval of Attorneys' Fees and Reimbursement of Litigation Expenses and Application For The Establishment of a Litigation Expense Fund (the "Omnibus Notice"), along with the Proof of Claim and Release. A.B. Data Decl. ¶3 & n.2.

[12] As in most securities class actions, the vast majority of potential Settlement Class Members are beneficial purchasers whose securities are held in "street name"—that is, the securities are purchased by brokerage firms, banks, institutions, and other third-party nominees in each instance in the name of the nominee, on behalf of the beneficial purchaser. Accordingly, A.B. Data maintains a proprietary database with names and mailing addresses and, in some instances, email addresses, of approximately 4,000 banks, brokers and other nominees, known as the "Nominee List." The Nominee List, which A.B. Data updates periodically, also includes institutions that regularly file third-party claims on behalf of their investor clients in securities class actions and all entities that have requested notification in every case involving publicly traded securities. *See* A.B. Data Decl. ¶3 & n.3.

[13] LENS enables DTC member banks and brokers to review the Notice Packet and contact the Claims Administrator directly to obtain copies for their clients who may be Settlement Class Members. *See* A.B. Data Decl. ¶3 & n.4.

94.     Building upon the notice already given in the Original Notice Program, A.B. Data provided direct notice of the Individual Defendants Settlements via:

a.      postcards (the "Postcard Notice") to all those persons who were previously identified as potential Settlement Class members with respect to the Auditor Settlements, including through the Company's stock transfer list, and to all those who were subsequently identified as potential Settlement Class Members by individuals, brokerage firms or other nominee holders in connection with the Individual Defendants Notice Program;

b.      re-mailing Postcard Notices to 115 individuals for whom A.B. Data learned new addresses;

c.      dissemination of the Detailed Notice to the Nominee List;

d.      causing the DTC to post the Individual Defendants Settlements Notice Packet[14] on LENS; and

e.      The publication of the Summary Notice in *Investor's Business Daily* and *PR Newswire* on June 19, 2023.

A.B. Data Decl. ¶¶4-12 & Exs. A-D.

95.     As explained above and in the A.B. Data Declaration, given the substantial work performed to identify potential Settlement Class Members in the Original Notice Program, Lead Plaintiff opted to provide Postcard Notice in connection with the Individual Defendants Settlements to maximize cost-savings to the Settlement Class.  As set forth in detail in the memorandum of law in support of Lead Plaintiff's Final Approval Motion, courts in this and other districts have held that providing notice to a settlement class via postcard notice is sufficient so long as it contains basic settlement information and instructions for settlement class members to access the more detailed Long (Detailed) Notice on the settlement website.  *See, e.g.*, *In re Advanced Battery Techs., Inc. Sec. Litig.*,

---

[14] The "Individual Defendants Settlements Notice Packet" contained copies of the Notice of (I) Pendency of Class Action and Proposed Individual Defendants Settlements; and (II) Final Approval Hearing For The Individual Defendants Settlements, The Individual Defendants Plan of Allocation and Motion For Approval of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Detailed Notice") and Proof of Claim and Release Form (the "Claim Form").

298 F.R.D. 171, 183 (S.D.N.Y. 2014); *In re Mutual Funds Inv. Litig.*, No. 04-md-15861-CCB, 2010 WL 2342413, at *6-7 (D. Md. May 19, 2010) (approving postcard notice); *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 973 (N.D. Ill. 2011) (holding that postcard notice was "more than sufficient" despite not providing detailed information about class members' options and deadlines because website and claims administrator via phone did). Indeed, the Court approved this method of notice in its Preliminary Approval Orders. ECF Nos. 446-47.

96. A.B. Data has also posted information regarding the Individual Defendants Settlements on a dedicated website established for the Action, www.AegeanSecuritiesLitigation.com, to provide Settlement Class Members with information concerning the Individual Defendants Settlements, as well as downloadable copies of the Postcard Notice, Detailed Notice, Stipulations and other relevant documents. A.B. Data Decl. ¶14. The website is the same as that created for the Auditor Settlements and also contains a link providing the Settlement Class with all pertinent documents related to those settlements.

97. A.B. Data also established and continues to maintain a case-specific, toll-free telephone helpline, 1-877-888-9760, with an interactive voice response system and live operators, to accommodate potential Settlement Class Members with questions about the Action and the Individual Defendants Settlements. A.B. Data Decl. ¶13.

98. In addition, Lead Counsel has provided a link to www.AegeanSecuritiesLitigation.com on its website.[15]

99. The Postcard and Detailed Notices apprised Settlement Class Members of the nature and pendency of the Action, the definition of the Settlement Class to be certified, the class claims and issues and the claims that will be released. In addition, the Court-approved Detailed Notice includes all the information required by Rule 23(c)(2)(B) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(a)(7), including: (a) the consideration provided by the Individual Defendants Settlements; (b) a description of the amount of

---

[15] *See* https://www.bermantabacco.com/case/aegean-marine-petroleum-network-securities-litigation/.

the settlement proposed to be distributed to the parties to the action, determined in the aggregate and on an average per share basis; (c) a statement of the potential outcome of the case, including that the Settling Parties disagree as to the amount of damages and a statement of Lead Plaintiff's estimated average amount of recovery per share; (d) a statement of attorneys' fees or costs sought; (e) identification and contact information for Lead Counsel; (f) a description of the reasons for the Individual Defendants Settlements; (g) an explanation of the rights of Settlement Class Members to participate in the Individual Defendants Settlements, object to any aspect of the Individual Defendants Settlements, the Individual Defendants Plan of Allocation and/or the Fee and Expense Application, or exclude themselves from the Individual Defendants Settlements; (h) the dates and deadlines for certain Individual Defendants Settlement-related events; (i) a reference to the Individual Defendants Plan of Allocation posted at www.AegeanSecuritiesLitigation.com and the rational for the Individual Defendants Plan of Allocation; (j) an explanation how to submit Claim Forms, object or opt out of the Individual Defendants Settlements and the timing needed to do so; and (k) a statement that the Claims Administrator will maintain a toll-free number to answer questions as well as maintain a website where, among other things, key pleadings in this case may be viewed.  The Detailed Notice specifically informed recipients that Lead Counsel intended to apply for an award of attorneys' fees not to exceed twenty-five percent (25%) of the Individual Defendants Settlement Amount and reimbursement of Lead Counsel's out-of-pocket expenses that were not reimbursed from the Auditor Settlements, which are estimated not to exceed $120,000.  A.B. Data Decl. Exs. A & B.

100.    Pursuant to the terms of the Preliminary Approval Orders, the deadline for Settlement Class Members to request exclusion or submit objections to the Individual Defendants Settlements, Fee and Expense Application is September 28, 2023.

101.    To date, Lead Counsel has not received any objections, but I was informed by A.B. Data that it has received one request for exclusion from an individual investor who stated that he expended $1,234.95 to purchase his Aegean securities.  Lead Plaintiff will address this and any other exclusions and/or objections, should they arise, in its reply papers which are due October 10, 2023.

Aside from the one request for exclusion noted above, I am informed and believe that A.B. Data has not received any objections or other requests for exclusion.  A.B. Data Decl. ¶¶15-18 & Ex. E.

## VII.    Application for Attorneys' Fees, Reimbursement of Lead Counsel's Expenses and Award to Lead Plaintiff

### A.    Lead Counsel's Request for Attorneys' Fees

102.    Lead Counsel requests attorneys' fees of 25% of the Individual Defendants Settlements, or $2,987,499.75.  This Court has previously awarded Lead Counsel's fee request of 25% of the Auditor Settlements, based on the ex ante fee agreement reached with Lead Plaintiff and a lodestar cross check for work performed from inception to June 30, 2022, and, as detailed below, similarly paying Lead Counsel's reasonable 25% fee request from the Individual Defendants Settlements Fund would properly compensate counsel for its efforts prosecuting and resolving the claims against the Individual Defendants and furthers an essential purpose of the federal securities laws.

103.    As described above and in the memorandum of law in support of the Fee and Expense Application, filed contemporaneously herewith, the requested fee of 25% of the Individual Defendants Settlement Fund, which, if granted, would result in a total award to Lead Counsel of 25% of the global settlement amount, is well within the range of percentage awards granted by courts in this Circuit and the lodestar multiplier of 0.52, based on the 9,607.45 hours expended by Lead Counsel from July 1, 2022 through August 31, 2023, is below the range of multipliers commonly awarded in complex common fund class action settlements.  During the same period, Bankruptcy Counsel incurred a cumulative lodestar of $15,429.00.[16]  That work included reviewing the confirmed plan of reorganization and related documents regarding D&O releases, reviewing emails and relevant bankruptcy related documents and providing responses to Lead Counsel regarding proofs of claims filed in connection with the Bankruptcy Action.

104.    Moreover, as detailed herein, the fee request is justified by the effort and skill of Lead Counsel.  Indeed, Lead Counsel exhausted considerable resources throughout the litigation including

---

[16] This time excludes any time in preparing the Fees and Expense Applications.

during the period of July 1, 2022 to August 31, 2023 including *inter alia*, (a) extensive meet and confers with counsel for the Individual Defendants regarding their responses and objections to Lead Plaintiff's discovery requests and Lead Plaintiff's responses and proposed production of documents in response to Gianniotis's document requests; (b) numerous meet and confers with counsel for previously subpoenaed non-parties to discuss their objections and the scope and manner of their productions; (c) the issuance of interrogatories to Melissanidis; (d) the issuance of two additional non-party subpoenas and two Freedom of Information Act (or "FOIA") requests to the SEC and U.S. Department of Justice ("DOJ") and meet and confers related to these additional requests; (e) the review and production of over 13,865 documents in response to Gianniotis's document requests; (f) the review and analysis of a significant number of the 187.052 gigabytes of documents produced in the Action; (g) the taking of a key non-party, Rule 30(b)6) deposition; (h) further consultation and analysis with Lead Plaintiff's forensic accounting/auditing and damages consultants; (i) continued consultation and analysis with international privacy law consultants and with foreign counsel on various matters; (j) the preparation of Lead Plaintiff's motion for class certification and revised motion for class certification; (k) the preparation and defense of Lead Plaintiff's expert; (l) significant preparation for and attendance at the second mediation and a settlement conference; (m) negotiating and preparing the instant Individual Defendants Settlement Agreements and the papers in support of approval of same; and (n) work with the Court-appointed Claims Administrator in connection with the Auditor Settlements and to provide notice of the Individual Defendants Settlements to Settlement Class Members.

105.    Moreover, Lead Counsel has national standing and extensive experience in litigating securities and other complex class actions and has recouped billions of dollars for investors in securities class actions since the enactment of the PSLRA.  *See* **Exhibit 4** (a true and correct copy of Berman Tabacco's firm resume).  Additionally, Lead Counsel's assessment of the fee request as fair and reasonable and is supported by Berman Tabacco's decades of experience litigating and resolving securities class actions, and its intimate familiarity with the facts in the case.

106.    As one of the lead partners on this Action, I reviewed Berman Tabacco's time and expense records in preparation of this declaration.  The purpose of this review was to confirm both the

accuracy of the time entries and expenses and the necessity for, and reasonableness of, the time and expenses committed to the Action for the requested period.  I have deleted any lodestar for timekeepers who billed less than 25 hours.

107.    Attached hereto as **<u>Exhibit 1</u>** is a summary table of the hours expended and the hourly rates of Berman Tabacco counsel, along with the lodestar calculation.  For personnel who are no longer employed by Berman Tabacco, the calculation is based upon the billing rates for such personnel in their final year of employment with Berman Tabacco.  The schedule was prepared from contemporaneous daily time records regularly prepared and maintained by my Firm.  The lodestar reported here includes work performed from July 1, 2022 to August 31, 2023 related to the final approval and administration of the Auditor Settlements, but does not include work that Lead Counsel performed on the Fee and Expense Application, nor does it include work that Lead Counsel will continue to perform on behalf of the Settlement Class, including working with the claims administrator to administer all of the settlements that are ultimately approved by the Court.

108.    The hourly rates for attorneys and professional support staff in my firm have been accepted by courts in other complex class actions, including this Action.  *See, e.g.*, ECF No. 403; Order Granting Class Counsel's Mot. for Award of Attorneys' Fees, *Laydon v. Mizuho Bank, Ltd. et al.*, No. 1:12-cv-03419-GBD-SLC (S.D.N.Y. Mar. 14, 2023), ECF No. 1099; Order Awarding (I) Attorneys' Fees, Reimbursement of Expenses, and (III) Award of Costs and Expenses to Plaintiffs., *Hayden v. Portola Pharms. Inc., et al.*, No. 3:20-cv-00367-VC (N.D. Cal. Mar. 6, 2023), ECF No. 259; Order Awarding Attorneys' Fees, Litigation Expenses, and Award to Lead Plaintiff Pursuant to 15 U.S.C. § 78u-4(a)(4); *Koch v. Healthcare Servs. Grp., Inc., et al.*, No. 2:19-CV-01227-ER (E.D. Pa. Jan. 12, 2022), ECF No. 85; Order Granting Mot. for Final Approval and Mot. for Attorney's Fees & Costs, *In re Aqua Metals, Inc. Sec. Litig.*, No. 4:17-cv-07142-HSG (N.D. Cal. Mar. 2, 2022), ECF No. 182.

109.    Lead Counsel undertook significant risk in prosecuting the action entirely on a contingent basis, receiving no compensation during the time the Action has been pending, and was never guaranteed payment of any fee.  Moreover, given that Aegean filed a petition for Bankruptcy,

the fact that most of the witnesses, the defendants and the evidence was oversees and in Greece, the risks far exceeded those of a typical securities fraud class action.   Nevertheless, Lead Counsel prosecuted this case vigorously, provided high-quality legal services and achieved a great result for the Settlement Class in these Individual Defendants Settlements.   In addition, the risks and challenges assumed by Lead Counsel in bringing these claims to a successful conclusion and the time and expenses incurred without any payment, were extensive.   In circumstances such as these, and in consideration of Lead Counsel's hard work and the extraordinary result achieved, the requested 25% fee is reasonable and should be approved.

110.    I am informed by Lead Plaintiff that it supports Lead Counsel's application for award of attorneys' fees of 25% of the Individual Defendants Settlement Funds, plus interest, for the time expended by Lead Counsel.

111.    Moreover, this 25% fee request is consistent with the fee agreement between Lead Counsel and URS entered into at the outset of the litigation.  It is also consistent with Lead Plaintiff's request previously approved by the Court in connection with the Auditor Settlements (ECF No. 403), and, if granted, Lead Plaintiff's request would result in a total award of 25% of the global settlements reached in the Action, with an overall negative multiplier of 0.68.

**B.    Lead Counsel's Request for Reimbursement of Litigation Expenses**

112.    Lead Counsel also seeks reimbursement from the Settlement Funds of $78,308.88 in litigation expenses reasonably and necessarily incurred or to be incurred by Lead Counsel in connection with prosecuting this Action since July, 1 2022, as well as reimbursement of monies expended for travel, lodging and meals throughout the litigation.  Lead counsel expressly stated in its Fee and Expense Application for the Auditor Settlements that it would wait to seek reimbursement of expenses related to travel, lodging and meals until a later settlement.  ECF No. 374 at 22.

113.    Lead Counsel's request for reimbursement of $78,308.88 relate solely to expenses incurred and paid by lead Counsel separate from those paid by the Litigation Expense Fund, as detailed below, as well as expenses for Lead Plaintiff's document repository, which houses all documents produced in the Action, including for an additional three months until a decision on Final Approval of

the Individual Defendants Settlements, as well as known delivery charges associated with the filing of these final approval motions.

114.     The types of expenses for which Lead Counsel seeks reimbursement were necessarily incurred in this Action and are of the type routinely charged to classes in contingent litigation, including expenses associated with, *inter alia*, research, and auditing and damages consultants.  These expenses are reflected on the books and records maintained by Lead Counsel.  These books and records are prepared from expense vouchers, check records and other source materials, and are an accurate record of the expenses incurred.  These expenses are set forth in detail and identified by the specific category of expense—*e.g.*, online/computer research, experts' fees, photocopying, telephone, fax and postage expenses and other costs incurred for which Lead Counsel seeks reimbursement.  As noted above, Lead Counsel expressly stated in its Fee and Expense Application for the Auditor Settlements that it would wait to seek reimbursement of all expenses related to travel, lodging and meals until a later settlement.  ECF No. 374 at 22.  In addition, Lead Counsel seeks reimbursement of expenses it will continue to incur from September 14, 2023 to November 2023 related to the preservation and maintenance of Lead Plaintiff's document database through third-party vendor Everlaw, and expenses for known delivery charges associated with the filing of these final approval motions.

115.     Attached hereto as **Exhibit 2** is a summary table of the expenses of Berman Tabacco incurred in connection with the prosecution of the Action after June 30, 2022, expenses incurred for travel, lodging and meals throughout the Action and expenses Lead Counsel will incur from September 14, 2023 to November 2023 for the preservation and maintenance of Lead Plaintiff's document database for three months ($2,084.64) and known delivery expenses associated with the filing of the final approval papers (estimated at $280.00).

116.     Of the total amount of expenses, the largest expense related to hosting the document production.  The second largest expense was $16,593.51 for expert consultants.  The next largest expense categories were related to legal and factual research, which totaled $12,894.69.  The other expenses include, among others, court fees, copying costs, long distance telephone and facsimile charges, postage and delivery expenses and monies expended for travel, lodging and meals.  *See* **Ex. 2**.

The expenses for which Lead Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.

117.    From the beginning of the case, Lead Counsel was aware that it might not recover any of their expenses and, at the very least, would not recover anything until the Action was successfully resolved.  Thus, Lead Counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.  All of the above-referenced litigation expenses for which Lead Counsel seeks reimbursement, which total $78,308.88, were necessary to the successful prosecution and resolution of Lead Plaintiff's claims.

118.    Lead Plaintiff supports the reimbursement of expenses incurred by counsel as fair, reasonable and necessary to the successful prosecution and resolution of this Action.  Lead Plaintiff Decl. ¶¶8, 10.

119.    In connection with the Auditor Settlements, the Court approved Lead Plaintiff's request for the establishment of a Litigation Expense Fund of $500,000 for the continued prosecution of the case against the Individual Defendants.  Lead Counsel exhausted $256,110.33 of this Court-awarded amount and has returned a balance (with interest) of $243,889.67 plus $10,386.53 in interest to the Auditor Settlements Funds on a 50-50 basis for distribution to the Settlement Class.  Thus, Lead Counsel's request here is separate and apart from the previously established Litigation Expense Fund, the balance of which was returned to the Auditor Defendants Settlement Funds.  Attached hereto as **Exhibit 3** is a chart identifying the expenses paid from the Litigation Expense Fund, information which were previously submitted in two quarterly reports filed in camera with the Court.  ECF Nos. 424, 440.

C.      **Reimbursement to Lead Plaintiff is Fair and Reasonable**

120.    The PSLRA specifically provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class."  15 U.S.C. § 78u-4(a)(4).  Accordingly, URS seeks reimbursement of its reasonable costs incurred directly for its work representing the Settlement Class in the amount of $5,000, which is in addition to the $10,000 that was previously awarded by the Court in connection with the Auditor Settlements.  ECF No. 403.  The amount of time and effort devoted to

this Action by URS is detailed in the accompanying Lead Plaintiff Declaration, attached hereto as **Exhibit 5**, at ¶¶4-6.

121.    As discussed in the Lead Plaintiff Declaration, URS has been fully committed to pursuing this Action from the outset, devoting its time to overseeing the litigation.  Lead Plaintiff Decl. ¶¶3-4.  As discussed in the Lead Plaintiff Declaration, from July 1, 2022 to August 31, 2023, Lead Plaintiff dedicated in excess of 60 hours to the litigation, which included time collecting documents for production to the Individual Defendants, assisting in Lead Counsel's efforts related to class certification, actively strategizing with Lead Counsel regarding potential settlement or the continued prosecution the Action, participating in settlement negotiations and attending the second mediation and the settlement conference and reviewing various pleadings and the Court's related orders and opinions. *Id.* ¶5.

122.    As a public pension fund and an institutional investor which manages more than $50 billion in assets for over 240,000 beneficiaries, URS is precisely the type of class representative the PSLRA encouraged to step forward as a lead plaintiff.  *See* Lead Plaintiff Decl. ¶¶1, 3; 15 U.S.C. § 78u-4(a)(3)(B) (providing a rebuttable presumption that plaintiff with largest financial interest is most adequate plaintiff that shall be appointed lead plaintiff).  According to the House Conference Report on the PSLRA, "[t]he Conference Committee believes that increasing the role of institutional investors in class actions will ultimately benefit shareholders and assist courts by improving the quality of representation in securities class actions."  H.R. Conf. Rep. 104-369, 33 (1995) *reprinted in* 1995 U.S.C.C.A.N. 730, 732.

**D.    The Reaction of the Settlement Class to the Requested Fee, Reimbursement of Expenses and Award to Lead Plaintiff**

123.    As noted, based on its involvement throughout the course of this Action, URS supports final approval of the settlement and Lead Counsel's Fee and Expense Application. *See* Lead Plaintiff Decl. ¶¶7-8.

124.    As mentioned above, consistent with the Court's Preliminary Approval Orders, a total of 40,676 Postcard Notices and Detailed Notices were mailed to potential Settlement Class Members

and their nominees advising them that Lead Counsel would (a) seek payment of up to 25% of the Individual Defendants Settlement Funds for attorneys' fees and (b) seek reimbursement of Litigation Fees.  A.B. Data Decl. ¶11 & Exs. A & B.  The Postcard Notice also directed Settlement Class Members to the Detailed Notice, located on the Settlement Website, for more detail regarding the Individual Defendants Settlements.  *Id.* ¶6.  In addition, A.B. Data re-mailed 115 Postcard Notices to persons whose original mailings were returned by the U.S. Postal Service and for whom updated addresses were provided to A.B. Data by the USPS.  *Id.* ¶11.  Additionally, the Summary Notice was published in *Investor's Business Daily*, and disseminated over *PR Newswire*.  *See id.* ¶12 & Exs. C & D.  The Detailed Notice, the Gianniotis Stipulation, the Melissanidis Stipulation, and other relevant pleadings have also been available on the settlement website maintained by A.B. Data and a phone line set up to assist potential Settlement Class Members.  *Id.* ¶¶13-14.  A.B. Data has also received requests from brokers and other nominee holders for 841 Detailed Notices to be forwarded by the nominees to their customers and has completed all such requests in a timely manner.  *Id.* ¶10.

125.    Although the deadline set by the Court for Settlement Class Members to object to the Fee and Expense Application has not yet passed, other than the one request for exclusion noted above, we have not received any objections or other requests for exclusion.  A.B. Data Decl. ¶¶15-18 & Ex. D.  We will respond to any objections and requests for exclusion received by the September 28, 2023 deadline in our reply briefing due October 10, 2023.

**VIII.    Conclusion**

126.    In view of the recovery to the Settlement Class and the very substantial risks of continued litigation against the Individual Defendants, as described above and in the accompanying memorandum of law in support of Lead Plaintiff's Final Approval Motion, Lead Counsel respectfully submits that the Individual Defendants Settlements should be approved as fair, reasonable and adequate.

127.    In view of the recovery in the face of substantial risks, the quality of work performed, the risks and challenges to pursuing claims against the Individual Defendants, the contingent nature of the fee and the standing and experience of Lead Counsel, as described herein and in the accompanying

memorandum of law in support of Lead Counsel's Fee and Expense Application, Lead Counsel respectfully requests that the request for attorneys' fees of 25% of the Individual Defendants Settlement Funds be approved, that Lead Counsel's litigation expenses in the amount of $78,308.88 be reimbursed and that Lead Plaintiff's expenses of $5,000 be reimbursed in full.

128.     Attached hereto are true and correct copies of the following documents:

| | |
|---|---|
| **Exhibit 1**: | Summary Table of the Hours and Lodestar of Berman Tabacco; |
| **Exhibit 2**: | Summary Table of the Expenses of Berman Tabacco; |
| **Exhibit 3:** | Litigation Expense Fund Report |
| **Exhibit 4**: | Berman Tabacco Firm Resume; |
| **Exhibit 5:** | Lead Plaintiff Declaration; |
| **Exhibit 6:** | A.B. Data Declaration; and |
| **Exhibit 7**: | Cornerstone Research Report. |

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed at San Francisco, California, on September 14, 2023.

*/s/ Nicole Lavallee*
Nicole Lavallee